UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

PATRICIA COSGROVE,                          )
                        Plaintiff,          )
                                            )
        v.                                  )
                                            )
NEW SEABURY RESOURCES                       )        Civil Action No.
        MANAGEMENT, INC.,                   )        1:05-cv-10791-GAO
                                            )
                        Defendant.          )
_____    )

**AFFIDAVIT OF HILLARY SCHWAB, ESQ. REGARDING EXHIBITS**

I, Hillary Schwab, Esq., under oath, hereby state as follows:

1.      I am an attorney in the law firm of Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C. and counsel to Plaintiff Patricia Cosgrove in this matter.

2.      I hereby certify that the exhibits attached to my affidavit are true and accurate copies of the original documents.  I am unaware of any objection to the authenticity or admissibility of these exhibits.  The exhibits are as follows:

Exhibit A:     Affidavit of Patricia Cosgrove;

Exhibit B:     New Seabury Resources Management, Inc. Employee Handbook;

Exhibit C:     Memorandum from Cosgrove to Brennan, dated Feb. 3, 2003;

Exhibit D:     Note from Jean Talbert, M.D.;

Exhibit E:     Payroll Change Notice and New Hire Authorization;

Exhibit F:     Administrative Assistant position description;

Exhibit G:     Letter from Cosgrove to Brennan, dated May 2, 2003;

Exhibit H:    Emails between Cosgrove and Brennan, dated May 7, 2003;

Exhibit I:    Patricia Cosgrove disability pay calculation;

Exhibit J:    Relevant pages of the deposition of Stephen Brennan, Jan. 18, 2006;

Exhibit K:    Relevant pages of the deposition of Patricia Cosgrove, Jan. 16, 2006;

Exhibit L:    Relevant pages of the deposition of Jennifer Perry, April 7, 2006;

Exhibit M:    Letters from Carlin to Brennan, dated Sept. 30, 2003, and Oct. 8, 2003.

Signed under the pains and penalties of perjury this 9th day of June, 2006.

__s/Hillary Schwab_____
Hillary Schwab

CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2006, I caused a copy of this document and accompanying exhibits to be served by electronic filing on Howard I. Wilgoren, 6 Beacon Street, Suite 700, Boston, MA 02108, counsel for the defendant.

__s/Hillary Schwab_____
Hillary Schwab, Esq.

EXHIBIT A

Summary
Judgment

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PATRICIA COSGROVE,<br>　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>NEW SEABURY RESOURCES<br>　　MANAGEMENT, INC.,<br><br>　　　　　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action No.**
**1:05-cv-10791-GAO**

### AFFIDAVIT OF PATRICIA COSGROVE

I, Patricia Cosgrove, depose and state as follows:

1.　　I am the Plaintiff in the above-referenced matter.  This affidavit is based on my personal knowledge.

2.　　I began working as an Account Executive at New Seabury Resources Management, Inc. (New Seabury) in April 1999.

3.　　I was promoted to the position of Conference Sales Manager in approximately June 1999.

4.　　In 2003, my rate of pay as Conference Sales Manager was $17 per hour.

5.　　In February 2003, I requested a twelve-week maternity leave pursuant to the Family and Medical Leave Act, to begin on or about July 30, 2003.

6.　　Due to complications in my pregnancy, I was required to begin my FMLA leave on approximately May 11, 2003.

7.    Shortly before I went out on FMLA leave in May 2003, in a meeting with General Manager Stephen Brennan, Jennifer Perry, Director of Catering Sales at New Seabury, and Roy Chase, Director of Food and Beverage at New Seabury, I was told that the Conference Sales Manager position was being eliminated and was offered the position of Administrative Assistant for the Catering Sales Department.

8.    The rate of pay for the position of Administrative Assistant for the Catering Sales Department was $12 per hour.

9.    The position of Administrative Assistant for the Catering Sales Department that was offered to me was a full-time year-round position.

10.    I accepted the position of Administrative Assistant for the Catering Sales Department in May 2003.

11.    However, I continued in my duties as Conference Sales Manager and at the pay rate of $17 per hour until I went on maternity leave.

12.    When I returned to work at New Seabury after my maternity leave, I was not restored to my position as Conference Sales Manager or to the position of Administrative Assistant for the Catering Sales Department.

13.    Instead, I was placed in a warehouse all day scanning documents. The work was monotonous, slow, and tedious.

14.    The warehouse was a typical warehouse, with machinery and equipment all around. Attached photographs 1 and 2 depict the warehouse.

15.    Attached photographs 3, 4, and 5 depict the Country Club facility in which my office would have been located for the position of Administrative Assistant for the Catering Sales Department.

16.    I worked in isolation for most of the day in the warehouse.

17.    In the position of Administrative Assistant in the Catering Sales Department, I would have been around other employees all day, communicating with my co-workers, supervisors, and clients.

18.    I would have been supervised by Jennifer Perry in the position of Administrative Assistant in the Catering Sales Department, with whom I would have worked closely.

19.    There was only one bathroom in the warehouse, which was dingy and dirty and which I was required to share with my male co-workers who also worked in the warehouse.  Attached photograph 6 depicts the bathroom in the warehouse.

20.    For the first one to two weeks that I was working at the warehouse, there was no refrigerator at the warehouse in which I could store my breastmilk. There was a refrigerator at the Country Club in which I could have stored my breastmilk if I had been working in the position of Administrative Assistant for the Catering Sales Department.

21.    My rate of pay while working in the warehouse was $12 per hour.

22.    My employment at New Seabury was terminated on approximately October 31, 2003.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at East Falmouth, Massachusetts, this 8 day of June, 2006.

_Patricia Cosgrove_

Patricia Cosgrove

**PHOTOGRAPH 1**



**PHOTOGRAPH 2**



PHOTOGRAPH 3



PHOTOGRAPH 4



**PHOTOGRAPH 5**



**PHOTOGRAPH 6**



PHOTOGRAPH 7







# NEW SEABURY RESOURCES MANAGEMENT, INC.

## EMPLOYEE HANDBOOK

### May 1, 2002

This Manual supercedes all previous documents
and is the Manual of Record. New Seabury Resources Mgt, Inc. reserves the
right to amend this Manual without notice.

# New Seabury Resources Management, Inc. Employee Manual

This Employee Handbook is for information purposes only. It is not intended as, and does not create, a contract for employment or for the benefits of any kind, between you and New Seabury Resources Management, Inc. The employment relationship is at-will and can be terminated by either you or New Seabury Resources Management, Inc. at any time and for any reason.

This manual is a summary of the current New Seabury Resources Management, Inc. policies and programs and is intended as a guideline. This manual replaces all previous policies. The Company may amend these policies and programs at any time without advance notice New Seabury Resources Management, Inc. reserves the right to proceed differently than described in this manual when appropriate. Except for the at-will employment provisions of this manual, which may be changed only by a written agreement between the employee and New Seabury Resources Management, Inc. and the anti-discrimination provisions of this manual, which may not be changed, the Company retains the right to modify the provisions of this manual at any time.





0110

# Table of Contents

Message to New Employees
The New Seabury Resort Environment                          4
Mission Statement                                          5
Objectives                                                 6
                                                           8

Terms of Employment
Equal Employment Opportunity
Americans with Disabilities Act                            9
Drug and Alcohol Free Workplace                            9
Employee Orientation                                      10
Employee Classification                                   10
Employee Records                                          11
Employment of Minors                                      11
Reference Checks                                          11
Working Hours and Pay Schedule                            11
Time Cards/Sheets                                         12
Attendance and Punctuality                                12
Performance Evaluations                                   13
Promotions                                                13
Job Posting                                               14
Transfers                                                 14
Employee Parking                                          14
                                                          15

Personal Conduct
Guest Courtesy and Etiquette Standards
Dress and Appearance                                      15
Employee Problems                                         15
Sexual Harassment                                         16
Solicitation and Distribution                             16
                                                          18

Business Conduct
Responsibility to Our Members
Responsibility to Our Company                             18
Conflict of Interest                                      19
Outside Employment                                        19
Training                                                  19
Safety                                                    19
Reporting on the Job Injuries and Illnesses               19
Emergency Procedures                                      20
Bloodborne Pathogens                                      20
Clean Air Policy                                          20
Company Vehicle Policy                                    21
Automobile Accidents                                      21
                                                          22

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any reproduction is strictly prohibited.
Revised 4/25/01

Guest Injury                                                    23
Communication System                                           23
Conduct                                                        25
Discipline                                                     26
Resignation                                                    27
Termination                                                    27

**Employee Benefits**
Vacation                                                       28

Personal Leave                                                 28

Holidays                                                       29
401 (k)                                                        29
Tuition Reimbursement                                          30
Employee Assistance Program                                    31
Group Insurance                                                32
COBRA Option                                                   33
Worker's Compensation                                          33
Salary Continuance                                             34
General Leave of Absence                                       35
Family and Medical Leave Act                                   36
Maternity Leave                                                39
Military Leave                                                 40
Sympathy Leave                                                 40
Jury Duty                                                      41
Golf Course                                                    41
Tennis Courts                                                  42
Beach and Cabana Club                                          42
Player's Club and Popponesset Inn                              42

**Appendix Page**
Acknowledgement of Receipt of Employee Manual                  43



# Message to New Employees

You have been selected to join our team based on our belief that you are truly a **Service Professional**. The success of New Seabury Resources Management, Inc. must now be your source of pride.

Take pride in the fact you are affiliated with the New Seabury Resources Management, Inc. and the service you perform for our members. Greet our members and guests with a smile, refer to them by name, and provide them with immediate attention. Take pride in your appearance, enjoying what you do, paying close attention to detail, and going out of your way to please the members and their guests. Remember that your performance will be judged not only through your efficiency, but also your appearance and attitude. Members will form an opinion of the Company based on their opinion of you and how well you treat them. From a Service Excellence perspective: **"You will never get a second chance to make a first impression"**.

As an employee of New Seabury Resources Management, Inc. your work has many advantages not found in other jobs. You will discover over time that you have received valuable training and experience in your field, and wages and benefits that are more than competitive in the local job market. Always remember that our members join our club because they can be assured of enjoying our outstanding recreational facilities, social functions, fine dining, and distinguished service.

Welcome again to New Seabury Resources Management, Inc. We hope your employment with us is long and very rewarding experience.

0143

This document is intended to be viewed by New Seabury Resources Management, Inc. employees, any form of copying or distribution is prohibited.4
Revised 4/25/01

# The New Seabury Resort Environment

New Seabury has developed into one of the premier resorts on the Atlantic coast of the United States. The carefully conceived New Seabury Master Plan has resulted in the development of a special social community with a distinctive architectural motif. These attributes have combined to make New Seabury a unique resort destination in the New England market.

New Seabury is comprised of activity centers and dwelling units designed in a pattern of villages, each separate and distinct from the others. In the case of residential villages, each is designed around a theme, which tends to bond residents with a common interest. Each distinct village helps to contribute to the range of different activities available to all New Seabury residents and guests. This philosophy has helped New Seabury to evolve into not only a premier resort, but also a community of residents that visit their New Seabury homes year round. New Seabury Resources Management, Inc. supports the concept that "strong neighborhoods build good real estate values." Presently, there are approximately fourteen hundred single-family residences and over six hundred villas in the thirteen unique villages.

Social activities that all members and guests can participate in are a regular part of the New Seabury Experience. New Seabury plans a broad spectrum of activities from the amateur and professional golf and tennis tournaments that sports enthusiasts can take advantage of, to arts and crafts festivals that interest both young and old. New Seabury entertains over fifty thousand guests annually through its hotel and recreation programs, and eight hundred members through its club operations for residents.

An important contributor to the New Seabury atmosphere is its unique architectural character. New Seabury has architecture that is a reflection of the feeling of traditional New England building forms, and most importantly, a respect for the nature and scale of the land is evident in buildings that complement rather than dominate the landscape.

This document is intended to be used by New Seabury Resources Management and employees. Any distribution is prohibited.
Rev. 04/28/2004

# New Seabury Resources Management, Inc.

## Mission Statement
The people of this organization are committed to the following beliefs:

## Sales through Superior Service and Constant Innovation
As a member of the team at New Seabury Resources Management, Inc. you must believe that the customers, guests, clients, and vendors are the purpose of the Company's work. They provide the Company with the ability to pay the expenses and allow the Company to invest in the future. Their expectations become the Company's expectations and they must be satisfied, as their satisfaction directly affects New Seabury Resources Management, Inc.'s future. If the Company excels at meeting these expectations, they will not only appreciate the value of what they have received but will also tell a few friends. "Word of mouth" is a far more effective and valuable marketing tool than any other.

## Personal Dedication
The employees are the number one assets of New Seabury Resources Management, Inc. The Company must have people who possess common sense, dedication to team spirit, and have mutual respect for each other. The management is committed to providing employees with the opportunity to gain personally and grow professionally within the New Seabury organization. The maximum potential of each individual must be utilized in a cooperative effort. The Company realizes the power of the whole will grow exponentially as each individual and each team strives for excellence. This process is a never-ending cycle in the pursuit of becoming an organization that is the one truly "above the rest".

## The Personality Edge
To promote a positive and hospitable attitude towards everyone through the following:
- Friendly smiles, warm welcomes, and gracious service
- Genuine interest and concern for customers and co-workers
- Listening carefully, addressing concerns quickly, and following up to ensure proper action is taken
- Assuring every effort to make people feel important

## Product Knowledge
New Seabury Resort is a 2600+-acre vertically integrated resort/residential community. The number, diversity, and unique qualities of the Company's products make it difficult to easily train employees on each product. The President of New Seabury or a designate provides Buyer's Guide training for all employees in an attempt to acquaint the employee with proper product knowledge. This is an information age, and the quality of information disseminated

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited.
Revised 4/2004

each day is critical to the Company's success. The Company hopes that the employees will take advantage of every opportunity to learn about the products. New Seabury Resources Management, Inc. feels that the employees are their most important products.

## Development

To provide a fertile environment for employees, New Seabury Resources Management, Inc. offers the following aspects:

- Training – Each department will train the employees to perform their primary focus through organized training and thorough the use of manuals, practice, and positive reinforcement.
- Cross Training – Enhances an employee's product knowledge. It will provide a different perception of his or her primary focus, and inherently result in more interdepartmental cooperation.
- Seminars – Provide employees with direct training on individual subjects. The Company feels strongly that further development of specific skills could lead to better job satisfaction.
- Tuition Reimbursement – Furthers an employee's education within a field or specialty. All employees are encouraged to take advantage of this benefit.

Sales through service, personal dedication, personality, and intense training and development can only materialize into a significant force that will make **"Here and No Where Else"** much more than a motto. Are you ready for the challenge?

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any term or condition ... 7
Revised 4/25/01

## New Seabury Resources Management. Inc. Objectives

New Seabury Resources Management, Inc. is a developer, manager, and operator of recreational, real estate, and related services. The Company's objectives are as follows:

1. Implementing the Master Plan for New Seabury Resort as it is now or may hereafter be defined in a manner, which will enhance the reputation and maximize the profitability of the real estate and resort operations of the Company.
2. Ensuring that each department's operations are conducted in this manner will enhance the reputation and maximize the value of the Company.
3. Expanding the capabilities, increasing the quality and service, and lowering the costs of the Company's operations.
4. Pursuing additional opportunities in areas of the Company's expertise beyond the Mashpee location to minimize risk and enhance the reputation, capabilities, and profitability of New Seabury Resources Management, Inc.
5. Through training and development, provide a fertile environment for employees as they strive to achieve personal and professional goals.

0117

## Terms of Employment

### Equal Employment Opportunity

The employment policies and practices of the New Seabury Resources Management, Inc. are:

- To recruit, hire, train, and promote employees based on qualifications, ability, and willingness to do the job, without discrimination because of age, sex, race, religion, color, national origin, disability or any other legally–protected status.
- To treat employees equally with respect to compensation, and opportunities for advancement, including but not limited to job assignment, supervision, training, upgrading, promotion, layoff, recall from layoff, and termination.
- All other policies and practices such as employee benefits, educational opportunities, and social and recreational programs are to be administered on the same basis of fair and equal treatment.
  New Seabury Resources Management, Inc. intends to treat its employees fairly. The standards for employment that we intend to maintain include:
- Overall competitive wages and benefits
- Clean, pleasant and safe work environment.
- Well-trained and knowledgeable management team that provides high quality supervision.
- Training opportunities for employees to maintain the competitive edge of Service excellence to our members
- Effective lines of communications that provides timely information to employees on all matters of Human resources, and is receptive to constructive feedback on job performance, and working conditions.

### Americans with Disabilities Act

New Seabury Resources Management, Inc. provides reasonable accommodations in accordance with the Americans with Disabilities Act. This will enable qualified applicants with a disability to perform the essential functions of the job that they are seeking and to enable a qualified employee with a disability to perform the essential functions of a job currently held.

Modifications and adjustments may be required in the work environment in the manner or circumstances in which the job is usually performed, or in circumstances in which the job is usually performed, or in the employment policies. Our goal is to allow an employee with a disability to enjoy the benefits and privileges of employment equal to those enjoyed by non-disabled employees.

We will not be able to make an accommodation that would pose an undue hardship on the operation of New Seabury Resources Management, Inc. or pose an undue threat to health and safety as defined by American with Disabilities Act.

## Drug and Alcohol Free Workplace

New Seabury Resources Management, Inc. intends to protect the safety of its employees, guests and residents. We therefore intend to maintain a workplace that is free from the effects of drug and alcohol abuse. As a condition of employment, all new hires must take and pass a drug test.

Employees are prohibited from the illegal use, sale, distribution, or possession of controlled substances or narcotics on New Seabury Property, in Company vehicles, or while conducting Company business. Employees believed to be under the influence of drugs, narcotics, or alcohol will be required to leave the premises, and be subject to disciplinary action up to and including termination.

An employee will required to submit to an alcohol/drug test in the event such employee is involved in an incident or accident on Company property or in the cause of Company business. Random drug testing of existing employees may also be required at the discretion of the office of Human Resources and/or Finance Administration. The results of these tests will be paid for by New Seabury Resources Management, Inc. All examination records will be kept confidential.

## Employee Orientation

All employees will attend an orientation session conducted by Human Resources to introduce new employees to New Seabury Resources Management, Inc. They will be provided with a copy of the employee handbook, a tour of our facilities, and an opportunity to discuss any questions they have about our operation. This will begin your initial phase of training.

The first ninety days is considered a probationary period for all new employees. This policy does not guarantee employment through the first ninety days or thereafter.

## Employee Classification

Full Time Employee – A person employed on the active payroll for 52 weeks in each calendar year for an approximate of 36 hours a week.

'Part Time Employee – A person on the active payroll 52 weeks per year, whose average hours is less than 36 hours per week.

Exempt Employee – A person who is not paid overtime and is described by at least one of the two categories listed below:

1. The employee must regularly direct the work of at least two other employees, or the non-manual work related to the management policies or general business operations; must not spend more than 20% of his or her time on work not directly related to

administrative duties; and must be paid a salary or fee basis of not less than $155.00 per week, exclusive of board, lodging, or other facilities.
The employee must regularly assist a proprietor, an executive, or an administrative employee; or under general supervision, execute special assignments and/or perform work along specialized or technical lines requiring special training, experience, and knowledge.

**Non-Exempt Employee** – A non-exempt employee is one who is not "exempt" as defined above. A non-exempt employee may be paid on an hourly or weekly basis, and will be paid overtime for working over 40 hours in one week.
**Temporary Employee** – An employee on the active payroll other than a full or part time basis, and whose length of active employment is less than 52 weeks per year.
**Seasonal Employee** – An employee on the active payroll for a period of fewer than 16 weeks for all seasons during a calendar year.

## Employee Records

When you are first hired, you will be asked to complete employment forms supplying the Company with confidential personal information. Keeping your records up to date is important, since it enables the New Seabury Resources Management, Inc. to reach you in an emergency, forward your mail, properly maintain your records for insurance and other benefits, and remain in full compliance with all Federal and State laws. It is your responsibility to provide the Human Resource Department with the following correct information or changes:

- Name
- Address and telephone number
- Marital Status
- Beneficiary and dependents designated on your insurance
- Number of dependents for withholding taxes
- Person to notify in case of an emergency
- I.D. in accordance with I-9 requirements

New employees must complete and sign an application, a W-4 form, and an I-9 form on the first day of work. The Department Head will have you sign a change of status form, which will show start date, rate of pay, job title, department, and other miscellaneous information.

## Employment of Minors

Minors may be employed in certain job categories within the Company. However, New Seabury Resources Management, Inc. will not employ:

- Persons under 15 years of age or persons 15 to 18 years of age without a work permit.
- Persons under 18 years of age to perform work defined in Federal or State legislation as hazardous or oppressive, or otherwise prohibited by this legislation.

## Reference Checks

It is the policy of New Seabury Resources Management, Inc. not to give out any information about current or former employees except for:

- Date of Hire
- Date of Termination
- Job Title
- Verification of Salary when authorized in writing

Human Resources should handle all reference check correspondence and telephone calls.

## Working Hours and Pay Schedule

The regular workweek for full-time employees will contain a minimum of 36 hours. There will be a one half hour for lunch or dinner. The meal break is an unpaid break, unless you have to maintain your workstation during this time. It is your choice to use, not use, or use only part of your mealtime. You must clock out during the meal break.

Non-exempt employees will be paid overtime when they work more than 40 hours in a week. An employee must not work overtime unless authorized to do so by the Department Head.

The workweek begins Sunday and ends on Saturday. Paychecks are distributed to all employees every other Friday on a bi-weekly basis. If you have an account with a participating direct deposit bank, you may request direct deposit of the paycheck to your account. In such a case, you will receive a payroll stub showing a breakdown of your weekly pay, including the net amount deposited.

## Break Time

Managers will monitor break time (for example coffee breaks, smoking breaks and general socializing). If break times are found excessive, employees will be told to clock out for the break.

## Time Cards/Sheets

**Employees assume full responsibility for maintaining accurate time reports for the hours they work each pay period.** All employees are required to fill out time cards or time sheets. Time cards are for those employees using a time clock to punch in and out. Time sheets are for all other employees. The employee and the Department Head should sign the time cards/sheets. The Department Head will submit the time cards/sheets to the Payroll Department on the Monday preceding the next pay date, along with any other compensation request to be paid on that pay date. All records of time must be accurate. The Department Head must initial any corrections made.

- Time worked in week one of the pay periods should be on the front of the card with an employee label. Time worked in week two should be on the reverse side of the same card.
- The Department Head is responsible for totaling the hours worked for each week and recording them in the appropriate place on each side of the card.
- Other hours to be paid should be recorded separately.
- For those using a time sheet, all time is recorded on one page.

An employee neglecting to either clock-in or clock-out during their work shift creates a great deal of disruption to the entire payroll process. Therefore, the following reporting rules will apply:

- If an employee is working a split shift, they are required to clock-out of their first shift, and then clock back in to start their next shift.
- If an employee neglects to clock in or out during their work shift, and his or her adjusted hours are not reported in a timely manner, the adjustment will appear in the next regular pay period.

- If an employee neglects to clock in or out during their work shift, the employee will forfeit that portion of the tip-share that is related to the actual time identified as being in error. (The reason for this is that the total amount of funds in the tip pool would have been distributed for that pay period to other employees in the work group).
- Employees are not allowed to clock-in or out for another employee.  Should this occur, it will result in termination.
- Tipped employees are required to declare all tips at the end of each shift.

## Attendance and Punctuality

Employees have an important role to perform at New Seabury Resources Management, Inc. and their co-workers rely on them to work effectively as a team. To exceed the service expectations of our members, the Company requires that all employees report to work on time.  Employees will be in uniform (when required) and ready to work prior to clocking in. Lateness and poor attendance disrupts the flow of work and will not be tolerated.

Being on time and ready for work is part of good attendance and critical to the Company's ability to provide exceptional service to our guests.

New Seabury Resources Management, Inc. understands that "acts of God" and certain emergencies will occur on occasion, resulting in an employee's absence. If for any reason you are unable to report to work, you must notify your Department Head at least two hours before your normal reporting time. This gives the Department Head enough time to try to find a replacement. Reprimands and/or attendance will ordinarily become a part of the employee's record. Failure to contact your Department Head for three consecutive days will be considered job abandonment and subject to termination.

## Performance Evaluations

New Seabury Resources Management, Inc. is committed to providing its employees with competitive wages. To maintain a competitive compensation schedule, periodically, we will review the local compensation structure, and if appropriate, make adjustments. Adjustments of this nature would be directed at a particular job title(s).

Individual performance appraisals will be completed on all employees and feedback will be provided to all employees on a regular basis. Compensation decisions will be made at that time based on the employees overall rating. Generally, Department Heads will complete performance evaluations on the following occasions:

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited.13
Revised 4/25/01

- At the end of the ninety-day evaluation period
- In conjunction with an annual performance wage evaluation at the end of an appraisal cycle which completes in October
- When the employee is transferred or promoted
- Whether the employee is exempt, non-exempt, full-time, or part-time, job performance is evaluated after the close of the season.
- Payroll adjustments based upon merit are indicative of the employee's job performance since his or her last evaluation.

## Promotions

When an employee receives a promotion, an increase will be awarded on the effective date of the promotion. A promotion is defined as placement in a job position whose responsibilities, accountabilities and requirements are different from and higher than those of the employee's previous job description or an enhancement of his or her current position by means of increased responsibilities, etc.

The Company does have the ability to change the above policy in regard to current economic conditions.

## Job Posting

Employees at all levels are encouraged to make full use of their career potential with New Seabury Resources Management, Inc. Therefore, New Seabury has established a Job Posting Program. As job openings occur, the job will be posted on each departmental bulletin board, so that the employee may be aware of opportunities for advancement.

### Applying for Job-Posted Positions

To apply for a job posted-position an employee must:
1. Complete 6 months service in the present position before being considered for a transfer or promotion. (An exception can be made only if all supervisors involved agree to the transfer/promotion).
2. Notify the Department Head of an interest and complete an Updated Resume Form available from the Human Resources Department.
3. The Updated Resume Form should be returned to the Human Resources Department within three working days from the date on which the job was posted.
4. Within five working days of returning the updated resume form, an appropriate Department Head will contact the employee.
5. If selected for an interview, the employee will have the Department Head's decision within two weeks after the interview.

## Transfer

Arrangements for transfer will be made within a reasonable length of time by the new and the current Department Heads. If an employee is transferred from part time or temporary status to full time status, benefits or the required waiting periods for benefits starts on the day of the

This document is intended to be viewed by New Seabury Resources Management, Inc. employees only. Any unauthorized viewing prohibited.    44
Revised 4/25/03

status change. Vacation time will be calculated retroactively from date of hire. No employee will be adversely affected as a result of expressing an interest in another job.

### Employee Parking
Considering the limited number of parking spaces available to our members and guests, it is important to emphasize that all employees are required to park in the areas designated by their Department Head.

## Personal Conduct

### Guest Courtesy and Etiquette Standards
All employees should practice basic courtesy towards members, guests, and co-workers.
The following list of etiquette tips applies to all employees and should be observed at all times. This is only a partial list, however, and employees should always strive to find new ways to make the guests feel at home.

- Greet all guests cheerfully with a pleasant tone of voice both in person and over the telephone.
- Try to learn the names of all the guests that you encounter. Guest recognition is the key to making them feels important.
- Acknowledge guests who walk up for service even when you are busy with another matter. Maintain eye contact, a smile and "I'll be with you in a moment" relaxes the member.
- A question or a request from a guest should never be considered an interruption and no question or request is ever trivial. If you are asked a question that you cannot answer, never reply with "I don't know." Instead, use the words "I'll find out for you" or "That's a good question, I'll find out for you." The member now feels that you are in control and you are taking care of his needs.
- Develop an affinity for the guests. Abide by the MMFI (Make Me Feel Important). We are here for one reason – to serve our members.
- There is never an excuse to be impolite or rude, nor is there ever a problem that cannot be solved with courteous or polite behavior. Guests expect to be impressed by the gracious manner and quality of service they receive from every New Seabury employee.

### Dress and Appearance
It is the policy of New Seabury Resources Management, Inc. that each employee's dress, grooming, and personal hygiene is appropriate to the work situation. Employees are expected at all times to present a professional, business-like image to customers, prospects, and the public. Favorable personal appearance is an ongoing requirement of employment with New Seabury Resources Management, Inc. Radical departures from conventional dress or personal grooming and hygiene standards are not permitted. The personal appearance of

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any further distribution is prohibited    15
Revised 2/2005

office workers and any employees who have regular contact with the public is to be governed by the following standards:

- Employees are expected to dress in a manner that is normally acceptable in similar establishments. The wearing of suggestive attire is not permitted, as it does not present a businesslike appearance.
- Hair should be clean, combed, and neatly trimmed or arranged. Shaggy, unkempt hair is not permissible regardless of length.
- Sideburns, moustaches, and beards should be neatly trimmed.
- Nails should be kept clean and neatly shaped at all times. Nails should be serviceable and the length should conform to health regulations. Nail polish should be subdued in color.

Employees requiring uniforms will be issued a uniform upon hiring. The uniform is the responsibility of the employee and should be kept clean and presentable. Employees will also receive a nametag. Nametags should be worn at all times for convenience of both guests and coworkers. Your department will indicate dress code or relaxing of the standards as needed.

The personal appearance of employees who do not regularly meet the public is to be governed by the requirements of safety and comfort, and should be as neat and businesslike as working conditions permit. Certain employees may be required to meet special dress, grooming, and/or hygiene standards depending on the nature of the job. Any employee who does not meet the standards of this policy will be required to take corrective action, which may include leaving the premises. Any work time missed because of failure to comply with this policy will not be compensated. Repeated violations of this policy will be cause for disciplinary action.

## Employee Problems

While one of the Company's major objectives is to maintain an atmosphere of mutual confidence and respect between you and the Company, it is realized that in any continuing relationship problems may arise that must be solved. No employee shall be subject to any harassment by another employee, contractor or vendor associated with New Seabury. Therefore, should you perceive that this has occurred to you, you should report the incident to your supervisor immediately so that the established procedures can be put in motion. In the event that you feel you prefer not to discuss this incident or any other problem with your supervisor, you should contact the Personnel Department to discuss the next steps that should be taken.

## Sexual Harassment Policy

It is the goal of New Seabury Resources Management, Inc. to promote a productive and pleasant work environment, which is professional and treats all employees with dignity and respect. Sexual harassment is unlawful and the Company has zero tolerance for this type of behavior. Any retaliation against an individual who has complained about sexual harassment or retaliation against someone for cooperating is similarly unlawful and will not be tolerated.

0125

**Sexual Harassment** is "unwelcome sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature" when:

- Submission to such conduct is made or implied to be a term or condition of employment,
- Submission to or rejection of such conduct affects employment decisions,
- Conduct has the purpose of, or effect of creating an intimidating, hostile, humiliating, or offensive work environment.

While it is not possible for New Seabury Resources Management, Inc. to list all those circumstances that the Company would consider being sexual harassment, the following are some examples:

- Verbal harassment, such as derogatory comments, slurs, teasing or jokes, suggestive or obscene letters, notes or invitations
- Physical harassment, such as interference with an individual's normal work or movement, impeding or blocking movement, or physical contact, such as petting, pinching, or brushing against another's body
- Assault or coerced sexual acts
- Use of sexual epithets, jokes, and/or written or oral references to sexual conduct
- Inquiries and/or discussion regarding one's sex life; comments on an individual's body, sexual activity, deficiencies, and/or prowess
- Visual harassment such as posters, cartoons, or drawings of a sexual nature
- Offering employment benefits in exchange for sexual favors
- Verbal sexual advances or propositions
- Making or threatening reprisals after a negative response to sexual advances

**Reporting Sexual Harassment** If you believe that you are a victim of sexual harassment, or if you have observed someone else who you believe is the victim of sexual harassment, it is New Seabury Resources Management, Inc. policy to provide the employee with the right to file a complaint with the Company. A complaint of this nature can be reported either orally or in writing to any Department Head.

**Investigating Complaints**
Once you file your complaint, the Company will investigate the allegation in a fair and expeditious manner. Management has selected a Review Board to investigate any such claim. The investigation may include private interviews with you, the employee(s) against whom you made the complaint, and any witnesses. Once the investigation is completed, the Review Board will notify you of the results and the appropriate action that will be taken to correct the situation.

**Disciplinary Action**
If the investigation reveals that sexual harassment did occur, New Seabury Resources Management, Inc. will take such action as is appropriate under the circumstances to eliminate the offending conduct, and where it is appropriate the Company will impose disciplinary action. If it is found that the complaint is without merit and contains reckless and unfounded allegations, the Company will view this as a malicious act. The employee who filed the complaint will be subject to disciplinary action. Such actions may include counseling, informal

or formal reprimands, written or verbal warnings, suspension, reduction in pay, reduction in duties, transfer, and other formal sanctions including termination from employment.

## State and Federal Remedies

In addition to the previous page, if you believe that you have been subjected to sexual harassment, a formal complaint may be filed with either or both of the following government agencies:

The United States Equal Employment Opportunity Commission
10 Congress Street
Boston, MA
617-565-3200

The Massachusetts Commission Against Discrimination
One Ashburton Place, Room 602
Boston, MA  02108
617-727-3990

Springfield Office:
424 Dwight Street
Springfield, MA

## Solicitation and Distribution

Unless authorized by New Seabury Resources Management, Inc. employees are prohibited from solicitation or similar non-Company business activity on Company property. Employees may be subject to disciplinary action, up to and including termination for violation of this policy.

## Business Conduct
### Responsibility to Our Members

The quality of service provided by New Seabury Resources Management, Inc. is measured by the Company's ability to meet the needs of the members. Each member expects and deserves the best possible service.

The employees represent the Company to the members we serve. Treat them well. Even if you are not in direct contact with them, your help is valuable. Only a Company in which the work is done smoothly, efficiently and correctly can provide our members with the level of service that they have come to expect. Employees with direct member contact are expected to know the Company's products and services and to learn the wants and needs of the members.

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy or distribution

Revised 4/25/01

Employees are encouraged to report member-related problems to their Department Head or the Office of Human Resources. The Company is always receptive to employee recommendations that would change policies or procedures to resolve such issues.

## Responsibility to the Company

The internal business affairs of the Company, particularly confidential information, represent the proprietary assets that each employee should protect. Confidential information must not be discussed with anybody not employed by New Seabury Resources Management, Inc. This includes members.

## Conflict of Interest

Employees must be aware of the importance of avoiding any Conflict of Interest in dealing with current or potential vendors and contractors of New Seabury Resources Management, Inc. No employee may accept a gift or gifts (including, without limitation – meals, trips, or material items) with aggregate value in any one year in excess of $50.00. Acceptance of gifts in excess of this limit will be grounds for immediate termination.

## Outside Employment

If you wish to supplement your income through outside employment, you are expected to discuss such employment with your Department Head. Outside employment will not be allowed in the event it:

- Interferes with your work hours at New Seabury Resources Management, Inc.
- Creates a conflict of interest with New Seabury
- Is in direct competition with New Seabury
- You must not use Company tools and/or equipment on outside jobs, without permission.
- You are cautioned to carefully consider the demands that additional work activity will create before considering outside employment. Outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, leaving early, refusal to travel or refusal to work different hours or overtime.

## Training

All employees can expect training from their Department Head so that they may be fulfill duties to the best of their ability and provide quality services to our members. Continuous training as required will be provided throughout your employment with New Seabury Resources Management, Inc. in order to maintain a high level of service.

## Safety

Your safety and the safety of your fellow employees are of a major concern. It is the policy of New Seabury Resources Management, Inc. to maintain safe and healthy working conditions for all employees. Management recognizes that each employee has a responsibility to comply with all safety and health standards and all rules and regulations issued to provide safe and healthy conditions.

Listed below are just a few simple but necessary rules to follow, as most accidents can often be prevented or reduced by greater awareness of potential hazards. Loss of work time and loss of wages can be avoided if these rules and regulations are observed.

- If you are not sure how to perform a job safely, ask your Department Head.
- Return all equipment to its proper place after use.
- Be particularly careful not to block passageways and fire exits. Be aware of the location of all fire extinguishers and fire exits.
- Broken furniture, loose and worn carpets, missing lights and other equipment requiring maintenance or replacement should be reported to your Department Head immediately.

## Reporting on the Job Injuries and Illnesses

**Any on-the-job injuries regardless of injury must be reported to your Department Head immediately.** There are no exceptions. Minor accidents could be the result of unsafe conditions that could result in more serious injury to someone else. Prompt reporting of an accident is important not only for your welfare but also for that of your fellow employee. If you observe a potential unsafe condition or a member is injured, notify your Department Head immediately.

## Emergency Procedures

New Seabury Resources Management, Inc. is very concerned about the safety of its employees and guests. The best way to ensure safety is through awareness. Unfortunately, emergencies will arise, and it is up to us, the staff, to be knowledgeable of the Company's emergency procedures in order to calm what could be a dangerous situation.

In some cases, specific emergency procedures are in place for your Department. Be sure to review these with your Department Head.

If an emergency should arise, do not panic. If members and guests see that the employees are calm and in control, they will be less alarmed. Go to the nearest telephone and dial 911. It is important to calmly relay any information pertaining to the emergency such as: your name, your exact location, and the nature of the emergency.

Know the location of the building's fire exits, fire extinguishers, First Aid equipment and Blood Pathogens equipment.

In case of a fire, attempt to control the blaze with a fire extinguisher if this can be accomplished with reasonable safety. If the fire cannot be contained, pull the closest fire alarm and call 911. All employees should be aware of the street address at your job site.

## Bloodborne Pathogens

The Company recognizes its responsibility to protect employees if there is a reasonable anticipation for exposure to materials that could cause infection while on the job. A separate booklet defining the issues and instructions for protection while working at New Seabury 29

Resources Management, Inc. has been prepared and will be distributed to you with your Employee Handbook.

## Clean Air Policy

Medical evidence clearly shows that smoking is harmful to the health of smokers. Smoke from cigarettes, cigars, and pipes are also an irritant to many non-smokers and can worsen allergic conditions. In sufficient concentrations, secondhand smoke is harmful to those with chronic heart or lung disease, and may be harmful to those with no pre-existing conditions. In an effort to consider the needs and concerns of smokers and non-smokers alike, and to provide a healthful working environment for every employee of New Seabury Resources Management, Inc. employees are expected to comply with the regulations detailed in this policy.

During working hours employees are prohibited from smoking in any building, vehicle, facility, or amenity owned, operated, or managed by New Seabury Resources Management, Inc. These include:

- Any location in which a fire or safety hazard exists
- Common areas, including but not limited to, hallways, stairwells, decks, patios, lobbies, waiting rooms, copier rooms, mail rooms, reception areas, customer service areas, employee lounges, conference rooms, rest rooms or any other area so designated.
- Private offices and shared work areas.

The Department Head will inform employees of designated smoking areas.

## Company Vehicle Policy

The following is a copy of New Seabury Resources Management, Inc. Vehicle policy. All employees who drive Company vehicles must read and sign off on a copy of this policy.

**All employees who drive Company vehicles must adhere to the following policy:**

- Any employee operating a Company vehicle must have a valid driver's license and a clean driving record. A copy of said license would be placed in the employee's personnel file.
- Company vehicles are only for company related business, both in and around the New Seabury Community, and for commuting between the employee's legal residence and New Seabury. No personal use of Company vehicles is permitted.
- Employees assigned to Company vehicles that are used as transportation to and from their home must properly secure (lock) the vehicle when at the employee's home.
- Except in the case of an emergency, no person except the employee assigned to the Company vehicle may operate the vehicle. This policy may be waived temporarily only by the Department Head.
- Other than the employee's regularly scheduled days off, the vehicle should not be left unattended for any extended period of time at the employee's place of residence.
- Keys are not to be left in an unattended vehicle, nor is the vehicle to be running while unattended.
- Employees are not permitted to drive a Company vehicle while under the influence of any narcotics and /or alcohol.

0130

- .Any employee who either operates a Company vehicle or is reimbursed for the use of his or her own vehicle is required to wear a seat belt during travel when on Company business
- Employees must operate Company vehicles in a safe and courteous manner.
- Employees must obey all posted traffic signs at all times.
- .Company vehicles are to be kept clean and in proper working condition.
- New Seabury's Clean Air Policy prohibits smoking in all Company vehicles.
- Should a Company vehicle be involved in an accident, the operator must complete the appropriate insurance forms in accordance with the Accident Reporting Policy. These insurance forms can be found in each vehicle. If it is determined that the operator was in any way negligent, he or she shall be subject to disciplinary measures.
- Massachusetts State Law restricts employees under the age of 18 from operating Company vehicles, and restricts employees between the ages of 16 and 18 from riding outside of a company vehicle (I.e. in the back of a pick-up truck, or in a golf cart). Employees between the ages of 16 and 18 may ride in a car, a van, or inside the cab of a truck.
- Failure to comply with the above stated policies may lead to:
    1. Immediate loss of use of the vehicle.
    2. Progressive discipline.
    3. Termination of employee.

## Automobile Accidents

If you are involved in an accident, your primary concern should be for any injuries to yourself and others. You should also follow these guidelines to limit the Company's liability and to speed resolution of insurance payments. When involved in an automobile accident you should:

- Identify yourself and the company,
- Show your driver's license,
- Obtain the other party's name, driver's license number, registration, and insurance company name.
- Obtain names and addresses of witnesses and occupants of the other vehicle and any nurses or doctors that may arrive on the scene,
- Obtain the make, year, model, and license plate number(s) of all vehicle(s) involved,
- Look around, identify the area, and obtain street names,
- Note the location of traffic signs, signals and anything that may be obstructing them,
- Note the time of the accident and the driving conditions (clear, cloudy, snow, wet pavement, etc.),
- Call for medical aid if someone is injured,
- Call the police if it is a serious accident,
- Cooperate fully with any law enforcement agency,
- Obtain the name, badge number, and department of any investigating officers,
- Obtain the accident report number,

0131

- When possible, pictures should be taken of all accidents.

**What you should not do:**
- Argue,
- Offer additional information,
- Answer specific questions unless it is the Company's insurer and policy number,
- Take the blame for anything or agree to any settlement,
- Discuss limits of insurance coverage, and
- Move an injured person or offer more than basic first aid.

**After an accident:**
- All accidents should be reported immediately to the Worker's Compensation Administrator and to your Department Head.
- The Department of Motor Vehicle Accident Report Form Is used for automobile accidents

**Guest Injury**
An employee involved in assisting an injured guest should describe the accident in writing to the Insurance Administrator. You should obtain as much information as possible, including:
        Name
        Address
        Phone Number
        Age
        Next of Kin
        Witnesses
        Hospital
        Any Company equipment involved

**Communication Systems**
It is the policy of New Seabury Resources Management, Inc. to provide or contract for the communications services and equipment necessary to promote the efficient conduct of its business.

Department Heads are responsible for instructing employees on the proper use of the communications services and equipment used by the Company for both internal and external business communications.

Most communications services and equipment have toll charges or other usage-related expenses. Employees should be aware of these charges and should consider cost and efficiency needs when choosing the proper vehicle for each business communication. Employees should consult their Department Head if there is a question about the proper mode of communication.

All Company communication services and equipment, including the messages transmitted or stored by them, are the sole property of New Seabury Resources Management, Inc. The company may access and monitor employee communications and files, as it considers appropriate. Communication equipment and services include mail, electronic mail (e-mail), courier services, facsimiles, telephone systems, personal computers, computer networks, on-line services, Internet connections, computer files, telex systems, video equipment and tapes, tape recorders and recordings, pagers, cellular phones, and bulletin boards. Employees whose communications may be monitored generally will be asked to sign a consent form authorizing the monitoring.

For New Seabury Resources Management, Inc. to protect its image, interests, and integrity, there are certain guidelines employees must follow regarding business communications. Employees must comply with these guidelines including those addressing proper use, privacy, and inappropriate communications.
**You may never send:**
- Offensive or disruptive messages,
- Chain letters,
- Solicitations for commercial ventures,
- Messages of a religious or political nature,
- Any internal information or communication via the Internet or by other means to persons not authorized to receive such information,
- Messages that contain derogatory, inflammatory, offensive or harassing remarks about another person's or group's age, sex, race, religion, national origin, disability or sexual orientation, and
- Sexually explicit materials, images and cartoons

**You may not:**
- Download software programs or any other copyrighted or trademarked materials,
- Visit Internet or such sites that offer inappropriate materials such as pornography, hate information or racially offensive materials,
- Solicit political, religious, or other personal causes or business ventures,
- Attempt to disguise the Company's name or origin of any transmission over the Internet,
- Use the Internet to engage in criminal activity, which includes attempting unauthorized access to computers and other devices connected to the Internet, and
- Transmit or download sexually explicit materials, including messages, images and cartoons.

Only employees specifically authorized by New Seabury Resources Management, Inc. may access on-line services and the Internet. Authorized employees must disclose all Internet passwords to the Company and their Department Heads, but must not share the passwords

with other employees. Employee's on-line use should be limited to work-related activities. In addition, employees should not duplicate or download any software or materials that are copyrighted, patented, trademarked, or otherwise identified as intellectual property. When appropriate Internet material is downloaded, it should be scanned using the Company's antivirus software.

Employees who use computers should respect the privacy of other employees' communications, as well as that of people outside the organization. Electronic messages sent by employees may be accessed by the employer but not by any employee other than the intended recipient. Unless authorized to do so by the employer, employees should not attempt to access the files of another's computer, either within or outside the Company.

Employees should not use New Seabury Resources Management, Inc.'s communications services and equipment for personal purposes except in emergencies or when extenuating circumstances warrant it. When personal use is unavoidable, employees must properly log any user charges and reimburse the Company for them. However, whenever possible, personal communications that incur user charges should be placed on a collect basis or charged directly to the employee's personal credit card or account. Company communications property or equipment may not be removed from the premises without written authorization from the employee's Department Head.

Employees who do not have direct access to a Company telephone should make provisions to have emergency or other necessary incoming calls routed to their Department Head or to the Personnel department, if the Department head is not accessible. Although the Company will attempt to deliver personal messages to employees, it cannot and does not accept responsibility for the prompt or accurate relay of these messages.

Employees should ensure that no personal correspondence appears to be an official communication of New Seabury Resources Management, Inc. since employees may be perceived as representatives of the Company and, therefore, damage or create liability for the Company. All outgoing messages, whether by mail, facsimile, e-mail, Internet transmission, or any other means, must be accurate, appropriate, and work-related. Employees may not use the Company's address for receiving personal mail or use Company stationery or postage for personal letters. In addition, personalized Company stationery and business cards may be issued only by the Company.

Improper use of New Seabury Resources Management, Inc.'s communications services and equipment will result in discipline, up to and including termination. Improper use includes any misuse as described in this policy as well as any harassing, offensive, demeaning, insulting, defaming, intimidating, or sexually suggestive written, recorded or electronically transmitted messages.

You should immediately report all violations of New Seabury Resources Management, Inc.'s policy on e-mail, interoffice mail, and the Internet to your Department Head.

**Conduct**

0134

The primary objectives are to provide superior customer service and quality products. New Seabury Resources Management, Inc. expects employees to conduct themselves in a mature and professional manner. The management will provide a positive environment for employees. In return, the employees are expected to portray an atmosphere of mutual respect for each other, the quest, and the Company. Any conduct determined by management contrary to the above will be subject to discipline including termination. The Company hopes that this environment will create the type of organization in which every employee can develop both personally and professionally.

However, if the circumstances described below are evident, New Seabury Resources Management, Inc. for any specific reason, or at Company Convenience, may terminate you either involuntarily or by your voluntary resignation. Company Convenience as defined in the Termination section of this handbook precludes the fact that management may eliminate a position or a function due to business cycles, reorganization, or for the purpose of strategic positioning. Management also reserves the right to eliminate personnel where major personality conflict is occurring and deemed detrimental to the future welfare of the organization.

The following list of infractions when they occur within or around New Seabury Resources Management, Inc. are considered a serious violation of policy and are grounds for immediate termination:

- Use, possession, distribution, or selling of alcohol or illegal drugs or misuse of legal drugs while on company premises or while working
- Stealing or attempting to steal property from the Company or any individual
- Bodily assault upon a person, fighting, or possession of a dangerous weapon
- Immoral or indecent conduct
- Insubordination to a supervisor
- Disclosing wage and salary information to other employees
- Sexual harassment of another employee
- Disclosing business information of a confidential nature, or creating poor public relations for New Seabury Resources Management, Inc.
- Falsification of employment applications, time cards, time sheets or any other company record
- Acts of sabotage, or defacing Company property
- Absence without notifying the Company
- Operation of Company equipment in unsafe, negligent, or destructive manner

**\*These lists are not intended to be inclusive.**

## Discipline

In the course of daily operations, lesser infractions of Company policy may arise that require the use of corrective discipline. These disciplinary actions may range from a verbal warning,

for first or minor offenses, to suspension or discharge for serious or repeated violations. Disciplinary action in most cases will follow the pattern below:

1. **Verbal Warning** - This can be a simple reprimand or a more serious documented discussion. A notation will be placed in your personnel file.
2. **Written Warning** - A copy will be placed in the your personnel file, or kept on record by your Department Head. Both you and your Department Head should discuss and sign the copy.
3. **Suspension** - Normally the last step before discharge, used for serious or repeated offenses.
4. **Discharge** - For serious offenses, will be immediate.

## Resignation
New Seabury Resources Management, Inc. requires at least two weeks advance notice if you are a salaried employee. This advance notice requirement may be modified by mutual agreement between you and your Department Head.

## Termination
New Seabury Resources Management, Inc. may terminate employees either voluntarily by resignation or involuntarily. The Company's policies and procedures as they apply to the termination of full-time employees are noted below.

### Termination at Company Convenience or Elimination of Position
In the event that New Seabury Resources Management, Inc. terminates your employment, without cause, you will be given notice in accordance with the following schedule, or at the Company's discretion, pay in lieu of notice (this excludes the employee specifically hired for part-time or temporary work).

| Continuous Full-time Service | Exempt Employee (Weeks) | Non-exempt Employee (Weeks) |
|---|---|---|
| 1 Year but less than 2 Years | 1 | 1 |
| 2 Years but less than 5 Years | 3 | 2 |
| 5 Years but less than 10 Years | 5 | 3 |
| 10 Years but less than 15 Years | 7 | 5 |
| 15 Years or More | 10 | 8 |

"**Company Convenience**" is defined as the elimination of a position or function.
"**Lay-Off**" is defined as the elimination of a job because of a slowdown of business or lack of work.

### Termination for Cause

If your conduct is found to be in conflict with Company rules or is detrimental to the welfare of fellow employees, you may be discharged for cause without either advance notice or receipt of pay in lieu of notice. See "Conduct and Discipline" policy.

**Termination by Failure to Report to Work**
The Company will consider it a voluntary resignation if an employee fails to report to work for 48 hours (two working days) without notifying the Department Head.

Should New Seabury Resources Management, Inc. disband all or part of its operations, as opposed to a position, for economic or organizational reasons, New Seabury has the right to waive the above stated policy.

## Employee Benefits

### Vacation
Vacation allowance for full-time employees of New Seabury Resources Management, Inc. will be based on their length of uninterrupted service. Upon your one-year anniversary date, the following schedule will apply:

| | |
|---|---|
| Year 2 through Year 5 | 10 Days |
| Year 6 or more | 15 Days |

- Vacation time cannot be taken from May 1 through October 12.  Any exception must be approved by Senior Management.

- Earned vacation time will be paid at termination, if you are not terminated for cause or if you give two weeks notice of your resignation.

- Choice vacation time will be based on seniority, meaning that employees with longer full-time uninterrupted service will be given preference over those with shorter service, management excepted.  However, management will observe a similar policy, based upon seniority and position, with job level taking precedence over length of service.

- Deductions will be made for vacation time taken after an employee has exhausted his or her allowed time. If benefits are paid under a Company-insured plan or other Company leaves provision, the employee's Department Head must specifically approve the time to be taken off from work.

### Personal Leave
Full time and part time employees are eligible for two personal days.  At hire, personal leave may be accrued at one half day per month, for a maximum of two days.  Thereafter, personal leave may be accrued at each Anniversary date and may be used by the following Anniversary date. Personal days will not be in effect for the days on which an employee is not

scheduled to work, is taking vacation, or is on an authorized leave of absence. Personal Leave cannot be carried over to the following year

## Holidays

New Seabury Resources Management, Inc. recognizes ten holidays per year, work schedules permitting, for all Full Time employees. Selection of the ten holidays is at management's discretion.
Typical Examples:

New Year's Day
Martin Luther King Day
President's Day
Good Friday
Memorial Day (observed)
Independence Day
Labor Day
Columbus Day
Thanksgiving
Day After Thanksgiving
Christmas / Reciprocal Religious Holiday

**Non-exempt employees**
- Will be paid for an average day's salary on each holiday
- If required to work on a holiday, you will be paid your regular hourly wage plus holiday pay.
- If your day off falls on any holiday, you will be paid your average day's salary for the holiday.

**Exempt employees**
- Receive their regular weekly salary during a week in which a holiday is observed.
- If required to work on the holiday, you will earn a bank day.
- If your day off falls on any holiday, you will be allowed to bank and subsequently use a paid day at another time.
- Bank days must be used within the calendar year they are earned. (Exceptions are Thanksgiving, day after Thanksgiving and Christmas, which must be taken by January 31 of the following year. The Department Head must approve use of those days).

In order to be eligible for a paid holiday or a bank day, you must work both the workday immediately preceding and the workday following the holiday, unless you are on vacation, it is your day off, or you are excused by the Department Head.

## 401(K)

This document is intended to be viewed by New Seabury Resources Management, Inc. employees          29

401(K) is a section of the Internal Revenue Code, which allows employees to contribute pre-tax dollars to the Company's savings plan on a payroll deduction basis. Thus, the plan enables employees to lower taxes immediately and to enjoy tax-deferred growth on these dollars. New Seabury Resources Management, Inc. provides its employees with a comprehensive and innovative savings plan that will help plan for a secure and comfortable retirement. This plan allows employees to accumulate money from their salary savings on a tax-deferred basis and share in the success of the Company as well. The Company's plan currently comes from Massachusetts Financial Services who will provide you access to investments in a broad range of categories, stocks, bonds, money markets, and government securities.

In order to be eligible to be a participant in this plan, you need to:
1. Work a minimum of 1,000 hours per year.
2. Be 21 years of age.
3. Have been employed by New Seabury Resources Management, Inc. for at least one year.
4. Open enrollment periods are each January and July after you have met the requirements.

Please contact the Personnel Department to participate in the plan or to obtain further information. As of January 1, 2000, the Company will match 33.3% up to 6% of salary deferrals. The Company reserves the right to amend this policy.


## Tuition Reimbursement Program

New Seabury Resources Management, Inc. has established a Tuition Reimbursement Program to encourage employees to further their education. Tuition reimbursement is for the following types of continuing education:

- Skills training or improvement (i.e. turf maintenance, carpentry, computer classes)
- Courses to prepare for license examinations (i.e. journeyman, master tradesman, or real estate salesperson)
- College level courses (course must be related to the employee's career at New Seabury Resources Management, Inc.)

### Eligibility

You are eligible for this program if you work at least 36 hours a week. Part time employees and employees who work less than 36 hours per week are not eligible for the program. To qualify for this program, you must have:

- At least 1 year of continuous, full time service and,
- Satisfactory performance, meaning a final course grade of 3.0 or better.

### Tuition Reimbursement is as follows:

- After one year of full time service, the cost of continuing education will be reimbursed up to a maximum of $600.00 or 6 credit hours per year, whichever is less.
- After two years of full-time service, the cost of continuing education will be reimbursed up to a maximum of $1,200.00 or 12 credit hours, whichever is less.

0139

**Tuition Reimbursement Program Application:**
1. Complete a Tuition Reimbursement Application. It is the employee's responsibility to make sure that the specific class will be covered.
2. Have your Department Head approve the application (by signing, your Department Head agrees that you comply with all program requirements).
3. Submit the application to Human Resources for approval 14 days before you register for the course(s).

**After Classes End:**
Within 90 days after you complete your course, you must submit the following to Human Resources:
1. Copy of grade report.
2. Certificate of completion, a license, or other written notification must be provided if no grades are given.
3. You must present a copy of proof of payment for the course.

You will not be reimbursed for all courses required in a degree program. Only those courses that are relevant to your job, the Company, or the field of business will be paid for. You must be enrolled at an accredited college or university. Doctorate-level courses are not reimbursable. New Seabury Resources Management, Inc. will pay only the cost of the course or credit hours. You are responsible for payment of other costs (i.e. registration fees, books, laboratory fees, materials, and room and board charges).

**Seminars**
New Seabury Resources Management, Inc. may also pay for seminars in professional subjects (i.e. marketing, personnel, and systems analysis) when an association, school, or company with the appropriate professional standing or accreditation sponsors the seminar. When attendance at the seminar is approved, New Seabury Resources Management, Inc. may pay the fee in advance. However, if you fail to attend or to complete the seminar, (except in the case of emergency), you will be required to reimburse the Company the full amount paid.

A requisition for Education/Training Compensation form must be submitted to and approved by Human Resources before payment for education can be made. Time attending classes and/or seminars is not counted as time worked for the purpose of computing overtime.

**Employee Assistance Program**
It is New Seabury Resources Management, Inc.'s policy to assist employees with counseling and referral services which will help in solving problems both on and off the job.
- Full or part-time employees and their immediate family members are eligible to receive professional assistance to help resolve problems adversely affecting their personal and professional lives.
- The Employee Assistance Program services are available at no charge to employees and family members, and are completely confidential.
- Employees wishing assistance may contact their Department Head or may contact the staff of Gosnold Employee Assistance directly by telephoning 1-800-649-8115 at any time of the day.

0140

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited.
Revised 4/25/01.

31

- Employees should contact the Personnel office or the EAP directly if they are unable to discuss the problem with their Department Head.

- In certain circumstances, the Company may require an employee to participate in counseling as a condition of continued employment.

Employees are encouraged to address any problems that are affecting their job performance with their Department Head. The employee and the Department Head can come to an understanding of the situation and deal with the problem if it is job related, or refer to an appropriate source of counseling.

Management should be alert to detect the existence of personal problems affecting their employees. Indications of personal problems include excessive absenteeism, changes in both behavior and employee attitudes, and substantial job performance change. Where appropriate, they should try to communicate with employees who seem to be experiencing problems in order to find a way to assist the employee in solving the problem.

Communications between employees, Department Heads, the Personnel Department, and professional counselors or agencies as a result of this policy are to be strictly confidential, except to the degree necessary to protect the safety of the employee and/or others or to protect the security of Company property.

<u>Group insurance</u>
**Eligibility:** Full-time employees of New Seabury Resources Management, Inc. will be eligible to participate in the group insurance after 30 days of continuous service.
**To enroll in the plan:**
- All necessary forms must be completed within the first 30 days of employment.
- Any delay in enrollment will delay the date coverage begins.
- Any changes such as adding/dropping a dependent must be filled out on a change form. There is a 30-day enrollment period from a dependent's eligibility date. (Birth of child, marriage, etc.). Any enrollment after that 30-day period will be delayed.
- Your portion of insurance costs will be deducted each pay period from your paycheck. These deductions are on a pre-tax basis in accordance with Section 125 of the Tax Code.

**Medical Coverage**
- Medical insurance is offered on a cost shared basis. The company contributes a percent of the premium and the employee is responsible for the balance.

**Life/Accidental Death and Dismemberment**
- New Seabury Resources Management, Inc. pays 100% of the Life/Accidental Death and Dismemberment premium.

**Dental Coverage**
- Preventative and basic dental coverage is available in conjunction with the medical insurance on a cost shared basis.

0141

Please contact the Employee Benefits Administrator for any questions, or to sign up for the group insurance.

## COBRA Coverage

Employees should be aware of their rights under the Consolidated Omnibus Budget Reconciliation Act of 1985 commonly referred to as COBRA. Under this law, employees who leave our employment, and have been covered under our group health insurance have the right under COBRA to continue to receive New Seabury medical and dental coverage, at their own expense, and for a limited period of time. The Director of Human Resources will provide additional information on COBRA upon request.

## Worker's Compensation Insurance

Worker's Compensation is an insurance plan paid by the Company. It is supervised by the state to cover any injuries and/or illnesses that can occur while you are working at New Seabury Resources Management, Inc. Depending on the situation, your benefits may be:
1. Payment of medical expenses related to the injury or illness,
2. A percentage of the your weekly wage to partially cover lost wages, and
3. Rehabilitation Services, if necessary.

## Eligibility

Employees are automatically enrolled in the Worker's Compensation Insurance Program upon employment with New Seabury Resources Management, Inc. This program is required by state law and is administered by the Company's insurance carrier.

## Reporting of Accident / Injury

It is the responsibility of the injured employee (or the employee's Department Head, if the employee is unable) to immediately report (within 24 hrs) the injury to the Worker's Compensation Administrator. Accident reports are kept in each department and are to be filled out completely, with as much information relative to the accident as possible. Omission of pertinent data may result in delayed payment of the claim. In the event of an accident the employee will be subject to a Drug and Alcohol test.

New Seabury Resources Management, Inc. is required to report the claim to the Division of Industrial Accidents within 48 hours of the time of the accident. If the injury results in five or more lost weekdays, the Department Head should notify the Worker's Compensation Administrator on the sixth day so that the appropriate forms can be filed with the state.

## Medical Expenses

Worker's Compensation insurance will also pay for all reasonable medical and hospital services. Therefore, all bills for medical services related to the employee's injury should be sent to the Workman's Compensation Administrator and will be paid directly to the hospital or doctor.

Work related medical expenses are not to be sent to the healthcare insurance carrier. Neither the employee, nor the employee's healthcare insurer is responsible for any expenses incurred as a result of a work related injury/illness.

## Lost Wages

If an employee is injured in the course of performing his or her assigned duties, and as a result is unable to work for more than five days following the day of the accident, Worker's Compensation Insurance will pay the employee two-thirds of his or her average weekly pay up to a pre-set maximum retroactive to the date of injury. The employee should receive his or her first Worker's Compensation check no more than 30 days after the injury is reported.

Employees should discuss their eligibility for personal days with their Department head. If the employee is absent from work less than five days, and is eligible for personal days, the Company will pay the employee for that time. If ineligible for personal days, the employee will not be paid for the time absent from work.

**Submission of fraudulent claims can subject employees to prosecution by the company and/or state, and disciplinary action, up to and including termination.**

## Salary Continuance

**Eligibility:** Full-time employees of New Seabury Resources Management, Inc. are eligible for the Company's Salary Continuance Program after one year of continuous full-time employment. Salary Continuance becomes effective upon:
- Medical evidence of total and continuous disability because of accident, sickness, or because of complications arising from pregnancy, and
- After all available personal time has been paid.

You must be under the continuous care of a physician while out of work. However, you do not have to be house or hospital confined.
The program is based on the length of uninterrupted full-time service, calculated from your date of employment, and will pay in accordance with the schedule below:

| Legnth of Service | | | |
|---|---|---|---|
| Month | 1 | 2 | 3 |
| 1 year to 5 years | 60 | 60 | 60 |
| 5 years or more | 75 | 75 | 75 |

The benefits paid will be a stated percent of your gross weekly pay. Benefits will be paid concurrent with the Company's payroll schedule.

0143

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited. Revised 4/25/01

34

- While on Salary Continuance, the Company will continue to pay its percentage of your Group Health. You will still be responsible for your percentage of these premiums.
- Service time will continue to accrue for the purpose of vacation time eligibility.


- If you return to work before the three month period has expired, you will be placed in a comparable, if not the same, position you had when you became disabled.
- The Company requires the employee to apply for Family Medical Leave concurrent with the use of Salary Continuance.

**Salary Continuance Benefits will be reduced by other benefits such as:**
- Unused personal days
- Worker's Compensation
- Social Security Disability
- 60% of the income derived from rehabilitation programs

All available benefits combined will pay you a maximum of the applicable percent of your gross pay, from the schedule above, less tax deductions.

Salary Continuance benefits are not payable for disabilities which result from commission or the attempt to commit an assault, battery, or felony; war or any act of war; insurrection, rebellion or participation in a riot, civil disorder or any illegal act.

<u>General Leave of Absence</u>
(Other than for Family and Medical Leave)
**Leave of Absence**
A leave of absence is authorized time-off without pay for a specified period, not to exceed 12 weeks, carrying the right of reinstatement to the same or comparable position with no interruption in service. Full-time employees may apply for a leave of absence without terminating their employment.
**Eligibility:**
- Employees with six months of continuous, full time service.
- Employees must give at least two weeks advance notice in writing to their Department Head.
- Leaves of absence are granted for only the most serious reasons and must be approved by a member of the Executive Committee and the Personnel Department.
- For the first month of your leave, New Seabury Resources Management, Inc. will pay the Company's percentage of the Group Health and Long-Term Disability Plan premiums.
- After one month on leave, you may continue your Group Health and Long Term Disability Plan by paying the total premiums to New Seabury Resources Management, Inc. at the group rate.
- While on leave, you will continue to accrue service time for the purpose of benefit eligibility.



- If you are granted a leave of absence and do not return to work on or before the expiration date of your leave, you will be considered to have voluntarily terminated your employment effective as of your last day of service.

Other than during peak periods, a member of the Executive Committee may grant time off without pay, not to exceed 10 working days, without cause. You must request such time off by writing to their Department Head. If granted, Human Resources must receive an original copy of the request so it may be placed in your personnel file.

## Family and Medical Leave Act
The Family and Medical Leave Act (FMLA) of 1993 is a Federal Law that entitles eligible employees to take up to 12 weeks of unpaid, job-protected leave in a 12-month period for specified family and medical reasons. New Seabury Resources Management, Inc. recognizes the FMLA and will comply with all the requirements as defined by the Federal Government.

### Purpose
FMLA is intended to balance the demands of the workplace with the needs of families. By providing workers faced with family obligations, serious family, or personal illnesses with reasonable amounts of leave, FMLA encourages stability in the family and productivity in the workplace.

### Employee Eligibility
To be eligible for FMLA benefits, an employee must:
- Have worked for the employer for a total of 12 months;
- Have worked at least 1,250 hours of service during the 12-month period immediately preceding the start of the leave

### Employee Entitlement to Leave
Eligible employees may take up to 12 workweeks of unpaid leave during each 12-month period for one or more of the following reasons:
- For the birth and care of the newborn child of an employee;
- For placement with the employee of a son or daughter for adoption or foster care;
- To care for an immediate family member (spouse, child or parent) with a serious health condition; or
- To take medical leave when the employee is unable to work because of a serious health condition

Spouses employed by the same employer are jointly entitled to a **combined** total of 12 workweeks of family leave for the birth and care of the newborn child, for placement of a child for adoption or foster care, and to care for a parent who has a serious health condition. Leave for birth and care, or placement for adoption or foster care must conclude within 12 months of the birth or placement.

New Seabury Resources Management, Inc. requires that any accrued paid vacation, personal leave, or family leave be used for any portion of an approved leave for the first three

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited. 36
Revised 4/25/01

reasons for leave given above. Accrued paid vacation or personal leave may be substituted for leave provided for a serious health condition of the employee or for care of a spouse, son, daughter, or parent with a serious health condition.

## Intermittent Leave

Intermittent leave may mean taking leave in blocks of time, or by reducing the employee's normal weekly or daily schedule. It is an option that may provide a convenient solution for both the employee and the employer.

- If FMLA leave is for birth and care or placement for adoption or foster care, use of intermittent leave is subject to the employer's approval.
- FMLA Leave may be taken intermittently whenever **medically necessary** to care for a seriously ill family member, or because the employee is seriously ill and unable to work.
  - Intermittent leave is applied towards the 12-week FMLA maximum benefit.

When intermittent leave is needed to care for an immediate family member or the employee's own illness, and is planned for medical treatment, the employee must try to schedule treatment so as not to unduly disrupt the employer's operation.

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited.

**"Serious health condition"** means an illness, injury, impairment, or physical or mental condition that involves:

- Any period of incapacity or treatment connected with inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical-care facility, and any period of incapacity or subsequent treatment in connection with such inpatient care; or
- Continuing treatment by a health provider which includes any period of incapacity (i.e., inability to work, attend school or perform other regular daily activities) due to:

1. A health condition (including treatment therefor, or recovery therefrom) lasting more than three consecutive days, and any subsequent treatment or period of incapacity relating to the same condition, that also includes treatment two or more times by or under the supervision of a health care provider; or one treatment by a health care provider with a continuing regimen of treatment.
2. Pregnancy or prenatal care. A visit to the health care provider is not necessary for each absence.
3. A chronic serious health condition, which continues over an extended period of time, requires periodic visits to a health care provider, and may involve occasional episodes of incapacity (e.g., asthma, diabetes). A visit to a health care provider is not necessary for each absence.
4. A permanent or long-term condition for which treatment may not be effective (e.g., Alzheimer's, a severe stroke, terminal cancer). Only supervision by a health care provider is required, rather than active treatment.

5. Any absences to receive multiple treatments for restorative surgery or for a condition which would likely result in a period of incapacity of more than three days if not treated (e.g., chemotherapy or radiation treatments for cancer.)

**"Health care provider"** means:
- Doctors of medicine or osteopathy authorized to practice medicine or surgery by the state in which the doctors practice; **or**
- Podiatrists, dentists, clinical psychologists, optometrists and chiropractors (limited to manual manipulation of the spine to correct a subluxation as demonstrated by x-ray to exist) authorized to practice, and performing within the scope of their practice, under state law; **or**
- Christian Science practitioners listed with the First Church of Christ, Scientist in Boston, Massachusetts; **or**
- Any health care provider recognized by the employer or the employer's group health plan benefits manager.

## Maintenance of Health Benefits
The employer is required to maintain group health insurance coverage for an employee on FMLA leave whenever such insurance was provided before the leave was taken and on the same terms as if the employee had continued to work. If applicable, arrangements will need to be made for employees to pay their share of health insurance premiums while on leave.

## Job Restoration
Upon return from FMLA leave, an employee must be restored to the employee's original job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment. During any period of leave, an employee will not lose any accrued employment benefit (i.e., group life insurance, health insurance, disability insurance, personal leave, vacation time or retirement benefits) that the employee earned or was entitled to before using the FMLA leave.

Under specified and limited circumstances where restoration to employment will cause substantial and grievous economic injury to its operations, an employer may refuse to reinstate certain highly paid **"key"** employees after using FMLA leave during which health coverage was maintained. A "key" employee is a salaried "eligible" employee who is among the highest paid ten percent of employees.

If the employee on leave is among the highest paid 10% of employees, New Seabury Resources Management, Inc. may deny restoration of employment, but only if necessary to prevent "substantial and grievous economic injury" to the Company, and if the employee has elected not to return immediately from an approved leave <u>after</u> receiving a notice from New Seabury Resources Management, Inc. of the Company's intent to deny restoration.

**Advance Notification and Medical Certification Requirements**
New Seabury Resources Management, Inc. requirements:
- When leaves are "foreseeable", employees must give 30 days advance notice to their Department Head in writing. In case of medical emergencies, notice must be provided within 1 to 2 workdays of the employee's knowledge for leave.
- Employees must advise their Department Heads "as soon as practicable" of any change in dates of scheduled leave or extension of such leave. Such changes should be confirmed in writing.
- Medical certification, within 15 days of the Company's request, supporting the need for leave due to a serious health condition affecting the employee or an immediate family member.
- Second or third medical opinions (at the employer's expense).
- Periodic medical certification every 30 days for continuous blocks of leave and every 6 months for intermittent leaves.
- Periodic reports during FMLA leave regarding the employee's status and intent to return to work as follows:
    - Biweekly during the first month, and
    - Monthly after the first month.

Please contact the Personnel Office for additional information.

<u>Maternity Leave</u>
**Eligibility** - Full-time employees of New Seabury Resources Management, Inc. will be eligible for maternity leave after 12 months of uninterrupted service.
- Maternity leave will be granted for pregnancy, childbirth, and recovery for a period of up to twelve weeks from the first day of leave.
- This leave must be requested at least two weeks in advance of the starting date.
- If you are eligible for paid leave, you will receive 60% of your average weekly salary, paid in accordance with Company payroll schedules, for a period of eight weeks.
- Upon return from this twelve-week leave, you are entitled to the same position you left, or a similar position with the same level, pay and length of service credit.
- If you do not return from your Maternity leave after twelve weeks, and you are not medically disabled, or on an approved extension, you will be voluntarily terminated.

**Extension of Leave**
- Any extension to the twelve-week leave that has been approved for you will not include the job protection mentioned above.
- Upon two weeks notification of your desire to return after an extension, the Company will let you know whether or not a position is available.

If you become medically disabled as a result of your pregnancy, and meet the length of service requirements, Salary Continuance will go into effect. You must have medical evidence of the disability, and be under the continual care of a physician. You do not have to be house or hospital confined.

**Advance Notification and Medical Certification Requirements**
New Seabury Resources Management, Inc. requirements:

- When leaves are "foreseeable", employees must give 30 days advance notice to their Department Head in writing. In case of medical emergencies, notice must be provided within 1 to 2 workdays of the employee's knowledge for leave.
- Employees must advise their Department Heads "as soon as practicable" of any change in dates of scheduled leave or extension of such leave. Such changes should be confirmed in writing.
- Medical certification, within 15 days of the Company's request, supporting the need for leave due to a serious health condition affecting the employee or an immediate family member.
- Second or third medical opinions (at the employer's expense).
- Periodic medical certification every 30 days for continuous blocks of leave and every 6 months for intermittent leaves.
- Periodic reports during FMLA leave regarding the employee's status and intent to return to work as follows:
    - Biweekly during the first month, and
    - Monthly after the first month.

Please contact the Personnel Office for additional information.

## Maternity Leave
**Eligibility -** Full-time employees of New Seabury Resources Management, Inc. will be eligible for maternity leave after 12 months of uninterrupted service.

- Maternity leave will be granted for pregnancy, childbirth, and recovery for a period of up to twelve weeks from the first day of leave.
- This leave must be requested at least two weeks in advance of the starting date.
- If you are eligible for paid leave, you will receive 60% of your average weekly salary, paid in accordance with Company payroll schedules, for a period of eight weeks.
- Upon return from this twelve-week leave, you are entitled to the same position you left, or a similar position with the same level, pay and length of service credit.
- If you do not return from your Maternity leave after twelve weeks, and you are not medically disabled, or on an approved extension, you will be voluntarily terminated.

## Extension of Leave
- Any extension to the twelve-week leave that has been approved for you will not include the job protection mentioned above.
- Upon two weeks notification of your desire to return after an extension, the Company will let you know whether or not a position is available.

If you become medically disabled as a result of your pregnancy, and meet the length of service requirements, Salary Continuance will go into effect. You must have medical evidence of the disability, and be under the continual care of a physician. You do not have to be house or hospital confined.

- Unusual circumstances regarding the geographic or family circumstances may be discussed with your Department Head.

Time paid for Sympathy Leave will not be counted as hours worked for computing overtime.

<u>Jury Duty</u>
All employees of New Seabury Resources Management, Inc. are allowed time off without loss of pay in the event they are called for Jury Duty, or have to participate in a court case, as long as the employee is not a party to the legal action.
- The Company will pay your average daily salary for the first three days.
- You will be paid the difference between your regular base pay and the fees you receive from the court for succeeding days to a maximum of thirty days, excluding meal and mileage allowance, providing the fees do not exceed your regular base pay.
- Days absent because of court leave are not counted as time worked for computing overtime.

**To receive this pay, you must:**
- Notify your Department Head and Human Resources immediately if you are required to serve for more than five consecutive days,
- Give a copy of the summons or subpoena within 14 days of the start of your service, or as soon as possible to your Department Head and Human Resources.
- Provide your department Supervisor with a Certification of "Jury Duty," "Record of Attendance" or "Subpoena for Witness" (your Department Head gives this form to Human Resources).

**Your Responsibilities:**
- Employees must call each day and inform their Department Head of the employee's status in court and report to work if dismissed from the court for the day if more than four hours remain in that workday,
- Properly record Jury duty days on your time card/sheet,
- Notify your Department Head and report to work if you are able to work more than four hours whenever you are not on jury duty,
- Be available for consultation during regular work hours while not participating as a trial juror, and
- Provide a copy of the court's payment receipt to Payroll for deduction from your paycheck.

**Temporary Deferrals:** If your absence would cause extreme hardship in your department, you and your Department Head may ask the court for a temporary deferral.

<u>Golf Course</u>

<u>Guidelines for Employee Play 2000</u>

- Guidelines are strictly enforced April 1 to November 1.
- Employees <u>must</u> have an identification card <u>signed</u> by their Department Manager in order to play golf at New Seabury.
- Employees may use a golf cart as part of their privileges with certain restrictions set forth by the Golf Director.

0150

- Employees cannot bring guests or family members as part of their golfing privilege without approval in writing by their respective department manager.   A written approval will be required on all occasions that an employee wishes to bring a guest.
- Employees are not permitted to play with members unless they have approval of the Golf Director or Resort General Manager.
- In all cases, members and guests have priority of play at New Seabury.

## Tennis Courts
- Employees may use the tennis courts during non-peak hours on weekdays and weekends after 3:00PM.
- Guests are permitted, but are required to play tennis with the employee and to pay guest fees.
- Employees must check in at the Tennis Shop before starting play.

## Beach and Cabana Club
- Employees may use only those sections of the beach facilities prescribed by the Beach Director.
- Employees may bring three guests.
- Because of heavy use of the Cabana Club and Decks by guests and members, these areas are not available to employees and their guests.
- Employee cars are to be parked in the areas designated by the Beach Director.

## Player's Club and Popponesset Inn
Employees may patronize the Player's Club and Popponesset Inn Lounges only after working hours, when the following conditions are met:
- Before or after dinner, when seated in the lounge and not at the bar.
- During an entertainment event in either restaurant, when seated in the lounge and not at the bar.
- When entertaining business clients or VIP's for New Seabury Resources Management, Inc.
- As an employee of New Seabury Resources Management, Inc. the employee may use the Company's Club facilities as long as the club rules and restrictions, both posted and published, are observed. In all cases, club members and resort guests have priority of play and use of the facilities over employees. In order to use any of the facilities, employees must present their Employee Identification Card. You may be asked to give up the use of a facility temporarily for a club member or resort guest. Your cooperation will be appreciated. You may not use the facilities while in uniform, and remember you are responsible for the behavior of your guests.

0151

## Acknowledgement of Receipt of the Employee Handbook and
## Acceptance of Terms of Employment

I, _____, hereby acknowledge that I received and read (or had it read to me) a copy of the New Seabury Resources Management, Inc. Employee Handbook, which replaces any other handbook, policy or procedure, oral or written, previously issued or utilized by New Seabury Resources Management, Inc.

I recognize and understand that this Employee Handbook is for informational purposes only; and is not intended to create contract of employment or for benefits, of any kind between New Seabury Resources Management, Inc. and me. I am completely free to leave New Seabury Resources Management, Inc. at any time I choose, and the Company has the same right to terminate the employment relationship at any time, and for any reason not prohibited by law.

_____

Employee Name (print)

_____

Employee Signature                              Date

_____

Company Representative                          Date

**To be signed, detached and filed in the personnel record.**





**New Seabury® Cape Cod**

## MEMORANDUM

**Date:** February 3, 2003

**To:** Steve Brennan, General Manager

**Cc:** Mark J. O'Neil, Sr.

**From:** Patricia A. Cosgrove

**Re:** Maternity Leave

I hereby request maternity leave on or about July 30, 2003.
It is my understanding, based on the Employee Handbook (Maternity Leave, pg. 39 & 40), I am eligible for paid leave and will receive 60% of my average weekly salary, paid in accordance with Company payroll schedule for a period of eight weeks. I am entitled to a twelve week leave, which upon return I am entitled to the same position I left, or a similar position with the same level, pay and length of service.

_Patricia A. Cosgrove_        2-3-03
Patricia A. Cosgrove          date
Conference Sales Manager

_Steve Brennan_               2-3-03
Steve Brennan                 date
General Manager

0340

CONFIDENTIAL

New Seabury Properties 98-1, LLC • New Seabury Properties 98-2, LLC • New Seabury Development, LLC
New Seabury Properties, LLC • New Seabury Resource Management, Inc. • Architectural Review Committee
Post Office Box 549, 155 Rock Landing Road, Mashpee, MA 02649-0549 • Phone: 508 477 9111 • Fax: 508 477 9790 • http://www.newseabury.com

EXHIBIT D

Summary
Judgment

EXHIBIT
12
KKg 1-16-06
Cassidy

# CAPE OBSTETRICS MIDWIFERY & GYNECOLOGY PC

WOMAN FOCUSED CARE FOR ALL AGES

## Jean Talbert MD • Susan Anderegg MD
## Dale Weldon MD • Elizabeth G. Murray MD
## Helena T. McDonough CNM

5/6/03

To Whom It May Concern,

Mrs. Patricia Cosgrove is under our care during her pregnancy. Due to complications of pregnancy, that have been progressive despite activity limitations, I have recommended that she stop work as of 5/11/03.

Thank you.

Jean Talbert MD

0076

182 Palmer Ave. • Falmouth, MA 02540
Sandwich Health Center • Route 130 • Sandwich, MA 02563



EXHIBIT E
Summary
Judgment

 **PAYROLL CHANGE NOTICE**

and

**NEW HIRE AUTHORIZATION** 

Today's Date: **5/11/03**

Dept. #: **423**     Dept. Name: **Catering**

Effective Date: **5/11/03**

Employee/New Hire Name: **Patricia Cosgrove**

Social Security Number: **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**

Employee File Number: **793**

**Reason For Change(s):**

| | | | | |
|---|---|---|---|---|
| ☐ | New Hire | ☐ | Probationary Period Completed | |
| ☐ | Re-hire | ☐ | Length of Service Increase | |
| ☐ | Promotion | ☐ | Re-evaluation of Exisiting Position | |
| ☐ | Demotion | ☐ | Resignation | |
| ☒ | Transfer | ☐ | Termination (Reason, see other below) | |
| ☐ | Merit Increase | ☐ | Layoff | |
| | | ☐ | Eligible for Rehire (Y or N, see other below for explanation) | |

☐  Leave of Absence     From: _____     To: _____

(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☐  Other (details)

| | | FROM | TO |
|---|---|---|---|
| ☐ | Department | 423 | 423 |
| ☐ | Position | Conf Slo mgr. | ADm. ASS.t |
| ☐ | Rate | 17.00 | 12.00 |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:     Yes     No     Signed Policy Attached:

Change Authorized By: **J. Perry.**     Date: **5/11/03.**

Change Approved By: _____     Date: _____



## Administrative Assistant

Check email

Check phone messages

Make Call backs

Send out Wedding Packages

Distribution, usually on Tuesdays, copies to:

    Kitchen – 2 copies, Joe/Neil, Roy, Amy, John Shea, Jean,
    Kathy, Meg, Tanya, EO Book, & Extra Copy

Any missing EO's should be emailed to all of the above, Josh & 2 hard
copies to the kitchen and a copy for the EO Book

On Tuesday copy the event sheets from the book that have changes &
give to Jean & Kathy – so they can update the reader board

Keep up with the supplies for the sales department

Manager's Schedule – email to: Steve Brennan, Tanya , Jean,
Sales Dept. and Post in Sales office, Jennifer's Office and Kitchen

Do Checks – attach grad Sheets

Contracts

Event Orders

Invoices

Refunds

Update the calendar, big book & wedding list – weddings

EXHIBIT G

Summary
Judgment

Patricia A. Cosgrove
480 Old Meeting House Road
East Falmouth, MA 02536


May 2, 2003


Mr. Steve Brennan
General Manager
New Seabury Properties
155 Rock Landing Road
Mashpee, MA  02649

Dear Steve,

As you know, I am happy with my current position as Conference Sales Manager and would like to remain in this position. I plan to take a 12-week maternity leave beginning on or about July 30, 2003, and would like to return to my current position at the end of my leave.

You informed me on April 28th, however, that my position was being eliminated. I do not understand the reason for this change because the duties I perform are still obviously needed by the Resort. I can only surmise that this change is being made because of my pregnancy and intention to take maternity leave. I am aware that two other women, Rhonda Rodgers and Michele O'Brien, have also recently had their positions changed or eliminated while they were pregnant. These actions to all three of us seem to be pregnancy discrimination.

You have offered to me a position as Administrative Assistant beginning May 6th. This position would be a demotion, since it would mean an approximate 30% pay reduction and would require a change in my schedule. I cannot afford this loss of income and the schedule change would be very difficult for me. However, I also cannot afford to be unemployed, so I will take this position if it is the only choice I have.

I am planning to file a complaint of discrimination with the Massachusetts Commission Against Discrimination. Please let me know if I can remain in my current position, or if I will have to take the demotion, in which case I will retain an attorney to represent me in my discrimination claim.


Sincerely,

*Patricia A. Cosgrove*
Patricia A. Cosgrove

0074



**Cosgrove, Patricia**

| | |
|---|---|
| From: | Cosgrove, Patricia |
| Sent: | Wednesday, May 07, 2003 3:34 PM |
| To: | Brennan, Stephen |
| Cc: | Perry, Jennifer |
| Subject: | RE: |

Steve,

I spoke with Jen and she agreed that it would be best if I continue my current position for the remainder of this week to complete my work for groups arriving next week. Then we can start fresh next week with training.

Thank you.

-----Original Message-----
| | |
|---|---|
| From: | Brennan, Stephen |
| Sent: | Wednesday, May 07, 2003 9:52 AM |
| To: | Cosgrove, Patricia |
| Subject: | RE: |

That's fine with me check with Jen.

-----Original Message-----
| | |
|---|---|
| From: | Cosgrove, Patricia |
| Sent: | Wednesday, May 07, 2003 9:49 AM |
| To: | Brennan, Stephen |
| Subject: | |

Steve,

I would like to continue with my Sales Manager responsibilities/duties for the next few days as there are 3 groups coming in next week and there is work to be completed to ensure everything runs smoothly when they arrive. This will also give me the opportunity to review these group files with Jennifer, so that she will be prepared for their arrival next week.

Thank you.

Patricia A. Cosgrove
The Club at New Seabury
508-539-8263
pcosgrove@newseabury.com

Tracking:

| Recipient | Read |
|---|---|
| Brennan, Stephen | |
| Perry, Jennifer | Read: 5/7/2003 3:34 PM |

1

EXHIBIT I

Summary
Judgment

Date ___ Rptr. ___
WWW.DEPOBOOK.COM

Date Prepared ___
Prepared by
a) C & L ___
b) Court and
Examined by ___
Reviewed by
C & L DVJLF ___

7/14 Baby        ( Oct 6
                   Return )

Patricia Cosgrove    $17.02

| W/E | | | | MAT. 60% | Pd | Date Pd | |
|---|---|---|---|---|---|---|---|
| 7/19/03 | 5 Days VAC | ✓ | | | 680 — | 7/25/03 | |
| 7/26/03 | 5 Days VAC | | | | 680 — | 8/8/03 | |
| 8/2/03 | 5 MAT | ✓ | | 680 | 408 — | 8/8/03 | ✓ |
| 8/9/03 | 5 MAT | ✓ | | 680 | 816 | 8/22/03 | |
| 8/16/03 | 5 MAT | ✓ | | 680 | | | |
| 8/23 | 5 MA | ✓ | | 680 | | | |
| 8/30 | 5 MAT | ✓ | | 680 | 816 | 9/5 | |
| 9/6 | 5 MAT | ✓ | | 680 | 816 | 9/19 | |
| 9/13 | 5 MAT | ✓ | | 680 | | | |
| 10/4 | 5 MAT | ✓ | | 680 | 408 | 10/17 | |



EXHIBIT J

Summary
Judgment

# O'BRIEN & LEVINE

## Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

# Patricia Cosgrove v. New Seabury Resources Management

Transcript of the Testimony of:

# Stephen Brennan

# January 18, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130   888.825.DEPO(3376)

ORIGINAL

Jill K. Ruggieri   1-17609

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

132

```
 1              understanding of the requirements --
 2      A       I just look at it as it reads in our
 3              handbook.
 4      Q       Do you have an understanding of the purpose
 5              behind that?
 6                      MR. WILGOREN:   Objection.   Calls for
 7              a legal conclusion.
 8      A       I believe it's simply to allow anybody
 9              that's affected by pregnancy to be able to
10              have time off with their like type position
11              and salary upon return.
12      Q       And is it your understanding that New
13              Seabury's policy reflects the requirements
14              of the Family and Medical Leave Act?
15      A       Yes.
16                      MS. SCHWAB:   I'm going to mark as
17              Exhibit 9.
18                      (Exhibit No. 9 marked for
19              identification.)
20      BY MS. SCHWAB:
21      Q       Can you turn to page 36 of the employee
22              handbook that I've handed you?
23                      And before I get there, can you
24              identify -- do you recognize that document?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

137

```
 1                      You can answer if you understand the
 2          question.
 3     A    I don't know what the differences would be
 4          or what you're looking for in that.
 5     Q    Do you know if the length of leave that
 6          you've granted for each person has differed
 7          for different people, how much time each
 8          person gets?
 9     A    Well, you -- each person, you're talking
10          about each of the individuals identified
11          as --
12     Q    Yes.
13     A    I would say that, you know, they could
14          follow what is in the handbook, which also
15          entails their vacation time and other things
16          that could go along with it, any time that
17          they've earned.
18     Q    But the amount of family and medical leave
19          has been the same for each of the four?
20     A    I would assume -- I don't know.  I would
21          assume so.  Whatever the policy is is how it
22          would have been done.
23     Q    Do you know if there's been any differences
24          in terms of the percentage of pay that
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

161

```
1              taken place, the discussions about

2              restructuring of catering and lodging?

3     A        February, early March, in that vicinity.

4     Q        At some point did you come to learn that

5              Ms. Cosgrove was pregnant?

6     A        Yes.

7     Q        Do you remember how you learned?

8     A        I think she notified us in some fashion,

9              written in some format.

10                     MS. SCHWAB:  This document was

11             produced before, but I'll mark this as

12             Exhibit 12.

13                     (Exhibit No. 12 marked for

14             identification.)

15    BY MS. SCHWAB:

16    Q        Do you recognize Exhibit 12?

17    A        I do.

18    Q        What is it?

19    A        It's Patricia's notice of -- to maternity

20             leave.

21    Q        Is this the document you're referring to by

22             which you learned that Ms. Cosgrove was

23             pregnant?

24    A        I can't say that I learned from this
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

162

| | | |
|---|---|---|
| 1 | | document, but from this document, it's |
| 2 | | obviously clear that it was notification. |
| 3 | Q | And is that your signature on the document |
| 4 | | over "Steve Brennan"? |
| 5 | A | It is. |
| 6 | Q | Do you remember if you had any discussion |
| 7 | | with anybody after receiving this document? |
| 8 | | MR. WILGOREN:  In what time frame? |
| 9 | A | When? |
| 10 | Q | Did you have any -- |
| 11 | | After receiving this document, did |
| 12 | | you have any discussion with anybody |
| 13 | | relating to the document or her request for |
| 14 | | maternity leave? |
| 15 | A | Well, obviously Mark O'Neil was copied on |
| 16 | | it.  There was a discussion from that since |
| 17 | | he knew about it. |
| 18 | Q | Do you remember what you talked about with |
| 19 | | Mark O'Neil after the document? |
| 20 | A | No. |
| 21 | Q | Do you remember if you talked to anybody |
| 22 | | else about it? |
| 23 | A | I'm sure Lee O'Shea, I probably handed it to |
| 24 | | her to go in the file. |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

163

| | | |
|---|---|---|
| 1 | Q | Do you remember any substance of your |
| 2 | | conversation with Lee O'Shea? |
| 3 | A | No. Patricia's pregnant, can you file this. |
| 4 | Q | Anybody else you might have talked about it |
| 5 | | with? |
| 6 | A | I mean, nothing comes to my mind. |
| 7 | Q | Do you remember if you talked to |
| 8 | | Ms. Cosgrove after receiving this document? |
| 9 | A | I don't recollect a conversation. |
| 10 | Q | At the bottom of the document, her last |
| 11 | | sentence says, "I am entitled to a 12-week |
| 12 | | leave, which upon return I'm entitled to the |
| 13 | | same position I left or a similar position |
| 14 | | with the same level pay and length of |
| 15 | | service." |
| 16 | | Did you ever discuss that line from |
| 17 | | the document with anybody? |
| 18 | A | No, it's basically what our policy says. |
| 19 | Q | And you signed the document. |
| 20 | | Did you agree to her characterization |
| 21 | | of the policy |
| 22 | A | Yes. I look at it as more of whatever our |
| 23 | | policy was is what we'd follow. Because she |
| 24 | | wrote the document didn't mean this was a |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

168

| 1 | | stated here. |
|---|---|---|
| 2 | Q | And any conversation about her going on |
| 3 | | leave? |
| 4 | A | No. |
| 5 | Q | So what did you say to -- and when you |
| 6 | | talked about -- |
| 7 | | Before talking to Ms. Cosgrove, you |
| 8 | | said you planned to eliminate her position. |
| 9 | | Did you come up with any substitute |
| 10 | | position to put her in at that time? |
| 11 | A | At that time, it looked as if there would be |
| 12 | | the opportunity for an administrative |
| 13 | | position in catering sales. |
| 14 | Q | And can you explain what that position would |
| 15 | | be? |
| 16 | A | It would be an administrative assistant with |
| 17 | | catering sales. |
| 18 | Q | And at what time was that, that looked like |
| 19 | | that would be available? |
| 20 | A | Spring. |
| 21 | Q | With whom -- before talking to Ms. Cosgrove, |
| 22 | | with whom did you talk about the |
| 23 | | administrative assistant position in |
| 24 | | catering sales? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

169

| | | |
|---|---|---|
| 1 | A | Would have been the same people, Jennifer |
| 2 | | Perry, that's correct. |
| 3 | Q | And did you talk to all of them about |
| 4 | | putting Ms. Cosgrove into this position? |
| 5 | A | At a minimum, Jennifer and Mark. |
| 6 | Q | And what did you say to Mark about that? |
| 7 | A | There's another position, obviously will be |
| 8 | | a lower paying position, but there's a |
| 9 | | position right now that is available. |
| 10 | Q | And what did he say to you about that? |
| 11 | A | He said it works. |
| 12 | Q | And what about Ms. Perry, what did you say |
| 13 | | to her about the administrative assistant |
| 14 | | position? |
| 15 | A | Basically the same, seemed to make sense. |
| 16 | Q | And what did she say to you? |
| 17 | A | Seemed to make sense. |
| 18 | Q | And can you elaborate at all about the |
| 19 | | responsibilities of the administrative |
| 20 | | assistant in catering sales? |
| 21 | A | As with any administrative position, it's |
| 22 | | basically answering the phone, filing, doing |
| 23 | | anything that's deemed necessary for the |
| 24 | | operation. |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

170

```
 1    Q    And catering sales was Jennifer Perry's
 2         department?
 3    A    Yes.
 4    Q    Who else was in that department?
 5    A    Aaron Brochu, Jane Henry.
 6    Q    Anyone else?
 7    A    Those three.
 8    Q    And where was the -- was there a particular
 9         location of the department?
10    A    Jane Henry and Aaron Brochu were located
11         upstairs in the country club.  Jennifer
12         Perry is on the main floor of the country
13         club.
14    Q    And did you have an idea about where the
15         administrative assistant would sit for the
16         catering sales?
17    A    With -- where Jane and Aaron sat.
18    Q    In a cubicle?
19    A    No, it's an open office.
20    Q    And were there a lot of vacant offices in
21         that area?
22    A    No.  It was a vacant office space.  The
23         three of them sat in one space.
24    Q    One space?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

172

```
 1              away, and we had a -- an admin position
 2              available if she chose to.
 3                   It would be a cut in pay, but if she
 4              chose to, she had the opportunity to take
 5              that.
 6    Q    Did you explain anything else about what the
 7         admin position would be?
 8    A    Nothing comes to mind.
 9    Q    So just there's an admin position in
10         catering sales?
11    A    She was already located there.   She
12         understood what the role was, I would
13         assume.
14    Q    And do you remember it -- what Ms. Cosgrove
15         said at the meeting?
16    A    No.
17                   She was disappointed.  I remember the
18         emotion, but I don't remember what she said.
19    Q    Do you remember if she accepted the admin
20         position at that point?
21    A    I think she asked if she could think about
22         it.
23    Q    Do you remember if she later accepted the
24         position?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

175

```
 1          full-time, part-time or seasonal.

 2     Q    Right.

 3     A    You could be full-time; you could be

 4          full-time seasonal.

 5     Q    But wouldn't seasonal be circled if you were

 6          a full-time seasonal?

 7     A    It could be.  It could be any of the above,

 8          if you were seasonal or full-time seasonal

 9          or you could be part-time seasonal.

10     Q    My understanding --

11     A    When Jennifer finished this out -- filled

12          this out, she obviously circled full-time.

13     Q    And you signed it as --

14     A    Right.

15     Q    -- an approval of the change?

16     A    Right.

17     Q    And full-time on this form means full-time

18          year-round?

19     A    On this form, I would say it does.

20     Q    Do you remember in Ms. Cosgrove started

21          assuming the responsibilities of

22          administrative assistant - catering sales

23          after you offered the position to her?

24     A    I don't believe she ever did.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

187

```
1              established procedure into place from the
2              handbook?
3                   MR. WILGOREN:  Objection.
4     A    No, there wasn't a reason to.
5     Q    So that's a no?
6     A    No, there wasn't a reason to.
7                   MR. WILGOREN:  The answer speaks for
8              itself.
9     Q    Are you aware of what position Ms. Cosgrove
10             was in when she went out on her leave?
11    A    You'll have to clarify the question.
12    Q    What position did she hold when she went out
13             on her leave?
14    A    I believe it was called conference sales or
15             conference services or something along those
16             lines.
17    Q    And what -- do you remember what pay rate
18             she was at?
19    A    I --
20                  MR. WILGOREN:  Are you talking about
21             the last day she worked?
22    Q    When she went out on her leave.
23    A    When she went out on her leave.  Her
24             previous rate was $17 an hour.  The new rate
```

188

1              was going to be $12, I believe.

2     Q     And do you remember what rate was in effect

3              during her leave?

4     A     I don't know.

5                     MR. WILGOREN:  Well, I'm going to

6              object and move to strike the question

7              because it assumes facts not in evidence.

8              She wasn't -- Ms. Cosgrove wasn't

9              working.  There was no rate in effect at the

10             time of her leave.

11                    MS. SCHWAB:  There is a rate in

12             effect for her disability leave.  How does

13             that assume facts not in evidence?

14                    MR. WILGOREN:  First of all, there's

15             no evidence about --

16                    MS. SCHWAB:  Well, my question was

17             what was her rate when she went out on

18             leave.

19                    MR. WILGOREN:  Well --

20                    MS. SCHWAB:  You can --

21    BY MS. SCHWAB:

22    Q     What was her rate the last day before she

23             went out on her leave?

24                    And, Mr. Brennan, is your answer that

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

191

| 1 | A | I can't say how Lee did it. |
| 2 | Q | Did you review Lee's schedules of maternity |
| 3 | | leave? |
| 4 | A | I did not. |
| 5 | Q | So would this be a document that you had |
| 6 | | reviewed? |
| 7 | A | No. |
| 8 | Q | Up at the top of the document, it says |
| 9 | | Patricia Cosgrove, $17; is that correct? |
| 10 | A | That's what it says. |
| 11 | Q | And then it appears to be -- although you |
| 12 | | haven't seen it before, it appears to be a |
| 13 | | document calculating maternity leave? |
| 14 | A | That's what it looks like. |
| 15 | Q | Reviewing this document, would you conclude |
| 16 | | from this document that she was paid 60 |
| 17 | | percent of a $17 per hour salary on her |
| 18 | | maternity leave? |
| 19 | A | That would be the appearance. |
| 20 | Q | Would it surprise you that she would be paid |
| 21 | | at $17 an hour -- at a rate based on a $17 |
| 22 | | an hour salary for her maternity leave? |
| 23 | A | I guess versus being the $12 an hour? |
| 24 | Q | Yes. |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

197

```
 1                    And you testified before that because
 2            of a communication -- a miscommunication,
 3            you hadn't thought she was coming back.
 4                    What actions did you take after you
 5            received this letter and realized that she
 6            was planning to come back from maternity
 7            leave?
 8      A     I still wasn't aware she accepted, other
 9            than this saying she was coming back.
10                    In my mind, I didn't remember
11            anything of her accepting the other
12            position.
13      Q     So then what did you expect would happen
14            when she would return from leave?
15      A     I still wasn't expecting her to return from
16            leave.
17      Q     Even after receiving this letter?
18      A     Yes.
19      Q     And even though it says in paragraph 3,
20            "Ms. Cosgrove plans to return to work next
21            week to the administrative assistant's
22            position to which she was demoted" --
23      A     That point, I didn't believe she was coming
24            back.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

198

```
 1    Q    Okay.
 2               So despite receiving this letter, you
 3          didn't believe that Ms. Cosgrove was coming
 4          back?
 5    A    At this point, this was the first time that
 6          I had the understanding that she was coming
 7          back; but the timing of this versus when she
 8          came back, I don't remember the exact date
 9          this was received, but I didn't receive it
10          on the 30th.
11    Q    And you don't remember whether you received
12          it before she came back or not?
13    A    I don't remember the date of it.
14    Q    After receiving this letter on -- or her
15          showing up to work, you at some point became
16          aware she was planning to come back to work,
17          correct?
18    A    Correct.
19    Q    What action did you take once you became
20          aware she was coming back to work?
21    A    I asked Lee to pull her file to see if there
22          was anything in there.  There was.
23    Q    Is this before you met with Ms. Cosgrove?
24    A    No, this is the day she came in.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

199

| 1 | Q | Okay. |
| 2 | A | And at that point, you know, looked at it, |
| 3 | | told Patricia that -- go home for the day. |
| 4 | | I need to figure out a place for you. |
| 5 | Q | And what did you do to figure out a place |
| 6 | | for her when she left? |
| 7 | A | I -- another girl -- another employee was |
| 8 | | leaving to go back to school that was doing |
| 9 | | an administrative position for us, so I was |
| 10 | | able to plug her into that. |
| 11 | Q | And was -- do you know if Lauralee Taddeo |
| 12 | | was still employed when Ms. Cosgrove came |
| 13 | | back? |
| 14 | A | She might have been a couple more days.  She |
| 15 | | was near the end of the season, so it was, |
| 16 | | you know, at a time when some of the |
| 17 | | administrative staff was starting to get |
| 18 | | laid off. |
| 19 | Q | And so how did you -- who did you talk to |
| 20 | | about putting Ms. Cosgrove in this other |
| 21 | | position? |
| 22 | A | Talked to Lee O'Shea about it.  In looking |
| 23 | | for things to do for her, I talked to Wayne |
| 24 | | Spencer about it, for any clerical stuff |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

200

| 1 | | that might need to be done. |
| 2 | | I talked to John Shea, who is our IT |
| 3 | | person, and he was able to set up a machine |
| 4 | | and scanner to allow us to give her a |
| 5 | | project to start on, that we needed to get |
| 6 | | documents scanned in to eliminate paper. |
| 7 | Q | And what was the -- can you describe more |
| 8 | | about what this position entailed? |
| 9 | A | It entailed scanning -- scanning documents, |
| 10 | | financial documents and membership |
| 11 | | documents, old existing documents that we |
| 12 | | needed to maintain permanently, but they |
| 13 | | were paper files so we were converting them |
| 14 | | to electronic files. |
| 15 | Q | And where was the scanning to take place? |
| 16 | A | It was in the offices inside the warehouse |
| 17 | | where the documents were all stored. |
| 18 | Q | How long did you anticipate this project |
| 19 | | lasting? |
| 20 | A | The project is basically an ongoing project. |
| 21 | | I envisioned -- I don't know, you know, not |
| 22 | | a definitive period of time but until we |
| 23 | | really slowed down and finished the layoffs. |
| 24 | Q | How would you compare this position to the |

201

| | | |
|---|---|---|
| 1 | | job of administrative assistant in the |
| 2 | | catering sales department? |
| 3 | A | They're both clerical. |
| 4 | Q | Any other comparisons? |
| 5 | A | They're both basically clerical, |
| 6 | | administrative positions. |
| 7 | Q | Are there differences between the two |
| 8 | | positions? |
| 9 | A | At the point in time when she was working on |
| 10 | | it, there wasn't a need for answering phones |
| 11 | | and things of that nature.  That wasn't the |
| 12 | | role or the project, where in catering sales |
| 13 | | you would be answering phones. |
| 14 | Q | So they differed in that way. |
| 15 | | What about in the work environment, |
| 16 | | was there a difference in the work |
| 17 | | environment? |
| 18 | A | One's at the country club and one's in an |
| 19 | | office in the warehouse. |
| 20 | Q | And what is the difference between those two |
| 21 | | locations? |
| 22 | A | One's a warehouse and one's a country club. |
| 23 | Q | And so what's the warehouse like? |
| 24 | A | The warehouse has -- is a normal warehouse |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

202

```
 1          with three offices in it.
 2    Q     And what's the country club like?
 3    A     The country club is a normal country club
 4          with offices in it, meeting space in it and
 5          dining space in it, a golf shop in it,
 6          locker rooms.
 7    Q     How many people work in the country club --
 8          at that time how many people worked at the
 9          country club?
10    A     It depends on the day.
11    Q     What's the average?
12    A     It depends on the day.
13               Are you talking about a Friday, a
14          Saturday, a Tuesday, a Monday?  What day are
15          you talking about?
16    Q     On a Tuesday.
17    A     On a Tuesday, you probably have -- if
18          there's no events going on -- maybe 10 or
19          12.
20    Q     How about Friday when there are events going
21          on?
22    A     Depending on the time of day, evening time,
23          you could add another 10 to 15 service
24          staff.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

203

1    Q    And are there also customers that come into

2         the country club?

3    A    Sure.

4    Q    Every day?

5    A    Most days.

6    Q    So what happened?  You said you found this

7         position scanning documents in an office in

8         the warehouse.

9              What happened next?  Did you meet

10        with Ms. Cosgrove about this position?

11   A    I think she approached me at one point about

12        it.

13   Q    You had told her go home for the day, I'm

14        going to try to figure something out?

15   A    Right.

16             The next day -- the next day, I

17        guess -- this goes back to Monday as the

18        refresher on it.  She went to the -- I told

19        her go to the country club, meet John Shea.

20             John was late for whatever reason

21        that day, and that John would set her up in

22        the warehouse to begin scanning.

23   Q    Before meeting with -- so did you personally

24        meet with Ms. Cosgrove and explain that this

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

.206

```
 1          be like in your understanding?

 2    A     Yes.

 3    Q     And at some point, did you learn that

 4          Ms. Cosgrove might have been dissatisfied

 5          with her new position?

 6    A     I think she sent an email or something to

 7          the effect.

 8    Q     And did you take any action in relation to

 9          that?

10    A     No, that was the position we had.

11               I know it was an issue with heat or

12          something at one point.  The guys fixed heat

13          or added heat or something to it.  I know

14          she needed a refrigerator.  They brought a

15          refrigerator to her.

16               They try to meet what you need.

17               MS. SCHWAB:  Let me mark Exhibit 18.

18               (Exhibit No. 18 marked for

19          identification.)

20    BY MS. SCHWAB:

21    Q     Do you recognize this document?

22    A     Yes.

23    Q     Do you remember receiving it?

24    A     Vaguely.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

207

```
 1    Q    And do you remember if you took any action

 2         after you received the document?

 3    A    I don't recall.

 4    Q    Do you recall calling an attorney after you

 5         received it?

 6    A    I would have forwarded it to my attorney.

 7    Q    Do you recall if you contacted Ms. Cosgrove

 8         after receiving the document?

 9    A    I don't recall.

10    Q    Were you aware of Ms. Cosgrove going to

11         Tanya Copestick's office to pump breast milk

12         during the time she was working in the

13         warehouse?

14    A    Yes.

15    Q    How did you become aware of that?

16    A    I don't know.  Someone told me.  I don't

17         know.

18    Q    Do you remember who might have told you?

19    A    No.

20    Q    Do you remember what your reaction was when

21         you learned?

22    A    I didn't see it as a big issue.

23    Q    Did you comment to Ms. Cosgrove about it?

24    A    I believe I did.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

208

```
 1    Q    And what do you remember you said?

 2    A    Something to the effect of we're walking a

 3         fine line here.  Don't cross the line.

 4    Q    With Ms. Cosgrove, you said that?

 5    A    Yes -- to -- no, not Ms. Cosgrove,

 6         Copestick.  I'm sure.

 7    Q    Okay.

 8              And what did you mean when you said

 9         we're walking a fine --

10              So you said that --

11    A    To Tanya, I'm sorry.

12    Q    You said, We're walking a fine line right

13         now, and what else, I'm sorry?

14    A    Just watch what you say, or something to

15         that effect.

16    Q    And what did you mean by that?

17    A    Basically Patricia had already put us on

18         notice that she was looking to try to sue

19         us.

20    Q    So how were you walking a fine line?

21    A    We just had to make sure that our ducks were

22         in a row and that we were doing what we

23         could to accommodate her.

24    Q    Did you make any comment to anybody else
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

215

| 1 | | dissatisfaction that Ms. Cosgrove had with |
|---|---|---|
| 2 | | the work environment at the warehouse? |
| 3 | A | My understanding, she didn't like the |
| 4 | | bathroom. |
| 5 | Q | And how did you understand that? |
| 6 | A | Somebody told me.  I don't know. |
| 7 | Q | Did you have an understanding of what it was |
| 8 | | she didn't like about it? |
| 9 | A | (Witness shakes head.) |
| 10 | Q | Anything else that you knew she was |
| 11 | | dissatisfied with? |
| 12 | A | No.  I think -- I think she was just |
| 13 | | dissatisfied because she wasn't located at |
| 14 | | the country club.  It wasn't what she |
| 15 | | wanted. |
| 16 | Q | And it wasn't the position she had |
| 17 | | originally accepted? |
| 18 | A | That position was no longer there. |
| 19 | Q | But it wasn't the position she originally |
| 20 | | had accepted? |
| 21 | A | She had accepted an administrative position. |
| 22 | | She was in an administrative position. |
| 23 | Q | Were you aware that she was unhappy that |
| 24 | | there was no phone or email in the |

216

| | | |
|---|---|---|
| 1 | | warehouse? |
| 2 | A | No. |
| 3 | Q | Did you know she was unhappy -- |
| 4 | A | And I believe, by the way, there were at |
| 5 | | least two phones in the warehouse. One of |
| 6 | | them might have been locked, but the other |
| 7 | | one was not. |
| 8 | Q | Do you remember if she was unhappy with the |
| 9 | | isolation in the warehouse? |
| 10 | A | I believe she felt that was an issue, even |
| 11 | | though there were two other people officed |
| 12 | | there. |
| 13 | Q | Do you remember seeing Ms. Cosgrove at the |
| 14 | | conference center at some point in October |
| 15 | | and instructing her that you wanted her back |
| 16 | | down at the warehouse? |
| 17 | A | She had an -- took an excessive amount of |
| 18 | | time away from the warehouse. In other |
| 19 | | words, as John Shea said, she was never |
| 20 | | there. |
| 21 | Q | So you do remember saying that to her? |
| 22 | A | I remember saying that. I remember that |
| 23 | | being the issue. |
| 24 | Q | And do you remember addressing that with |

EXHIBIT K

Summary
Judgment

1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MASS

3                 C.V. NO.: 05-10791-GAO

4

5     * * * * * * * * * * * * * * * * * * * * * * * *

6     PATRICIA COSGROVE,                              *

7                         Plaintiff,                  *

8                         vs.                         *

9     NEW SEABURY RESOURCES,                          *

10    MANAGEMENT, INC.,                               *

11                        Defendant.                  *

12    * * * * * * * * * * * * * * * * * * * * * * * *

13

14          DEPOSITION OF:  PATRICIA COSGROVE

15

16          LAW OFFICE OF HOWARD WILGOREN

17                6 Beacon Street

18          Boston, Massachusetts 02110

19

20

21       January 16, 2006        10:00 a.m. - 4:53 p.m.

22

23                KATHRYN K. GIANNO

24                COURT REPORTER

1    Q    I stand corrected.  I said it was a bad

2    choice of words.  And that was done -- you were on

3    the clock when you were doing that, you were being

4    paid for that time?

5    A    Yes.

6    Q    And you say it wasn't done with the

7    consent, but it was done with the full knowledge of

8    the management of New Seabury?

9    A    Correct.

10    Q    On how many occasions during the course of

11    a regular day would it be necessary for you to leave

12    your work site and go to Tanya Copestik's office in

13    the administration building to pump your breasts?

14    A    Once or twice a day.

15    Q    How long would that entire process take?

16    A    Generally, 15 to 20 minutes each time.

17    Q    That would include leaving your work site,

18    getting in your car, driving over there, doing what

19    was necessary to pump your breasts and driving back?

20    A    Yes.  I would say, approximately.

21    Q    Fifteen to 20 minutes?

22    A    Yes.

23    Q    Maybe a little more?

24    A    Maybe a little more, maybe a little less.

1      A      When I accepted the position prior to my

2      maternity leave as administrative assistant, I was

3      reporting to Jennifer Perry.

4      Q      I see.  And when you returned to work as

5      administrative assistant, who were you then

6      reporting to?

7      A      I reported to Jennifer Perry when I

8      returned, but then was asked to report to Steve

9      Brennan.

10     Q      It was your understanding that your

11     supervisor as administrative assistant would provide

12     you with any job duties he chose?

13            MS. SCHWAB:  Objection.

14            THE WITNESS:  No, I don't believe so.

15     Q    (By Mr. Wilgoren:)  What is the basis of your

16     belief that an employer is restricted from

17     determining what job duties to provide an employee?

18            MS. SCHWAB:  Objection.

19            You can answer.

20            THE WITNESS:  Could you ask the question

21         again?

22     Q    (By Mr. Wilgoren:)  What is the basis of your

23     belief that there are limitations on job duties that

24     can be provided by an employer to a employee?

1           MS. SCHWAB:  Same objection.

2           THE WITNESS:  I don't believe there is any

3      limitation.  I'm basing it on the fact that

4      that was not the position I accepted.

5  Q    (By Mr. Wilgoren:) What position did you

6  accept?

7      A    Administrative assistant in the catering

8  sales department.

9      Q    I see.

10           Do you know an individual by the name

11  of Mark O'Neil?

12     A    Yes.

13     Q    Who was Mark O'Neil?

14     A    I believe he was hired as a consultant by

15  New Seabury Properties.

16     Q    Do you know why he was hired as a

17  consultant by New Seabury Properties?

18     A    Not specifically, no.

19     Q    Well, tell me --

20     A    I believe he was hired when the new club

21  was built to help come up with constructive ways to

22  generate revenue for the business and for the

23  property.

24     Q    Now, constructive ways to generate

1      A      Steve.

2      Q      What particularly did he say about that?

3      A      That the administrative assistant in the

4   sales office was a position that I was well-suited

5   for.

6      Q      Did he say why?

7      A      Because I had the knowledge of conference

8   sales and also catering sales, having worked with

9   the department for the last year.

10     Q      Did anyone else say anything in those

11  meetings?

12     A      Jennifer Perry agreed to that; she thought

13  I would be perfect, considering I knew all about the

14  sales end of the job.

15     Q      Did she say anything else?

16     A      That she thought it was a perfect fit;

17  that I was already there, my office was already

18  there; I was already familiar with all the groups

19  that were coming in, the clients, the contacts, the

20  policies and procedures of how the sale office

21  worked; and I was very familiar with the rooms and

22  the layout of the property, function rooms,

23  everything from soup to nuts.  And that I had

24  actually worked helping the catering sales

1    department out in many aspects when they were

2    shorthanded.

3        Q    Jennifer Perry said all of that?

4        A    Yes.

5        Q    Did she say anything else?

6        A    Not that I can recall.

7        Q    Did she say anything about the elimination

8    of your job?

9        A    No.

10        Q    Did Roy Chase say anything?

11        A    Not that I can remember, other than he

12    agreed with Jennifer.

13        Q    Was anything else said by any of the

14    participants of the meeting, or have you told me

15    your full recollection?

16        A    I believe Steve said, "That's the offer on

17    the table, administrative assistant.  You can have

18    some time to think about it."

19              I told him I would like to think

20    about it, because I was concerned about my job and

21    my salary, because the salary was being reduced.

22        Q    Who said it was being reduced?

23        A    Steve.

24        Q    What did he say about that?

```
 1              THE WITNESS:  I believe it was part of the

 2        reason.

 3   Q     (By Mr. Wilgoren:)  But you were not denied

 4   maternity leave, were you?

 5        A    No, I was not.

 6        Q    So you met with Steve Brennan on May 5,

 7   2003?

 8        A    Yes.

 9        Q    Where did the meeting take place?

10        A    In Jen Perry's office.

11        Q    Who was present?

12        A    Jen Perry, Steve and myself.

13        Q    Tell me, to the best of your recollection,

14   exactly what each individual in the room said at

15   that meeting.

16        A    To the best of my recollection, Steve had

17   my letter in his hand and said, "I received your

18   letter and it is what it is.  Your position has been

19   eliminated as conference sales manager.  We've

20   offered you a position as administrative assistant

21   in the sales office, and that's the offer on the

22   table."

23        Q    Did anyone else say anything in response?

24        A    No, Jennifer was silent.
```

1      Q    Did you say anything?

2      A    I said, "Well, I really would like my old

3   job back." And I stated the reasons why, because I

4   felt I was needed by the sales office to perform my

5   job as I had always been, and it was my recollection

6   that, at a past meeting with Mark O'Neil, we were to

7   work as a team, and that the sales office would be

8   combining conference sales and the catering sales to

9   work together as one department. And I was misled,

10  and I feel that my position is still needed.

11              But if this is the only the position

12  that's available, I will accept the position,

13  because I can't afford to be without a job or

14  healthcare benefits. So I intend on accepting the

15  position and will return after maternity leave.

16     Q    So your intention was to stop working at

17  that point as of the meeting?

18     A    No, to accept the position and return to

19  it when I come back from maternity leave.

20     Q    Anything else? Is that the full

21  recollection of what everyone said at the meeting?

22     A    Yes, it was a very short meeting.

23     Q    What did you do after the meeting?

24     A    I went back to work.

1    seat in the sales office.

2               And then some short time after,

3    another employee asked me to report to Steve in

4    his office.

5    Q    Had you indicated to anyone at New Seabury

6    that you were intending to return to work on

7    October 7th?

8    A    Yes, I spoke with Lee O'Shea and I spoke

9    with the administrative assistant at the time for

10   Steve.

11   Q    When did you speak with Lee O'Shea?

12   A    Probably about a week or two prior to

13   that.

14   Q    Why did you call Lee O'Shea?

15   A    To find when the exact day was that my

16   maternity leave was ended, I guess.

17   Q    Why would you call Lee O'Shea regarding

18   that?

19   A    Because she had the attendance record and

20   my personnel file as to when I left.  And she knew

21   how much vacation time I used and personal time and

22   maternity leave time.

23   Q    Tell me, as best you can recollect, the

24   full extent of your conversation between you and Lee

1   O'Shea.

2       A       Just a brief conversation checking on the

3   exact day I was to return, and what maternity leave

4   time I had used and vacation time up until then, and

5   what I had remaining when I returned.

6       Q       What, if anything, did Lee O'Shea say to

7   you?

8       A       She stated to me what I had used for

9   maternity leave and vacation and personal time.

10      Q       Did she tell you when you should be

11  reporting back to work?

12      A       I believe she confirmed with me, when I

13  had given her the date, she said, "That should be

14  the day that you should be returning."

15      Q       That was October 7th?

16      A       I believe so, yes.

17      Q       Now, you spoke to, you said, Steve

18  Brennan's administrative assistant?

19      A       Yes.

20      Q       What was that person's name?

21      A       At the time it was Jean Civitolo.

22      Q       And you called Jean Civitolo on the phone?

23      A       I actually called Steve, but Jean picked

24  up the phone.

1    Q    Tell me, if you will, the full extent of

2    your conversation with Jean Civitolo on that day.

3    A    I asked if Steve was in and she said he

4    wasn't in.

5         She asked if there was a message, and

6    I said I just wanted to touch base with Steve and

7    let him know that I'm going to be returning from

8    maternity leave, and that I would return on

9    October 7th, and I just wanted him to confirm that

10   with me; to please call me back about returning.

11   Q    Why did you call Steve Brennan?

12   A    He's the general manager.  I assumed that

13   he would report it to my supervisor.

14   Q    Well, your supervisor -- you mean Jen

15   Perry?

16   A    Yes.

17   Q    She was your supervisor when you were

18   conference sales, correct?

19   A    Right.

20   Q    Did Mr. Brennan call you back?

21   A    No.

22   Q    So, I think, before we digress back, you

23   had been told that Steve Brennan wanted to see you?

24   A    Yes.

1    not you had complied with the New Seabury policy

2    about returning to work from pregnancy leave?

3        A    No.

4        Q    No discussion whatsoever?

5        A    No.

6        Q    So then, did you, in fact, return to work

7    the next day?

8        A    Yes, I did.

9        Q    What happened?

10       A    I returned to the country club, and Steve

11   had said I should wait for John Shea, who was in

12   communications, to give me a project to do.  And I

13   waited for an hour or two, whatever, and he showed

14   up and said to come down to the warehouse.

15              And Steve had mentioned there were

16   some old files that they were trying to get on disk

17   or something that needed to be scanned that had been

18   sitting there and nobody had a chance to do it.  And

19   the person who was doing it was no longer employed

20   there.

21       Q    Did they tell you who the person who had

22   previously done it was?

23       A    I think it was Robin.  She used to work at

24   the health club.  And when the health club was

1    in the warehouse?

2        A    There are partitioned offices in the

3    warehouse.

4        Q    So you weren't in the warehouse itself,

5    you were in one of these partitioned offices?

6        A    Right, which is inside the warehouse.

7        Q    All right.  And what happened when you got

8    there?

9        A    He basically showed me a box of files and

10   said that they needed to be scanned.  And he

11   instructed me on how to use the computer and

12   scanner, and said it was a very long and slow

13   process.

14       Q    Now, where was Mr. Shea's office; do you

15   know?

16       A    Directly behind the partitioned office

17   that was assigned to me.

18       Q    So, he was in the office next to your

19   office?

20       A    It wasn't so much an office, it was a

21   communications room with all kinds of --

22       Q    Did it have a desk in there?

23       A    It may have, I'm not sure.

24       Q    This office that you were assigned to work

1    Q    You didn't park here, did you?

2    A    Yes.

3    Q    Isn't it true that you went around the

4    side of the building and parked directly by a door

5    that entered directly to your office?

6    A    No, I never did that.

7    Q    If anyone said that you did, they would be

8    lying?

9    A    Yes.

10    Q    Now, there's a picture of a toilet here.

11    A    Yes.

12    Q    What is this picture of?

13    A    That's the rest room used for male

14    employees and myself.

15    Q    In fact, you never used this rest room,

16    did you?

17    A    I tried not to.

18    Q    You never used this rest room, did you?

19    A    Yes, I did.

20    Q    You're sure of that?

21    A    Yes.

22    Q    In fact, you were allowed to go to the

23    administration office to use the rest room

24    facilities there, were you not?

1      A    Yes, I was.

2      Q    In fact, that's where you -- when you had

3  to use the rest room facilities, that's where you

4  went, you didn't go to this toilet?

5          MS. SCHWAB:  Objection.

6          She testified she did go to that toilet.

7          THE WITNESS:  No, I did use that rest room

8      in the warehouse.

9  Q    (By Mr. Wilgoren:)  You could also go to the

10  country club and use the rest room facilities there?

11      A    Yes.

12      Q    No one objected to you getting in your car

13  and driving a quarter mile away to use those

14  facilities any time you want, did they?

15      A    No.

16      Q    Was Mr. Shea your supervisor in this

17  project when you were scanning the documents?

18      A    No, I would say he was not.

19      Q    Who was supervising your work?

20      A    No one that I can recall.

21      Q    So, Mr. Shea wouldn't review the progress

22  you made in terms of the amount of documents you

23  scanned?

24      A    No.

1    allowed to.

2         Q    Sometimes if you talked to Tanya maybe it

3    was a little longer?

4         A    Yes.

5         Q    Maybe as much as a half hour?

6         A    It could have been.

7         Q    Could have been a half hour, twice a day?

8         A    It could have been; it could have been

9    less.

10        Q    Also, there was also heat in that office,

11   is that correct?

12        A    There was heat, yes.

13        Q    And you also were provided with a space

14   heater in addition?

15        A    Yes, it was a supplement.

16        Q    And you also were provided with a

17   refrigerator, were you not, to store the breast

18   milk?

19        A    Yes, after some time I was, yes.

20        Q    After how much time?

21        A    Maybe a week or two.

22        Q    Who did you -- did you make a request for

23   a refrigerator?

24        A    I believe I requested a refrigerator, yes.

1     A    Yes.

2

3                              (Exhibit No. 16, Job Description

4                              Prepared by Patricia Cosgrove.)

5

6    Q    (By Mr. Wilgoren:) I just want to be sure I'm

7    clear on this point.  Except for the couple of times

8    when you got deliveries and the occasion or two when

9    you went to the copier, all of the work you

10   performed scanning the documents was done in a

11   separate office partitioned off from the warehouse?

12       A    Yes, it was partitioned within the

13   warehouse.

14       Q    Let me show you Deposition Exhibit No. 16

15   and ask if you can identify this document.

16       A    That was the job description I was asked

17   to prepare for the job I was performing prior to my

18   maternity leave, so that it could be passed along to

19   the employee who was going to fill in for me while I

20   was out on maternity leave.

21       Q    You weren't performing the administrative

22   assistant job prior to your maternity leave, were

23   you?

24       A    No, not fully, no.

1    Q   Not at all.  You just testified that this

2    was the job description for the job you were

3    performing prior to your maternity leave.  That's

4    not accurate, is it?

5            You weren't doing the admin -- you

6    previously testified that at the time you went out

7    you had not started doing the administrative

8    assistant work at all, you were finishing your work

9    as sales manager?

10    A   Right.

11    Q   So, your statement this was the job

12    description for the job you were doing prior to

13    maternity leave was not accurate?

14    A   This was the job I was preparing to do.

15    Let me correct myself.

16    Q   How did you know what all the job duties

17    were if you hadn't done the job at all?

18    A   Experience being in the sales office and

19    getting the information --

20    Q   Who --

21           MS. SCHWAB:  Objection.  Let her finish

22    her answer.

23    Q   (By Mr. Wilgoren):  I'm sorry, go ahead.

24    A   This information was cumulative from

1    Jennifer Perry and the other sales staff as to what

2    they needed the administrative assistant to

3    undertake on a day-to-day basis.

4        Q    Who asked you to prepare this document?

5        A    Jennifer Perry.

6        Q    Who did you give it to?

7        A    I believe I gave it to Jennifer Perry, and

8    I posted one in the sales office.

9        Q    Do you have any experience in designing

10   job descriptions?

11       A    No.

12       Q    Have you ever seen job descriptions?

13       A    In the past, yes, from other employers.

14       Q    Typically, they have a statement:  All

15   other duties assigned by the supervisor.

16           MS. SCHWAB:  Objection.

17           THE WITNESS:  They may.  I'm not aware of

18       that.

19   Q    (By Mr. Wilgoren:) That was not anything that

20   was approved by New Seabury or -- this was something

21   you created?

22       A    Yes, at the request of my supervisor.

23       Q    So, your view that scanning documents is

24   not part of the administrative assistant's job is

1    position and the location that I left.

2         Q    How was it dissimilar?

3         A    I worked in the country club.

4         Q    That was pretty nice.

5         A    In a sales office communicating with other

6    sales team members.

7         Q    And that was the job you felt you were

8    entitled to?

9         A    Yes.

10

11                         (Exhibit No. 17, E-mail from

12                         Patricia Cosgrove to Stephen

13                         Brennan Dated October 30, 2003.)

14

15    Q    (By Mr. Wilgoren:) I'll show you what's been

16    marked as Deposition Exhibit No. 17.  Do you

17    recognize this document?

18         A    Yes.

19         Q    What is it?

20         A    It's an e-mail to Steve Brennan.

21         Q    You wanted -- this was read October 30th?

22         A    Correct.

23         Q    After you'd been back to work a couple

24    weeks?

```
 1    was it, as you previously testified?

 2        A    It was unheated at one point because the

 3    heater was not working properly, and that's why they

 4    supplied me, after I requested, the space heater.

 5        Q    When was it unheated?

 6        A    For the first week or so I was there.

 7        Q    Who did you tell -- complain that the heat

 8    was not working?

 9        A    I may have mentioned it to John Shea.

10        Q    You may have mentioned it to John Shea?

11    Do you have any recollection --

12        A    He was the one that brought the space

13    heater in, so I would assume.

14        Q    Do you have any recollection, as you sit

15    here today, that you did or did not mention it, that

16    the heater wasn't working, to John Shea?

17        A    To the best of my recollection, I did

18    mention it to him at one point.

19        Q    The next paragraph, 18, is not quite

20    precise, is it?  You were given the job of

21    administrative assistant after you returned from

22    maternity leave, although not the one you wanted.

23    You were given an administrative assistant job?

24            MS. SCHWAB:  Objection to the term
```

EXHIBIT L

Summary
Judgment

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Patricia Cosgrove v. New Seabury Resources Management, Inc.

### Transcript of the Testimony of:

# Jennifer L. Perry

# April 7, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

ORIGINAL

Deborah G. Rumson   18770

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

49

| | | |
|---|---|---|
| 1 | Q. | Who was that? |
| 2 | A. | I believe it was Laura Lee Taddeo. |
| 3 | Q. | Do you remember how that happened? |
| 4 | A. | No. |
| 5 | Q. | Do you know, were you involved in contacting |
| 6 | | Laura Lee Taddeo? |
| 7 | A. | I don't remember. |
| 8 | | MS. SCHWAB:  I am going to mark |
| 9 | | Exhibit 3. |
| 10 | | (Document marked as Exhibit 3 for |
| 11 | | identification) |
| 12 | Q. | Ms. Perry, do you recognize this document? |
| 13 | A. | Are you asking if I have seen it before? |
| 14 | Q. | Yes. |
| 15 | A. | I don't remember seeing it, but everything |
| 16 | | on here is familiar. |
| 17 | Q. | The descriptions are familiar? |
| 18 | A. | Right. |
| 19 | Q. | What's familiar about them? |
| 20 | A. | It says "administrative assistant" at the |
| 21 | | top, and then it has responsibilities |
| 22 | | underneath it, which looks to be what that |
| 23 | | position would do. |
| 24 | Q. | The position that Ms. Cosgrove was offered? |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

50

| | | |
|---|---|---|
| 1 | A. | Right. |
| 2 | Q. | Can you go through and just read through to |
| 3 | | yourself and let me know if there is |
| 4 | | anything in this list that isn't within the |
| 5 | | administrative assistant position that Ms. |
| 6 | | Cosgrove was offered. |
| 7 | A. | Can you repeat that question. |
| 8 | Q. | Just go through and read to yourself and see |
| 9 | | if anything in here is something that |
| 10 | | wouldn't be done by the administrative |
| 11 | | assistant position. |
| 12 | A. | Everything would be done by the |
| 13 | | administrative assistant. |
| 14 | Q. | Does it leave anything out? |
| 15 | A. | There is always room in a position for other |
| 16 | | areas that you might do, but just depends |
| 17 | | upon what it is. |
| 18 | Q. | Anything specific jump to mind that's not in |
| 19 | | this description? |
| 20 | A. | There's nothing about meeting with clients |
| 21 | | or doing site visits, things like that. |
| 22 | | That was something that sometimes they would |
| 23 | | do. |
| 24 | Q. | Anything else? |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

69

```
 1     A.    She did not.

 2     Q.    New Seabury's policy provides for disability

 3           pay for pregnancy leave?

 4     A.    Am I aware of it?

 5     Q.    Yes.

 6     A.    I am aware there is disability leave.  I

 7           don't know all of the details.

 8     Q.    And you get paid a certain percentage of

 9           your income?

10     A.    Yes.

11     Q.    Do you know what that percentage of your

12           income is based upon?

13     A.    To be honest, I don't know.

14     Q.    Well, would it be what you're earning prior

15           to going out on a leave of absence?

16     A.    Right.

17     Q.    Do you know what Ms. Cosgrove received for

18           her disability pay?

19                 MS. SCHWAB:  Objection.

20     A.    Yes.

21     Q.    Tell us what she received.

22     A.    It was the disability percentage on her

23           original salary of $17 per hour.

24     Q.    Does that lead you to conclude that at the
```

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

70

```
 1            time she commenced her leave of absence she

 2            was still in the position of the manager?

 3    A.      Yes.

 4                    MS. SCHWAB:  Objection.

 5    Q.      And do you know how that came about, that

 6            Ms. Cosgrove obtained disability pay based

 7            on her compensation as catering sales

 8            manager or conference sales manager?

 9    A.      What I remember, she was finishing out that

10            week in her one position, her initial

11            position as sales manager and was going to

12            start the next week as administrative

13            assistant, but then went out on disability

14            at the end of that week.

15    Q.      Do you have any sense as to why she did it

16            that way?

17                    MS. SCHWAB:  Objection.

18    A.      She was getting paid more money to go out on

19            the higher salary.

20                    MS. SCHWAB:  Objection.  How could

21            she have a sense of why Ms. Cosgrove went

22            out on leave.

23    Q.      Now, do you know the reason -- did Ms.

24            Cosgrove go out on the maternity leave of
```



# PYLE, ROME, LICHTEN & EHRENBERG, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles

Telephone (617) 367-7200
Fax (617) 367-4820

Lara A. Sutherlin
Jennifer B. Rieker
Alison D. Morantz
M. Amy Carlin

*Also admitted in Maine
**Also admitted in New York

September 30, 2003

Steven Brennan, General Manager
New Seabury Properties
155 Rock Landing Road
Mashpee, MA 02649

RE:   Patricia Cosgrove

Dear Mr. Brennan:

Our law firm has been retained by Patricia Cosgrove in connection with her employment at New Seabury Properties.

Based on the facts as we understand them, Ms. Cosgrove's demotion and the elimination of her position constituted sex and pregnancy discrimination, in violation of Massachusetts General Laws 151B § 4, and with violations of Mass. Gen. Law. Ch. 149 § 105D, the Massachusetts Maternity Leave Act.

As you are certainly aware, Ms. Cosgrove's maternity leave ends next week. Accordingly, Ms. Cosgrove plans to return to work next week to the Administrative Assistant position to which she was demoted, however, this is only because New Seabury Properties has made it clear this is her only option if she wishes to continue working.

Enclosed is a copy of the Charge of Discrimination we are filing on Ms. Cosgrove's behalf with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission. We intend to file this Charge next Wednesday, October 8, 2003.

**PYLE, ROME, LICHTEN & EHRENBERG, P.C.**

Mr. Steven Brennan
September 30, 2003
Page 2 of 2

Please call me if you would like to discuss this matter.

Sincerely,

M. Amy Carlin

Enclosure
cc:    Shannon Liss-Riordan, Esq.
       Patricia Cosgrove

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

EEOC

## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
### (State or local Agency, if any)                                    and EEOC

| NAME (Indicate Mr., Mrs. or Mrs.) Patricia Cosgrove | HOME TELEPHONE NO. (Include Area Code) (508) 548-3311 |
|---|---|

| STREET ADDRESS 480 Old Meeting House Road | CITY, STATE AND ZIP CODE East Falmouth, MA 02536 | COUNTY Barnstable |
|---|---|---|

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME** (If more than one list below.)

| NAME New Seabury Properties | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) (508) 477-9111 |
|---|---|---|

| STREET ADDRESS The Club at New Seabury, P.O. Box 549, 155 Rock Landing Road, | CITY, STATE AND ZIP CODE Mashpee, MA 02649-0549 |
|---|---|

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)). ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN ☐ AGE  ☐ RETALIATION  ☒ OTHER (Specify) Pregnancy | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) Ongoing |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

### SEE ATTACHMENT A

0069

MY COMMISSION EX 4.23.04

☒ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing

NOTARY - (When necessary to meet State and Local Requirements)
Dewirmarie Guthrie

I swear or affirm that I have read the above charge and that it

ATTACHMENT A

Complainant is a woman who worked as a Sales Manager for New Seabury Properties in Mashpee, Massachusetts. Shortly after announcing that she was pregnant, Complainant's employer told her she would be demoted. While Complainant was out on pregnancy/maternity leave, she was in fact demoted. In the last year, two other women at the company have had their positions changed or eliminated while they were pregnant. While Complainant agreed under protest to accept the demotion, she alleges that the elimination of her position and her demotion were discriminatory.

Complainant charges New Seabury Properties with discrimination on the basis of sex and pregnancy in violation of Mass. Gen. Law. Ch. 151B § 4, and with violations of Mass. Gen. Law. Ch. 149 § 105D, the Massachusetts Maternity Leave Act.



# PYLE, ROME, LICHTEN & EHRENBERG, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome                    Telephone (617) 367-7200
Harold L. Lichten*                     Fax (617) 367-4820
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles

Lara A. Sutherlin
Jennifer B. Rieker
Alison D. Morantz
M. Amy Carlin

*Also admitted in Maine
**Also admitted in New York

October 8, 2003

Stephen Brennan, General Manager
New Seabury Properties
20 Red Brook Road
Mashpee, MA 02649

RE:    Patricia Cosgrove

Dear Mr. Brennan:

We have not heard from you in response to our correspondence dated September 30, 2003, which enclosed a copy of the Charge of Discrimination we are filing on Ms. Cosgrove's behalf with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission. However, we understand from Ms. Cosgrove that you may not have received it, and we are attaching both our letter and the Charge here.

We have now learned that when Ms. Cosgrove returned to work yesterday, on the exact day her maternity leave elapsed, she was informed that she no longer has a job.

New Seabury Properties' action here is untenable and discriminatory. Ms. Cosgrove made it clear to New Seabury Properties on May 2, 2003 that she was accepting the position of Administrative Assistant, not because it was a position she wanted, but because New Seabury had eliminated her Sales Manager position and had given her no other option if she wanted to continue working. Ms. Cosgrove accepted this position in writing, by letter to you dated May 2, 2003. In that letter, she also informed you of her belief that New Seabury's elimination of her position after she gave notice of her pregnancy was discriminatory, and that barring New Seabury's reconsidering her demotion, she would be filing a discrimination claim.

PYLE, ROME, LICHTEN & EHRENBERG, P.C.

Mr. Stephen Brennan
October 8, 2003
Page 2 of 2

In light of the above, New Seabury Properties' action here is on its face unlawful retaliation and evidences a serious disregard for Massachusetts' anti-discrimination laws. We plan to add New Seabury Properties' most recent act of discrimination to Ms. Cosgrove's Charge and file it immediately.

Please call me if you would like to discuss this matter.

Sincerely,

M. Amy Carlin

Enclosures
cc:    Shannon Liss-Riordan, Esq.
       Patricia Cosgrove