## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * *****
PATRICIA COSGROVE                    *
                                     *
              Plaintiff              *
                                     *
v.                                   *        CIVIL ACTION NO. 05-10791- GAO
                                     *
NEW SEABURY RESOURCES                *
MANAGEMENT, INC.,                    *
                                     *
              Defendant              *
                                     *
* * * * * * * * * * * * * * * * * * * * * *****
```

### CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS OF DEFENDANT NEW SEABURY RESOURCES MANAGEMENT, INC., IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, PURSUANT TO LOCAL RULE 56.1

New Seabury Resources Management, Inc., Defendant in the captioned matter, ("NSRM") by its undersigned attorney, hereby submits in support of its Motion for Summary Judgment the following material facts of record, as to which no genuine dispute exists for trial, pursuant to L.R.D. Mass. 56.1:

**The Parties**

1.      Patricia Cosgrove (Hereinafter, "Cosgrove") was hired by NSRM in April 1999 as an Account Executive. From June 1999 through May 11, 2003 Cosgrove held the position of Conference Sales Manager. (Complaint ¶4)

2.      The primary function of Cosgrove's position as Conference Sales Manager was to provide lodging related functions for groups of ten people or more booking functions and lodging at NSRM.  Booking of the lodging rooms for  groups coming to NSRM was Cosgrove's primary responsibility as Conference Sales Manager.

One hundred per cent of Cosgrove's responsibilities revolved around lodging. This aspect of Cosgrove's job took up the bulk of her work day.  The other functions she performed were in conjunction with the booking of lodging rooms (Excerpts from the Deposition Transcript of Patricia Cosgrove, 52-54, 106, a true copy of which is annexed hereto as "Exhibit 1". Excerpts from the Deposition Transcript of Jennifer Perry, 74, a true copy of which is annexed hereto as "Exhibit 2")

3.    At all times Cosgrove was an employee at will.  (See Receipt and Acknowledgement, a true copy of which is annexed hereto as "Exhibit 3")

4.    Cosgrove advised NSRM that she was pregnant on or about February 3, 2003.  (Complaint ¶6).

5.    After Cosgrove announced she was pregnant she was not treated any differently by any representative of NSRM including but not limited to Stephen Brennan, Mark O'Neil and Jennifer Perry her direct supervisor. There were no adverse consequences associated with the announcement by Cosgrove that she was pregnant. (Cosgrove Dep. 144-146).

6.    NSRM is engaged in the operation of a Country Club and related facilities including a 36 hole golf course, a private beach, a banquet facility in the Poponesset Inn, a tennis facility and housing development. (Excerpts from the Deposition Transcript of Stephen Brennan, 35 – 36, a true copy of which is annexed hereto as "Exhibit 4").

7.    NSRM operates a seasonal business. The high season generally runs from June through Labor Day. NSRM employee complement increases during the high season and is greatly reduced during the off season   (Brennan Dep. 42).

8.     NSRM is also has lodging units that are available for rent.  In 2002 there were in excess of one hundred units in the lodging rental pool.  As of 2005 there were approximately 20 lodging units available for rental on a given day.   (Brennan Dep. 50).

9.     As part of the complement of available lodging units in the rental pool were units owned by homeowners and turned over to NSRM so that they would be able to participate in the rental program.  This program known as the "Villa Rental Program" ended at the end of 2003. (Brennan Dep. 60 -62).

10.    Between 2002 and 2006 revenues received by NSRM attributable to lodging rentals have decreased by more than one million dollars.    (Brennan Dep. 50).

11.    NSRM's lodging function is nearly a break even operation at the current time whereas it was losing hundreds of thousands of dollars per year before the number of units was reduced. (Brennan Dep. 50 - 51).

12.    NSRM operates a seasonal facility. As such its employee complement increases during the high season from June – September and is diminished in the off season months. NSRM reached its peak high season complement of 384 employees on July 26, 2002.   NSRM reached its peak off season complement of 124 employees on January 10, 2003.  (2002 – 2003 Company Payroll Comparison, a true copy of which is annexed hereto as "Exhibit 5").

13.    For the 2003 high season the peak employee complement of 339 employees was reached on August 8, 2003.  By the week of December 26, 2003 the employee complement was reduced to 89 employees. (Exhibit 5).

14.    By the week of March 5, 2004 the employee complement was just 50 employees. The employee complement for the high season of 2004 reached a peak of

307 employees during the week of August 20, 2004. .  (A 2003 – 2004 Company Payroll Comparison, a true copy of which is annexed hereto as "Exhibit 6").

15.    Cosgrove received the New Seabury Resources Management, Inc, Employee Handbook.  Contained therein are the NSRM policies pertaining to "Equal Employment Opportunity,"  "Family and Medical Leave Act,"   and "Maternity Leave." (Excerpts from the Employee Handbook, a true copy of which is annexed hereto as "Exhibit 7")

## NSRM'S Efforts to Reduce Costs

16.    Mark O'Neil was hired by NSRM as a consultant to turn around an underperforming company by reducing costs, increasing revenue and enhancing profitability. (Brennan Dep. 77).

17.    O'Neil who is the principal of the Essex Golf  Group was consulted by NSRM in the summer of 2002 to improve the operational profitability of NSRM   Part of the initial discussion involved a review of employee staffing levels  (Excerpts from the Deposition Transcript of Mark O'Neil, 13 -15, a true copy of which is annexed hereto as "Exhibit 8").

18.    O'Neil was retained by NSRM in August 2002 to conduct an Operational Audit. An Operational Audit is a review of the entire operation, department by department, gather information and make recommendations. (O'Neil Dep. 18-19).

19.    In August 2002 O'Neil began to make regular and periodic trips to NSRM on a weekly basis, reviewed documents and had frequent telephone conferences with NSRM representatives.   O'Neil reviewed department staffing plans and met with department managers to review the operation of each department.  (O'Neil Dep. 22-25).

20.    At the end of his review O'Neil produced an Operational Audit Report. (Operational Audit dated December 12,, 2002, a true copy of which is annexed hereto as "Exhibit 9").

21.    In the Operational Audit Report O'Neil identified a number of staffing changes that needed to be made to improve efficiency, reduce costs and eliminate redundant positions. (O'Neil Dep. 27-33)

22.    In the Operational Audit Report O'Neil recommended that the Director of Membership Sales[1].be replaced because she did not have the requisite skills to perform the job.  In this regard he wrote, "Existing membership sales person does not have the basic sales ability and drive to accomplish the aggressive sales goals that are required." (O'Neil Dep. 31-32, 40, Exhibit 9).

23.    Stephen Brennan was hired as General Manager/COO in December 2002 as part of NSRM's ongoing effort to turn around an underperforming company by reducing costs, increasing revenue and enhancing profitability. Prior to becoming employed by NSRM commencing in or about September or October 2002 Brennan worked with O'Neil reviewing documents pertaining to NSRM.   In November 2002 Brennan toured the NSRM facility. (Brennan Dep. 34, 65).

24.    Brennan reviewed the headcount list with O'Neil reviewing the functions performed by each individual in a given department.  (Brennan Dep. 157-159).

25.    As part of the 2003 budgeting process NSRM engaged in an assessment of every aspect of its operation.   This analysis included a review of employee headcount, payroll costs, and the number of employees needed to perform the

---

[1]  This is the position held by Rhonda Rodgers at the time. (O'Neil Dep.39).

5

workload.  The process examined whether jobs could be eliminated or combined and how to have a more effective process with fewer employees.  (Brennan Dep. 65 - 67)

26.    Specifically, the 2003 budgeting process focused on the need to reduce the off season employee complement to essential personnel. (Brennan Dep. 66).

27.    When jobs were eliminated efforts were made to retain an employee in an available position if justified by business reasons.  (Brennan Dep. 67).

28.    In January 2003   the Director of Golf Operations was demoted to the Golf Course Superintendent position with a reduction in pay of $9,000.00 annually. (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 10"). The Golf Course Superintendent was demoted to Assistant Superintendent on March 5, 2003 with a. reduction in pay of $13,000.00 annually. (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 11") The Head Golf Professional was demoted to Instructor of Golf on January 15, 2003 with a. reduction in pay of almost $900.00 on a bi – weekly basis. (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 12").  (Brennan Dep. 68 – 72, 86-99)

29.    Brennan eliminated the Director of Golf Position. (Brennan Dep. 72).

30.    NSRM completely closed the restaurant for six weeks to reduce costs. This action included laying employees off.  (Brennan Dep. 72).

31.    In mid to late February 2003 Brennan received budget proposals from the various department heads relating to restructuring of staffing levels

32     The Chief Financial Officer Position was eliminated. (Brennan Dep. 80 – 86 103, (O'Neil Dep. 63-64).

6

33.    A number of Kitchen and Food and Beverage employees were reclassified from full time positions to full time seasonal positions.    Approximately four full time members of the kitchen staff were laid off at the beginning of 2003 for periods from one to three months.  (Brennan Dep. 86, 123).

34.    Dining room captains were reclassified from full time to on call status. (Brennan Dep. 123-124).

35.    NSRM also eliminated a Bar Manager position.  (Brennan Dep. 124-125).

36.    NSRM reclassified the Assistant Bar Manager and an Outside Golf Position from year round to seasonal.  (Brennan Dep. 124-125).

**Elimination of Plaintiff's Position and the Offer of a New Position**

37. In the Operational Audit report O'Neil recommended the elimination one of the three sales managers who were Cosgrove, Aaron Brochu and Jane Henry. (O'Neil Dep. 44-45).

38.    Early in the audit process O'Neil identified the Food and Beverage Department[2] as one that needed reorganization.  O'Neil questioned the redundancy in positions. O'Neil questioned the need for three sales managers those being Aaron Brochu, Jane Henry and Cosgrove.[3] In particular O'Neil identified the position held by Cosgrove as being redundant because her primary function was dealing with the lodging component which he viewed as a duplication of effort with the Lodging Department. O'Neil made his judgment on the basis of the responsibilities of the position not the person holding the position.  The position he identified in the audit as

---

[2] O'Neil considered the Food and Beverage and Catering Sales Departments to be interchangeable (O'Neil Dep. 81).
[3] While Brochu and Henry regularly worked 60 - 70 hours per week during the high season, Cosgrove would work only 40 hours per week. (Cosgrove Dep. 114 – 115).

being redundant was the one held by Cosgrove. O'Neil first identified the position held by Cosgrove as redundant in the August – November 2002 time frame. (O'Neil Dep. 79- 81, 95-96,129 Exhibit 9).

39.    In connection with the 2003 budget process in the Dec 2002 to February 2003 time frame,   O'Neil prepared documents that addressed the reorganization of the Food and Beverage Department. (O'Neil Dep. 78 -79, New Seabury F& B Departmental Reorganization, a true copy of which is annexed hereto as "Exhibit" 13).

40.    The reorganization of the department contemplated transitioning Henry to a non sales position, lowering the base salaries and increasing incentive pay for Perry, Chase, and Brochu, (O'Neil Dep. 80-81, Exhibit 13).

41.    The reorganization model set forth in Exhibit 13 contained no salary for Cosgrove because O'Neil had targeted her position for elimination because of the redundancy of the sales team.  This redundancy was first identified by O'Neil when he conducted the audit in the August 2002 to December 2002 time frame and was identified by him "early on." (O'Neil Dep. 82).

42.    In the budget review process commencing in December 2002 O'Neil identified Cosgrove's position for elimination. At that time he had no knowledge that Cosgrove was pregnant. (O'Neil Dep. 129 -130, 2003 Payroll Document, a true copy of which is annexed hereto as "Exhibit 14").

43.    In November 2002 while reviewing a headcount list of NSRM employees Brennan identified Cosgrove's position as Conference Sales Manager and questioned the need for this position given the cross over between catering, catering sales and

lodging. Brennan determined that Cosgrove's job function was duplicating the function of the Lodging Department. (Brennan Dep. 157, 233).

44.    During the budget process in February 2003 Brennan reviewed with Jennifer Perry, the manager of the Catering Sales Department,  the overlap in the Catering Sales Department with respect to the lodging function and the overlap between the lodging function performed by her department and the same function being performed by the Lodging Department.  A second discussion between Brennan and Perry focused on the lodging department taking responsibility for any of the groups that needed lodging. Perry told Brennan that with the decrease in lodging and not having meeting rooms Cosgrove's duties could be absorbed by the Catering Sales staff. (Brennan Dep. 160, Perry Dep. 27).[4]

45.    Brennan and O'Neil discussed that there was no need for Cosgrove's position given that the Catering Sales Department handled the functions and the lodging Department could handle booking of the rooms.  There was no mention about Cosgrove being pregnant (Brennan Dep. 166, 167).

46.    Perry told Brennan that the position held by Cosgrove was not needed as her department could handle the functions for the clients as they had been doing. Specifically, Perry told Brennan that the primary function of Cosgrove's position involved booking the lodging for groups that needed ten lodging rooms or more. Perry told Brennan that Cosgrove had very little involvement with groups coming to NSRM once the lodging was booked.  There was no mention about Cosgrove being pregnant. (Brennan Dep. 166, 236 - 237).

---

[4]  The major responsibility of Cosgrove's job involved booking of lodging for groups having functions at NSRM.  As recounted by Lauralee Taddeo NSRM got rid of a lot of its rental properties. (See Affidavit of Lauralee Taddeo, ¶ 3 a true copy of which is attached hereto as "Exhibit 17").

47.     Brennan also discussed the impact of eliminating Cosgrove's position with Roy Chase, Director of Food and Beverage. Chase replied that the elimination of the position would have no effect on his operation.  There was no mention about Cosgrove being pregnant (Brennan Dep. 167).

48.     Cosgrove's job as sales manager was eliminated.  Cosgrove admitted that after her job was eliminated no one replaced her. **(**Cosgrove Dep. 22, 24 -25, 61-62).

49.     Cosgrove believes that instead of having her job eliminated NSRM should have found another way to cut costs. She suggests that someone with less tenure should have been selected; or salaries of all employees should be reduced across the board. (Cosgrove Dep. 157 - 158). Cosgrove does not have any direct evidence that her job was eliminated because of her gender and/or pregnancy. (Cosgrove Dep. 153 – 154)

50.     After deciding to eliminate Cosgrove's position Brennan identified an Administrative Assistant position is the Catering Sales Department as one that might available to offer to her. Brennan discussed this possibility with O'Neil and Perry both of whom concurred that the position should be offered to Cosgrove. (Brennan Dep. 168-169).

51.     The duties of the Administrative Assistant position being offered to Cosgrove included doing anything necessary for the operation. (Brennan Dep.  169).

52.     On or about April 28, 2003 Brennan met with Cosgrove to advise her that her position was being eliminated. Also attending the meeting were Perry and Chase. Brennan offered Cosgrove the Administrative Assistant position explaining that position paid $12.00 per hour.  Brennan advised Cosgrove that the job would be seasonal

(Brennan Dep. 171-172, 177, 178, See also Defendant's Answers to Interrogatories No. 7, a true copy of which is annexed hereto as "Exhibit 15").

53.    The Administrative Assistant position offered to Cosgrove was always considered a seasonal position. It was a 40 hour per week position from May through October each year. (Perry Dep. 35 – 36, Taddeo).

54.    Brennan told Cosgrove the job required her to work a Tuesday through Saturday schedule since Saturday is one of the busiest days for the catering sales department and she would be needed to cover the office. Cosgrove understood that her work week would be Tuesday through Saturday. (Cosgrove Dep. 150,196).

55.    Cosgrove was well aware at all times that the Administrative Assistant position in the Catering Sales Department was always classified as a seasonal position. Taddeo did work for Cosgrove who observed when she was there and when she was laid off. (Exhibit 17 Affidavit of Lauralee Taddeo ¶ 8, Perry Dep. 76 -77).

56.    Seasonal employees are not called back to work the following season. If the individual is interested in returning to work they call to make that known to the supervisor who determines whether the person will be reemployed. (Perry Dep. 77 -78)

57.    Cosgrove was scheduled to assume the Administrative Assistant position effective May 11, 2003 (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 16")

58.    Cosgrove worked April 29 and 30, 2003 and was off on May 1 and 2, 2003 for previously scheduled appointments and took two vacation days. (Cosgrove Dep. 151-152).

59.    Cosgrove and Perry agreed that Cosgrove would continue in her current position for two weeks to wrap up her work and assume the Administrative Assistant position on May 11, 2003.  Before Cosgrove could assume the new position she went out on a leave on May 7, 2003. (Brennan Dep. 176).

60.    After her job as Conference Sales Manager was eliminated Cosgrove accepted an Administrative Assistant position. (Complaint ¶  11, Cosgrove Dep. 224).

61.    Cosgrove advised Perry that she had a problem with varicosity in her legs during her pregnancy and as a result had to elevate her legs. Perry accommodated Cosgrove's request for accommodation and she was allowed to elevate her legs at her desk. (Perry Dep. 71 – 73).

**Plaintiff's Maternity Leave**

62.    Cosgrove was provided with a leave of absence to accommodate complications relating to her pregnancy and for purposes of giving birth. The leave commenced May 7 and continued until October 7, 2003 for a total duration of twenty one weeks. (Cosgrove Dep. 128).

63.    Cosgrove went out on disability leave on May 7, 2003 at a time when she was finishing her last week as Sales Manager and just a few days prior to her scheduled start date as Administrative Assistant.  Her disability leave began earlier than anticipated. (Perry Dep. 69 -71).

64.    During the course of Cosgrove's leave of absence she received disability pay in accordance with NSRM policy at the rate of sixty (60%) per cent of her pay.  The rate of pay used in determining Cosgrove's disability pay was $17.00 per hour, the rate

in effect at the commencement of her leave of absence from May 7, 2003 to October 7, 2003, (Brennan Dep. 189-192, (Cosgrove Dep. 128).

65.    Brennan agreed to maintain Cosgrove's pay at $17.00 per hour until the end of the pay period prior to her anticipated start of the Administrative Assistant position on May 11, 2003. (Cosgrove Dep. 171).

66.    Cosgrove wrote to Lee O'Shea, NSRM Director of Human Resources, "I've accepted the new administrative assistant position." (Cosgrove Dep. 171).

67.    While Cosgrove was on maternity leave Lauralee Taddeo was hired as a replacement to fill in for Cosgrove. (Brennan Dep. 178-177, Affidavit of Lauralee Taddeo ¶4, a true copy of which is annexed hereto as "Exhibit 17").

68.    Taddeo had previously held the Administrative Assistant position in the Catering Sales Department for a number of years. This position was always seasonal. Taddeo worked from May to October each year at which time she was laid off.  (Affidavit of Lauralee Taddeo ¶2).

69.    At the commencement of Cosgrove's leave of absence she was classified as an Administrative Assistant. (Cosgrove Dep. 129).

70.    There was no job description for the Administrative Assistant position Cosgrove was scheduled to start at the time her leave of absence commenced. (Cosgrove Dep. 129).

**Plaintiff's Return to Work in a Substantially Similar Position**

71.    On or about October 7, 2003 Cosgrove arrived at NSRM for the purpose of returning to work. She met with Brennan that day who was surprised because he did not believe that she was returning to work. Given his surprise Brennan told Cosgrove to

return the next day at which time he would have a position for her. Brennan Dep. 198-199).

72.    Cosgrove never notified Perry, her direct supervisor that she was returning to work at the conclusion of her leave of absence. (Perry Dep. 68-69).

73.    Cosgrove was given an Administrative Assistant position when she returned to work at the conclusion of her leave of absence (Cosgrove Dep. 228).

74.    At the time Cosgrove returned to work Taddeo was scheduled to be laid off from the Administrative Assistant position in Catering Sales. Other administrative staff was also being laid off as well. (Brennan Dep. 199).

75.    On or about October 10, 2003, three days after Cosgrove returned to work from her maternity leave, Taddeo was laid off.  (Affidavit of Lauralee Taddeo ¶ 6, (Brennan Dep. 239)

76.    By early October it was no longer necessary to staff the Administrative Assistant position in the Catering Sales Department.  (Perry Dep. 55).

77.    Brennan explored the availability of Administrative Assistant positions which might be available for Cosgrove. John Shea, Director of information Technology had some scanning work that needed to be done.  Brennan considered this to be an appropriate Administrative Assistant position comparable to the Administrative Assistant position in Catering Sales.  (Brennan Dep. 200-201).

78.    The scanning work had previously been performed by Robin Almedia who was classified as an Administrative Assistant. (Affidavit of John Shea ¶4, which is annexed hereto as "Exhibit 18").

79.    Cosgrove admits that Almeida was classified as an Administrative Assistant. (Cosgrove Dep. 198).

80.    Cosgrove was assigned to work in an enclosed office in the warehouse. There were three offices located in the warehouse including Shea's whose office was adjacent to that occupied by Cosgrove. (Affidavit of John Shea ¶2, (Cosgrove Dep. 198-199).

81.    The project assigned to Cosgrove involved scanning financial records that were in several hundred boxes located in the warehouse.    There was no business reason for Cosgrove to go into the warehouse. The boxes containing the records to be scanned were brought to her office.  (Affidavit of John Shea ¶10, Cosgrove Dep. 206).

82.    John O'Shea and Jeff Fullerton both had their offices in the same building as where Cosgrove's office was located. (Cosgrove Dep. 214).

83.    Cosgrove was allowed to get in her car and go to the Administration building to use a private office to pump her breast milk.  This was done during work hours and Cosgrove was paid for this time.  Cosgrove notified management of NSRM who did not object to her so doing during the course of the wok day. Cosgrove was allowed to go to Tanya's office in the Administration building whenever it was necessary Cosgrove had to go to Tanya's office once or twice per day to pump her breasts   Each occasion would take 15 to 30 minutes or longer each time (Cosgrove Dep. 26-28, 204 -205, 218-219, Affidavit of John Shea ¶7).

84.     Cosgrove was allowed to go to the Administration Building or the Clubhouse to use the restroom facilities whenever she needed to without objection by

any representative of NSRM. Patricia also went to the Clubhouse on a daily basis for her lunch and other breaks.  .  (Affidavit of John Shea ¶8, Cosgrove Dep. 203, 218-219)

85.    Shea provided Cosgrove with a key to a door which led directly from the parking area to her office Cosgrove never had to go into the warehouse. .  (Affidavit of John Shea ¶ 11).

86.    Cosgrove was provided with a refrigerator in her office to store her breast milk.  .  (Affidavit of John Shea ¶ 9)

87.    Cosgrove was provided with a space heater after she said the heat in her office was not working properly.  There was also heat in the office used by Cosgrove. (Cosgrove Dep. 205, Affidavit of John Shea ¶ 12).

88.    In a typical eight hour day Patricia was away from her work station approximately four hours per day. .  (Affidavit of John Shea ¶ 6).

**Layoff of Employees Including the Plaintiff**

89.    On or about October 31, 2003 Cosgrove was laid off along with a number of other seasonal employees.  With the end of the season NSRM accelerated the process of laying off of staff. (Brennan Dep. 217).

90.    Brennan informed Cosgrove that she was being laid off in a meeting held on or about October 31, 2003.  Brennan advised Cosgrove that her position was ending for the season.  At the time of the lay off there were no other administrative assistant positions available. (Brennan Dep. 219-220).

91    Between September 1, and December 16, 2003 seventy – eight employees were laid off by NSRM.  Thirty four employees were laid off between October 27 and October 31, 2006.  Administrative Assistant Lauralee Taddeo was laid

off on October 10, 2003,   Administrative Assistant Joan Johnson   was laid off on November 7, 2003,  (Brennan  Dep. 219-224, Termination Report a true copy of which is annexed hereto as "Exhibit 19").).

92.     Cosgrove never called NSRM to return to work. Two other administrative assistants who called NSRM were rehired in 2004. (Brennan Dep. 219-224).

**Treatment of Other Pregnant Employees**

93.     Jennifer Perry, the Director of Catering Sales was provided with a Family and Medical Leave Act leave for pregnancy.   At the conclusion of her leave she was restored to her previous position. (Brennan Dep. 135, 139-140).

94.     Rhonda Rodgers was transferred from Membership Sales to the Lodging Department. This was a lateral transfer without a reduction in pay. The transfer was made because Ms. Rodgers was not meeting the need of obtaining memberships to the Country Club. The new position had greater responsibilities than her former position. Ms. Rodgers declined the transfer opting to stay at home with her new child. (Brennan Dep. 104 - 106, 118).

95.     The decision to transfer Ms. Rodgers was made by Brennan and O'Neil before they knew she was pregnant.   The decision was made based on her lack of performance. He started interviewing replacements for Rodgers in December 2002. (Brennan Dep. 140, 233, O'Neil Dep. 118).

96.     Rhonda Rodgers was given a Family and Medical Leave for her pregnancy. She chose not to return to work at the conclusion of her leave (Brennan Dep. 123-124).

97.    Rodgers was offered a similar job with no loss in pay. (Cosgrove Dep. 117 – 118).

98.    Michele O'Brien's job principally involved the selling of real estate for NSRM.  Ms. O'Brien was aware that NSRM hired a new management team including Stephen Brennan as General Manager, to cut payroll and bring costs in line. (Affidavit of Michele M. O'Brien, a true copy of which is annexed hereto as "Exhibit 20")[5]

99.    Ms. O'Brien's job was eliminated on or about March 10, 2003.  At the time her job was eliminated NSRM only had eight condominium units for sale together with some time shares and some land.  Ms. O'Brien states that her layoff was not due to her being pregnant. (Affidavit of Michele M. O'Brien ¶ 6 – 8).

100.    Ms. O'Brien was not replaced. (Brennan Dep. 122).

Respectfully submitted,

NEW SEABURY RESOURCES
MANAGEMENT, INC.,

By its attorney,

s/ Howard I. Wilgoren
Howard I. Wilgoren (BBO No. 527840)
6 Beacon Street, Suite 700
Boston, MA 02108
(617) 523 – 5233

Dated:  June 12, 2006

---

[5] Cosgrove acknowledged that O'Brien told her attorney that there were legitimate business reasons justifying elimination of her job. (Cosgrove Dep. 119-120).

**CERTIFICATE OF SERVICE**

I, Howard I. Wilgoren, hereby certify that the foregoing document was filed through the ECF system on June 12, 2006, and that a true paper copy of this document was sent to those indicated as non registered participants on the Notice of Electronic Filing on May 31, 2006 by first class mail. I further certify that a courtesy copy of the foregoing document was served on June 12, 2006 by first class mail upon plaintiff's counsel Hilary Schwab, Esquire, 18 Tremont Street, Boston, MA 02108

s/ Howard I. Wilgoren_____
Howard I. Wilgoren

Dated:  June 12, 2006

2003 & 2004 PAYROLL COMPARISON REPORT

| | | 2003 | | PAY DATE | ACTIVE # | PAYROLL | 2004 | VARIANCE | ACCT VAR |
|---|---|---|---|---|---|---|---|---|---|

| PAY DATE | ACTIVE # | PAYROLL | | PAY DATE | ACTIVE # | PAYROLL | VARIANCE | ACCT VAR |
|---|---|---|---|---|---|---|---|---|
| 1/10/03 | 124 | $113,301 | | 1/9/04 | 85 | $113,470 | (39) $169 | $169 |
| 1/24/03 | 82 | $90,788 | | 1/23/04 | 59 | $98,068 | (23) $7,280 | $7,449 |
| 2/7/03 | 59 | $83,312 | | 2/6/04 | 51 | $98,015 | (8) $14,703 | $22,152 |
| 2/21/03 | 59 | $77,861 | | 2/20/04 | 56 | $85,293 | (3) $7,432 | $29,584 |
| 3/7/03 | 54 | $80,311 | | 3/5/04 | 50 | $75,866 | (4) ($4,445) | $25,139 |
| 3/21/03 | 104 | $160,533 | | 3/19/04 | 63 | $88,702 | (41) ($71,831) | ($46,692) |
| 4/4/03 | 91 | $96,135 | | 4/2/04 | 71 | $87,462 | (20) ($8,673) | ($55,365) |
| 4/18/03 | 130 | $102,035 | | 4/16/04 | 90 | $111,286 | (40) $9,251 | ($46,114) |
| 5/2/03 | 135 | $132,971 | | 4/30/04 | 107 | $144,890 | (28) $11,919 | ($34,195) |
| 5/16/03 | 172 | $156,333 | | 5/14/04 | 132 | $158,888 | (40) $2,555 | ($36,750) |
| 5/30/03 | 230 | $200,083 | | 5/28/04 | 156 | $172,790 | (74) ($27,293) | ($91,336) |
| 6/13/03 | 267 | $224,678 | | 6/11/04 | 227 | $244,992 | (40) $20,314 | ($71,022) |
| 6/27/03 | 303 | $251,757 | | 6/25/04 | 276 | $275,416 | (27) $23,659 | ($47,363) |
| 7/11/03 | 325 | $304,387 | | 7/9/04 | 291 | $339,268 | (34) $34,881 | ($12,482) |
| 7/25/03 | 328 | $280,526 | | 7/23/04 | 303 | $370,011 | (25) $89,485 | $77,003 |
| 8/8/03 | 339 | $320,829 | | 8/6/04 | 303 | $344,111 | (36) $23,282 | $100,285 |
| 8/22/03 | 329 | $272,892 | | 8/20/04 | 307 | $363,202 | (22) $90,310 | $190,595 |

CONFIDENTIAL
0372

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9/5/03 | 302 | $274,200 | 9/3/04 | 282 | $314,738 | (20) $40,538 | $231,133 |
| 9/19/03 | 234 | $229,251 | 9/17/04 | 228 | $271,913 | (6) $42,662 | $273,795 |
| 10/3/03 | 204 | $187,782 | 10/1/04 | 188 | $212,693 | (16) $24,911 | $298,706 |
| 10/17/03 | 200 | $176,400 | 10/15/04 | 188 | $224,830 | (12) $48,430 | $345,136 |
| 10/31/03 | 181 | $173,044 | 10/29/04 | 172 | $167,055 | (9) ($5,989) | $339,147 |
| 11/14/03 | 141 | $146,580 | 11/12/04 | 123 | $129,223 | (18) ($17,357) | $321,790 |
| 11/28/03 | 98 | $102,851 | 11/26/04 | 98 | $120,907 | 0 $18,056 | $339,846 |
| 12/12/03 | 93 | $133,157 | 12/10/04 | 93 | $115,628 | 0 ($17,529) | $322,317 |
| 12/26/03 | 89 | $123,331 | 12/23/04 | 82 | $115,963 | 7 ($7,368) | $314,949 |

CONFIDENTIAL



# NEW SEABURY RESOURCES MANAGEMENT, INC.

## EMPLOYEE HANDBOOK

May 1, 2002

**This Manual supercedes all previous documents
and is the Manual of Record. New Seabury Resources Mgt, Inc. reserves the
right to amend this Manual without notice.**

0169

# Terms of Employment

## Equal Employment Opportunity

The employment policies and practices of the New Seabury Resources Management, Inc. are:

- To recruit, hire, train, and promote employees based on qualifications, ability, and willingness to do the job, without discrimination because of age, sex, race, religion, color, national origin, disability or any other legally–protected status.
- To treat employees equally with respect to compensation, and opportunities for advancement, including but not limited to job assignment, supervision, training, upgrading, promotion, layoff, recall from layoff, and termination.
- All other policies and practices such as employee benefits, educational opportunities, and social and recreational programs are to be administered on the same basis of fair and equal treatment.
  New Seabury Resources Management, Inc. intends to treat its employees fairly. The standards for employment that we intend to maintain include:
- Overall competitive wages and benefits
- Clean, pleasant and safe work environment.
- Well-trained and knowledgeable management team that provides high quality supervision.
- Training opportunities for employees to maintain the competitive edge of Service excellence to our members
- Effective lines of communications that provides timely information to employees on all matters of Human resources, and is receptive to constructive feedback on job performance, and working conditions.

## Americans with Disabilities Act

New Seabury Resources Management, Inc. provides reasonable accommodations in accordance with the Americans with Disabilities Act. This will enable qualified applicants with a disability to perform the essential functions of the job that they are seeking and to enable a qualified employee with a disability to perform the essential functions of a job currently held.

Modifications and adjustments may be required in the work environment in the manner or circumstances in which the job is usually performed, or in circumstances in which the job is usually performed, or in the employment policies. Our goal is to allow an employee with a disability to enjoy the benefits and privileges of employment equal to those enjoyed by non-disabled employees.

This document is a member of the New Seabury Resources Management Inc. intends to treat its employees fairly. The Resources intent

- If you are granted a leave of absence and do not return to work on or before the expiration date of your leave, you will be considered to have voluntarily terminated your employment effective as of your last day of service.

Other than during peak periods, a member of the Executive Committee may grant time off without pay, not to exceed 10 working days, without cause. You must request such time off by writing to their Department Head. If granted, Human Resources must receive an original copy of the request so it may be placed in your personnel file.

## Family and Medical Leave Act

The Family and Medical Leave Act (FMLA) of 1993 is a Federal Law that entitles eligible employees to take up to 12 weeks of unpaid, job-protected leave in a 12-month period for specified family and medical reasons. New Seabury Resources Management, Inc. recognizes the FMLA and will comply with all the requirements as defined by the Federal Government.

### Purpose

FMLA is intended to balance the demands of the workplace with the needs of families. By providing workers faced with family obligations, serious family, or personal illnesses with reasonable amounts of leave, FMLA encourages stability in the family and productivity in the workplace.

### Employee Eligibility

To be eligible for FMLA benefits, an employee must:
- Have worked for the employer for a total of 12 months;
- Have worked at least 1,250 hours of service during the 12-month period immediately preceding the start of the leave

### Employee Entitlement to Leave

Eligible employees may take up to 12 workweeks of unpaid leave during each 12-month period for one or more of the following reasons:
- For the birth and care of the newborn child of an employee;
- For placement with the employee of a son or daughter for adoption or foster care;
- To care for an immediate family member (spouse, child or parent) with a serious health condition; or
- To take medical leave when the employee is unable to work because of a serious health condition

Spouses employed by the same employer are jointly entitled to a **combined** total of 12 work-weeks of family leave for the birth and care of the newborn child, for placement of a child for adoption or foster care, and to care for a parent who has a serious health condition. Leave for birth and care, or placement for adoption or foster care must conclude within 12 months of the birth or placement.

New Seabury Resources Management, Inc. requires that any accrued paid vacation, personal leave, or family leave be used for any portion of an approved leave for the first three

reasons for leave given above. Accrued paid vacation or personal leave may be substituted for leave provided for a serious health condition of the employee or for care of a spouse, son, daughter, or parent with a serious health condition.

**Intermittent Leave**

Intermittent leave may mean taking leave in blocks of time, or by reducing the employee's normal weekly or daily schedule. It is an option that may provide a convenient solution for both the employee and the employer.

- If FMLA leave is for birth and care or placement for adoption or foster care, use of intermittent leave is subject to the employer's approval.
- FMLA Leave may be taken intermittently whenever **medically necessary** to care for a seriously ill family member, or because the employee is seriously ill and unable to work.
    - Intermittent leave is applied towards the 12-week FMLA maximum benefit.

When intermittent leave is needed to care for an immediate family member or the employee's own illness, and is planned for medical treatment, the employee must try to schedule treatment so as not to unduly disrupt the employer's operation.

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited.

**"Serious health condition"** means an illness, injury, impairment, or physical or mental condition that involves:

- Any period of incapacity or treatment connected with inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical-care facility, and any period of incapacity or subsequent treatment in connection with such inpatient care; or
- Continuing treatment by a health provider which includes any period of incapacity (i.e., inability to work, attend school or perform other regular daily activities) due to:

1. A health condition (including treatment therefor, or recovery therefrom) lasting more than three consecutive days, and any subsequent treatment or period of incapacity relating to the same condition, that also includes treatment two or more times by or under the supervision of a health care provider; or one treatment by a health care provider with a continuing regimen of treatment.
2. Pregnancy or prenatal care. A visit to the health care provider is not necessary for each absence.
3. A chronic serious health condition, which continues over an extended period of time, requires periodic visits to a health care provider, and may involve occasional episodes of incapacity (e.g., asthma, diabetes). A visit to a health care provider is not necessary for each absence.
4. A permanent or long-term condition for which treatment may not be effective (e.g., Alzheimer's, a severe stroke, terminal cancer). Only supervision by a health care provider is required, rather than active treatment.

5. Any absences to receive multiple treatments for restorative surgery or for a condition which would likely result in a period of incapacity of more than three days if not treated (e.g., chemotherapy or radiation treatments for cancer.)

## "Health care provider" means:

- Doctors of medicine or osteopathy authorized to practice medicine or surgery by the state in which the doctors practice; **or**
- Podiatrists, dentists, clinical psychologists, optometrists and chiropractors (limited to manual manipulation of the spine to correct a subluxation as demonstrated by x-ray to exist) authorized to practice, and performing within the scope of their practice, under state law; **or**
- Christian Science practitioners listed with the First Church of Christ, Scientist in Boston, Massachusetts; **or**
- Any health care provider recognized by the employer or the employer's group health plan benefits manager.

## Maintenance of Health Benefits

The employer is required to maintain group health insurance coverage for an employee on FMLA leave whenever such insurance was provided before the leave was taken and on the same terms as if the employee had continued to work. If applicable, arrangements will need to be made for employees to pay their share of health insurance premiums while on leave.

## Job Restoration

Upon return from FMLA leave, an employee must be restored to the employee's original job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment. During any period of leave, an employee will not lose any accrued employment benefit (i.e., group life insurance, health insurance, disability insurance, personal leave, vacation time or retirement benefits) that the employee earned or was entitled to before using the FMLA leave.

Under specified and limited circumstances where restoration to employment will cause substantial and grievous economic injury to its operations, an employer may refuse to reinstate certain highly paid **"key"** employees after using FMLA leave during which health coverage was maintained. A "key" employee is a salaried "eligible" employee who is among the highest paid ten percent of employees.

If the employee on leave is among the highest paid 10% of employees, New Seabury Resources Management, Inc. may deny restoration of employment, but only if necessary to prevent "substantial and grievous economic injury" to the Company, and if the employee has elected not to return immediately from an approved leave <u>after</u> receiving a notice from New Seabury Resources Management, Inc. of the Company's intent to deny restoration.

174
38

## Advance Notification and Medical Certification Requirements

New Seabury Resources Management, Inc. requirements:

- When leaves are "foreseeable", employees must give 30 days advance notice to their Department Head in writing. In case of medical emergencies, notice must be provided within 1 to 2 workdays of the employee's knowledge for leave.
- Employees must advise their Department Heads "as soon as practicable" of any change in dates of scheduled leave or extension of such leave. Such changes should be confirmed in writing.
- Medical certification, within 15 days of the Company's request, supporting the need for leave due to a serious health condition affecting the employee or an immediate family member.
- Second or third medical opinions (at the employer's expense).
- Periodic medical certification every 30 days for continuous blocks of leave and every 6 months for intermittent leaves.
- Periodic reports during FMLA leave regarding the employee's status and intent to return to work as follows:
  - Biweekly during the first month, and
  - Monthly after the first month.

Please contact the Personnel Office for additional information.

## Maternity Leave

**Eligibility -** Full-time employees of New Seabury Resources Management, Inc. will be eligible for maternity leave after 12 months of uninterrupted service.

- Maternity leave will be granted for pregnancy, childbirth, and recovery for a period of up to twelve weeks from the first day of leave.
- This leave must be requested at least two weeks in advance of the starting date.
- If you are eligible for paid leave, you will receive 60% of your average weekly salary, paid in accordance with Company payroll schedules, for a period of eight weeks.
- Upon return from this twelve-week leave, you are entitled to the same position you left, or a similar position with the same level, pay and length of service credit.
- If you do not return from your Maternity leave after twelve weeks, and you are not medically disabled, or on an approved extension, you will be voluntarily terminated.

## Extension of Leave

- Any extension to the twelve-week leave that has been approved for you will not include the job protection mentioned above.
- Upon two weeks notification of your desire to return after an extension, the Company will let you know whether or not a position is available.

If you become medically disabled as a result of your pregnancy, and meet the length of service requirements, Salary Continuance will go into effect. You must have medical evidence of the disability, and be under the continual care of a physician. You do not have to be house or hospital confined.