## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * *****

**PATRICIA COSGROVE**                    *
                                         *
           **Plaintiff**          *
                                         *
**v.**                                   *     **CIVIL ACTION NO. 05-10791- GAO**
                                         *
**NEW SEABURY RESOURCES**                *
**MANAGEMENT, INC.,**                    *
                                         *
           **Defendant**          *
                                         *

* * * * * * * * * * * * * * * * * * * * * * *****

### CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS OF DEFENDANT NEW SEABURY RESOURCES MANAGEMENT, INC., IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, PURSUANT TO LOCAL RULE 56.1

New Seabury Resources Management, Inc., Defendant in the captioned matter, ("NSRM") by its undersigned attorney, hereby submits in support of its Motion for Summary Judgment the following material facts of record, as to which no genuine dispute exists for trial, pursuant to L.R.D.  Mass. 56.1:

**The Parties**

1.    Patricia Cosgrove (Hereinafter, "Cosgrove") was hired by NSRM in April 1999 as an Account Executive. From June 1999 through May 11, 2003 Cosgrove held the position of Conference Sales Manager. (Complaint ¶4)

2.    The primary function of Cosgrove's position as Conference Sales Manager was to provide lodging related functions for groups of ten people or more booking functions and lodging at NSRM.  Booking of the lodging rooms for  groups coming to NSRM was Cosgrove's primary responsibility as Conference Sales Manager.

One hundred per cent of Cosgrove's responsibilities revolved around lodging. This aspect of Cosgrove's job took up the bulk of her work day.   The other functions she performed were in conjunction with the booking of lodging rooms (Excerpts from the Deposition Transcript of Patricia Cosgrove, 52-54, 106, a true copy of which is annexed hereto as "Exhibit 1". Excerpts from the Deposition Transcript of Jennifer Perry, 74, a true copy of which is annexed hereto as "Exhibit 2")

3.    At all times Cosgrove was an employee at will.   (See Receipt and Acknowledgement, a true copy of which is annexed hereto as "Exhibit 3")

4.    Cosgrove advised NSRM that she was pregnant on or about February 3, 2003.  (Complaint ¶6).

5.    After Cosgrove announced she was pregnant she was not treated any differently by any representative of NSRM including but not limited to Stephen Brennan, Mark O'Neil and Jennifer Perry her direct supervisor. There were no adverse consequences associated with the announcement by Cosgrove that she was pregnant. (Cosgrove Dep. 144-146).

6.    NSRM is engaged in the operation of a Country Club and related facilities including a 36 hole golf course, a private beach, a banquet facility in the Poponesset Inn, a tennis facility and housing development. (Excerpts from the Deposition Transcript of Stephen Brennan, 35 – 36, a true copy of which is annexed hereto as "Exhibit 4").

7.    NSRM operates a seasonal business. The high season generally runs from June through Labor Day. NSRM employee complement increases during the high season and is greatly reduced during the off season   (Brennan Dep. 42).

8.    NSRM is also has lodging units that are available for rent.  In 2002 there were in excess of one hundred units in the lodging rental pool.  As of 2005 there were approximately 20 lodging units available for rental on a given day.   (Brennan Dep. 50).

9.    As part of the complement of available lodging units in the rental pool were units owned by homeowners and turned over to NSRM so that they would be able to participate in the rental program.  This program known as the "Villa Rental Program" ended at the end of 2003. (Brennan Dep. 60 -62).

10.    Between 2002 and 2006 revenues received by NSRM attributable to lodging rentals have decreased by more than one million dollars.    (Brennan Dep. 50).

11.    NSRM's lodging function is nearly a break even operation at the current time whereas it was losing hundreds of thousands of dollars per year before the number of units was reduced. (Brennan Dep. 50 - 51).

12.    NSRM operates a seasonal facility. As such its employee complement increases during the high season from June – September and is diminished in the off season months. NSRM reached its peak high season complement of 384 employees on July 26, 2002.   NSRM reached its peak off season complement of 124 employees on January 10, 2003.  (2002 – 2003 Company Payroll Comparison, a true copy of which is annexed hereto as "Exhibit 5").

13.    For the 2003 high season the peak employee complement of 339 employees was reached on August 8, 2003.  By the week of December 26, 2003 the employee complement was reduced to 89 employees. (Exhibit 5).

14.    By the week of March 5, 2004 the employee complement was just 50 employees. The employee complement for the high season of 2004 reached a peak of

307 employees during the week of August 20, 2004. . (A 2003 – 2004 Company Payroll Comparison, a true copy of which is annexed hereto as "Exhibit 6").

15.     Cosgrove received the New Seabury Resources Management, Inc, Employee Handbook.  Contained therein are the NSRM policies pertaining to "Equal Employment Opportunity,"   "Family and Medical Leave Act,"    and "Maternity Leave." (Excerpts from the Employee Handbook, a true copy of which is annexed hereto as "Exhibit 7")

## NSRM'S Efforts to Reduce Costs

16.     Mark O'Neil was hired by NSRM as a consultant to turn around an underperforming company by reducing costs, increasing revenue and enhancing profitability. (Brennan Dep. 77).

17.     O'Neil who is the principal of the Essex Golf  Group was consulted by NSRM in the summer of 2002 to improve the operational profitability of NSRM   Part of the initial discussion involved a review of employee staffing levels  (Excerpts from the Deposition Transcript of Mark O'Neil, 13 -15, a true copy of which is annexed hereto as "Exhibit 8").

18.     O'Neil was retained by NSRM in August 2002 to conduct an Operational Audit. An Operational Audit is a review of the entire operation, department by department, gather information and make recommendations. (O'Neil Dep. 18-19).

19.     In August 2002 O'Neil began to make regular and periodic trips to NSRM on a weekly basis, reviewed documents and had frequent telephone conferences with NSRM representatives.   O'Neil reviewed department staffing plans and met with department managers to review the operation of each department.  (O'Neil Dep. 22-25).

4

20. At the end of his review O'Neil produced an Operational Audit Report. (Operational Audit dated December 12,, 2002, a true copy of which is annexed hereto as "Exhibit 9").

21. In the Operational Audit Report O'Neil identified a number of staffing changes that needed to be made to improve efficiency, reduce costs and eliminate redundant positions. (O'Neil Dep. 27-33)

22. In the Operational Audit Report O'Neil recommended that the Director of Membership Sales[1].be replaced because she did not have the requisite skills to perform the job. In this regard he wrote, "Existing membership sales person does not have the basic sales ability and drive to accomplish the aggressive sales goals that are required." (O'Neil Dep. 31-32, 40, Exhibit 9).

23. Stephen Brennan was hired as General Manager/COO in December 2002 as part of NSRM's ongoing effort to turn around an underperforming company by reducing costs, increasing revenue and enhancing profitability. Prior to becoming employed by NSRM commencing in or about September or October 2002 Brennan worked with O'Neil reviewing documents pertaining to NSRM. In November 2002 Brennan toured the NSRM facility. (Brennan Dep. 34, 65).

24. Brennan reviewed the headcount list with O'Neil reviewing the functions performed by each individual in a given department. (Brennan Dep. 157-159).

25. As part of the 2003 budgeting process NSRM engaged in an assessment of every aspect of its operation. This analysis included a review of employee headcount, payroll costs, and the number of employees needed to perform the

---

[1] This is the position held by Rhonda Rodgers at the time. (O'Neil Dep.39).

workload. The process examined whether jobs could be eliminated or combined and how to have a more effective process with fewer employees. (Brennan Dep. 65 - 67)

26. Specifically, the 2003 budgeting process focused on the need to reduce the off season employee complement to essential personnel. (Brennan Dep. 66).

27. When jobs were eliminated efforts were made to retain an employee in an available position if justified by business reasons. (Brennan Dep. 67).

28. In January 2003 the Director of Golf Operations was demoted to the Golf Course Superintendent position with a reduction in pay of $9,000.00 annually. (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 10"). The Golf Course Superintendent was demoted to Assistant Superintendent on March 5, 2003 with a. reduction in pay of $13,000.00 annually. (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 11") The Head Golf Professional was demoted to Instructor of Golf on January 15, 2003 with a. reduction in pay of almost $900.00 on a bi – weekly basis. (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 12"). (Brennan Dep. 68 – 72, 86-99)

29. Brennan eliminated the Director of Golf Position. (Brennan Dep. 72).

30. NSRM completely closed the restaurant for six weeks to reduce costs. This action included laying employees off. (Brennan Dep. 72).

31. In mid to late February 2003 Brennan received budget proposals from the various department heads relating to restructuring of staffing levels

32 The Chief Financial Officer Position was eliminated. (Brennan Dep. 80 – 86 103, (O'Neil Dep. 63-64).

33.     A number of Kitchen and Food and Beverage employees were reclassified from full time positions to full time seasonal positions.  Approximately four full time members of the kitchen staff were laid off at the beginning of 2003 for periods from one to three months.  (Brennan Dep. 86, 123).

34.     Dining room captains were reclassified from full time to on call status. (Brennan Dep. 123-124).

35.     NSRM also eliminated a Bar Manager position.  (Brennan Dep. 124-125).

36.     NSRM reclassified the Assistant Bar Manager and an Outside Golf Position from year round to seasonal.  (Brennan Dep. 124-125).

**Elimination of Plaintiff's Position and the Offer of a New Position**

37. In the Operational Audit report O'Neil recommended the elimination one of the three sales managers who were Cosgrove, Aaron Brochu and Jane Henry. (O'Neil Dep. 44-45).

38.     Early in the audit process O'Neil identified the Food and Beverage Department[2] as one that needed reorganization.  O'Neil questioned the redundancy in positions. O'Neil questioned the need for three sales managers those being Aaron Brochu, Jane Henry and Cosgrove.[3] In particular O'Neil identified the position held by Cosgrove as being redundant because her primary function was dealing with the lodging component which he viewed as a duplication of effort with the Lodging Department. O'Neil made his judgment on the basis of the responsibilities of the position not the person holding the position.  The position he identified in the audit as

---

[2] O'Neil considered the Food and Beverage and Catering Sales Departments to be interchangeable (O'Neil Dep. 81).
[3] While Brochu and Henry regularly worked 60 - 70 hours per week during the high season, Cosgrove would work only 40 hours per week. (Cosgrove Dep. 114 – 115).

being redundant was the one held by Cosgrove. O'Neil first identified the position held by Cosgrove as redundant in the August – November 2002 time frame.  (O'Neil Dep. 79- 81, 95-96,129 Exhibit 9).

39.    In connection with the 2003 budget process in the Dec 2002 to February 2003 time frame,   O'Neil prepared documents that addressed the reorganization of the Food and Beverage Department. (O'Neil Dep. 78 -79, New Seabury F& B Departmental Reorganization, a true copy of which is annexed hereto as "Exhibit" 13).

40.    The reorganization of the department contemplated transitioning Henry to a non sales position, lowering the base salaries and increasing incentive pay for Perry, Chase, and Brochu, (O'Neil Dep. 80-81, Exhibit 13).

41.    The reorganization model set forth in Exhibit 13 contained no salary for Cosgrove because O'Neil had targeted her position for elimination because of the redundancy of the sales team.  This redundancy was first identified by O'Neil when he conducted the audit in the August 2002 to December 2002 time frame and was identified by him "early on." (O'Neil Dep. 82).

42.    In the budget review process commencing in December 2002 O'Neil identified Cosgrove's position for elimination. At that time he had no knowledge that Cosgrove was pregnant. (O'Neil Dep. 129 -130, 2003 Payroll Document, a true copy of which is annexed hereto as "Exhibit 14").

43.    In November 2002 while reviewing a headcount list of NSRM employees Brennan identified Cosgrove's position as Conference Sales Manager and questioned the need for this position given the cross over between catering, catering sales and

lodging. Brennan determined that Cosgrove's job function was duplicating the function of the Lodging Department. (Brennan Dep. 157, 233).

44.    During the budget process in February 2003 Brennan reviewed with Jennifer Perry, the manager of the Catering Sales Department,  the overlap in the Catering Sales Department with respect to the lodging function and the overlap between the lodging function performed by her department and the same function being performed by the Lodging Department.   A second discussion between Brennan and Perry focused on the lodging department taking responsibility for any of the groups that needed lodging. Perry told Brennan that with the decrease in lodging and not having meeting rooms Cosgrove's duties could be absorbed by the Catering Sales staff. (Brennan Dep. 160, Perry Dep. 27).[4]

45.    Brennan and O'Neil discussed that there was no need for Cosgrove's position given that the Catering Sales Department handled the functions and the lodging Department could handle booking of the rooms.  There was no mention about Cosgrove being pregnant (Brennan Dep. 166, 167).

46.    Perry told Brennan that the position held by Cosgrove was not needed as her department could handle the functions for the clients as they had been doing. Specifically, Perry told Brennan that the primary function of Cosgrove's position involved booking the lodging for groups that needed ten lodging rooms or more. Perry told Brennan that Cosgrove had very little involvement with groups coming to NSRM once the lodging was booked.   There was no mention about Cosgrove being pregnant. (Brennan Dep. 166, 236 - 237).

---

[4]  The major responsibility of Cosgrove's job involved booking of lodging for groups having functions at NSRM.  As recounted by Lauralee Taddeo NSRM got rid of a lot of its rental properties. (See Affidavit of Lauralee Taddeo, ¶ 3 a true copy of which is attached hereto as "Exhibit 17").

47. Brennan also discussed the impact of eliminating Cosgrove's position with Roy Chase, Director of Food and Beverage. Chase replied that the elimination of the position would have no effect on his operation. There was no mention about Cosgrove being pregnant (Brennan Dep. 167).

48. Cosgrove's job as sales manager was eliminated. Cosgrove admitted that after her job was eliminated no one replaced her. **(**Cosgrove Dep. 22, 24 -25, 61-62).

49. Cosgrove believes that instead of having her job eliminated NSRM should have found another way to cut costs. She suggests that someone with less tenure should have been selected; or salaries of all employees should be reduced across the board. (Cosgrove Dep. 157 - 158). Cosgrove does not have any direct evidence that her job was eliminated because of her gender and/or pregnancy. (Cosgrove Dep. 153 – 154)

50. After deciding to eliminate Cosgrove's position Brennan identified an Administrative Assistant position is the Catering Sales Department as one that might available to offer to her. Brennan discussed this possibility with O'Neil and Perry both of whom concurred that the position should be offered to Cosgrove. (Brennan Dep. 168-169).

51. The duties of the Administrative Assistant position being offered to Cosgrove included doing anything necessary for the operation. (Brennan Dep. 169).

52. On or about April 28, 2003 Brennan met with Cosgrove to advise her that her position was being eliminated. Also attending the meeting were Perry and Chase. Brennan offered Cosgrove the Administrative Assistant position explaining that position paid $12.00 per hour. Brennan advised Cosgrove that the job would be seasonal

(Brennan Dep. 171-172, 177, 178, See also Defendant's Answers to Interrogatories No. 7,  a true copy of which is annexed hereto as "Exhibit 15").

53.    The Administrative Assistant position offered to Cosgrove was always considered a seasonal position.  It was a 40 hour per week position from May through October each year.  (Perry Dep. 35 – 36, Taddeo).

54.    Brennan told Cosgrove the job required her to work a Tuesday through Saturday schedule since Saturday is one of the busiest days for the catering sales department and she would be needed to cover the office.   Cosgrove understood that her work week would be Tuesday through Saturday. (Cosgrove Dep. 150,196).

55.    Cosgrove was well aware at all times that the Administrative Assistant position in the Catering Sales Department was always classified as a seasonal position. Taddeo did work for Cosgrove who observed when she was there and when she was laid off. (Exhibit 17 Affidavit of Lauralee Taddeo ¶ 8, Perry Dep. 76 -77).

56.    Seasonal employees are not called back to work the following season. If the individual is interested in returning to work they call to make that known to the supervisor who determines whether the person will be reemployed. (Perry Dep. 77 -78)

57.    Cosgrove was scheduled to assume the Administrative Assistant position effective May 11, 2003 (Change of Status Form, a true copy of which is annexed hereto as "Exhibit 16")

58.    Cosgrove worked April 29 and 30, 2003 and was off on May 1 and 2, 2003 for previously scheduled appointments and took two vacation days. (Cosgrove Dep. 151-152).

59. Cosgrove and Perry agreed that Cosgrove would continue in her current position for two weeks to wrap up her work and assume the Administrative Assistant position on May 11, 2003. Before Cosgrove could assume the new position she went out on a leave on May 7, 2003. (Brennan Dep. 176).

60. After her job as Conference Sales Manager was eliminated Cosgrove accepted an Administrative Assistant position. (Complaint ¶ 11, Cosgrove Dep. 224).

61. Cosgrove advised Perry that she had a problem with varicosity in her legs during her pregnancy and as a result had to elevate her legs. Perry accommodated Cosgrove's request for accommodation and she was allowed to elevate her legs at her desk. (Perry Dep. 71 – 73).

**Plaintiff's Maternity Leave**

62. Cosgrove was provided with a leave of absence to accommodate complications relating to her pregnancy and for purposes of giving birth. The leave commenced May 7 and continued until October 7, 2003 for a total duration of twenty one weeks. (Cosgrove Dep. 128).

63. Cosgrove went out on disability leave on May 7, 2003 at a time when she was finishing her last week as Sales Manager and just a few days prior to her scheduled start date as Administrative Assistant. Her disability leave began earlier than anticipated. (Perry Dep. 69 -71).

64. During the course of Cosgrove's leave of absence she received disability pay in accordance with NSRM policy at the rate of sixty (60%) per cent of her pay. The rate of pay used in determining Cosgrove's disability pay was $17.00 per hour, the rate

in effect at the commencement of her leave of absence from May 7, 2003 to October 7, 2003, (Brennan Dep. 189-192, (Cosgrove Dep. 128).

65.    Brennan agreed to maintain Cosgrove's pay at $17.00 per hour until the end of the pay period prior to her anticipated start of the Administrative Assistant position on May 11, 2003. (Cosgrove Dep. 171).

66.    Cosgrove wrote to Lee O'Shea, NSRM Director of Human Resources, "I've accepted the new administrative assistant position." (Cosgrove Dep. 171).

67.    While Cosgrove was on maternity leave Lauralee Taddeo was hired as a replacement to fill in for Cosgrove. (Brennan Dep. 178-177, Affidavit of Lauralee Taddeo ¶4, a true copy of which is annexed hereto as "Exhibit 17").

68.    Taddeo had previously held the Administrative Assistant position in the Catering Sales Department for a number of years. This position was always seasonal. Taddeo worked from May to October each year at which time she was laid off.  (Affidavit of Lauralee Taddeo ¶2).

69.    At the commencement of Cosgrove's leave of absence she was classified as an Administrative Assistant. (Cosgrove Dep. 129).

70.    There was no job description for the Administrative Assistant position Cosgrove was scheduled to start at the time her leave of absence commenced. (Cosgrove Dep. 129).

**Plaintiff's Return to Work in a Substantially Similar Position**

71.    On or about October 7, 2003 Cosgrove arrived at NSRM for the purpose of returning to work. She met with Brennan that day who was surprised because he did not believe that she was returning to work. Given his surprise Brennan told Cosgrove to

return the next day at which time he would have a position for her. Brennan Dep. 198-199).

72.    Cosgrove never notified Perry, her direct supervisor that she was returning to work at the conclusion of her leave of absence. (Perry Dep. 68-69).

73.    Cosgrove was given an Administrative Assistant position when she returned to work at the conclusion of her leave of absence (Cosgrove Dep. 228).

74.    At the time Cosgrove returned to work Taddeo was scheduled to be laid off from the Administrative Assistant position in Catering Sales. Other administrative staff was also being laid off as well. (Brennan Dep. 199).

75.    On or about October 10, 2003, three days after Cosgrove returned to work from her maternity leave, Taddeo was laid off.   (Affidavit of Lauralee Taddeo ¶ 6, (Brennan Dep. 239)

76.    By early October it was no longer necessary to staff the Administrative Assistant position in the Catering Sales Department.  (Perry Dep. 55).

77.    Brennan explored the availability of Administrative Assistant positions which might be available for Cosgrove. John Shea, Director of information Technology had some scanning work that needed to be done.  Brennan considered this to be an appropriate Administrative Assistant position comparable to the Administrative Assistant position in Catering Sales.  (Brennan Dep. 200-201).

78.    The scanning work had previously been performed by Robin Almedia who was classified as an Administrative Assistant. (Affidavit of John Shea ¶4, which is annexed hereto as "Exhibit 18").

79.     Cosgrove admits that Almedia was classified as an Administrative Assistant. (Cosgrove Dep. 198).

80.     Cosgrove was assigned to work in an enclosed office in the warehouse. There were three offices located in the warehouse including Shea's whose office was adjacent to that occupied by Cosgrove. (Affidavit of John Shea ¶2, (Cosgrove Dep. 198-199).

81.     The project assigned to Cosgrove involved scanning financial records that were in several hundred boxes located in the warehouse.    There was no business reason for Cosgrove to go into the warehouse. The boxes containing the records to be scanned were brought to her office.  (Affidavit of John Shea ¶10, Cosgrove Dep. 206).

82.     John O'Shea and Jeff Fullerton both had their offices in the same building as where Cosgrove's office was located. (Cosgrove Dep. 214).

83.     Cosgrove was allowed to get in her car and go to the Administration building to use a private office to pump her breast milk.  This was done during work hours and Cosgrove was paid for this time.  Cosgrove notified management of NSRM who did not object to her so doing during the course of the wok day. Cosgrove was allowed to go to Tanya's office in the Administration building whenever it was necessary Cosgrove had to go to Tanya's office once or twice per day to pump her breasts   Each occasion would take 15 to 30 minutes or longer each time (Cosgrove Dep. 26-28, 204 - 205, 218-219, Affidavit of John Shea ¶7).

84.      Cosgrove was allowed to go to the Administration Building or the Clubhouse to use the restroom facilities whenever she needed to without objection by

any representative of NSRM. Patricia also went to the Clubhouse on a daily basis for her lunch and other breaks.  .  (Affidavit of John Shea ¶8, Cosgrove Dep. 203, 218-219)

85.    Shea provided Cosgrove with a key to a door which led directly from the parking area to her office Cosgrove never had to go into the warehouse. .  (Affidavit of John Shea ¶ 11).

86.    Cosgrove was provided with a refrigerator in her office to store her breast milk.  .  (Affidavit of John Shea ¶ 9)

87.    Cosgrove was provided with a space heater after she said the heat in her office was not working properly.  There was also heat in the office used by Cosgrove. (Cosgrove Dep. 205, Affidavit of John Shea ¶ 12).

88.    In a typical eight hour day Patricia was away from her work station approximately four hours per day. .  (Affidavit of John Shea ¶ 6).

**Layoff of Employees Including the Plaintiff**

89.    On or about October 31, 2003 Cosgrove was laid off along with a number of other seasonal employees.  With the end of the season NSRM accelerated the process of laying off of staff. (Brennan Dep. 217).

90.    Brennan informed Cosgrove that she was being laid off in a meeting held on or about October 31, 2003.  Brennan advised Cosgrove that her position was ending for the season.  At the time of the lay off there were no other administrative assistant positions available. (Brennan Dep. 219-220).

91    Between September 1, and December 16, 2003 seventy – eight employees were laid off by NSRM.  Thirty four employees were laid off between October 27 and October 31, 2006.  Administrative Assistant Lauralee Taddeo was laid

off on October 10, 2003,  Administrative Assistant Joan Johnson  was laid off on November 7, 2003,  (Brennan  Dep. 219-224, Termination Report a true copy of which is annexed hereto as "Exhibit 19").).

92.    Cosgrove never called NSRM to return to work. Two other administrative assistants who called NSRM were rehired in 2004. (Brennan Dep. 219-224).

**Treatment of Other Pregnant Employees**

93.    Jennifer Perry, the Director of Catering Sales was provided with a Family and Medical Leave Act leave for pregnancy.  At the conclusion of her leave she was restored to her previous position. (Brennan Dep. 135, 139-140).

94.    Rhonda Rodgers was transferred from Membership Sales to the Lodging Department. This was a lateral transfer without a reduction in pay. The transfer was made because Ms. Rodgers was not meeting the need of obtaining memberships to the Country Club. The new position had greater responsibilities than her former position. Ms. Rodgers declined the transfer opting to stay at home with her new child. (Brennan Dep. 104 - 106, 118).

95.    The decision to transfer Ms. Rodgers was made by Brennan and O'Neil before they knew she was pregnant.  The decision was made based on her lack of performance. He started interviewing replacements for Rodgers in December 2002. (Brennan Dep. 140, 233, O'Neil Dep. 118).

96.    Rhonda Rodgers was given a Family and Medical Leave for her pregnancy. She chose not to return to work at the conclusion of her leave (Brennan Dep. 123-124).

97.   Rodgers was offered a similar job with no loss in pay. (Cosgrove Dep. 117 – 118).

98.   Michele O'Brien's job principally involved the selling of real estate for NSRM.  Ms. O'Brien was aware that NSRM hired a new management team including Stephen Brennan as General Manager, to cut payroll and bring costs in line. (Affidavit of Michele M. O'Brien, a true copy of which is annexed hereto as "Exhibit 20")[5]

99.   Ms. O'Brien's job was eliminated on or about March 10, 2003.  At the time her job was eliminated NSRM only had eight condominium units for sale together with some time shares and some land.  Ms. O'Brien states that her layoff was not due to her being pregnant. (Affidavit of Michele M. O'Brien ¶ 6 – 8).

100.   Ms. O'Brien was not replaced. (Brennan Dep. 122).

Respectfully submitted,

NEW SEABURY RESOURCES
MANAGEMENT, INC.,

By its attorney,


s/ Howard I. Wilgoren
Howard I. Wilgoren (BBO No. 527840)
6 Beacon Street, Suite 700
Boston, MA 02108
(617) 523 – 5233

Dated:  June 12, 2006

---

[5] Cosgrove acknowledged that O'Brien told her attorney that there were legitimate business reasons justifying elimination of her job. (Cosgrove Dep. 119-120).

## **CERTIFICATE OF SERVICE**

I, Howard I. Wilgoren, hereby certify that the foregoing document was filed through the ECF system on June 12, 2006, and that a true paper copy of this document was sent to those indicated as non registered participants on the Notice of Electronic Filing on May 31, 2006 by first class mail. I further certify that a courtesy copy of the foregoing document was served on June 12, 2006 by first class mail upon plaintiff's counsel Hilary Schwab, Esquire, 18 Tremont Street, Boston, MA 02108

s/ Howard I. Wilgoren_____
Howard I. Wilgoren

Dated:  June 12, 2006

# O'BRIEN&LEVINE

### Court Reporting Services



#### YOUR BOSTON CONNECTION...WORLDWIDE

## Patricia Cosgrove v. New Seabury Resources Management, Inc.

#### Transcript of the Testimony of:

# Jennifer L. Perry

# April 7, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Deborah G. Rumson  18770

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

26

1      would be supervising her?
2    A.  I would assume so, yes.
3    Q.  Do you remember doing that?
4    A.  No.
5    Q.  Do you remember reviewing her
6      responsibilities at any point when she came
7      into your department?
8    A.  She had her responsibilities initially.
9      She, basically, was — I was just the one
10     she was reporting to and who she would go to
11     if she needed time off or scheduling.
12     That's, basically, my extent of managing
13     her. She pretty much managed herself.
14   Q.  She would just ask you about
15     personnel-related things?
16   A.  For the most part, yes.
17   Q.  Did your supervision of Ms. Cosgrove ever
18     become more in depth than that, than just
19     asking for time off, things like that?
20   A.  Not really.
21   Q.  At any point did you have conversations with
22     either the general manager or anyone else at
23     New Seabury about Patricia's
24     responsibilities and what she was doing?

27

1    A.  Yes.
2    Q.  With whom?
3    A.  With Steve Brennan.
4    Q.  And anyone else?
5    A.  No.
6    Q.  What about Mark O'Neil?
7    A.  I don't remember.
8    Q.  You may have with Mark O'Neil?
9    A.  I may have, but I don't remember.
10   Q.  When was the first conversation you had with
11     Steve Brennan?
12   A.  I don't remember.
13   Q.  Do you know how many conversations you and
14     he had about Patricia?
15   A.  No.
16   Q.  What did you and he talk about relating to
17     Patricia Cosgrove?
18   A.  Just the position, lodging was decreasing
19     every year. There was a lot less to do.
20     Again, we didn't have any meeting room
21     space. We had a ballroom and then one
22     boardroom to sell. So that was basically
23     it. We talked about us absorbing those
24     responsibilities. Us, being the catering

28

1      sales staff.
2    Q.  What specifically did you talk about? Did
3      he ask if you could absorb those
4      responsibilities?
5    A.  Yes.
6    Q.  What did you say?
7    A.  That we could.
8    Q.  Did you talk to the catering sales managers
9      about that?
10   A.  I don't think so.
11   Q.  At the time did you and he talk about
12     specific responsibilities that Ms. Cosgrove
13     had and who would take over those
14     responsibilities?
15   A.  We just talked about if we would be able to
16     take on those responsibilities. We knew
17     what they were. I knew what they were. And
18     because there wasn't that much to sell, I
19     thought we could, and we did.
20           MS. SCHWAB: I am going to mark
21     this as Exhibit 1.
22     (Document marked as Exhibit 1 for
23     identification)
24   Q.  I am handing you Exhibit 1. Do you

29

1      recognize that document?
2    A.  It looks like a job description. I have not
3      seen it before.
4    Q.  Can you look it over and see if it looks
5      like a description of Ms. Cosgrove's
6      position as conference sales manager?
7    A.  The first one, solicit group business
8      through telemarketing, is that making phone
9      calls?
10   Q.  The question I asked was, does it look like
11     a description of Ms. Cosgrove's position as
12     conference sales manager?
13   A.  Not completely.
14   Q.  What do you mean by "not completely"?
15   A.  That all of the items on here are not
16     things, I think, she was involved with.
17     Telemarketing, is that soliciting through
18     phone calls? Well, you are asking me if she
19     did everything that's on this job
20     description; is that correct?
21   Q.  I am asking you if it looks like her job
22     description. It seems like your answer is,
23     some of the things on here are things she
24     didn't do; is that correct?

8 (Pages 26 to 29)

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

34

1   A.  Prior to joining the catering sales office,
2       yes.
3   Q.  Is that something that has been taken over
4       in the catering sales department?
5   A.  We are, in essence, the conference sales
6       representative. We book it and coordinate
7       it.
8   Q.  So there is no conference services
9       department anymore; is that right?
10  A.  I have absorbed that responsibility in my
11      department as well.
12  Q.  So you have the details and pertinent
13      information?
14  A.  Yes.
15  Q.  The second No. 7, which is actually No. 8,
16      "Maintain contact with client and conference
17      service representative assigned to the group
18      while their events are taking place," is
19      that something that Ms. Cosgrove did?
20  A.  Yes.
21  Q.  What has happened to that responsibility?
22  A.  Again, the conference sales position is a
23      representative. That's my position. So I
24      am that person.

35

1   Q.  How about 9; "Attend and staff trade shows,"
2       do you know if that's something that Ms.
3       Cosgrove did?
4   A.  Yes.
5   Q.  Is that something that's been taken over?
6   A.  We don't do that anymore.
7   Q.  "No. 10. Attend local and regional trade
8       meetings, for example, HSMA, Meeting
9       Planners International, et cetera," is that
10      something that Ms. Cosgrove did?
11  A.  Yes.
12  Q.  Is that something that has been taken over
13      by the catering sales department?
14  A.  We no longer do that.
15  Q.  "No. 11. Submit weekly activities report to
16      director of sales." Is that something that
17      Ms. Cosgrove did?
18  A.  Not when she was reporting to me.
19  Q.  She didn't submit a weekly activities report
20      to you?
21  A.  No, she didn't.
22  Q.  Did you ask her for that?
23  A.  No, I didn't.
24  Q.  And did you assign her any special projects

36

1       when she was reporting to you?
2   A.  Occasionally, yes.
3   Q.  What types of special projects?
4   A.  I don't remember.
5   Q.  Can you give me an example of, would it have
6       been something administrative?
7   A.  Possibly. It was a long time ago.
8   Q.  You said that as to Nos. 9 and 10,
9       "Attending trade shows and regional trade
10      meetings," that's not something that's done
11      anymore. Was there an explicit decision not
12      to attend trade shows and regional trade
13      meetings?
14  A.  The trade shows that Patricia was attending
15      were in relation to meetings, groups coming
16      in doing their meetings and lodging, which,
17      again, there wasn't a lot of space for them
18      to stay or meet in.
19          We did do wedding trade shows, but
20      stopped that because we were not booking
21      weddings from those trade shows. She did
22      not attend -- just the trade shows for the
23      meetings. It was not necessary. It didn't
24      bring in anymore business, so there was no

37

1       point in doing it.
2   Q.  Before you and the other two catering sales
3       managers absorbed the tasks listed in
4       Exhibit 1 that we have discussed, did you
5       talk about it with the catering sales
6       managers?
7   A.  At some point I did.
8   Q.  What did you say to them?
9   A.  I don't remember what I said exactly.
10  Q.  Did you tell them, "We are going to be
11      taking on more responsibility now"?
12  A.  Yes.
13  Q.  Did they express any concern with the new
14      work?
15  A.  No.
16  Q.  Was there anymore discussion about how to
17      deal with the additional workload?
18          MR. WILGOREN: Objection.
19  A.  No.
20  Q.  Did you and the catering sales staff talk
21      about whether you would be hiring anyone
22      else?
23  A.  I don't remember.
24  Q.  At some point in 2003 did you hear that Ms.

10 (Pages 34 to 37)

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

42

1  Q. What transpired at that meeting?
2  A. Again, it was a long time ago. I believe
3     Steve offered her the position and explained
4     why, that type of thing.
5  Q. Do you remember what he said?
6  A. Not exactly.
7  Q. Generally?
8  A. Just what I said. That there would be
9     changes, and we were eliminating her initial
10    position, and we would be offering her this
11    other position. But, again, I don't
12    remember everything that was said.
13 Q. Do you remember how the new position was
14    described?
15 A. No.
16 Q. Do you remember how Ms. Cosgrove reacted, if
17    at all?
18 A. She was upset.
19 Q. Do you remember anything that she said?
20 A. Not really.
21 Q. Did you say anything at the meeting?
22 A. I don't think I said anything at the
23    meeting, no.
24 Q. After that meeting, what happened next with

43

1     respect to Ms. Cosgrove's position? You
2     offered her this new position. Then what
3     happened.
4  A. That day or -- I don't understand the
5     question.
6  Q. The next thing that happened? Whether she
7     accepted the position, whether she started
8     taking on the responsibilities of the
9     position?
10 A. A lot of her interaction was with Steve
11    Brennan. I was involved in it somewhat, but
12    not much. It was mostly with Steve. So I
13    believe I remember that she accepted the
14    position, yes.
15 Q. Do you remember if the position was
16    described to her as a full-time position?
17 A. I don't remember.
18 Q. Do you remember if it was described as a
19    seasonal position?
20 A. I don't remember. The position initially
21    was a May through October, a seasonal
22    position. It was a 40-hour week, but May
23    through October.
24 Q. But you don't know if that was communicated

44

1     to Ms. Cosgrove?
2  A. I don't remember.
3        MS. SCHWAB: I am going to mark
4     this as Exhibit No. 2.
5     (Document marked as Exhibit 2 for
6     identification)
7  Q. Do you recognize the document marked as
8     Exhibit No. 2?
9  A. I do.
10 Q. What is that?
11 A. It is a change of status.
12 Q. For Ms. Cosgrove?
13 A. Yes.
14 Q. Is that your handwriting filling out the
15    form?
16 A. Part of it is.
17 Q. Which part?
18 A. The department number, the date, the
19    department, her name, and my signature and
20    the date.
21 Q. Where it says "Change Authorized By"?
22 A. Yes.
23 Q. Do you remember filling out this form?
24       MR. WILGOREN: Objection. She

45

1     testified she filled out part of the form.
2  A. The parts that I filled out, I vaguely
3     remember filling out.
4  Q. In the form in the section that I believe
5     you didn't fill out, which is the department
6     position rate, et cetera, FT is circled. Do
7     you see that?
8  A. Yes.
9  Q. What does FT mean?
10 A. Full time.
11 Q. Full time year-round?
12 A. It depends upon the position. The position
13    that she was going into was full time,
14    seasonal. Again, it was a May through
15    October position. It was never a year-round
16    position.
17 Q. I am just asking about this form. There is
18    also a place to circle "seasonal"?
19       MR. WILGOREN: Objection.
20 A. Yes.
21 Q. It is correct that "seasonal" is not
22    circled; is that correct?
23       MR. WILGOREN: Objection.
24 A. "Seasonal" is not circled, no.

12 (Pages 42 to 45)

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

54

1　　planning to come back?
2　A.　No.
3　Q.　Once Ms. Cosgrove appeared at her desk, then
4　　did you interact with her at some point?
5　A.　I don't recall that day what actually
6　　happened. I think I probably called Steve
7　　and said, "She is here. I didn't know she
8　　was coming back," and then he took over from
9　　there.
10　Q.　Do you know what Steve said?
11　A.　I don't remember.
12　Q.　Did Ms. Cosgrove reassume the
13　　responsibilities of the administrative
14　　assistant in the catering sales department
15　　when she came back?
16　A.　I don't remember what she did at that point.
17　Q.　Did she start working for you?
18　A.　We had someone in that position while she
19　　was out, Laura Lee, and she came back. We
20　　didn't know she was coming back at that
21　　date.
22　Q.　Right. But when she did come back, did she
23　　take over the responsibilities that Laura
24　　Lee Taddeo had been doing?

55

1　A.　I don't remember what she was doing. Steve
2　　stepped in from there.
3　Q.　But if she had been working as an
4　　administrative assistant in catering sales,
5　　presumably, she would have been working with
6　　you closely; is that correct?
7　A.　Right. But that position was ending. It
8　　was October. So it was no longer necessary
9　　to have that position. We were laying off
10　　the person that was in the position, Laura
11　　Lee, at the time, so the position was not
12　　needed.
13　Q.　When Ms. Cosgrove came back, was Laura Lee
14　　Taddeo still there?
15　A.　I believe so, yes.
16　Q.　Do you know if Laura Lee Taddeo left early
17　　so that Ms. Cosgrove could fill her
18　　position?
19　A.　Laura Lee left at different times every
20　　year. She was scheduled to leave, I
21　　believe, that following week.
22　Q.　Ms. Cosgrove never came in and replaced
23　　Laura Lee?
24　A.　No.

56

1　Q.　And do you know if Ms. Cosgrove remained at
2　　her prior desk when she came back?
3　A.　No.
4　Q.　No, she didn't?
5　A.　No, she didn't.
6　Q.　Do you know where she went?
7　A.　I don't know.
8　Q.　Did you have any interaction with her during
9　　the period after she came back?
10　A.　No, I didn't.
11　Q.　Did you and Mr. Brennan have any discussion
12　　about what happened with her?
13　A.　I don't remember having any conversations
14　　with him.
15　Q.　What about with anybody else at New Seabury?
16　A.　No.
17　Q.　Did you at some point hear that Ms. Cosgrove
18　　had stopped working at New Seabury?
19　A.　I knew she was no longer there. I really
20　　was not involved in what she was doing or
21　　when she left.
22　Q.　When did you find out that she was no longer
23　　there?
24　A.　I don't remember the date.

57

1　Q.　And do you remember what you heard?
2　A.　I don't remember. I wasn't involved in it.
3　Q.　Well, before she went out on leave, she had
4　　been offered the administrative assistant
5　　position in your department?
6　A.　Yes.
7　Q.　And you said she may have begun training for
8　　that position and then went out on leave
9　　afterwards?
10　A.　Yes.
11　Q.　Did she ever take on the position of
12　　administrative assistant for the catering
13　　sales department?
14　A.　I don't believe so, because she went on
15　　leave within days.
16　Q.　What about the next season?
17　A.　She was on maternity leave. She showed up
18　　for work without telling us.
19　Q.　Not the 2003 season. The 2004 season.
20　A.　What was the question?
21　Q.　Whether Ms. Cosgrove took on the
22　　administrative assistant for the catering
23　　sales department responsibilities for the
24　　2004 season?

15 (Pages 54 to 57)

Case 1:05-cv-10791-GAO    Document 24-2    Filed 06/12/2006    Page 6 of 8

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

66

1   A.  No one told me she was coming back.
2   Q.  Including Mr. Brennan?
3   A.  Yes.
4           MS. SCHWAB: I have no further
5       questions. Thank you for your time.
6
7       EXAMINATION BY MR. WILGOREN:
8
9   Q.  When you went on your maternity leave, who
10      was your supervisor prior to that time?
11  A.  Steve Brennan.
12  Q.  Did you have any discussions with Mr.
13      Brennan about your return to work?
14  A.  I talked with him approximately when I would
15      come back, my approximate date to go out and
16      give birth. Then at that point I would come
17      back within a certain amount of time, yes.
18  Q.  While you were out on maternity leave, did
19      you have discussions with Mr. Brennan about
20      returning to work?
21  A.  Yes.
22  Q.  Tell me each and every discussion you had
23      with him.
24  A.  I think I called or e-mailed him and told

67

1       him I wanted to take -- it was during the
2       off season, so I could take a little extra
3       time. I took 16 weeks off. So 8 weeks paid
4       and then some vacation time and some unpaid
5       time.
6   Q.  Did you have discussions about when you
7       would be returning to work?
8   A.  Yes.
9   Q.  What did you discuss with Mr. Brennan?
10  A.  I told him January 10, that Monday I would
11      be returning to work.
12  Q.  How far before January 10 did you tell Mr.
13      Brennan you would be coming back to work?
14  A.  I would say it was within the month after I
15      left. Sometime during that time, as soon as
16      I knew, how much time I could take and
17      wanted to take.
18  Q.  When did you go out on maternity leave?
19  A.  September 25, and I had my baby on the 26th,
20      and then I came back on January 10.
21  Q.  You worked until the day before you gave
22      birth?
23  A.  Yes.
24  Q.  And between September 26 and January 10,

68

1       when you returned to work, how often did you
2       communicate with Mr. Brennan?
3   A.  I would say once or twice. I communicated a
4       lot with my staff, the managers, Jane and
5       Aaron.
6   Q.  During the course of your conversations with
7       your staff, Jane and Aaron, did you make
8       them aware when you were returning to work?
9   A.  I did.
10  Q.  And when Ms. Cosgrove went out on her leave
11      of absence, you were her supervisor?
12  A.  Yes.
13  Q.  Would you have expected anyone you
14      supervised going out on a leave of absence
15      to advise you when they expect to return to
16      work?
17          MS. SCHWAB: Objection.
18  A.  Yes.
19  Q.  And did, in fact, Ms. Cosgrove at any time
20      advise you if and when she was returning to
21      work after the conclusion of her leave of
22      absence?
23          MS. SCHWAB: Objection. Asked and
24      answered.

69

1   A.  She did not.
2   Q.  New Seabury's policy provides for disability
3       pay for pregnancy leave?
4   A.  Am I aware of it?
5   Q.  Yes.
6   A.  I am aware there is disability leave. I
7       don't know all of the details.
8   Q.  And you get paid a certain percentage of
9       your income?
10  A.  Yes.
11  Q.  Do you know what that percentage of your
12      income is based upon?
13  A.  To be honest, I don't know.
14  Q.  Well, would it be what you're earning prior
15      to going out on a leave of absence?
16  A.  Right.
17  Q.  Do you know what Ms. Cosgrove received for
18      her disability pay?
19          MS. SCHWAB: Objection.
20  A.  Yes.
21  Q.  Tell us what she received.
22  A.  It was the disability percentage on her
23      original salary of $17 per hour.
24  Q.  Does that lead you to conclude that at the

18 (Pages 66 to 69)

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

70

1    time she commenced her leave of absence she
2    was still in the position of the manager?
3    A.  Yes.
4            MS. SCHWAB: Objection.
5    Q.  And do you know how that came about, that
6    Ms. Cosgrove obtained disability pay based
7    on her compensation as catering sales
8    manager or conference sales manager?
9    A.  What I remember, she was finishing out that
10   week in her one position, her initial
11   position as sales manager and was going to
12   start the next week as administrative
13   assistant, but then went out on disability
14   at the end of that week.
15   Q.  Do you have any sense as to why she did it
16   that way?
17           MS. SCHWAB: Objection.
18   A.  She was getting paid more money to go out on
19   the higher salary.
20           MS. SCHWAB: Objection. How could
21   she have a sense of why Ms. Cosgrove went
22   out on leave.
23   Q.  Now, do you know the reason -- did Ms.
24   Cosgrove go out on the maternity leave of

71

1    absence earlier than you anticipated?
2    A.  She went out on disability before she
3    initially went out on maternity, yes.
4    Q.  Did you have any conversations with Ms.
5    Cosgrove as to the need for that disability
6    leave of absence?
7            MS. SCHWAB: Objection.
8    A.  I was just made aware that she had brought
9    in a doctor's note stating that she needed
10   to go out on disability. There wasn't a lot
11   of discussion about her length of maternity
12   leave, when she would be back. There was
13   not a lot of discussion regarding it.
14   Q.  Do you find that unusual being her
15   supervisor, that there was not a lot of
16   discussion about those issues?
17           MS. SCHWAB: Objection.
18   A.  I do.
19   Q.  Now, prior to her going out on her leave of
20   absence, was she given any accommodations
21   for her maternity?
22           MS. SCHWAB: Objection.
23   A.  I'm sorry?
24   Q.  Were you made aware that she had an issue

72

1    with respect to varicosity?
2    A.  Yes.
3    Q.  And how did you become aware of that issue
4    with varicosity?
5    A.  She had told me that she had some issues
6    with her legs during the pregnancy and had
7    to put her feet up and things like that.
8    Q.  And prior to Ms. Cosgrove going out on her
9    disability leave of absence, was she
10   accommodated with respect to that varicosity
11   issue?
12   A.  Yes.
13           MS. SCHWAB: Objection.
14   Q.  Describe how she --
15   A.  Most of her responsibilities were at her
16   desk. She could put her feet up. She did
17   have something that she was putting her feet
18   up on. Anything she would have asked, we
19   would have let her do.
20   Q.  If she had asked, would she have had the
21   ability to put her feet up at her desk for
22   an hour at a time on several occasions
23   during the course of the day?
24           MS. SCHWAB: Objection.

73

1    A.  Yes.
2    Q.  Did she ever ask you whether she could have
3    done that or not?
4    A.  She never asked me if she could do it.
5    Q.  Was she, in fact, elevating her legs prior
6    to the time she was went out on disability?
7    A.  Yes.
8    Q.  You observed that?
9    A.  Yes.
10   Q.  How did she go about doing that at her desk?
11   A.  She had something under her desk that she
12   had her feet up on.
13   Q.  That could have been accommodated for an
14   hour twice a day?
15           MS. SCHWAB: Objection.
16   A.  Yes.
17   Q.  When Ms. Cosgrove began working under your
18   supervision, did you have an understanding
19   of what her job duties were?
20   A.  As sales manager?
21   Q.  Yes.
22   A.  Somewhat.
23   Q.  And could you tell, did she have a
24   particular focus of her job?

19 (Pages 70 to 73)

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

| 74 | |
|---|---|
| 1 | A. Her focus was to take the calls in and book |
| 2 | the lodging, block the rooms, give the |
| 3 | rates, block the meeting room space, mail |
| 4 | out menus to the clients, maybe site with |
| 5 | the clients, that type of thing. Once the |
| 6 | event was booked, the food and beverage was |
| 7 | passed on to us. |
| 8 | Q. Do you have a sense as her supervisor what |
| 9 | percentage of her workday was devoted to the |
| 10 | lodging aspect of group sales? |
| 11 | MS. SCHWAB: Objection. She |
| 12 | testified she didn't directly supervise her |
| 13 | and just had personnel-related interactions. |
| 14 | A. Well, Patricia had come into our department |
| 15 | knowing what she was supposed to do, so I |
| 16 | had a general knowledge of what she was |
| 17 | doing. I also did take the business, the |
| 18 | food and beverage part, after she had booked |
| 19 | the business. Her primary focus, in my |
| 20 | opinion, was the lodging, yes. |
| 21 | Q. And after Ms. Cosgrove's position was |
| 22 | eliminated, how was lodging for group sales |
| 23 | handled? |
| 24 | A. It was taken on by myself and the two |

| 75 | |
|---|---|
| 1 | catering sales managers, and there wasn't |
| 2 | very much to sell. |
| 3 | Q. Why was that? |
| 4 | A. There were very few rooms at that point. |
| 5 | Now we have 20 rooms so... |
| 6 | Q. And 20 lodging rooms? |
| 7 | A. Right. |
| 8 | Q. When you started working for New Seabury, |
| 9 | how many lodging rooms did they have? |
| 10 | MS. SCHWAB: Objection. |
| 11 | A. I don't know exactly. There were over a |
| 12 | hundred. |
| 13 | Q. And when you started working at New Seabury, |
| 14 | how many rooms were available for functions? |
| 15 | MS. SCHWAB: Objection; foundation. |
| 16 | A. There were several. Let me tell you the |
| 17 | number of the rooms. There were probably |
| 18 | three different locations that we did |
| 19 | meetings at with several different rooms in |
| 20 | addition to the country club, but actually |
| 21 | the country club was under reconstruction |
| 22 | when I started. |
| 23 | Q. And what's the basis of your knowledge of |
| 24 | the rooms available for meetings? |

| 76 | |
|---|---|
| 1 | A. When I began my position there as catering |
| 2 | sales manager, I oversaw the staff that did |
| 3 | the coffee breaks and lunches and that kind |
| 4 | of thing for the group, so... |
| 5 | Q. When you absorbed the conference aspect of |
| 6 | it, did you do an assessment of the |
| 7 | facilities available for meetings? |
| 8 | A. Yes. I would check the meeting room space |
| 9 | in the morning, open the room, turn the |
| 10 | lights on, make sure the room was set |
| 11 | correctly, make sure there was water, greet |
| 12 | the client. |
| 13 | Q. How has the availability of meeting rooms, |
| 14 | function rooms changed? |
| 15 | A. It has diminished just to two meetings rooms |
| 16 | at this point. |
| 17 | Q. Did Ms. Cosgrove, prior to the elimination |
| 18 | of her position, have the opportunity to |
| 19 | interact on a regular basis with Ms. Taddeo |
| 20 | in her capacity as administrative assistant? |
| 21 | MS. SCHWAB: Objection. |
| 22 | A. Yes. |
| 23 | Q. How often did she do so? |
| 24 | A. Daily. |

| 77 | |
|---|---|
| 1 | Q. And, to your knowledge, was Ms. Cosgrove |
| 2 | aware that the administrative assistant |
| 3 | position in the sales department was a |
| 4 | seasonal position? |
| 5 | MS. SCHWAB: Objection. |
| 6 | A. Yes. |
| 7 | Q. How? What's the basis of that belief? |
| 8 | A. Well, Laura Lee also did administrative |
| 9 | responsibilities for Patricia. She typed up |
| 10 | the contracts and sent them out. |
| 11 | Q. Ms. Cosgrove would have the opportunity to |
| 12 | observe when she was there and when she was |
| 13 | laid off? |
| 14 | MS. SCHWAB: Objection. |
| 15 | A. Yes. |
| 16 | Q. Now, how do seasonal employees become |
| 17 | reemployed by New Seabury for the following |
| 18 | season? |
| 19 | A. Not all of them come back. They call us |
| 20 | back when they are ready to come back or |
| 21 | want to come back. They don't necessarily |
| 22 | get rehired. It depends upon if there is a |
| 23 | need or when they call us to come back. |
| 24 | Q. Do you take any steps to call any seasonal |

20 (Pages 74 to 77)

## RECEIPT AND ACKNOWLEDGMENT

I have read the New Seabury Employee Handbook, and I am satisfied that I understand the company's policies and benefits. I also agree to abide by all company policies. I know that if I have any questions concerning any of the policies or benefits, I may ask my supervisor.

I understand and acknowledge that the New Seabury Employee Handbook does not constitute a contract of employment, and that I am an employee "at will" of New Seabury Company Limited Partnership, without an express or implied contract of any kind, either verbal or written. I understand and acknowledge that the policies and benefits set forth in the New Seabury Employee Handbook are not contractual obligations of New Seabury Company Limited Partnership as my employer, and may be subject to revision or elimination at the discretion of New Seabury Company

I understand that this book in no way limits the authority of New Seabury Company                to make policy, to institute changes in existing policy or introduce new subjects in the future.

_Patricia A. Sylvia_
_____
Employee Signature

4·12·99
_____
Date

Please return this form to the Personnel Department.

0014

## 2002 & 2003 COMPANY PAYROLL COMPARISON

|          | 2002 |          |          | 2003 |          |          |          |
| PAY DATE | ACTIVE # | PAYROLL | PAY DATE | ACTIVE # | PAYROLL | VARIANCE | ACC VAR |
|----------|----------|---------|----------|----------|---------|----------|---------|
| 1/11/02 | 106 | $128,473 | 1/10/03 | 124 | $113,301 | 18 ($15,172) | ($15,172) |
| 1/25/02 | 95 | $111,655 | 1/24/03 | 82 | $90,788 | (13) ($20,867) | ($36,039) |
| 2/8/02 | 89 | $116,712 | 2/7/03 | 59 | $83,312 | (30) ($33,400) | ($69,439) |
| 2/22/02 | 93 | $119,158 | 2/21/03 | 59 | $77,861 | (34) ($41,297) | ($110,736) |
| 3/8/02 | 106 | $135,611 | 3/7/03 | 54 | $80,311 | (52) ($55,300) | ($166,039) |
| 3/22/02 | 123 | $146,038 | 3/21/03 | 104 | $160,533 | (19) $14,495 | ($151,544) |
| 4/5/02 | 128 | $146,262 | 4/4/03 | 91 | $96,135 | (37) ($50,127) | ($201,671) |
| 4/19/02 | 152 | $163,991 | 4/18/03 | 130 | $102,035 | (22) ($61,956) | ($263,627) |
| 5/3/02 | 188 | $183,738 | 5/2/03 | 135 | $132,971 | (53) ($50,767) | ($314,394) |
| 5/17/02 | 209 | $214,697 | 5/16/03 | 172 | $156,333 | (37) ($58,364) | ($372,758) |
| 5/31/02 | 264 | $229,789 | 5/30/03 | 230 | $200,083 | (34) ($29,706) | ($402,464) |
| 6/14/02 | 339 | $307,080 | 6/13/03 | 267 | $224,678 | (72) ($82,402) | ($484,866) |
| 6/28/02 | 360 | $316,418 | 6/27/03 | 303 | $251,757 | (57) ($64,661) | ($549,527) |
| 7/12/02 | 371 | $348,577 | 7/11/03 | 325 | $304,387 | (46) ($44,190) | ($593,717) |
| 7/26/02 | 384 | $345,758 | 7/25/03 | 328 | $280,526 | (56) ($65,232) | ($658,949) |
| 8/9/02 | 378 | $347,039 | 8/8/03 | 339 | $320,829 | (39) ($26,210) | ($685,159) |
| 8/23/02 | 361 | $335,318 | 8/22/03 | 329 | $272,892 | (32) ($62,426) | ($747,585) |
| 9/6/02 | 336 | $303,864 | 9/5/03 | 302 | $274,200 | (34) | ($777,249) |

CONFIDENTIAL 6370

| | | | | | | | ($29,664) |
|---|---|---|---|---|---|---|---|
| 9/20/02 | 269 | $276,527 | 9/19/03 | 234 | $229,251 | (35) ($47,276) | ($824,525) |
| 10/4/02 | 230 | $233,933 | 10/3/03 | 204 | $187,782 | (26) ($46,151) | ($870,676) |
| 10/18/02 | 221 | $221,463 | 10/17/03 | 200 | $178,400 | (21) ($43,063) | ($1,049,076) |
| 11/1/02 | 186 | $191,974 | 10/31/03 | 181 | $173,044 | (5) ($18,930) | ($1,068,006) |
| 11/15/02 | 147 | $152,405 | 11/14/03 | 141 | $146,580 | (6) ($5,825) | ($1,073,831) |
| 11/28/02 | 128 | $133,843 | 11/28/03 | 98 | $102,851 | (27) ($30,992) | ($1,104,823) |
| 12/13/02 | 115 | $119,633 | 12/12/03 | 93 | $133,157 | (22) $13,524 | ($1,091,299) |
| 12/27/02 | 113 | $124,359 | 12/26/03 | 89 | $123,331 | (24) ($1,028) | ($1,092,327) |

CONFIDENTIAL
0371

2003 & 2004 PAYROLL COMPARISON REPORT

| | 2003 | | | 2004 | | | |
|---|---|---|---|---|---|---|---|
| PAY DATE | ACTIVE # | PAYROLL | PAY DATE | ACTIVE # | PAYROLL | VARIANCE | ACCT VAR |
| 1/10/03 | 124 | $113,301 | 1/9/04 | 85 | $113,470 | (39) $169 | $169 |
| 1/24/03 | 82 | $90,788 | 1/23/04 | 59 | $98,068 | (23) $7,280 | $7,449 |
| 2/7/03 | 59 | $83,312 | 2/6/04 | 51 | $98,015 | (8) $14,703 | $22,152 |
| 2/21/03 | 59 | $77,861 | 2/20/04 | 56 | $85,293 | (3) $7,432 | $29,584 |
| 3/7/03 | 54 | $80,311 | 3/5/04 | 50 | $75,866 | (4) ($4,445) | $25,139 |
| 3/21/03 | 104 | $160,533 | 3/19/04 | 63 | $88,702 | (41) ($71,831) | ($46,692) |
| 4/4/03 | 91 | $96,135 | 4/2/04 | 71 | $87,462 | (20) ($8,673) | ($55,365) |
| 4/18/03 | 130 | $102,035 | 4/16/04 | 90 | $111,286 | (40) $9,251 | ($46,114) |
| 5/2/03 | 135 | $132,971 | 4/30/04 | 107 | $144,890 | (28) $11,919 | ($34,195) |
| 5/16/03 | 172 | $156,333 | 5/14/04 | 132 | $158,888 | (40) $2,555 | ($36,750) |
| 5/30/03 | 230 | $200,083 | 5/28/04 | 156 | $172,790 | (74) ($27,293) | ($91,336) |
| 6/13/03 | 267 | $224,678 | 6/11/04 | 227 | $244,992 | (40) $20,314 | ($71,022) |
| 6/27/03 | 303 | $251,757 | 6/25/04 | 276 | $275,416 | (27) $23,659 | ($47,363) |
| 7/11/03 | 325 | $304,387 | 7/9/04 | 291 | $339,268 | (34) $34,881 | ($12,482) |
| 7/25/03 | 328 | $280,526 | 7/23/04 | 303 | $370,011 | (25) $89,485 | $77,003 |
| 8/8/03 | 339 | $320,829 | 8/6/04 | 303 | $344,111 | (36) $23,282 | $100,285 |
| 8/22/03 | 329 | $272,892 | 8/20/04 | 307 | $363,202 | (22) $90,310 | $190,595 |

CONFIDENTIAL

0372

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9/5/03 | 302 | $274,200 | 9/3/04 | 282 | $314,738 | (20) $40,538 | $231,133 |
| 9/19/03 | 234 | $229,251 | 9/17/04 | 228 | $271,913 | (6) $42,662 | $273,795 |
| 10/3/03 | 204 | $187,782 | 10/1/04 | 188 | $212,693 | (16) $24,911 | $298,706 |
| 10/17/03 | 200 | $178,400 | 10/15/04 | 188 | $224,830 | (12) $46,430 | $345,136 |
| 10/31/03 | 181 | $173,044 | 10/29/04 | 172 | $167,055 | (9) ($5,989) | $339,147 |
| 11/14/03 | 141 | $146,580 | 11/12/04 | 123 | $129,223 | (18) ($17,357) | $321,790 |
| 11/28/03 | 98 | $102,851 | 11/26/04 | 98 | $120,907 | 0 $18,056 | $339,846 |
| 12/12/03 | 93 | $133,157 | 12/10/04 | 93 | $115,628 | 0 ($17,529) | $322,317 |
| 12/26/03 | 89 | $123,331 | 12/23/04 | 82 | $115,963 | 7 ($7,368) | $314,949 |

CONFIDENTIAL



# NEW SEABURY RESOURCES MANAGEMENT, INC.

## EMPLOYEE HANDBOOK

May 1, 2002

**This Manual supercedes all previous documents
and is the Manual of Record. New Seabury Resources Mgt, Inc. reserves the
right to amend this Manual without notice.**

0169

## Terms of Employment

### Equal Employment Opportunity

The employment policies and practices of the New Seabury Resources Management, Inc. are:

- To recruit, hire, train, and promote employees based on qualifications, ability, and willingness to do the job, without discrimination because of age, sex, race, religion, color, national origin, disability or any other legally-protected status.
- To treat employees equally with respect to compensation, and opportunities for advancement, including but not limited to job assignment, supervision, training, upgrading, promotion, layoff, recall from layoff, and termination.
- All other policies and practices such as employee benefits, educational opportunities, and social and recreational programs are to be administered on the same basis of fair and equal treatment.

  New Seabury Resources Management, Inc. intends to treat its employees fairly. The standards for employment that we intend to maintain include:

- Overall competitive wages and benefits
- Clean, pleasant and safe work environment.
- Well-trained and knowledgeable management team that provides high quality supervision.
- Training opportunities for employees to maintain the competitive edge of Service excellence to our members
- Effective lines of communications that provides timely information to employees on all matters of Human resources, and is receptive to constructive feedback on job performance, and working conditions.

### Americans with Disabilities Act

New Seabury Resources Management, Inc. provides reasonable accommodations in accordance with the Americans with Disabilities Act. This will enable qualified applicants with a disability to perform the essential functions of the job that they are seeking and to enable a qualified employee with a disability to perform the essential functions of a job currently held.

Modifications and adjustments may be required in the work environment in the manner or circumstances in which the job is usually performed, or in circumstances in which the job is usually performed, or in the employment policies. Our goal is to allow an employee with a disability to enjoy the benefits and privileges of employment equal to those enjoyed by non-disabled employees.

- If you are granted a leave of absence and do not return to work on or before the expiration date of your leave, you will be considered to have voluntarily terminated your employment effective as of your last day of service.

Other than during peak periods, a member of the Executive Committee may grant time off without pay, not to exceed 10 working days, without cause. You must request such time off by writing to their Department Head. If granted, Human Resources must receive an original copy of the request so it may be placed in your personnel file.

## Family and Medical Leave Act

The Family and Medical Leave Act (FMLA) of 1993 is a Federal Law that entitles eligible employees to take up to 12 weeks of unpaid, job-protected leave in a 12-month period for specified family and medical reasons. New Seabury Resources Management, Inc. recognizes the FMLA and will comply with all the requirements as defined by the Federal Government.

### Purpose

FMLA is intended to balance the demands of the workplace with the needs of families. By providing workers faced with family obligations, serious family, or personal illnesses with reasonable amounts of leave, FMLA encourages stability in the family and productivity in the workplace.

### Employee Eligibility

To be eligible for FMLA benefits, an employee must:
- Have worked for the employer for a total of 12 months;
- Have worked at least 1,250 hours of service during the 12-month period immediately preceding the start of the leave

### Employee Entitlement to Leave

Eligible employees may take up to 12 workweeks of unpaid leave during each 12-month period for one or more of the following reasons:
- For the birth and care of the newborn child of an employee;
- For placement with the employee of a son or daughter for adoption or foster care;
- To care for an immediate family member (spouse, child or parent) with a serious health condition; or
- To take medical leave when the employee is unable to work because of a serious health condition

Spouses employed by the same employer are jointly entitled to a **combined** total of 12 work-weeks of family leave for the birth and care of the newborn child, for placement of a child for adoption or foster care, and to care for a parent who has a serious health condition. Leave for birth and care, or placement for adoption or foster care must conclude within 12 months of the birth or placement.

New Seabury Resources Management, Inc. requires that any accrued paid vacation, personal leave, or family leave be used for any portion of an approved leave for the first three

reasons for leave given above. Accrued paid vacation or personal leave may be substituted for leave provided for a serious health condition of the employee or for care of a spouse, son, daughter, or parent with a serious health condition.

## Intermittent Leave

Intermittent leave may mean taking leave in blocks of time, or by reducing the employee's normal weekly or daily schedule. It is an option that may provide a convenient solution for both the employee and the employer.

- If FMLA leave is for birth and care or placement for adoption or foster care, use of intermittent leave is subject to the employer's approval.
- FMLA Leave may be taken intermittently whenever **medically necessary** to care for a seriously ill family member, or because the employee is seriously ill and unable to work.
  - Intermittent leave is applied towards the 12-week FMLA maximum benefit.

When intermittent leave is needed to care for an immediate family member or the employee's own illness, and is planned for medical treatment, the employee must try to schedule treatment so as not to unduly disrupt the employer's operation.

This document is intended to be viewed by New Seabury Resources Management, Inc. employees. Any form of copy is prohibited.

**"Serious health condition"** means an illness, injury, impairment, or physical or mental condition that involves:

- Any period of incapacity or treatment connected with inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical-care facility, and any period of incapacity or subsequent treatment in connection with such inpatient care; or
- Continuing treatment by a health provider which includes any period of incapacity (i.e., inability to work, attend school or perform other regular daily activities) due to:

1. A health condition (including treatment therefor, or recovery therefrom) lasting more than three consecutive days, and any subsequent treatment or period of incapacity relating to the same condition, that also includes treatment two or more times by or under the supervision of a health care provider; or one treatment by a health care provider with a continuing regimen of treatment.
2. Pregnancy or prenatal care. A visit to the health care provider is not necessary for each absence.
3. A chronic serious health condition, which continues over an extended period of time, requires periodic visits to a health care provider, and may involve occasional episodes of incapacity (e.g., asthma, diabetes). A visit to a health care provider is not necessary for each absence.
4. A permanent or long-term condition for which treatment may not be effective (e.g., Alzheimer's, a severe stroke, terminal cancer). Only supervision by a health care provider is required, rather than active treatment.

5. Any absences to receive multiple treatments for restorative surgery or for a condition which would likely result in a period of incapacity of more than three days if not treated (e.g., chemotherapy or radiation treatments for cancer.)

## "Health care provider" means:

- Doctors of medicine or osteopathy authorized to practice medicine or surgery by the state in which the doctors practice; **or**
- Podiatrists, dentists, clinical psychologists, optometrists and chiropractors (limited to manual manipulation of the spine to correct a subluxation as demonstrated by x-ray to exist) authorized to practice, and performing within the scope of their practice, under state law; **or**
- Christian Science practitioners listed with the First Church of Christ, Scientist in Boston, Massachusetts; **or**
- Any health care provider recognized by the employer or the employer's group health plan benefits manager.

## Maintenance of Health Benefits

The employer is required to maintain group health insurance coverage for an employee on FMLA leave whenever such insurance was provided before the leave was taken and on the same terms as if the employee had continued to work. If applicable, arrangements will need to be made for employees to pay their share of health insurance premiums while on leave.

## Job Restoration

Upon return from FMLA leave, an employee must be restored to the employee's original job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment. During any period of leave, an employee will not lose any accrued employment benefit (i.e., group life insurance, health insurance, disability insurance, personal leave, vacation time or retirement benefits) that the employee earned or was entitled to before using the FMLA leave.

Under specified and limited circumstances where restoration to employment will cause substantial and grievous economic injury to its operations, an employer may refuse to reinstate certain highly paid **"key"** employees after using FMLA leave during which health coverage was maintained. A "key" employee is a salaried "eligible" employee who is among the highest paid ten percent of employees.

If the employee on leave is among the highest paid 10% of employees, New Seabury Resources Management, Inc. may deny restoration of employment, but only if necessary to prevent "substantial and grievous economic injury" to the Company, and if the employee has elected not to return immediately from an approved leave after receiving a notice from New Seabury Resources Management, Inc. of the Company's intent to deny restoration.

## Advance Notification and Medical Certification Requirements

New Seabury Resources Management, Inc. requirements:

- When leaves are "foreseeable", employees must give 30 days advance notice to their Department Head in writing. In case of medical emergencies, notice must be provided within 1 to 2 workdays of the employee's knowledge for leave.
- Employees must advise their Department Heads "as soon as practicable" of any change in dates of scheduled leave or extension of such leave. Such changes should be confirmed in writing.
- Medical certification, within 15 days of the Company's request, supporting the need for leave due to a serious health condition affecting the employee or an immediate family member.
- Second or third medical opinions (at the employer's expense).
- Periodic medical certification every 30 days for continuous blocks of leave and every 6 months for intermittent leaves.
- Periodic reports during FMLA leave regarding the employee's status and intent to return to work as follows:
    - Biweekly during the first month, and
    - Monthly after the first month.

Please contact the Personnel Office for additional information.

## Maternity Leave

**Eligibility -** Full-time employees of New Seabury Resources Management, Inc. will be eligible for maternity leave after 12 months of uninterrupted service.

- Maternity leave will be granted for pregnancy, childbirth, and recovery for a period of up to twelve weeks from the first day of leave.
- This leave must be requested at least two weeks in advance of the starting date.
- If you are eligible for paid leave, you will receive 60% of your average weekly salary, paid in accordance with Company payroll schedules, for a period of eight weeks.
- Upon return from this twelve-week leave, you are entitled to the same position you left, or a similar position with the same level, pay and length of service credit.
- If you do not return from your Maternity leave after twelve weeks, and you are not medically disabled, or on an approved extension, you will be voluntarily terminated.

## Extension of Leave

- Any extension to the twelve-week leave that has been approved for you will not include the job protection mentioned above.
- Upon two weeks notification of your desire to return after an extension, the Company will let you know whether or not a position is available.

If you become medically disabled as a result of your pregnancy, and meet the length of service requirements, Salary Continuance will go into effect. You must have medical evidence of the disability, and be under the continual care of a physician. You do not have to be house or hospital confined.



# PAYROLL CHANGE NOTICE

**and**

## NEW HIRE AUTHORIZATION



Today's Date: _1-15-03_

Dept. #: _510_     Dept. Name: _GOLF OPERATIONS_

Effective Date: _1-20-03_ ✓

Employee/New Hire Name: _Robert McGraw_

Social Security Number ___ - ___ - ___

Employee File Number: _____

**Reason For Change(s):**

| | | | |
|---|---|---|---|
| ☐ | New Hire | ☐ | Probationary Period Completed |
| ☐ | Re-hire | ☐ | Length of Service Increase |
| ☐ | Promotion | ☒ | Re-evaluation of Exisiting Position |
| ☐ | Demotion | ☐ | Resignation |
| ☐ | Transfer | ☐ | Termination (Reason, see other below) |
| ☐ | Merit Increase | ☐ | Layoff |
| | | ☐ | Eligible for Rehire (Y or N, see other below for explanation) |

☐ Leave of Absence     From: [ ]     To: [ ]

(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☒ Other (details) _____

_____

_____

| | | | |
|---|---|---|---|
| ☐ | Department | | |
| ☒ | Position | Head Golf Prof. | Dir. of Instruction |
| ☒ | Rate | 2230.77 | 1346.15 |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:     Yes ✓     No     Signed Policy Attached:

Change Authorized By: _____     Date: _____

Change Approved By: _[signature]_     Date: _1-15-03_

CONFIDENTIAL

038

## CHANGE OF STATUS

Name: _SCOTT  NICKERSON_     Effective Date _1-27-03_     File No. _____

New Hire _____    Rehire _____    Transfer _____    Termination _____

Source: Advertisement___ Employee Referral___ Resume___ Walk In___
    Employment Agency___ Dept/Emp.& Training___ Other___

Merit Increase___    Promotion___   . Other _✓_
_CHANGE  IN  POSITION  +  RESPONSIBILITIES_

### New/Current Status:

Department Name_____
Department Number_____

Job Title _DIR. OF GOLF OP'S_
Pay Grade_____

Salary: $_____ Hour
     $_____ BiWeekly
     $_90,000_ Annual

Non-Exempt_____ Exempt _✓_
Tip_____ Ind-Tip_____ Non-Tip_____

Status Type:
    Full Time_____ Part Time_____
    Temporary_____ End Date_____
    Seasonal_____ End Date_____

Scheduled Hours per Week_____
Adj. Hours/Emp Convenience_____

Performance Review Date:_____

Authorized Use of Company Vehicle
    Yes _✓_ No_____
(If yes attach signed Vehicle Policy)

### Change To:

Department Name_____
Department Number_____

Job Title _GOLF COURSE SUPT._
Pay Grade_____

Salary: $_____ Hour
     $_3,1539_ BiWeekly
     $_81,000_ Annual

Non-Exempt_____ Exempt _✓_
Tip_____ Ind-Tip_____ Non-Tip_____

Status Type:
    Full Time_____ Part Time_____
    Temporary_____ End Date_____
    Seasonal_____ End Date_____

Scheduled Hours per Week_____
Adj.Hours/Emp Convenience_____

Performance Review Date:_____

Authorized Use of Company Vehicle
    Yes _✓_ No_____
(If yes attach signed Vehicle Policy)

CONFIDENTIAL
0363



# PAYROLL CHANGE NOTICE

## and

## NEW HIRE AUTHORIZATION



Today's Date: _3/5/03_

Dept. #: _520_          Dept. Name: _Golf maint._

Effective Date:                     _3/2/03_

Employee/New Hire Name:             _Dan Stone_

Social Security Number              _011 - 70 - 6198_

Employee File Number:               _604_

## Reason For Change(s):

| | | | |
|---|---|---|---|
| ☐ New Hire | | ☐ Probationary Period Completed | |
| ☐ Re-hire | | ☐ Length of Service Increase | |
| ☐ Promotion | | ☐ Re-evaluation of Exisiting Position | |
| ☐ Demotion | | ☐ Resignation | |
| ☐ Transfer | | ☐ Termination (Reason, see other below) | |
| ☐ Merit Increase | | ☐ Layoff | |
| | | ☐ Eligible for Rehire (Y or N, see other below for explanation) | |

☐ Leave of Absence    From: [        ]    To: [        ]

(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☐ Other (details) _____

_____

_____

| | | FROM | TO |
|---|---|---|---|
| ☐ | Department | 520 | 520 |
| ☑ | Position | Golf Super. | Asst Super. |
| ☑ | Rate | 2230.77 / 58,000. | 1730.77 Biwk / 45,000. |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:    Yes    No    Signed Policy Attached:

Change Authorized By: _____    Date: _____

Change Approved By: _[signature]_    Date: _3/5/03_

CONFIDENTIAL

C362

**New Seabury**
**F&B Departmental Reorganization**

| | Current | | Proposed | | |
|---|---|---|---|---|---|
| | Base | Possible Incentive | Base | Possible Incentive | Possible Total |
| Roy | 62,500 | | 62,500 | 6,250 | 68,750 |
| Jennifer Perry | 50,000 | | 42,000 | <20,000 | 62,000 |
| Aarron B. | 47,242 | | 34,000 | <20000 | 54,000 |
| Jane Henry | 45,000 | | 45,000 | 0 | 45,000 |
| Patricia | 35,360 | | N/A | | N/A |
| Patty Packard | 40,000 | | 40,000 | | 40,000 |
| Marion | 50,000 | <50,000 | 50,000 | <50,000 | 100,000 |
| Sales Asst. | N/A | | 25,000 | N/A | 25,000 |
| Total | 330,102 | <50,000 | 298,500 | 96,250 | 394,750 |

<380,102                   <394,750





PLAINTIFF'S
EXHIBIT NO. 16
FOR IDENTIFICATION
2-14-06
DATE:        RPTR

**Dept:**    **Food and Beverage, Banquet Sales**

**BUDGET:**

|  |  | 1st QTR. | 2nd QTR. | 3rd QTR. | 4th QTR. | TOTAL |
|---|---|---|---|---|---|---|
| **CLUB** |  |  |  |  |  |  |
|  | Bqt. Sales | 42,095 | 373,000 | 456,000 | 273,000 | 1,144,095 |
|  | Room Rental | 1,305 | 59,000 | 82,500 | 45,700 | 188,505 |
|  |  |  |  |  |  |  |
| **POPPY** |  |  |  |  |  |  |
|  | Bqt. Sales | 0 | 530,400 | 903,900 | 170,500 | 1,604,800 |
|  | Room Rental |  | 64,000 | 138,000 | 29,500 | 231,500 |
|  |  |  |  |  |  |  |
|  | Total | 43,400 | 1,026,400 | 1,580,400 | 518,700 | 3,168,900 |

**Jennifer Perry**
| 1/2 % of sales |  | 5,132 | 7,902 | 2,594 | 15,628 |
| Base 42,000 | 12,500 | 10,500 | 10,500 | 10,500 | 44,000 |
| Total '03 Compensation |  |  |  |  | $59,628 |

2 1/2% % of sales from $3,168,900 to $3,500,000                                    $8,277
5% of sales revenue over $3,500,000.

**Aaron Brochau**
| 1/2% of sales |  | 5,132 | 7,902 | 2,594 | 15,628 |
| Base 34,000 | 11,810 | 8,500 | 8,500 | 8,500 | 37,310 |
| Total '03 Compensation |  |  |  |  | $52,938 |

CONFIDENTIAL

**New Seabury**
**F&B Departmental Reorganization**

|  | Current | | Proposed | | |
|---|---|---|---|---|---|
|  | Base | Possible Incentive | Base | Possible Incentive | Possible Total |
| Roy | 62,500 | | 62,500 | 6,250 | <68750 |
| Jennifer Perry | 50,000 | | 40,000 | <20,000 | <60,000 |
| Aarron B. | 47,242 | | 35,000 | <20,000 | <55000 |
| Jane Henry | 45,000 | | 45,000 | 0 | 45,000 |
| Patricia | 35,360 | | | | |
| Patty Packard | 40,000 | | 40,000 | | 40,000 |
| Marion | 50,000 | <50,000 | 50,000 | <50,000 | <100,000 |
| Sales Asst. | N/A | | 30,000 | N/A | 30,000 |
| Total | 330,102 | <50,000 | 302,500 | 96,250 | <398750 |

<380,102            <398,750

CONFIDENTIAL

Brennan
L3



**PAYROLL CHANGE NOTICE**

and

**NEW HIRE AUTHORIZATION**



Today's Date: 5/11/03

Dept. #: 423    Dept. Name: Catering

Effective Date: 5/11/03

Employee/New Hire Name: Patricia Cosgrove

Social Security Number: 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

Employee File Number: 793

**Reason For Change(s):**

☐ New Hire
☐ Re-hire
☐ Promotion
☐ Demotion
☒ Transfer
☐ Merit Increase

☐ Probationary Period Completed
☐ Length of Service Increase
☐ Re-evaluation of Exisiting Position
☐ Resignation
☐ Termination (Reason, see other below)
☐ Layoff
☐ Eligible for Rehire (Y or N, see other below for explanation)

☐ Leave of Absence    From: _____    To: _____
(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☐ Other (details)

| | | |
|---|---|---|
| ☐ Department | 423 | 423 |
| ☐ Position | Conf. Slo mgr. | Adm. Asst |
| ☐ Rate | 17.00 | 12.00 |
| ☐ Exempt/Non | | |
| ☐ (FT/PT, Seasonal | | |

Use of Company Vehicle:    Yes    No    Signed Policy Attached:

Change Authorized By: J. Perry.    Date: 5/11/03.

Change Approved By: _____    Date: _____

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\*\*\*

| | |
|---|---|
| **PATRICIA COSGROVE** | \* |
| | \* |
| **Plaintiff** | \* |
| | \* |
| v. | \* |
| | \* |
| **NEW SEABURY RESOURCES** | \* |
| **MANAGEMENT, INC.,** | \* |
| | \* |
| **Defendant** | \* |
| | \* |

**CIVIL ACTION NO. 05-10791- GAO**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*\*\*\*\*

### AFFIDAVIT OF LAURA LEE TADDEO

I, Lauralee Taddeo of 49 Waterway, Mashpee, Massachusetts under the pains and penalties of perjury state as follows:

1.    I was employed by New Seabury Resources Management, Inc., for a number of years as an Administrative Assistant in the Catering Sales Department.

2.    My position was always a seasonal job. I worked each year from May to October. I was laid off each year in October.

3.    I know Patricia Cosgrove. She was employed by New Seabury Resources Management, Inc. Patty formerly had a job that involved booking of the lodging for groups. New Seabury Resources Management, Inc. got rid of a lot of its rental properties.

4.    Patricia Cosgrove was demoted to my job in 2003. She went out on maternity leave and I returned to my job.

5.    Patricia returned to work from her maternity leave of absence in October 2003.

6.    Shortly after Patricia returned to work in October 2003 I was laid off. Patricia was given another job by New Seabury Resources Management, Inc.,

7.    It seems like New Seabury Resources Management, Inc., le a lot of employees go. They eliminated a lot of jobs.

8.    Patricia Cosgrove was well aware that at all times the job I held as Administrative Assistant in the Catering Sales Department was always classified as a seasonal position.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 6th DAY OF JUNE 2006.

<u>s/LAURA LEE TADDEO</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * *****
PATRICIA COSGROVE                      *
                                       *
              Plaintiff                *
                                       *
v.                                     *    CIVIL ACTION NO. 05-10791- GAO
                                       *
NEW SEABURY RESOURCES                  *
MANAGEMENT, INC.,                      *
                                       *
              Defendant                *
                                       *
* * * * * * * * * * * * * * * * * * * * * * * *****
```

## AFFIDAVIT OF JOHN SHEA

I, John Shea   under the pains and penalties of perjury state as follows:

1.    I am employed by New Seabury Resources Management, Inc., ("NSRM") as the Director of Information Technology.

2.    In October 2003 my office was located in a partitioned office in the warehouse on the NSRM property in Mashpee, Massachusetts. My office was adjacent to an office occupied by an Administrative Assistant.

3.    In September 2003 I established a test project to scan financial records that were located in boxes which were stored in the warehouse where my office was located. There were several hundred boxes containing the financial records that needed to be stored.  Given the number of boxes of records that needed to be scanned it made sense to do the scanning in the office adjacent to the warehouse.

4.    When the process of scanning began in mid September 2003, it was performed by Robin Almedia who was classified as an Administrative Assistant.  Robin Almedia left the employ of NSRM on or about September 30, 2006.

5.      On or about October 7, 2006 Patricia Cosgrove returned to work from a maternity leave of absence.  As an Administrative Assistant she was assigned by NSRM General Manager Stephen Brennan to perform the scanning of the financial records.

6.      I did everything possible to make Patricia Cosgrove's return to work as easy as possible.  In a typical eight hour day Patricia was away from her work station approximately four hours per day.

7.      Patricia was allowed to go to the Administration Building to use a private office to pump her breast milk.  This involved getting in her car and driving to that location which was several minutes away by car.

8.      Patricia was allowed to go to the Administration Building or the Clubhouse to use the restroom facilities. Patricia also went to the Clubhouse on a daily basis for her lunch and other breaks.

9.      Patricia complained about the bathroom in the warehouse. I told her she did not have to use it. She was allowed to go to the Administration office or Clubhouse without objection by NSRM.

9.      Patricia was provided with a refrigerator so she could store the breast milk.

10.     There was no business need for Patricia to go into the warehouse area. The boxes of records to be scanned were brought to her office.

11.     Patricia was provided with a key to the door which led directly from the parking area to her office. She never had to go into the warehouse.

12    Patricia was provided with a space heater after she said the heat in the office was not working properly.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 8 DAY OF JUNE 2006.

s/JOHN SHEA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * * * * * * * * *****
```
PATRICIA COSGROVE                          *
                                           *
                    Plaintiff              *
                                           *
v.                                         *    CIVILACTIONNO.05-10791- GAO
                                           *
NEW SEABURY RESOURCES                      *
MANAGEMENT, INC.,                          *
                                           *
                    Defendan          t*
                                           *
```
* * * * * * * * * * * * * * * * * * * * * * * * *****
```

### AFFIDAVIT OF MICHELE M. O'BRIEN

I, Michele M. O'Brien, of 99 Holly Ridge Drive, Sandwich, Massachusetts under the pains and penalties of perjury depose and say:

1.    I was employed by New Seabury Resources Management Inc., (NSRM) until I was laid off on March 10, 2003.

2.    Prior to my being laid off I my duties principally involved the selling of real estate for the Company. In this regard I was involved in going to the Land Court, and interacting with realtors among other duties.

3.    In January 2003 NSRM hired a new management team. Stephen Brennan was hired as the new General Manager.

4.    I understand that the new management team was charged with cutting the payroll and bring costs of the operation in line.    They were restructuring the operation and reducing high salaries.

5.    The duties of my position could be handled by outsourcing to vendors particularly realtors in the area. At the time my employment by NSRM

ended there were only eight condominium units available for sale, some time shares, and some land.

6.    I can not say that my termination was as a result of my status as a pregnant female.

7.    In or about September or October 2003 I received a telephone call from Amy Carlin who identified herself as Patricia Cosgrove's attorney. Ms. Carlin asked me if I thought my layoff was due to my status as a pregnant woman.

8.    I told Ms. Carlin that my layoff was not due to my being pregnant.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 2nd DAY OF June 2006.

s/MICHELE M. OBRIEN