1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASS

3              C.V. NO.: 05-10791-GAO

4

5    * * * * * * * * * * * * * * * * * * * * * * * * *

6    PATRICIA COSGROVE,                              *

7                        Plaintiff,                  *

8                        vs.                         *

9    NEW SEABURY RESOURCES,                          *

10   MANAGEMENT, INC.,                               *

11                       Defendant.                  *

12   * * * * * * * * * * * * * * * * * * * * * * * * *

13

14         DEPOSITION OF:   PATRICIA COSGROVE

15

16         LAW OFFICE OF HOWARD WILGOREN

17              6 Beacon Street

18         Boston, Massachusetts 02110

19

20

21    January 16, 2006      10:00 a.m. - 4:53 p.m.

22

23              KATHRYN K. GIANNO

24              COURT REPORTER

1    maternity leave?

2        A    Before my maternity leave.

3        Q    Tell me exactly what you said to her and

4    what she said to you.

5        A    From what I can recall, I discussed with

6    her my change in position and my concern for my job.

7        Q    Do you remember particularly what you

8    said, rather than summarizing it?

9        A    No, I don't remember particularly, no.

10       Q    Do you remember what Mary Carrol said to

11   you?

12       A    No, I do not, not specifically.

13       Q    By the way, you referred to your change in

14   the job.  You're aware, are you not, that your job

15   as sales manager was eliminated; is that right?

16       A    Yes.

17       Q    And no one replaced you, is that also your

18   understanding?

19       A    No one replaced me, no.

20       Q    When was the second conversation about the

21   case you had with Mary Carrol?

22       A    I can't recall specifically.

23       Q    Other than Wendy Ghelfi, Mary Carrol,

24   Rhonda Rogers and Sharon Marshall, have you spoken

```
 1    name is Ed.  He was previously in maintenance.  And
 2    I can't recall anyone else at this time.
 3        Q     Did you speak to Tanya Copestik about the
 4    facts and circumstances involved in your lawsuit?
 5        A     Could you clarify what are "facts and
 6    circumstances"?
 7        Q     Well, anything pertaining to your lawsuit.
 8        A     Yes.
 9        Q     On how many occasions did you have those
10    discussions?
11        A     Maybe a couple of occasions.
12        Q     When was the first conversation?
13        A     Back in '03.
14        Q     Where did that conversation take place?
15        A     At the reception center.
16        Q     Were you working at that time?
17        A     I was leaving for the day, so I was not
18    working at the time.
19        Q     Tell me, as best you can recall, what you
20    said to Tanya Copestik and what she said to you, if
21    anything, at that time.
22        A     Just that there had been a change in my
23    position; I remember stating that.  And that I was
24    upset and concerned for my job, and she commented
```

1    that it was unfair.

2        Q    What did you mean by a "change in your

3    position"?

4        A    They had eliminated my position and

5    offered me another position.

6        Q    Did you have another conversation with

7    Tanya about this pertaining to your case?

8        A    Yes, I did.

9        Q    When did that occur?

10        A    I don't recall the day.

11        Q    Do you remember the month and the year?

12        A    I would say it was 2003.

13        Q    Were you still employed at New Seabury?

14        A    Yes.

15        Q    And where did that conversation take

16    place?

17        A    We may have spoken over the phone or at

18    work.

19        Q    I see.   Now Tanya Copestik had an office

20    in the administration building?

21        A    Yes, she did.

22        Q    And you had occasion to visit, then, on a

23    regular basis when you returned to work in October

24    of 2003, did you not?

1       A     Yes, I did.

2       Q     Tell me all the reasons that would prompt

3   you to visit Tanya Copestik's office when you

4   returned to work in October 2003.

5       A     I returned to the reception center because

6   she had offered her office as a private location for

7   me to pump breast milk.

8       Q     That was done with the consent of the

9   management of New Seabury?

10      A     It was not done with consent; however,

11  they were notified.

12      Q     You notified them?

13      A     Yes.

14      Q     And did anyone object?

15      A     No.

16      Q     And, in fact, you were allowed to go to

17  Tanya Copestik's office in the administration

18  building at your pleasure, whenever you needed to

19  pump your breast milk?

20           MS. SCHWAB:  Objection.

21           THE WITNESS:  When it was necessary.

22  Q     (By Mr. Wilgoren:) When it was necessary.  Bad

23  choice of words, I'm sorry.  When it was necessary.

24      A     It wasn't pleasure.

1      Q    I stand corrected.  I said it was a bad
2   choice of words.  And that was done -- you were on
3   the clock when you were doing that, you were being
4   paid for that time?

5      A    Yes.

6      Q    And you say it wasn't done with the
7   consent, but it was done with the full knowledge of
8   the management of New Seabury?

9      A    Correct.

10      Q    On how many occasions during the course of
11   a regular day would it be necessary for you to leave
12   your work site and go to Tanya Copestik's office in
13   the administration building to pump your breasts?

14      A    Once or twice a day.

15      Q    How long would that entire process take?

16      A    Generally, 15 to 20 minutes each time.

17      Q    That would include leaving your work site,
18   getting in your car, driving over there, doing what
19   was necessary to pump your breasts and driving back?

20      A    Yes.  I would say, approximately.

21      Q    Fifteen to 20 minutes?

22      A    Yes.

23      Q    Maybe a little more?

24      A    Maybe a little more, maybe a little less.

1    Q    All which was being paid for by New

2    Seabury?

3    A    Yes.

4    Q    Now, what prompts you to say that it was

5    not done with the consent of the management of New

6    Seabury?

7    A    Could you rephrase that?

8    Q    Well, in other words, they were paying

9    you, they were informed of it, and they did not

10    object; so based on all of that, what prompts you to

11    say it was not done with the consent of New Seabury

12    management?

13    A    I never specifically asked if I could take

14    time to breast-feed or breast-pump.

15    Q    Have you told me the full extent of your

16    recollection of your conversations about the facts

17    pertaining to this case with Tanya Copestik?

18    A    To the best of my recollection.

19    Q    And Ed, whose last name you don't know,

20    from maintenance, on how many occasions did you

21    speak to him about the circumstances pertaining to

22    this case?

23            MS. SCHWAB:  Objection.  Are you referring

24            to before or after October 2003?

1    draw in new clients, the sales team would.

2        Q    Did your job change at some point in time?

3        A    At some point in time from start to

4    finish?

5        Q    Yes.

6        A    Yes, it did.

7        Q    When was the next change in your job

8    responsibilities or title?

9        A    I would say probably the next significant

10   change was when the old clubhouse was torn down and

11   the new clubhouse was built.

12       Q    What happened to your job at that time?

13       A    They relocated me to the sales office in

14   the new country club.

15       Q    What was your job title at that point?

16       A    It was the same position.

17       Q    So your position stayed the same until it

18   was eliminated?

19       A    Yes.

20       Q    That was Sales Manager?

21       A    Sales Manager, correct.

22       Q    And is it fair to say that, particularly

23   when you were in the country club when you relocated

24   there, that the focus of your job was on the lodging

1    aspect of groups that would come to New Seabury?

2        A    That was probably 50 percent of the job

3    description.

4        Q    Well, without regard to the job

5    description, I'm asking you about what your actual

6    job duties were on a day-to-day basis.

7        A    Yes, that was primarily my responsibility.

8        Q    Tell me how you would go about handling

9    groups that came in, the lodging aspect of that.

10       A    I would assign them -- block them rooms,

11   with the initial contact from the client, I believe,

12   I blocked the rooms based on their needs for their

13   attendees.  I would also set up function space for

14   them and meeting rooms.

15       Q    You set up the function space?

16       A    Yes.

17       Q    How would you go about doing that?

18       A    I would secure and reserve function space

19   based on our availability.

20       Q    How would you do that?

21       A    They had a log, quite a large book in the

22   conference sales and catering sales department that

23   recorded all events going on on a day-to-day basis.

24       Q    What else did you do?

1      A      Rooms, function space, meeting space.  I

2  would secure the meeting space the same way.

3      Q      In the logbook?

4      A      By looking at the log, correct.

5      Q      Where is this logbook located?

6      A      In the sales office in the country club.

7      Q      Then at some point would you transfer the

8  group over to someone else in the sales department?

9      A      The catering sales department would then

10  handle it for all food and beverage selections.

11      Q      Who would you hand the case off to?

12      A      Generally the manager of catering sales.

13      Q      Who was?

14      A      Jennifer Perry at the time.

15      Q      What percentage of your job

16  responsibilities for groups revolved around lodging?

17      A      100 percent.

18      Q      So the other functions were very little

19  part -- took up very little part of your time?

20      A      They were in conjunction with the rooms.

21          MR. WILGOREN:  Let's have this marked as

22      Exhibit 1.

23

24                      (Exhibit No. 1, Resume for

1    function space as well, because they solicited

2    weddings and events.

3        Q    And that would be Jen Perry's operation?

4        A    Yes.

5        Q    Who else worked there at that time?

6        A    Aaron Broshu and Jane Henry.

7        Q    Anyone else?

8        A    Former employees as well?

9        Q    No, just at that time.

10       A    At that time it was just those three.

11       Q    Would they also solicit business groups?

12       A    Yes.

13       Q    And they would also provide resort

14   literature?

15       A    Yes.

16       Q    They would also arrange and perform site

17   inspections with potential customers?

18       A    Yes.

19       Q    And while you were there, you were doing

20   the group bookings, blocking rooms -- lodging rooms?

21   You were the only one that was doing that?

22       A    For groups, yes.

23       Q    Groups over ten or more; is that right?

24       A    Yes.

weddings and events

2   weddings and events.

3       Q    And that would be Jen Perry's operation?

4       A    Yes.

5       Q    Who else worked there at that time?

6       A    Aaron Broshu and Jane Henry.

7       Q    Anyone else?

8       A    Former employees as well?

9       Q    No, just at that time.

10      A    At that time it was just those three.

11      Q    Would they also solicit business groups?

12      A    Yes.

13      Q    And they would also provide resort

14  literature?

15      A    Yes.

16      Q    They would also arrange and perform site

17  inspections with potential customers?

18      A    Yes.

19      Q    And while you were there, you were doing

20  the group bookings, blocking rooms -- lodging rooms?

21  You were the only one that was doing that?

22      A    For groups, yes.

23      Q    Groups over ten or more; is that right?

24      A    Yes.

1    Q    Would the catering sales staff also book

2    meeting and function space?

3    A    Yes.

4    Q    And take reservations, revisions, deposits

5    and billings?

6    A    They would not take reservations, no.

7    Q    Well, lodging reservations?

8    A    No.

9    Q    You were the only one that did that until

10    your job was eliminated?

11    A    Yes.

12    Q    Would the catering sales staff also create

13    and maintain existing group accounts, contracts,

14    deposits, and invoices?

15    A    Yes.

16    Q    And assist clients with all on- and

17    off-property activity arrangements as needed?

18    A    Yes.

19    Q    And assist catering sales in function,

20    setup, and other departments as needed?

21    A    Yes.

22    Q    Attend weekly events, order food and

23    beverage meetings to address needs related to

24    upcoming group events?

```
 1    previously while you were working at Stanmar, and

 2    then you had another 12 hours during the day?

 3        A    Approximately, yes.

 4        Q    And that's when your parents, your in-laws

 5    or Olivia's godparents would baby-sit?

 6        A    Yes.  For the days, and evenings was my

 7    husband.

 8        Q    Were you ever offered -- are you still

 9    working there?

10        A    Yes.

11        Q    Have your hours changed any since -- are

12    you still working 28 hours a week?

13        A    No.

14        Q    How many hours a week do you work now?

15        A    Approximately 12.

16        Q    When did that occur?

17        A    November of '04.

18        Q    What were you making when you were hired

19    at SVS, per hour?

20        A    Sixteen dollars an hour.

21        Q    How much are you making currently?

22        A    The same.

23        Q    What prompted the reduction of your hours

24    from 24 to 28, to 12 hours a week in November of
```

1      A     No.

2      Q     Not applied to a single job on the

3   Internet?

4      A     No.

5      Q     Not applied to any job from any source

6   between May 5, 2004 to the present?

7      A     No.

8      Q     Made no efforts to seek full-time --

9            MS. SCHWAB:  Howard, it's getting

10           excessive.  It's the same question over and

11           over.

12           MR.WILGOREN:   Well, I just want to be

13           thorough.

14     A     No.  I have not pursued any other career

15   avenue or applied for any other position while I've

16   been employed.

17     Q     Have you ever been charged with a criminal

18   offense?

19     A     No.

20     Q     Now, you've indicated that your primary

21   function at New Seabury as the sales manager was to

22   book the lodging, that took the bulk of your

23   workday?

24     A     Yes.

1           MS. SCHWAB:  Objection.

2           You can answer.

3           THE WITNESS:  Yes.

4    Q    (By Mr. Wilgoren:) In the time you were there,

5    were you aware that employees at New Seabury became

6    pregnant from time to time?

7        A    Yes.

8        Q    Can you tell me the name of every employee

9    who became pregnant during the entire time you

10   worked at New Seabury?

11          MS. SCHWAB:  Objection.

12          You can answer if you know.

13          THE WITNESS:  Rhonda Rogers.

14   Q    (By Mr. Wilgoren:) Anyone else?

15       A    Michelle O'Brien and Deb Adams.

16       Q    Anyone else?

17       A    Not that I can recall.

18       Q    Do you remember when Rhonda Rogers became

19   pregnant?

20       A    No, not specifically.

21       Q    Was it around the same time as you?

22       A    Before me.

23       Q    Was she given a pregnancy leave of

24   absence, do you know?

1      A      Not that I recall exactly, no.

2      Q      And you believe Michelle O'Brien was

3  discriminated against on the basis of her pregnancy?

4              MS. SCHWAB:  Objection.

5              THE WITNESS:  Yes.

6  Q      (By Mr. Wilgoren:)  What's the basis of that

7  belief?

8      A      Because her position was also changed or

9  eliminated while she was pregnant.

10     Q      Do you know the reasons why her position

11  was changed or eliminated while she was pregnant?

12     A      No, I do not.

13     Q      Do you know what her job duties and

14  responsibilities were?

15     A      Not specifically, no.

16     Q      Do you know that she was involved in the

17  sales of real estate?

18     A      I do, to some extent, yes.

19     Q      And do you know that the number of units

20  that New Seabury had for sale was diminishing?

21     A      No, I did not know that.

22     Q      Did you have any discussions with Michelle

23  O'Brien about her understanding as to the reasons

24  why she was laid off?

    1        Q      Did you ever bring your complaints of your

    2    belief that you were discriminated against on the

    3    basis of pregnancy to any representative of New

    4    Seabury management?

    5        A      No.

    6        Q      Let me call your attention to page 34 of

    7    the employee handbook, "Salary Continuance."  Are

    8    you familiar with that policy?

    9        A      As I read it, yes.

   10        Q      Did you, in fact, receive salary

   11    continuance of 60 percent of your full pay for the

   12    entire duration of your leave of absence due to

   13    pregnancy?

   14        A      I believe I did.

   15        Q      And you were given a leave of absence from

   16    May 7, 2003 to October 7, 2003 for your pregnancy

   17    and related issues, were you not?

   18        A      I believe so.

   19        Q      Let me call your attention to page 39,

   20    "Maternity Leave."  Were you provided with all the

   21    benefits pursuant to that policy?

   22        A      No.

   23        Q      Which ones were you not provided?

   24        A      "Upon return from this 12-week leave,

1    you're entitled to the same position you left or a

2    similar position with the same level of pay and

3    length of service credit."

4         Q    Well, you had an administrative assistant

5    position at the time you started your maternity

6    leave on May 7, 2003, did you not?

7         A    Yes.

8         Q    And you returned to an administrative

9    assistant position with no loss of pay or benefits

10   on October 7, 2003, were you not?

11             MS. SCHWAB:  Objection.

12             THE WITNESS:  I do not believe I was

13        returned to an administrative assistant

14        position when I returned.

15   Q    (By Mr. Wilgoren:) What is the basis of your

16   belief?

17        A    The job description, which I did not

18   receive.

19        Q    Was there a job description?

20        A    No.

21        Q    When you accepted the position as

22   administrative assistant, who did you report to?

23        A    Jennifer Perry.

24        Q    Not Mr. Brennan?

```
 1    were not aware that employees were being laid off at

 2    New Seabury?

 3         A    Not that I can recall.

 4         Q    Were things pretty slow in that period of

 5    time for you, work-wise?

 6              MS. SCHWAB:  Objection.  Characterize

 7         "slow."

 8              You can answer.

 9              THE WITNESS:  It was considered the

10         off-season, so there was no business

11         on-property; so, yes, it's generally a slower

12         work pace.

13    Q    (By Mr. Wilgoren:) I see.  Were the level of

14    room reservations that you were handling in that

15    period of time, February 2003 to the end of

16    April 2003, how did that level compare to what you

17    had done in the same time frame the previous year?

18         A    I would say it was about the same.

19         Q    Despite the fact that you had less lodging

20    rooms available for rental?

21         A    Yes.

22         Q    Anything else significant happen between

23    February 2, 2003 when you informed New Seabury

24    Resources that you were pregnant and April 28, 2003?
```

1      A      Significant to what?

2      Q      Were you treated any differently by any

3    representative of New Seabury management?

4      A      No, I don't believe so.

5      Q      No adverse consequences of your announcing

6    your pregnancy?

7              MS. SCHWAB:   Objection, vague term.

8    Q      (By Mr. Wilgoren:) Do you understand what I

9    mean by "adverse consequences"?

10     A      No, I do not.

11     Q      Nothing happened to your job benefits

12   or -- strike that.

13                 No one treated you any differently

14   than before you had announced you were pregnant?

15     A      Not that I can recall.

16     Q      Including Mr. Steve Brennan?

17     A      No, not that I can recall.

18     Q      How about Mark O'Neil?

19     A      No, definitely not.

20     Q      Why is it that you're so certain of that?

21     A      Because I never saw Mark O'Neil.

22     Q      One way or the other.  How about Jen

23   Perry?  She was your direct supervisor at that time,

24   yes?

```
 1        A    Yes.

 2        Q    Did she treat you any differently?

 3        A    No.

 4        Q    Do you have any reason to believe you

 5   needed a lawyer at that time?

 6             MS. SCHWAB:  Objection.

 7             THE WITNESS:  Yes.

 8   Q    (By Mr. Wilgoren:) Prior to April 28th.

 9        A    Prior to April 28th?

10        Q    2003.

11        A    No, not prior, I don't believe.

12        Q    So on or about April 28, 2003, you recall

13   a meeting with Mr. Brennan?

14        A    Yes.

15.       Q    Where did this meeting take place?

16        A    At the boardroom at the country club.

17        Q    Who else was present?

18        A    If I remember correctly, it was Jennifer

19   Perry, and Roy Chase, and --

20        Q    Jennifer Perry being your immediate

21   supervisor?

22        A    Yes.

23        Q    And Roy Chase being who?

24        A    Director of food and beverage at the time.
```

1      A    He mentioned that there would be a pay cut

2    from my hourly salary from, I think it was $17 to

3    $12 an hour.

4      Q    Was there any further discussion about the

5    job you were being offered?

6      A    That the hours -- I had asked if the hours

7    would change, if it was still Monday through Friday.

8    And he had informed me that he would like it to be

9    Tuesday through Saturday since Saturday is one of

10   the busiest days for the catering sales department,

11   and that's when they need the most help for sites.

12   And the other catering sale staff was usually very

13   busy with weddings and functions on that day, so

14   they would need someone in the office.

15     Q    So the office was another reason, the fact

16   that the administrative office was closed on Monday.

17   Was that communicated to you?

18          MS. SCHWAB:  Objection.

19          THE WITNESS:  No, it was never closed on

20      Monday.

21     Q    (By Mr. Wilgoren):  Did other members of

22   the catering department work Tuesday to Saturday as

23   well?

24          MS. SCHWAB:  Objection.

1          Testify if you know.

2          THE WITNESS:  They may have.

3     Q    (By Mr. Wilgoren):  Did Mr. Brennan say

4  anything else about the job you were being offered?

5     A    Just that I could think about it and get

6  back to him or Jennifer.

7     Q    Was there any further discussion, any

8  meeting by any of the participants?

9     A    I don't believe so, that I can recall.

10    Q    What did you do next?

11    A    I asked if I could be dismissed for the

12 day and they said I could.

13    Q    Did they pay you for the balance of the

14 day?

15    A    I believe they did, yes.

16    Q    That was on the 28th of April?

17    A    To the best of my recollection.

18    Q    Did you work on the 29th of April?

19    A    I don't know what day of the week it was,

20 so I can't recall.

21    Q    If I told you the 28th was a Monday, would

22 that refresh your recollection?

23    A    More than likely I did work the following

24 day.

```
 1

 2                        (Exhibit No. 9, E-mail to Steve

 3                        Brennan Dated April 30, 2003.)

 4

 5   Q      (By Mr. Wilgoren:) Ms. Cosgrove, let me show

 6   you what's been marked as Deposition Exhibit No. 9

 7   and ask if you could identify that.

 8         A    This was an e-mail to Steve Brennan.

 9         Q    Dated Wednesday, April 30th?

10         A    Yes.

11         Q    You write, "As you know, I will be out of

12   the office tomorrow and Friday."

13                        How did Mr. Brennan know that you

14   were going to be out of the office tomorrow and

15   Friday?

16         A    I had a previous appointment scheduled and

17   I had requested two vacation days.

18         Q    And then you wanted to speak to him on

19   Monday?

20         A    Correct.

21         Q    You were still considering what course of

22   action you would take?

23         A    Yes.

24         Q    Whether you would accept the job or not?
```

```
1      A     Correct.

2      Q     Did you speak to anyone else subsequent to

3    the meeting on the 28th about what was going on?

4      A     After the fact, you mean?

5      Q     Yes.

6      A     Yes.

7      Q     Who did you speak to?

8            MS. SCHWAB:  Objection, to the extent that

9      there's any attorney-client communications.  I

10     assume that's excluded from the question.

11           MR.WILGOREN:  Right.

12           THE WITNESS:  Yes, I did.

13     Q     (By Mr. Wilgoren):  Did you seek out an

14   attorney after the meeting on the 28th of April?

15     A     Yes, did I.

16     Q     Why did you do that?

17     A     Because I felt it was pregnancy

18   discrimination.

19     Q     What led you to believe, other than the

20   fact that you were pregnant and your job was

21   eliminated, what was the link that caused you to

22   conclude that the elimination was due to your

23   pregnancy?

24           MS. SCHWAB:  Objection.
```

1              THE WITNESS:  Because I believe that my

2         standings as a good employee didn't warrant me

3         being demoted or my position being eliminated

4         when there were other employees in the company

5         that probably should have been demoted or

6         eliminated.

7         Q    In fact, you found out later that there

8    were a lot of other employees who were demoted

9    and/or had their jobs eliminated around the same

10   time as you, did you not?

11        A    Around the same time.

12        Q    Did that change your opinion about whether

13   or not you were being singled out for having your

14   job eliminated because of pregnancy?

15        A    No.

16        Q    How many people do you think lost their

17   job either through job elimination or layoff around

18   this same time as yours was eliminated?

19             MS. SCHWAB:  Objection.

20             You can answer if you know.

21             THE WITNESS:  I don't know exactly; maybe

22        two or three.

23        Q    (By Mr. Wilgoren):  You weren't aware of

24   the 40 or 50 people that had been laid off between

1    January and April 2003?

2          A    No.

3          Q    Have you seen the documentation that's

4    been provided to the MCAD to that regard?

5          A    I may have, yes.

6          Q    Does that change your view in any respect

7    as to whether or not your job elimination was

8    motivated by legitimate business reasons?

9          A    I wasn't aware of it at the time, but

10   after reading the MCAD review, then I was made aware

11   of it.

12         Q    So, you were aware of it after reading the

13   MCAD review, and now you know that your job

14   elimination was motivated by legitimate business

15   reasons?

16              MS. SCHWAB:  Objection.

17              MR.WILGOREN:    Well, I'm asking her

18         whether it is or isn't.

19              THE WITNESS:  You confused me with the

20         question.  I'm sorry.

21         Q    (By Mr. Wilgoren):  After reviewing the

22   information submitted by the company to the MCAD,

23   you now realize that the elimination of your job had

24   nothing to do with your pregnancy, but was motivated

```
 1    wasn't going to be eliminated from the beginning.

 2    We were going to work as a team in the conference

 3    sales department and the catering sales department,

 4    and that we would all be assuming the same

 5    responsibilities.

 6                    So if that was the case, I believe

 7    that someone who had less tenure in the company

 8    should have been the one to be demoted and have

 9    their salary reduced or straight across the board.

10    Q    I see.  So you had a dispute over the

11    business decision the company made?

12                    MS. SCHWAB:  Objection.

13    Q    (By Mr. Wilgoren:) That you were selected and

14    not someone else.  Someone else should have been

15    selected if they wanted to achieve their goal?

16    A    No, I don't believe anybody should have

17    been selected.  I believe there should have been

18    another fair -- you know, should have been resolved

19    more fairly.

20    Q    How would you have resolved it more

21    fairly?

22    A    I would have cut everybody's salary

23    instead of eliminating one salary that probably

24    wasn't as high as others.
```

1      Q     But that assumes that yours was the only

2    salary job that was eliminated?

3      A     No, I'm not assuming that.

4      Q     In fact, you know now that a lot of jobs

5    were eliminated.

6      A     By what I've read, yes.

7      Q     But you still think that your job was

8    eliminated because of discrimination based on

9    pregnancy?

10      A     I do.

11      Q     Okay.  So you, in addition to contacting

12    an attorney after the meeting on the 28th, who else

13    did you speak to about the elimination of your job

14    between the 28th and the end of that week or

15    including the week up to May 5th?

16      A     I believe I spoke to Mary Carrol, and

17    Tanya Copestik and Rhonda Rogers.

18      Q     Tell me about your conversation with Mary

19    Carrol.

20      A     I think we had that question, didn't we?

21      Q     Oh, these are the same.  Did any of them

22    indicate to you that they thought your job was

23    eliminated because of pregnancy discrimination?

24      A     No.

1     Q    You wrote, "I've accepted the new

2  administrative assistant position"?

3     A    Right.

4     Q    You wrote that?

5     A    Yes.

6     Q    And you wrote, "Steve agreed to my current

7  rate of pay through the rest of the pay period"?

8     A    Right.

9     Q    When was the end of the pay period, do you

10  know?

11     A    I believe it was two weeks, because we

12  were paid every two weeks.  So, it was the beginning

13  of the pay cycle when I was informed of the change.

14     Q    Okay.  And then Lee wrote back, "Don't let

15  the stress get you down.  If it gets too much, go to

16  your doctor and get a medical note."  Did she write

17  that?

18     A    She did write that, yes.

19     Q    Did you take her advice?  Strike that.

20             Before she wrote this to you, had you

21  had any basis for concluding that you were in some

22  way unable to perform all the functions of your job?

23     A    I'm not sure what you mean by that.  Do

24  you mean medically, physically?  I don't understand.

1    position."

2                    He said, "I have no knowledge of

3    that."  I said, "It's in my employee file.  I signed

4    and filled out something with Jennifer Perry before

5    I left stating that I was going from a conference

6    sales manager to administrative assistant."

7                    And he asked Lee to pull the file and

8    she did, and she handed him the form.  And he said,

9    "I wasn't even aware that that was in your file."  I

10   said, "Well, it states there I'm to return full-time

11   as administrative assistant."

12                   And he said, "Well, I'll have to

13   think of something for you to do.  So, you can go

14   home for the day, and give me some time to think

15   about it."  I said, "Well, am I coming back to work

16   tomorrow?"

17                   And he said, "You can."  I said,

18   "Well, my position was supposed to be Tuesday

19   through Saturday, 8:30 to 5:00."

20                   And he said, "You can come in

21   tomorrow at 8:30 and report to the country club."

22   And I said, "I'll be there."  And he left the

23   office.

24       Q    Was there any discussion about whether or

1    closed, she did that in her spare time.

2         Q    What was Robin's position or job title, do

3    you know?

4         A    I really don't know.

5         Q    Would it surprise you to learn that she

6    was an administrative assistant?

7         A    As far as I know, she worked as the health

8    club -- not coordinator, but she worked at the desk

9    at the health club and she worked in reservations.

10        Q    Did she work at the beach club at some

11   point in time?

12        A    Oh, yes.  I think she did work at the

13   beach club at one point, yes.

14        Q    Were you aware that she was the

15   administrative assistant at the beach club?

16        A    Yes, and then, I believe, in off-season

17   when everything closed down, she did some busy work.

18        Q    And then got laid off?

19        A    I don't know if she got laid off.

20        Q    So, John Shea took you to the office area

21   in the warehouse?

22        A    He asked me to meet him at the warehouse.

23        Q    Now, when you say "the warehouse," where

24   particularly did you meet him?  Is there an office

1    in the warehouse?

2        A    There are partitioned offices in the

3    warehouse.

4        Q    So you weren't in the warehouse itself,

5    you were in one of these partitioned offices?

6        A    Right, which is inside the warehouse.

7        Q    All right.  And what happened when you got

8    there?

9        A    He basically showed me a box of files and

10   said that they needed to be scanned.  And he

11   instructed me on how to use the computer and

12   scanner, and said it was a very long and slow

13   process.

14       Q    Now, where was Mr. Shea's office; do you

15   know?

16       A    Directly behind the partitioned office

17   that was assigned to me.

18       Q    So, he was in the office next to your

19   office?

20       A    It wasn't so much an office, it was a

21   communications room with all kinds of --

22       Q    Did it have a desk in there?

23       A    It may have, I'm not sure.

24       Q    This office that you were assigned to work

1    Q    You didn't park here, did you?

2    A    Yes.

3    Q    Isn't it true that you went around the

4  side of the building and parked directly by a door

5  that entered directly to your office?

6    A    No, I never did that.

7    Q    If anyone said that you did, they would be

8  lying?

9    A    Yes.

10    Q    Now, there's a picture of a toilet here.

11    A    Yes.

12    Q    What is this picture of?

13    A    That's the rest room used for male

14  employees and myself.

15    Q    In fact, you never used this rest room,

16  did you?

17    A    I tried not to.

18    Q    You never used this rest room, did you?

19    A    Yes, I did.

20    Q    You're sure of that?

21    A    Yes.

22    Q    In fact, you were allowed to go to the

23  administration office to use the rest room

24  facilities there, were you not?

```
 1        A    Yes, I was.

 2        Q    In fact, that's where you -- when you had

 3   to use the rest room facilities, that's where you

 4   went, you didn't go to this toilet?

 5             MS. SCHWAB:  Objection.

 6             She testified she did go to that toilet.

 7             THE WITNESS:  No, I did use that rest room

 8        in the warehouse.

 9   Q    (By Mr. Wilgoren:) You could also go to the

10   country club and use the rest room facilities there?

11        A    Yes.

12        Q    No one objected to you getting in your car

13   and driving a quarter mile away to use those

14   facilities any time you want, did they?

15        A    No.

16        Q    Was Mr. Shea your supervisor in this

17   project when you were scanning the documents?

18        A    No, I would say he was not.

19        Q    Who was supervising your work?

20        A    No one that I can recall.

21        Q    So, Mr. Shea wouldn't review the progress

22   you made in terms of the amount of documents you

23   scanned?

24        A    No.
```

1       Q    So, he would have no knowledge of the

2    level of productivity you had during the time you

3    were scanning documents?

4       A    No, I don't believe so.

5       Q    If he told me that you scanned about half

6    the documents in twice as much time as Robin

7    Almeida, he would be telling a lie?

8            MS. SCHWAB:  Objection.

9            THE WITNESS:  No.

10   Q    (By Mr. Wilgoren:) In fact, you were working

11   about four hours out of the eight-hour day doing the

12   scanning, is that about right?

13      A    No, I don't believe so.

14      Q    You also were allowed to leave the office

15   where you were working doing the scanning and travel

16   a quarter mile away -- get in your car, travel a

17   quarter mile away, take about a half hour once or

18   twice a day to pump your breast milk in Tanya

19   Copestik's office.

20           MS. SCHWAB:  Objection.  She had testified

21      earlier it was 15 to 20 minutes.

22      Q    (By Mr. Wilgoren):  You were allowed to do

23   that?

24      A    Approximately 15 to 20 minutes; I was

1    allowed to.

2        Q      Sometimes if you talked to Tanya maybe it

3    was a little longer?

4        A      Yes.

5        Q      Maybe as much as a half hour?

6        A      It could have been.

7        Q      Could have been a half hour, twice a day?

8        A      It could have been; it could have been

9    less.

10       Q      Also, there was also heat in that office,

11   is that correct?

12       A      There was heat, yes.

13       Q      And you also were provided with a space

14   heater in addition?

15       A      Yes, it was a supplement.

16       Q      And you also were provided with a

17   refrigerator, were you not, to store the breast

18   milk?

19       A      Yes, after some time I was, yes.

20       Q      After how much time?

21       A      Maybe a week or two.

22       Q      Who did you -- did you make a request for

23   a refrigerator?

24       A      I believe I requested a refrigerator, yes.

1       Q     Who did you make that request to?

2       A     I may have mentioned it to John Shea.

3       Q     The guy that wasn't supervising your work?

4       A     Right.

5       Q     Now, these files that you were scanning,

6    what type of files were they?

7       A     To be honest with you, I can't remember.

8       Q     Were they financial records?

9       A     No, I don't believe so.

10       Q     Where were they being stored?

11       A     I think in, like, a loft area.

12       Q     Loft area outside your office in the

13    warehouse?

14       A     Yes, up above the facility --

15       Q     Fair to say --

16       A     -- in, like, an attic.

17       Q     You never went to the loft area to get the

18    boxes?

19       A     No.

20       Q     They were always brought into your office?

21       A     Yes.

22       Q     So, you never had to go to the warehouse

23    for that purpose?

24       A     I never had to go up into the loft to get

1    Q      (By Mr. Wilgoren:) What was objectionable to

2    you, or what did you find that was illegal about

3    working in solitude?

4        A      I believe it wasn't a position that was at

5    all similar to the position I left.

6        Q      What do you base that on?

7        A      The duties that I was performing.

8        Q      The fact of the matter is, you weren't

9    working in solitude, were you?

10       A      For most of the day I was, yes.

11       Q      There were two other employees that were

12   working in that office as well, were there not?

13       A      Not on a regular basis, no.

14       Q      What about John Shea, wasn't he working

15   there?

16       A      On occasion.

17       Q      How about Jeff Fuller, where was he?

18       A      On occasion he was in the building.

19       Q      Where were the files that you were

20   scanning, they were in this loft?

21       A      I think that's where they were.

22       Q      Do you know how many boxes of files?

23       A      I have no idea.

24       Q      Hundreds, maybe?

1    given every opportunity to use the ladies' rest room

2    in the country club or at the reception area

3    whenever you wanted?

4         A    Correct.

5         Q    And you were also allowed to go, as you

6    testified previously, to a private area the

7    receptionist had in Tanya Copestik's office one or

8    two occasions a day for 20 to 30 minutes at a time

9    to pump your breast milk?

10        A    Right.

11        Q    So, why were you writing of your need to

12   do that when you've been doing it for several weeks?

13        A    Because it was more conducive for me to be

14   in the same building so that I wouldn't have to

15   travel back and forth in my car on the property.

16        Q    That was a convenience to you?

17        A    Yes, and productivity.

18        Q    And then you wrote, "Please consider a

19   Monday-to-Friday workweek rather than a

20   Tuesday-to-Saturday workweek."

21        A    Correct.

22        Q    The fact of the matter is, the job you

23   accepted prior to your maternity leave had a

24   Tuesday-to-Saturday schedule?

```
 1        A    Correct.

 2        Q    You wanted the scanner to be relocated

 3   from the warehouse to a vacant office.  You wanted

 4   to work in the country club or the reception desk?

 5        A    Correct.

 6        Q    That was the personal preference of yours?

 7        A    Yes.

 8        Q    What was involved in relocating the

 9   scanner monitor?

10             MS. SCHWAB:  Objection.

11             Answer if you know.

12             THE WITNESS:  Well, I don't know exactly,

13        only what I've been told.

14   Q    (By Mr. Wilgoren:) What have you been told?

15        A    Basically, unplugging the monitor and

16   plugging it back in with the scanner at a

17   workstation anywhere there was a vacant --

18        Q    And you wrote that part of the reason you

19   wanted it to be more conducive in an area allowing

20   you to use the ladies' rest room and a private area

21   to pump breast milk for your daughter?

22        A    Correct.

23        Q    But the fact of the matter is, when you

24   had written this letter on October 30th, you were
```

```
 1    District Court for the District of Massachusetts?

 2         A    Yes, I believe I did.

 3         Q    Did you review it to ensure the accuracy

 4    of the document?

 5         A    I believe I did.

 6         Q    Let me call your attention to the fifth

 7    line on the first page, "Shortly after announcing

 8    she was pregnant, plaintiff was told by her employer

 9    she would be demoted to administrative assistant

10    position."  Did you read that to ensure its

11    accuracy?

12         A    Yes.

13         Q    Did you review this before it was filed in

14    court?

15         A    Yes.

16         Q    You're satisfied that it was accurate in

17    all respects?

18         A    In all respects, yes, with a play on

19    words.

20         Q    What does that mean, "a play on words"?

21         A    Because the administrative assistant

22    position I accepted was specifically for the sales

23    office.

24         Q    Oh, I see.  Well, your job wasn't
```

1          "wanted."

2                  THE WITNESS:  I was not given the

3          administrative assistant position that I was

4          offered --

5.   Q    (By Mr. Wilgoren:) Well, that's not --

6          A    -- when I returned to work.

7          Q    You were given a job of administrative

8    assistant, were you not?

9          A    Of an administrative assistant.

10         Q    That's the job you were given,

11   administrative assistant?

12         A    Per se.

13

14                        (Exhibit No. 19, Plaintiff's

15                        Answers to Defendant's First Set

16                        of Interrogatories.)

17

18   Q    (By Mr. Wilgoren:) Ms. Cosgrove, you have

19   before you what's been marked as Deposition Exhibit

20   No. 19.  Can you identify this document?

21         A    I believe it's the answers to the

22   interrogatories.

23         Q    Were these prepared for your signature?

24         A    Yes.

# O'BRIEN&LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

## Patricia Cosgrove v. New Seabury Resources Management

Transcript of the Testimony of:

# Stephen Brennan

# January 18, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

Jill K. Ruggieri   1-17609

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

| 34 | | 36 | |
|---|---|---|---|
| 1 | A   While I was still at ClubCorp, Mark O'Neil | 1 | You have a cabana club; you have a beach |
| 2 | was obtained by New Seabury as a consultant | 2 | club, you have a tennis facility; you have a |
| 3 | to look into the issues and problems of | 3 | wastewater treatment plant; you have a |
| 4 | underperformance. | 4 | practice facility; you have a fitness |
| 5 | At that point, Mark started passing | 5 | center, and we have a housing development as |
| 6 | documents on to me to assess and look at and | 6 | well |
| 7 | give me feedback on. | 7 | Q   Other than those buildings, are there other |
| 8 | Q   What period was that? | 8 | buildings on the property? |
| 9 | A   Probably September-October of 2002, | 9 | A   On the -- I guess my question is the |
| 10 | somewhere in that range, the fall. | 10 | property directly that we own and the New |
| 11 | As he moved through his due | 11 | Seabury area? |
| 12 | diligence, his feeling was that some changes | 12 | Q   What's the difference? |
| 13 | needed to be made specifically at the top, | 13 | A   There's 1200 units/homes there, okay? We -- |
| 14 | suggested that to the corporate entity of | 14 | additionally, I'm sorry, I did leave out |
| 15 | New Seabury, and they agreed. | 15 | we've got 20 rental units as well. |
| 16 | They asked me to come up in November. | 16 | Q   Other than residential buildings, are there |
| 17 | I toured the property, continued reviewing | 17 | other buildings on the New Seabury property |
| 18 | documents. In December I accepted the | 18 | other than the ones you've mentioned? |
| 19 | position and started in January. | 19 | A   Property that we don't own, there's two real |
| 20 | Q   Had you -- when did you first -- was this | 20 | estate offices that we don't own. They're a |
| 21 | your first dealing with Mark O'Neil? | 21 | separate entity from us  And there is also |
| 22 | A   No | 22 | what's called a marketplace that we do not |
| 23 | Q   When did you first meet Mark O'Neil? | 23 | own. |
| 24 | A   Mark O'Neil -- he hired me in Connecticut to | 24 | Q   And where's your office? |

| 35 | | 37 | |
|---|---|---|---|
| 1 | go work for the PGA Tour. | 1 | A   My office is in the warehouse. |
| 2 | Q   Did you work closely with him when you | 2 | Q   I don't think you mentioned the warehouse |
| 3 | worked for the PGA Tour? | 3 | before. |
| 4 | A   He was the general manager. I ran the | 4 | A   There's two warehouses. One warehouse was |
| 5 | outside operation. | 5 | converted into office space. There's a golf |
| 6 | Q   And other than a PGA Tour, did you work with | 6 | maintenance facility as well. |
| 7 | Mark O'Neil on any other position? | 7 | Q   Okay. So there's two warehouses. |
| 8 | A   After hours at KSL, Mark had applied with | 8 | What's the warehouse -- is there a |
| 9 | KSL in a regional role. They ultimately | 9 | name by which people refer to the warehouse |
| 10 | asked me my opinion. I endorsed it. He was | 10 | that your office is in? |
| 11 | hired by KSL. | 11 | A   The warehouse. |
| 12 | When he took over the mid Atlantic, | 12 | Q   They call it the warehouse? |
| 13 | at that point they asked me to go work | 13 | A   (Witness nods.) |
| 14 | directly for him up in Virginia. | 14 | Q   What about the other warehouse, what do they |
| 15 | Q   What about at ClubCorp? | 15 | call that? |
| 16 | A   No. | 16 | A   Maintenance. |
| 17 | Q   Can you describe to me what the New Seabury | 17 | Q   How many offices are in the warehouse where |
| 18 | facility is like? Is it just one facility? | 18 | you work? |
| 19 | A   It's 2600 acres, 40,000-square-foot | 19 | A   Between cubes and offices, there's probably |
| 20 | clubhouse, 36 holes of golf, three miles of | 20 | 25 |
| 21 | private beach, banquet facility within the | 21 | Q   And you called it a warehouse. |
| 22 | clubhouse. | 22 | Does it look like a warehouse on the |
| 23 | You have a separate restaurant and | 23 | outside? |
| 24 | banquet facility called the Popponesset Inn | 24 | A   Mm-hmm. |

10 (Pages 34 to 37)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

38

| | | |
|---|---|---|
| 1 | Q | Has it been refurbished on the inside? |
| 2 | A | Yes. |
| 3 | Q | So on the inside, is it all office space? |
| 4 | A | Yes. |
| 5 | Q | Has your office been in that building the |
| 6 | | whole time you've been at New Seabury? |
| 7 | A | No, just since last summer. |
| 8 | Q | Before last summer, where was your office? |
| 9 | A | What is now known as the sales cottage, |
| 10 | | which deals with the real estate. |
| 11 | Q | What was that building known as before? |
| 12 | A | Administration or reception center. |
| 13 | Q | So you mentioned you don't own the real |
| 14 | | estate offices? |
| 15 | A | This particular one is part of the real |
| 16 | | estate development. Doesn't fall under my |
| 17 | | purview. |
| 18 | Q | Does the -- is the sales cottage still owned |
| 19 | | by New Seabury? |
| 20 | A | It's owned by an entity of New Seabury. |
| 21 | Q | What's your understanding -- |
| 22 | | MR. WILGOREN: Can I -- just so we |
| 23 | | understand, when we say New Seabury, we're |
| 24 | | talking about the defendant, New Seabury |

39

| | | |
|---|---|---|
| 1 | | Resources Management, Inc.? |
| 2 | | MS. SCHWAB: Yes. |
| 3 | | MR. WILGOREN: Okay. |
| 4 | | THE WITNESS: Okay. |
| 5 | | MS. SCHWAB: What else would we be |
| 6 | | talking about, the community? |
| 7 | | MR. WILGOREN: I don't know. I just |
| 8 | | wanted to define just for clarity. |
| 9 | | MS. SCHWAB: Yes, that's what I'm |
| 10 | | talking about. Thank you. |
| 11 | | BY MS. SCHWAB: |
| 12 | Q | When was the warehouse that your office is |
| 13 | | in renovated? |
| 14 | A | Began sometime in the spring and we moved in |
| 15 | | in August. |
| 16 | Q | Spring of '05? |
| 17 | A | Yes. |
| 18 | Q | Before that, what was that building like? |
| 19 | A | It was a warehouse. |
| 20 | Q | And was it used? |
| 21 | A | Yes. |
| 22 | Q | Do you know what it was used for? |
| 23 | A | As a warehouse and office space. |
| 24 | Q | But your office wasn't in there until after |

40

| | | |
|---|---|---|
| 1 | | the refurbish; is that correct? |
| 2 | A | Correct. |
| 3 | Q | How many different departments are there at |
| 4 | | New Seabury? |
| 5 | A | I'd say nine. |
| 6 | Q | Can you name the departments? |
| 7 | A | Golf, golf maintenance, tennis. I don't |
| 8 | | know if I call fitness a department, but |
| 9 | | fitness could be stated, catering, food and |
| 10 | | beverage, lodging, lodging/housekeeping. |
| 11 | | They're one, basically, and you have |
| 12 | | administration. |
| 13 | Q | How many -- are these the same departments |
| 14 | | that were at New Seabury when you started |
| 15 | | working there in January '03? |
| 16 | A | Pretty much. |
| 17 | Q | So there hasn't been a significant |
| 18 | | restructure of the departments? |
| 19 | A | Of roles within the department. Not so much |
| 20 | | the departments themselves. |
| 21 | Q | Is there a personnel department at New |
| 22 | | Seabury? |
| 23 | | MR. WILGOREN: Objection. |
| 24 | | At what point in time? |

41

| | | |
|---|---|---|
| 1 | | MS. SCHWAB: Now. |
| 2 | A | Our HR is based in Florida. |
| 3 | Q | But when you started in January '03, was |
| 4 | | there an HR personnel department? |
| 5 | A | There was HR/payroll. |
| 6 | Q | And was that a department? |
| 7 | A | It was an individual. |
| 8 | Q | Lee O'Shea? |
| 9 | A | Yes. |
| 10 | Q | At New Seabury you have seasonal employees |
| 11 | | and permanent employees; is that correct? |
| 12 | A | We have full-time employees. We have |
| 13 | | full-time seasonal employees, and we have |
| 14 | | part-time employees. |
| 15 | Q | Okay. |
| 16 | | And what is the definition of a |
| 17 | | full-time employee? |
| 18 | A | Full-time employee is in excess of ten |
| 19 | | months a year, basically 40 hours plus a |
| 20 | | week. |
| 21 | Q | What about full-time seasonal? |
| 22 | A | Forty hours a week, less than ten months. |
| 23 | Q | And part time? |
| 24 | A | Anything less than the 40-hour factor. |

11 (Pages 38 to 41)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

42

1    Generally seasonal being summertime help.
2    Q   What is the season for employment purposes
3        at New Seabury?
4    A   I need a little more scope of what you're
5        looking for.
6    Q   Well, what's the time frame that a seasonal
7        employee would work?
8    A   Generally it would be in June at some point,
9        and most of them would be gone by just after
10       Labor Day.
11   Q   When someone is hired at New Seabury, are
12       they informed whether they're a full-time
13       employee, full-time seasonal or part-time
14       employee?
15   A   Generally.
16   Q   And what -- how is a seasonal employee
17       informed of what that entails, how long they
18       can expect to work?
19   A   The department head would basically give
20       them a scope of what the work is.
21   Q   Is there usually an employment contract for
22       a seasonal employee?
23   A   No.
24   Q   Is there usually some sort of a notation in

43

1        someone's personnel file if they're a
2        seasonal employee?
3    A   On their status form.
4    Q   And similarly if someone's a full-time
5        employee, is there a notation on their
6        personnel file?
7    A   Yes.
8    Q   Where do you get these definitions for
9        you've given me for full-time, full-time
10       seasonal and part-time?
11   A   Just a rule of thumb that we use.
12   Q   Are there -- is there any written guidance
13       for what qualifies as full-time versus
14       seasonal?
15   A   I believe the only thing in the handbook
16       goes back to the benefit eligibility.
17   Q   And is that the same as the definitions that
18       you've given me?
19   A   No.
20   Q   How does it differ?
21   A   I believe it's 36 hours or -- I don't know
22       the exact number, something less than 40
23       hours, slightly less than 40 hours has to be
24       maintained for benefits.

44

1    Q   And what about for seasonal, do you know
2        what the definition is?
3    A   Temporary employment. There's no
4        definition.
5    Q   And does the notation in somebody's
6        personnel file refer to the rule of thumb
7        definitions that you've used or the handbook
8        definitions?
9    A   It would be the rule of thumb. It's
10       different from the -- whether they're
11       eligible for benefits or not.
12   Q   Can you give me a rough estimate of how many
13       employees you have in the golf department?
14           Can you tell me how many -- let's
15       look -- let's take 2005.
16   A   Mm-hmm.
17   Q   How many seasonal employees you had and how
18       many full-time employees you had in the golf
19       department.
20           MR. WILGOREN:  Objection.
21           When in 2005?
22   Q   Well, during the whole year.
23   A   Full-time, there's three.
24   Q   How many seasonal?

45

1    A   Fifty.
2    Q   Fifty?
3    A   Ballpark.
4    Q   How about golf maintenance?
5    A   Year round is ten, and there are roughly 50.
6    Q   Tennis?
7    A   No employees.
8    Q   So what goes on in the tennis department?
9    A   It's a contract. It's contracted out.
10   Q   Do you know how many contracted employees
11       there are?
12   A   I pay one contract.
13   Q   Excuse me?
14   A   I pay one contract. I don't know how many
15       they have.
16   Q   How about fitness?
17   A   It's contract.
18   Q   Catering?
19   A   Catering currently there's two full-time
20       people and total headcount probably --
21       probably exceeds 100.
22   Q   And that's during the high season, during --
23   A   Yes, they're all part-time type.
24   Q   How about food and beverage?

12 (Pages 42 to 45)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

| 50 | | 52 | |
|---|---|---|---|
| 1 | A  I think there was about eight. | 1 | pay to use the facility, to be members. |
| 2 | Q  How about seasonal in mid-2003? | 2 | This is roughly how much we do in revenue. |
| 3 | A  Would have been just one. | 3 | This is what we're expected to do in |
| 4 | Q  How have the revenues at New Seabury changed | 4 | initiation fees, and this is what we expect |
| 5 | from when you started to now? | 5 | the bottom line to be. |
| 6 | A  The lodging revenues have been reduced | 6 | And we do comparatives of the growth |
| 7 | dramatically due to the fact that in '02 | 7 | over the last three years of the changes |
| 8 | there was 100-plus units that were in the | 8 | we've made, making the club private, making |
| 9 | rental pool. | 9 | it more exclusive and delivering a better |
| 10 | Today we have -- on a given day we | 10 | product. |
| 11 | might have 20 to rent.  In excess of a | 11 | Q  Any other information to employees in 2005 |
| 12 | million dollars came out of the lodging | 12 | about the financials? |
| 13 | revenues. | 13 | A  I will generally give a capital summary as |
| 14 | Q  And what was the reason for the reduction in | 14 | far as reinvestment goes. |
| 15 | the number of units? | 15 | Q  When will you do that? |
| 16 | A  We were able to sell off the existing | 16 | A  In the employee meetings. |
| 17 | Maushop units, M-A-U-S-H-O-P. | 17 | Q  How frequent are employee meetings? |
| 18 | Q  Is that a region? | 18 | A  Every employee goes through them.  They take |
| 19 | A  It's a section. | 19 | place basically June 1st through July 1st. |
| 20 | Q  Any other reason that there was such a | 20 | Q  What about in 2004, what information did you |
| 21 | reduction in units? | 21 | give to employees about financials? |
| 22 | A  Yes, it was not profitable. | 22 | A  Preferably the same information, the |
| 23 | Q  So how have profits changed, then, in the | 23 | year-over-year growth, the goals for the |
| 24 | lodging area? | 24 | year.  We had made some significant changes |

| 51 | | 53 | |
|---|---|---|---|
| 1 | MR. WILGOREN:  Objection. Assumes | 1 | taking the club private, setting the |
| 2 | that there were profits at a certain point | 2 | expectations higher. |
| 3 | in time. | 3 | Q  What about in 2003? |
| 4 | A  The lodging by itself is nearly a breakeven | 4 | A  Kind of setting parameters again, explaining |
| 5 | operation now, comparative to losing | 5 | that we're in the process of establishing |
| 6 | hundreds of thousands of dollars. | 6 | what New Seabury was and what it was |
| 7 | Q  What other changes have there been in the | 7 | becoming. |
| 8 | revenues since you started? | 8 | Q  When did you communicate that information? |
| 9 | A  The dues line has increased dramatically. | 9 | A  To the department head specifically.  And |
| 10 | The initiation fees have increased | 10 | then we did a couple of great -- what was |
| 11 | dramatically.  The food and beverage and | 11 | called great training sessions. |
| 12 | catering sales have stabilized with | 12 | Q  When -- when was the information |
| 13 | reasonable growth.  And the bottom line has | 13 | communicated to the department heads? |
| 14 | increased from 800,000 to 2.7 million. | 14 | A  Every week. |
| 15 | Q  What's the bottom line? | 15 | Q  And when were the great training sessions? |
| 16 | A  Bottom line's EBITDA. | 16 | A  Early summer. |
| 17 | Q  I was waiting for that term to come back | 17 | Q  Of 2003? |
| 18 | into play. | 18 | A  Mm-hmm. |
| 19 | What type of information do you -- in | 19 | Q  Anything between when you started in January |
| 20 | 2005, what type of information did you give | 20 | '03 and early summer '03 that -- any |
| 21 | to New Seabury employees about financials, | 21 | information communicated other than to |
| 22 | revenues, bottom line? | 22 | department heads? |
| 23 | A  2005, the employee training, they get a | 23 | A  It could have been disseminated down through |
| 24 | broad-brush stroke this is how much people | 24 | the department heads. |

14 (Pages 50 to 53)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

| 58 | | | 60 | | |
|---|---|---|---|---|---|
| 1 | Q | Have you had occasion at your tenure at New | 1 | Q | Any other situations when you've given |
| 2 | | Seabury to give any verbal warnings? | 2 | | verbal warnings? |
| 3 | A | Yes. | 3 | A | I gave one to Mary Polino. |
| 4 | Q | On how many occasions? | 4 | Q | Who is Mary Polino? |
| 5 | A | Probably just a couple. | 5 | A | She was my assistant at one point. |
| 6 | Q | What were the circumstances? | 6 | Q | What was the reason for the verbal warning? |
| 7 | A | It would be department head level or above. | 7 | A | Attitude. |
| 8 | Q | Can you describe specifics? | 8 | Q | What was the outcome? |
| 9 | A | One individual it was simply job performance | 9 | A | A few weeks later she quit. |
| 10 | | and maintaining the levels we needed to | 10 | Q | Between the verbal warning and the time she |
| 11 | | maintain within his department. | 11 | | quit, did you have occasion to give her any |
| 12 | Q | What do you mean by maintaining the levels? | 12 | | other discipline? |
| 13 | A | Maintaining the levels of the expectations | 13 | A | No. |
| 14 | | set forth. | 14 | Q | Any other situations when you've given |
| 15 | Q | And did you give this person a verbal | 15 | | verbal warnings? |
| 16 | | warning? | 16 | A | Not that comes to mind. |
| 17 | A | Yes. | 17 | Q | How about have you ever had occasion to give |
| 18 | Q | And what happened after that? | 18 | | written warnings? |
| 19 | A | It corrected itself. | 19 | A | I have not. |
| 20 | Q | What -- and who is this individual? | 20 | | MR. WILGOREN: That's with reference |
| 21 | | MR. WILGOREN: For the purpose of | 21 | | to his tenure at New Seabury, I take it? |
| 22 | | whenever we talk about individual employees | 22 | | MS. SCHWAB: Yes, it is. |
| 23 | | of New Seabury Resources Management, the | 23 | Q | Can you explain to me what the Villa Program |
| 24 | | parties have a confidentiality agreement, | 24 | | was at New Seabury? |

| 59 | | | 61 | | |
|---|---|---|---|---|---|
| 1 | | and so those portions of the transcript | 1 | A | The Villa Rental Program was an opportunity |
| 2 | | should be denoted as confidential. | 2 | | for homeowners to be able to participate in |
| 3 | A | Brendan Reilly. | 3 | | our rental program. |
| 4 | Q | What other situations have you had occasion | 4 | | They would give us X number of weeks, |
| 5 | | to give verbal warnings? | 5 | | designate the weeks. In lieu of that, we |
| 6 | A | Scott Nickerson at one point. | 6 | | would attempt to rent those out through our |
| 7 | Q | What was the situation? | 7 | | lodging program, and they would get a |
| 8 | A | Misapplication -- | 8 | | percentage of the income from it, and we'd |
| 9 | | MR. WILGOREN: Again, I have a | 9 | | get a percentage. |
| 10 | | running objection to this entire line of | 10 | Q | What percent would New Seabury keep, if you |
| 11 | | questioning about discipline in general and | 11 | | remember? |
| 12 | | particular individuals who may have been | 12 | A | It's 50 percent. |
| 13 | | disciplined by Mr. Brennan? | 13 | Q | And was that program in effect when you |
| 14 | A | It was a misapplication of a chemical. | 14 | | started at New Seabury? |
| 15 | Q | Can you be more specific? | 15 | A | Yes. |
| 16 | A | It was a misapplication of a chemical on the | 16 | Q | Did it end at some point? |
| 17 | | golf course. | 17 | A | Yes. |
| 18 | Q | And after that, you gave Mr. Nickerson a | 18 | Q | What -- at what period did it end? |
| 19 | | written warning? | 19 | A | Basically went away at the end of '03, |
| 20 | A | No. | 20 | | beginning of '04. |
| 21 | Q | A verbal warning. I'm sorry? | 21 | Q | So in '04, did you rent any units through |
| 22 | A | Yes. | 22 | | the Villa Program? |
| 23 | Q | And what happened after that? | 23 | A | They would have been a couple of the |
| 24 | A | We didn't have a problem. | 24 | | existing Secor [ph.] units. Where our units |

16 (Pages 58 to 61)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

## 62

| 1 | arc. they're quarter shares. so they could |
| 2 | put their quarter shares in with our quarter |
| 3 | shares because we were already maintaining |
| 4 | it. |
| 5 | Q   Other than that, any other -- |
| 6 | A   Not outside of that. |
| 7 | Q   Did you -- were you involved in the decision |
| 8 | to end the Villa Program? |
| 9 | A   Yes. |
| 10 | Q   And what were -- and who else was involved |
| 11 | in that decision? |
| 12 | A   Tanya Copestick had written the budget two |
| 13 | ways, with the Villa rental program and |
| 14 | without it. and it came out block and white. |
| 15 | Q   When did Tanya Copestick write the two |
| 16 | budgets? |
| 17 | A   Would have been in the fall of '03. |
| 18 | Q   So what was the specific reason, then, for |
| 19 | ending the program? |
| 20 | A   It was not profitable. |
| 21 |        MS. SCHWAB:  Why don't we take about |
| 22 | a five-minute break, if that's all right. |
| 23 |        MR. WILGOREN:  Sure. |
| 24 |        (Recess.) |

## 63

BY MS. SCHWAB:

| 2 | Q   Just one question about something we talked |
| 3 | about before. |
| 4 |        You mentioned that one revenue stream |
| 5 | is initiation fees; is that correct? |
| 6 | A   That's correct. |
| 7 | Q   And what department handles initiations? |
| 8 | A   It goes out basically under membership. |
| 9 | Q   And is that a separate department than the |
| 10 | ones that we talked about previously? |
| 11 | A   It's a one-person department. |
| 12 | Q   Was that a department that existed in |
| 13 | 2003 -- |
| 14 | A   Yes. |
| 15 | Q   -- when you started? |
| 16 | A   Yes. |
| 17 | Q   How many people were employed in membership |
| 18 | when you started? |
| 19 | A   There was one. It could have been deemed as |
| 20 | two. |
| 21 | Q   Excuse me? |
| 22 | A   One that I know for sure, but another person |
| 23 | could have been deemed in that department. |
| 24 | Q   Any seasonal employees in the membership |

## 64

| 1 | department? |
| 2 | A   I don't think so. |
| 3 | Q   And now there aren't? |
| 4 | A   No. |
| 5 | Q   Before your hire at New Seabury, do you know |
| 6 | who the previous general manager was? |
| 7 | A   Wayne Kapral |
| 8 | Q   And when you mentioned before that Mark |
| 9 | O'Neil felt that there needed to be a change |
| 10 | at the top, are you referring to a need to |
| 11 | replace Wayne Kapral? |
| 12 | A   Yes. |
| 13 | Q   And do you have an understanding of why |
| 14 | Mr. O'Neil thought that Mr. Kapral should be |
| 15 | replaced? |
| 16 |        MR. WILGOREN:  Objection. Relevancy. |
| 17 | A   Yes. He -- the property was not performing |
| 18 | to the levels it should. |
| 19 | Q   Was it your understanding that Mr. Kapral |
| 20 | was an acting general manager or permanent |
| 21 | general manager? |
| 22 | A   I believe it was permanent  I've heard |
| 23 | other people say acting. |
| 24 | Q   When you came on in January '03. was there |

## 65

| 1 | some sort of announcement to the employees |
| 2 | that you had come on as general manager? |
| 3 | A   I believe there was a memo sent out |
| 4 | Q   Do you know if there was any indication |
| 5 | about what your role would be in the |
| 6 | company? |
| 7 | A   General manager and chief operating officer |
| 8 | Q   Was there any mention of your involvement |
| 9 | of -- in turning the company around? |
| 10 | A   I don't believe the memo stated that |
| 11 | directly. |
| 12 | Q   Do you know if there was any time after you |
| 13 | started working at New Seabury that it was |
| 14 | communicated to employees that you would be |
| 15 | involved in a turnaround of the company? |
| 16 | A   On the department head level. |
| 17 | Q   And other than that? |
| 18 | A   Probably not. |
| 19 | Q   What was communicated to department heads |
| 20 | about that? |
| 21 | A   The budget process, the goals and objectives |
| 22 | for the '03 year, the assessment and |
| 23 | challenging of every aspect of how we do the |
| 24 | operation. |

17 (Pages 62 to 65)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

66

1  Q  Were there specific discussions about
2     staffing?
3  A  Absolutely.
4  Q  What -- what types of discussions?
5  A  Headcount, total payroll dollars per
6     department, types of positions, seasonal
7     activity versus -- busy season versus not
8     busy season, activity, to dictate the
9     levels.
10 Q  What discussions did you have with
11    department heads about headcount?
12 A  That when we're out of season, we need to
13    pare it all the way down to only the bare
14    essentials.
15 Q  What about -- what discussions did you have
16    about payroll?
17 A  That we need to maintain the payroll dollars
18    being at or below our budget levels.
19 Q  And what about types of positions?
20 A  Necessary positions. It wasn't a type.
21 Q  What parameters or guidelines did you
22    discuss with department heads about reducing
23    the number of employees?
24 A  Challenging the number of employees versus

67

1     the workload at hand, can you do it better,
2     can you do it without this, can you do it
3     without that.
4  Q  Any discussion about what factors to
5     consider with respect to individual
6     employees to lay off?
7  A  No, it was more on what roles could be
8     combined, what roles were deemed to be
9     necessary and how to do it more efficiently.
10 Q  Did you have any discussions with department
11    heads about position changes under
12    demotions?
13 A  That would have come up when a particular
14    position wasn't needed, but there could have
15    been something else that was still needed at
16    that point in time.
17 Q  And what did you say about that?
18 A  We did it whenever we could.
19 Q  Why would you do that whenever you could?
20 A  When there was an opportunity to retain
21    somebody, we'd try to retain them, if the
22    business reason justified it.
23 Q  When you were -- when you started 59 New
24    Seabury, did you have responsibilities

68

1     relating to hiring people?
2  A  Yes.
3  Q  And how many people were you involved in
4     hiring, people who weren't already employed
5     at New Seabury?
6        MR. WILGOREN:  Objection.
7        What points in time?
8  Q  In all of 2003.
9  A  Anybody that wasn't there.
10 Q  And how many people were hired who -- how
11    many people were brought on to the staff,
12    new people, in 2003?
13 A  Well, there -- I couldn't even begin to
14    guess.  I mean, we had in excess of 300
15    employees, you know, right around 300
16    employees for the summertime.  I obviously
17    did not hire every individual.
18 Q  Well, how many people were you involved in
19    hiring?
20        MR. WILGOREN:  What do you mean by
21    "involved in"?
22 Q  That you had any involvement in reviewing
23    the applications, interviewing, approving.
24 A  Well, I'll start with the golf course.  The

69

1     golf -- director of golf was demoted and
2     moved him into the superintendent position.
3        The superintendent was demoted from
4     superintendent to assistant superintendent.
5     And the golf pro was demoted to the
6     instructor of golf.
7        At that point, I had to hire a head
8     golf professional.
9  Q  And when was that?
10 A  That -- I think he came on board in May,
11    roughly.
12 Q  Is that a seasonal position?
13 A  That is a year-round position.
14 Q  What was your involvement in hiring the head
15    golf pro?
16 A  Advertising, interviewing, going through the
17    whole process.
18 Q  Did you make the final selection?
19 A  Yes, I did.
20 Q  Who is the person that you hired?
21 A  Brendan Reilly.
22 Q  What other -- let's focus on permanent or
23    full-time people.
24        What other full-time nonseasonal

18 (Pages 66 to 69)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

70

| | |
|---|---|
| 1 | employees were you involved in hiring in |
| 2 | 2003? |
| 3 | A   Membership director |
| 4 | Q   Who did you hire? |
| 5 | A   Bob Higgins. |
| 6 | Q   When was he brought on? |
| 7 | A   Same day I was. |
| 8 | Q   Were you the one who made the final decision |
| 9 | on that? |
| 10 | A   Mm-hmm. |
| 11 | Q   Anyone else? |
| 12 | A   Marion Lent. |
| 13 | Q   What was she hired to do? |
| 14 | A   Business development. |
| 15 | Q   When was she brought on? |
| 16 | A   Just after I started. |
| 17 | Q   Did you make the final decision on that? |
| 18 | A   Yes. |
| 19 | Q   Anyone else? |
| 20 | A   In 2003?  Is that correct? |
| 21 | Q   Yes, 2003. |
| 22 | A   Wasn't a new hire but promoted Wayne Spencer |
| 23 | and Phyllis D'Eramo after the termination of |
| 24 | Kaprol. |

72

| | |
|---|---|
| 1 | A   Director of golf is the top.  That position |
| 2 | was not replaced. |
| 3 | Q   That person was demoted to what position? |
| 4 | A   Superintendent.  Golf course superintendent. |
| 5 | Q   So you talked to McGraw — Mr. McGraw about |
| 6 | being head golf pro, and he indicated he |
| 7 | wasn't interested? |
| 8 | A   Correct. |
| 9 | Q   Why was it that you approached Mr. McGraw |
| 10 | before looking outside for the position? |
| 11 | A   To find out if he was really qualified, to |
| 12 | find out if he was interested.  Ultimately, |
| 13 | he had had a heart attack very young and did |
| 14 | not want to — couldn't physically maintain |
| 15 | what we were — what we needed. |
| 16 | Q   Would you have liked to have hired from |
| 17 | within, if possible? |
| 18 | A   If there's an opportunity |
| 19 | Q   And what about membership director, did you |
| 20 | make an effort to hire from that position |
| 21 | from within? |
| 22 | A   No. |
| 23 | Q   Why did you not do that? |
| 24 | A   Because you need a sales professional to do |

71

| | |
|---|---|
| 1 | Q   What positions did you promote them to? |
| 2 | A   Controller and assistant controller. |
| 3 | Q   What's Phyllis's last name, I'm sorry? |
| 4 | A   D'Eramo |
| 5 | Q   D'Eramo. |
| 6 | Any other people from outside hired |
| 7 | in permanent positions in 2003? |
| 8 | A   That I did, no |
| 9 | Q   That you were involved in in any way. |
| 10 | A   Correct. |
| 11 | Q   And as to the head golf pro, before you |
| 12 | hired Brendan Reilly, did you make an effort |
| 13 | to hire — hire that position internally? |
| 14 | A   The conversation was had with Bob McGraw to |
| 15 | explain what the role and the parameters, |
| 16 | the expectation of the position was.  He was |
| 17 | not interested in that.  So he was the only |
| 18 | one that would have been remotely even |
| 19 | closely qualified for it. |
| 20 | Q   Was he the one who was demoted from director |
| 21 | of golf, I think you said? |
| 22 | A   No, from head golf professional to director |
| 23 | of instruction. |
| 24 | Q   And was he at the top of the golf — |

73

| | |
|---|---|
| 1 | it. |
| 2 | Q   And how about business development position, |
| 3 | Marian Lent, did you make an effort to hire |
| 4 | from within for that position? |
| 5 | A   No, same — same scenario. |
| 6 | Q   And what was it — I'm sorry, what was the |
| 7 | reason? |
| 8 | A   You need a sales professional, experienced |
| 9 | sales. |
| 10 | Q   What do you define as an experienced sales |
| 11 | professional? |
| 12 | A   Somebody that has a proven track record in |
| 13 | developing and delivering new clients, |
| 14 | contracts. |
| 15 | MS. SCHWAB:  I'd like to mark as an |
| 16 | exhibit the position statement of New |
| 17 | Seabury. |
| 18 | The position statement I have — I |
| 19 | don't have the exhibits.  Frankly, I didn't |
| 20 | have time to copy them all.  I'd be happy to |
| 21 | include them in the final exhibits so it's |
| 22 | complete, if you'd like. |
| 23 | MR. WILGOREN:  That's fine. |
| 24 | MS. SCHWAB:  We'll mark that as |

19 (Pages 70 to 73)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

74

1        Exhibit 1.
2             (Exhibit No. Position statement
3        marked for identification.)
4    BY MS. SCHWAB:
5    Q    Do you recognize this document?
6    A    I do.
7    Q    What is it?
8    A    It's the position statement for New Seabury.
9    Q    Have you reviewed the document before?
10   A    Yes.
11   Q    And can you turn to page 14 of the document.
12        Do you see the affirmation of
13        respondent?
14   A    Mm-hmm.
15   Q    And where it says Stephen Brennan, is that
16        your signature above that?
17   A    Yes, it is.
18   Q    And did you review the document to make sure
19        that it was true and accurate to the best of
20        your knowledge?
21   A    We did.
22   Q    I apologize. I'm looking for something in
23        the document.
24             (Pause.)

75

1    Q    Can you turn to page 7 of the document?
2             The last paragraph, the third
3        sentence, it says an outside salesperson was
4        hired?
5    A    Correct.
6    Q    Who was the outside salesperson?
7    A    That was the business development person,
8        Marian Lent.
9    Q    What were her duties relating to sales?
10   A    She goes and develops business relationships
11        for large one-day events.
12   Q    How was it that you determined that there
13        wasn't anybody internal who would be able to
14        satisfy your needs for this position?
15             MR. WILGOREN: Objection. Relevancy.
16   A    In my assessment, we didn't have any
17        professional salespeople.
18   Q    What was your assessment based on?
19   A    The lack of sales or developing new
20        business. It was wait for the phone to
21        ring. And we get our business that way, and
22        we needed to grow the business.
23   Q    Did you have any discussions with any
24        employees to determine if they might be

76

1        qualified to perform the duties of business
2        developer/development?
3    A    At that time, no.
4    Q    How about subsequent to that?
5    A    Haven't needed to.
6    Q    When you started at New Seabury, were you
7        involved in direct supervision of any
8        employees?
9    A    Department heads.
10   Q    How many department heads were there?
11   A    It was eight or nine, somewhere in that
12        vicinity.
13   Q    Were you involved in direct supervision of
14        any other employees?
15   A    Department heads had direct -- well, the
16        accounting staff, the controller was
17        obviously there, worked directly with the
18        accounting staff.
19             There were many renovations in the
20        accounting process that had to happen, and
21        then I had an administrative assistant that
22        reported directly to me.
23   Q    When you came on in part to do this
24        turnaround, who else was involved in the

77

1        turnaround?
2             MR. WILGOREN: At what point in time?
3    Q    When you started, who else was involved in
4        affecting the turnaround?
5    A    Well, initially Mark O'Neil was brought in
6        as a consultant and was retained for a
7        period of time, I don't know, I guess 9
8        months, 12 months, something like that. He
9        was there as well.
10             He wasn't there. He was involved as
11        well.
12   Q    Can you explain your role as compared with
13        Mark O'Neil's role?
14   A    Mark was a consultant hired by American Real
15        Estate Partners to basically get a team in
16        place -- me -- to, in effect, get the
17        properties at a level of profitability and
18        have it amortized to the point that it was
19        ready when we started building homes.
20   Q    What -- after getting you in place, what
21        other involvement did Mark O'Neil have?
22   A    Reviewed financials, periodic visits, have a
23        second set of eyes.
24   Q    Did you discuss decisions with him, things

20 (Pages 74 to 77)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

**78**

1  that you were thinking of doing?
2  A   Yes.
3  Q   Did you discuss employment-related decisions
4  with him?
5  MR. WILGOREN: Objection. Vague.
6  A   I would say yes, we discussed everything
7  from the, you know, budgeted dollars to
8  efficiencies of departments.
9  Q   You mentioned before that you talked with
10  department heads about reducing headcount.
11  Were you involved in all of the
12  decisions relating to what specific
13  employees to lay off or terminate?
14  MR. WILGOREN: Objection.
15  A   I would -- you can't say all.
16  Q   Were you involved at all in decisions as to
17  individual employees?
18  A   Some.
19  Q   What employees would you be involved in the
20  decisions?
21  A   It would be more of -- as an example, the
22  chef tried to figure out how he could pare
23  down for the off season and how to do it.
24  Counseled him on that, ways to become more

**79**

1  efficient, doing it without the bodies.
2  Q   And what things did you talk about with the
3  chef relating to that?
4  A   Basically being able to finish your what we
5  call winter work. It's the deep clean in an
6  efficient time and manner, not to cast it
7  out over a period of the wintertime and
8  months.
9  We closed the restaurant completely
10  for six weeks to enable that. It would be
11  to walk through and challenge every position
12  as to why do you need him when we don't have
13  any business going on.
14  Q   So would you go through each specific person
15  and say what are they doing? Why do you
16  need them?
17  A   I wouldn't say each person. They would come
18  with a recommendation. If it was what I
19  would deem as a more relevant position, I
20  would be more involved. If it was a less
21  relevant position, I would be less involved.
22  Q   Did each department head come to you with a
23  recommendation in terms of staffing
24  decisions during that time period?

**80**

1  A   There was a discussion with each department
2  head.
3  Q   And what would you talk about during the
4  discussions?
5  A   What they need to do to maintain, be
6  prepared for the spring, and doing it as
7  efficiently as possible with as much
8  cross-over as possible.
9  Q   And would you have to sign off on every
10  staffing decision that was made?
11  A   Ultimately, yes.
12  Q   Was there a deadline that you gave to each
13  department head to come to you with a
14  proposal relating to staffing?
15  A   No, because it was ongoing. It goes on to
16  this day.
17  Q   So in 2003 -- when you started in 2003, what
18  was the first meeting that you had with the
19  department head relating to restructuring of
20  staffing?
21  A   There was a department head meeting with all
22  of them, and at that point, put the
23  challenge forth on -- through the budget
24  process, establishing what they needed.

**81**

1  Q   When --
2  A   The budget wasn't completed at that point in
3  time, so we used that as the tone to set the
4  level of staff.
5  Q   When was that meeting?
6  A   It was early February.
7  Q   And after that, when was the next meeting
8  that you had either with the department
9  heads overall or with an individual
10  department head about staffing?
11  A   We do weekly meetings.
12  Q   With all the department heads?
13  A   Yes.
14  Q   And when was the first time that you had --
15  that you received some sort of a proposal or
16  suggestion from a particular department head
17  about how to restructure the staffing in
18  that department?
19  A   Probably mid to late February, when the --
20  the first run of labor for the budget.
21  Q   First what?
22  A   Run of labor for the budget.
23  Q   What does that mean?
24  A   It means what they're proposing for labor

21 (Pages 78 to 81)

Stephen Brennan 1 18 2006
Patricia Cosgrove v. New Seabury Resources Management

| 82 | | 84 | |
|---|---|---|---|
| 1 | for their budgeted year | 1 | through position changes, either demotions |
| 2 | Q Was there one particular department head | 2 | or transfers? |
| 3 | that came to you at that time? | 3 | A The three I already mentioned. There were |
| 4 | A No, all. | 4 | at least five. |
| 5 | Q So all of them came to you? | 5 | Q Okay. |
| 6 | A Yes | 6 | A Six. At least six. |
| 7 | Q With their first run of labor? | 7 | Q All right. |
| 8 | A (Witness nods.) | 8 | So there was Scott Nickerson, you |
| 9 | Q And did they give you some sort of documents | 9 | mentioned Mr. Robert McGraw, and who was the |
| 10 | relating to what they were thinking of in | 10 | other golf person that you mentioned? |
| 11 | terms of restructure? | 11 | A Dan Stone. |
| 12 | A No, it was verbal. | 12 | Q Dan Stone. |
| 13 | Q Was this a meeting with all of the | 13 | And then you said there were two or |
| 14 | department heads together? | 14 | three others? |
| 15 | A No, it was one on one with the controller | 15 | A Wayne Kapral was terminated. |
| 16 | and myself, testing the numbers. | 16 | Q Okay. |
| 17 | Q And the controller, that's Wayne -- | 17 | I'm just talking about demotions or |
| 18 | MR. WILGOREN: Spencer. | 18 | transfers. |
| 19 | Q Wayne Spencer? | 19 | A Initially he was demoted from GM just to |
| 20 | A Yes. | 20 | CFO. |
| 21 | Q So you and Wayne Spencer had meetings with | 21 | Q Okay. |
| 22 | each of the individual department heads? | 22 | A Ultimately to be terminated, but at that |
| 23 | A (Witness nods.) | 23 | point he was demoted. |
| 24 | Q And what information did they present to you | 24 | Q Okay. |

| 83 | | 85 | |
|---|---|---|---|
| 1 | at that time? | 1 | And then who else? |
| 2 | A Explaining the positions that they had per | 2 | A Rhonda had the option of being transferred, |
| 3 | month, what those positions were going to be | 3 | Rodgers. |
| 4 | used for; and then we'd challenge back on | 4 | Q Okay. |
| 5 | can they start two weeks later, can they -- | 5 | Anyone else? |
| 6 | you know, when do you need them, think about | 6 | A Ultimately Patricia's position was |
| 7 | when you truly need them, and it was pared | 7 | eliminated and had an option to transfer. |
| 8 | back from there. | 8 | Q Anyone else? |
| 9 | Q At that time, did you have any discussions | 9 | A That's who comes to mind right now. |
| 10 | with individual department heads about the | 10 | Q Okay. |
| 11 | full-time employees? | 11 | So those six people were either |
| 12 | MR. WILGOREN: Objection. Vague. | 12 | transferred or demoted -- |
| 13 | A As it relates to? | 13 | A Correct. |
| 14 | Q As it relates to reduction in staffing. | 14 | Q -- during 2003? |
| 15 | A I can't recall at this time. I mean, there | 15 | About how many people -- how many |
| 16 | was discussions had, but I can't recall the | 16 | full-time employees had their jobs |
| 17 | discussions. | 17 | eliminated or terminated in 2003? |
| 18 | Q Was the main focus at that time the | 18 | A I don't know. On a year-over-year basis, I |
| 19 | anticipation of the current -- of the coming | 19 | mean, we reduced by close to 100 bodies, |
| 20 | high season and staffing relating to that | 20 | whether full-time or part-time. I don't |
| 21 | high season? | 21 | remember. |
| 22 | A No, it's every day what you need for staff. | 22 | Q Okay. |
| 23 | Q In 2003, how many full-time employees, to | 23 | Other than you mentioned Wayne Kapral |
| 24 | the best of your recollection, were went | 24 | was terminated, right? |

22 (Pages 82 to 85)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

|  | 86 |
|---|---|
| 1 | A    Mm-hmm.  Michele O'Brien's position was also |
| 2 | eliminated. |
| 3 | Q    The plaintiff -- |
| 4 | A    This is '03 we're talking about? |
| 5 | Q    '03 |
| 6 | A    Right. |
| 7 | Q    Any others that you can remember, any other |
| 8 | full-time employees? |
| 9 | A    Again, some of the kitchen staff was full |
| 10 | time, and they became full time seasonal. |
| 11 | You've had some F&B staff that was full time |
| 12 | that became full time seasonal. |
| 13 | I believe -- and I am not 100 percent |
| 14 | sure on this, but I believe some of the |
| 15 | captains were deemed as full time when they |
| 16 | were more of a -- they may have worked all |
| 17 | year round, but they weren't 40-hour-a-week |
| 18 | employees. |
| 19 | Q    All right. |
| 20 | As to Robert McGraw, when was his |
| 21 | position changed? |
| 22 | A    Spring of '03. |
| 23 | Q    And what was the change? |
| 24 | A    From head golf professional to director of |

|  | 87 |
|---|---|
| 1 | instruction |
| 2 | Q    How would you categorize that position |
| 3 | change? |
| 4 | A    Took a pay cut, less responsibility.  It's a |
| 5 | completely different position. |
| 6 | Q    Would you consider it a demotion? |
| 7 | A    Yes. |
| 8 | Q    Was he still full time after the -- in the |
| 9 | new position? |
| 10 | A    Yes. |
| 11 | Q    And is Mr. McGraw currently employed at New |
| 12 | Seabury? |
| 13 | A    He just left within the last three months. |
| 14 | Q    Before he left, what was his position? |
| 15 | A    Director of instruction. |
| 16 | Q    And that's the position he had been demoted |
| 17 | to in 2003? |
| 18 | A    Yes. |
| 19 | Q    Why did he terminate his employment? |
| 20 | A    He was able to -- basically, he made a |
| 21 | boatload off his house on the Cape.  They |
| 22 | were able to sell it.  They were moving back |
| 23 | to be closer to family in New Hampshire. |
| 24 | Basically paid off his house in Florida, |

|  | 88 |
|---|---|
| 1 | house in New Hampshire and sold his house. |
| 2 | MS. SCHWAB:  Can I mark this as |
| 3 | Exhibit 2? |
| 4 | (Exhibit No. 2 marked for |
| 5 | identification.) |
| 6 | BY MS. SCHWAB: |
| 7 | Q    This document you've handed you is a |
| 8 | three-page document with three different |
| 9 | payroll change forms. |
| 10 | Can you turn to the third page of the |
| 11 | document? |
| 12 | A    Yes. |
| 13 | Q    Do you recognize this document? |
| 14 | A    Yes. |
| 15 | Q    What is it? |
| 16 | A    It's a payroll notice form. |
| 17 | Q    Did you fill it out? |
| 18 | A    No, Mark O'Neil did this. |
| 19 | Q    And where it says change approved by, do you |
| 20 | recognize that as Mark O'Neil's signature? |
| 21 | A    Yes, it is. |
| 22 | Q    Okay. |
| 23 | In the reason for the change, it says |
| 24 | reevaluation of existing position? |

|  | 89 |
|---|---|
| 1 | A    Correct. |
| 2 | Q    Do you know why that -- that was checked |
| 3 | there? |
| 4 | A    Because the position was changing to be a |
| 5 | larger position than what he had previously |
| 6 | had, and he didn't have an interest in |
| 7 | taking that position or maintaining in the |
| 8 | position as it was going to be restructured |
| 9 | to, as far as responsibilities. |
| 10 | Q    So you would check reevaluation of existing |
| 11 | positions when an existing position changed |
| 12 | and the person doesn't accept that position, |
| 13 | then is offered a different position? |
| 14 | A    It could simply be the position changed. |
| 15 | Q    But in his situation, the position changed, |
| 16 | and then he took a different position? |
| 17 | A    Correct. |
| 18 | Q    Okay. |
| 19 | And Scott Nickerson you talked about |
| 20 | before.  When was his position changed? |
| 21 | A    Roughly the same time, right at the end of |
| 22 | January. |
| 23 | Q    And what was his position changed -- from |
| 24 | what to what? |

23 (Pages 86 to 89)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

| 90 | | | 92 | | |
|---|---|---|---|---|---|
| 1 | A | Director of golf to golf course | 1 | | turnaround of New Seabury? |
| 2 | | superintendent | 2 | A | I talked about the goals |
| 3 | Q | Going back for a minute, I'm sorry, to | 3 | Q | And what did you say about the goals? |
| 4 | | Mr. McGraw, were you involved in the | 4 | A | Just that for obvious reasons, things had to |
| 5 | | conversation with Mr. McGraw about his | 5 | | change with the efficiencies and how things |
| 6 | | demotion? | 6 | | were being run. |
| 7 | A | I was involved with the -- yes, ultimately, | 7 | Q | And did you say, you know, a lot of people |
| 8 | | yes, I was. | 8 | | are going to be going through position |
| 9 | | I was initially involved in the | 9 | | changes? |
| 10 | | discussion of his interest in the new | 10 | A | No. |
| 11 | | position and what it would entail. | 11 | Q | All right. |
| 12 | Q | And what did you discuss during that meeting | 12 | | How about Mr. Nickerson, were you |
| 13 | | with him? | 13 | | involved in his position change? |
| 14 | A | What I saw as the objectives for the | 14 | A | Yes. |
| 15 | | position and the responsibilities of the | 15 | Q | What was your involvement? |
| 16 | | position as head golf professional, as I | 16 | A | I spoke with him on my first visit to New |
| 17 | | needed it. | 17 | | Seabury in November of '02. Scott was very |
| 18 | Q | And did you have any other discussions with | 18 | | diligent in understanding why I was there in |
| 19 | | Mr. McGraw about his position change, other | 19 | | November before I had even accepted the job, |
| 20 | | than that initial conversation? | 20 | | and he basically said I hope you come |
| 21 | A | I guess I need more detail on your question. | 21 | | aboard. We're a sinking ship. And the only |
| 22 | Q | You said you were involved in seeing if he | 22 | | thing I ask is that I get my job back. I |
| 23 | | was interested in the new -- | 23 | | took the director of golf position, you |
| 24 | A | Correct. | 24 | | know, at the company's request, and at the |

| 91 | | | 93 | | |
|---|---|---|---|---|---|
| 1 | Q | In the -- I guess the reevaluation of his | 1 | | time I said I wanted my job back ultimately |
| 2 | | old position? | 2 | | when that change had to be made. And it was |
| 3 | A | Right. | 3 | | certainly fair to do that, and he's done a |
| 4 | Q | Were you involved in other discussions with | 4 | | great job for us since then. |
| 5 | | him about putting him in this new different | 5 | Q | Okay. |
| 6 | | position? | 6 | | So going back to November '02, what |
| 7 | A | I asked him really what his goals were, what | 7 | | did you say and what did he say during that |
| 8 | | he wanted to do, and he said his love is | 8 | | conversation? |
| 9 | | teaching. There wasn't a director of | 9 | A | I just said that. |
| 10 | | instruction, so he moved into that position. | 10 | Q | You said he was very understanding, but what |
| 11 | Q | And so you tried to satisfy what he was | 11 | | specifically did you say to him during that |
| 12 | | looking for? | 12 | | conversation? |
| 13 | A | Well -- | 13 | A | The initial conversation was me gaining |
| 14 | | MR. WILGOREN: Objection. | 14 | | insight as to the property, how the golf and |
| 15 | | Mischaracterization of the witness's | 15 | | golf course operations work. |
| 16 | | testimony. | 16 | | You know, we spent half a day |
| 17 | A | -- with the pay cut that he took, I wouldn't | 17 | | together doing that, and from there at the |
| 18 | | call it that. | 18 | | end of the conversation he said, I hope you |
| 19 | Q | In terms of his job responsibilities, | 19 | | come aboard, you know, we have issues, we're |
| 20 | | though? | 20 | | a sinking ship; and, you know, ultimately, |
| 21 | A | Correct. | 21 | | you know, as I stated when I first took this |
| 22 | Q | At any time during your discussions with | 22 | | position, I just want my position back. I |
| 23 | | Mr. McGraw about the position change, did | 23 | | understand when it's time to do that. |
| 24 | | you talk about the overall restructure or | 24 | Q | And you said he said, you know, I hope you |

24 (Pages 90 to 93)

Stephen Brennan 1 18 2006
Patricia Cosgrove v. New Seabury Resources Management

94

1    come aboard. We're a sinking ship.
2        What had you said about your general
3    role?
4    A    Nothing  I was coming to view it for
5    O'Neil, for another set of eyes.
6    Q    So how did he -- was it your impression that
7    he thought you were coming to restructure
8    the company and -- but make it more
9    profitable?
10   A    Oh, there's no question he understood that.
11   Q    And how did he understand that?
12   A    He's intelligent.
13   Q    Did you say something to him about that?
14   A    Not in that visit.
15   Q    Previously had you?
16   A    That was the first time I had ever met him.
17   Q    When is the next time you met Mr. Nickerson?
18   A    When I started.
19   Q    And when was the next conversation that you
20   had had about his position and his change of
21   position?
22   A    Conversation was probably the third week of
23   January, before I got there.
24   Q    And what was the conversation? What did you

95

1    say during that conversation?
2    A    That we're going to move you back to the
3    superintendent position. Dan at the same
4    time will be moving back to the assistant
5    superintendent position, and, you know,
6    let's go forward, make it the best we can.
7    Q    And what did he say in response?
8    A    He goes, Hurry up and get here.
9    Q    And how would you characterize the change in
10   position from director to superintendent?
11   A    It changes from overseeing the golf course
12   and all of golf to simply overseeing --
13   "simply" is a poor term, but to overseeing
14   the golf courses only.
15   Q    Would you characterize it as a demotion?
16   A    Absolutely.
17   Q    And you mentioned that he wanted to be
18   returned to the director of golf operations?
19   A    No.
20   Q    Oh, I thought you said -- I misunderstood.
21       I thought you said the first
22   position -- the first discussion you said he
23   wanted to be returned to his position?
24   A    As golf course superintendent

96

1    Q    When was he golf course superintendent?
2    A    Prior to being promoted to director of golf
3    operations.
4    Q    And he wanted to be returned back to his
5    previous position?
6    A    That's correct.
7    Q    I understand.
8        Is Mr. Nickerson still working at New
9    Seabury?
10   A    Yes, he is.
11   Q    And what's his position?
12   A    Golf course superintendent.
13   Q    And on this change of status form, do you
14   have that -- that should be this -- I
15   believe the second page in the exhibit?
16   A    Yes.
17   Q    Did you fill this form out?
18   A    I did not.
19   Q    Have you seen it before?
20   A    Yes.
21   Q    Do you know who filled it out?
22   A    I believe Mark O'Neil did.
23   Q    Okay.
24       And it says change in position and

97

1    responsibilities?
2    A    That would be correct.
3    Q    And we talked already about how his position
4    had changed.
5        Okay. How about Dan Stone, when is
6    the first time that you talked to Dan Stone
7    about a position change?
8    A    Probably not until end of February.
9    Q    And are you basing that on the fact that the
10   document is dated March 5, '03?
11   A    No, it was just -- it was after the fact.
12   Q    After what fact?
13   A    After the fact of me getting there and
14   getting my feet on the ground.
15   Q    And what was the conversation that you had
16   with Mr. Stone, the first conversation?
17   A    Scott Nickerson had the initial conversation
18   with him, and then I explained the salary
19   change.
20   Q    What's your understanding of what
21   Mr. Nickerson said to Dan Stone?
22   A    I don't know. I wasn't there.
23   Q    And so did you come in on a meeting that
24   Mr. Nickerson and Mr. Stone were having?

25 (Pages 94 to 97)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

| 98 | | | | 100 | | |
|---|---|---|---|---|---|---|
| 1 | A | No. | | 1 | A | Albo Antenucci. Good luck. |
| 2 | Q | You had a separate meeting -- | | 2 | Q | And what -- who is currently the president? |
| 3 | A | Yes. | | 3 | A | John Webber. |
| 4 | Q | -- with Mr. Stone? | | 4 | Q | When did Mr. Antenucci -- when was his |
| 5 | | And what did you say in that meeting | | 5 | | position as president ended? |
| 6 | | to him? | | 6 | A | Summer '03 |
| 7 | A | I just wanted to explain the change in the | | 7 | Q | Do you have any knowledge of why he ended |
| 8 | | salary, the timing of it. Went through | | 8 | | his position as president? |
| 9 | | that, and that was the conversation. | | 9 | | MR. WILGOREN: Objection. Relevancy. |
| 10 | Q | What was -- what was Mr. Stone's reaction? | | 10 | A | I believe that it was a restructure of |
| 11 | A | Well, people aren't generally happy when | | 11 | | position and a salary decrease. |
| 12 | | they take a $13,000 pay cut, but he | | 12 | Q | Where is the president's office located? |
| 13 | | understood, and it obviously worked well | | 13 | A | Manhattan. |
| 14 | | since he's still there doing a good job for | | 14 | Q | And were you -- |
| 15 | | us. | | 15 | A | My -- I'm sorry. This is president not of |
| 16 | Q | Is he still in the same position? | | 16 | | New Seabury. |
| 17 | A | He is. | | 17 | Q | And who is it president -- what entity is he |
| 18 | Q | Did you explain during the meeting that | | 18 | | president of? |
| 19 | | there was a restructure generally of New | | 19 | A | American Real Estate Partners. |
| 20 | | Seabury at the time? | | 20 | Q | And what is New Seabury's relationship to |
| 21 | A | No, we talked about the department. | | 21 | | American Real Estate Partners? |
| 22 | Q | The golf department? | | 22 | A | A subsidiary. |
| 23 | A | Golf course, golf department, yes. | | 23 | Q | So were you involved at all in Mr. Antenucci |
| 24 | Q | And this form, the first page of Exhibit 2, | | 24 | | not being -- terminating his presidency? |

| 99 | | | | 101 | | |
|---|---|---|---|---|---|---|
| 1 | | do you recognize this form? | | 1 | A | No. No. |
| 2 | A | I do. | | 2 | Q | When you came on board, was Mr. Kapral CFO? |
| 3 | Q | Did you fill it out? | | 3 | A | Yes. |
| 4 | A | Yes. | | 4 | Q | And at some point, he was terminated; is |
| 5 | Q | Where -- | | 5 | | that correct? |
| 6 | A | I signed it. | | 6 | A | Correct. |
| 7 | Q | Okay. | | 7 | Q | When did that happen? |
| 8 | A | I'm -- | | 8 | A | I'm guessing early March, late February, |
| 9 | Q | So where it says change approved by, that's | | 9 | | early March, somewhere in that vicinity. |
| 10 | | your signature? | | 10 | Q | Were you involved in his termination? |
| 11 | A | Yes. | | 11 | A | Yes. |
| 12 | Q | Did you fill out the form? | | 12 | Q | What was your involvement? |
| 13 | A | I did not. | | 13 | A | It was reviewed with the president for the |
| 14 | Q | Do you know who filled it out? | | 14 | | reasons we -- and the separation agreement |
| 15 | A | No, not for sure. | | 15 | | was established, and myself and Mark O'Neil |
| 16 | Q | And what about Wayne Kapral, were you | | 16 | | handled the termination. |
| 17 | | involved in his demotion from general | | 17 | Q | What were the reasons? |
| 18 | | manager to CFO? | | 18 | | MR. WILGOREN: Objection. Relevancy. |
| 19 | A | No, the president of the company was. | | 19 | A | Basically failure to perform |
| 20 | Q | Do you know when it took place? | | 20 | Q | Had you had any discussions with Mr. Kapral |
| 21 | A | Right before I got there. | | 21 | | about his performance problems previous to |
| 22 | Q | Who is the president of the company? | | 22 | | this? |
| 23 | A | It was Albo Antenucci. | | 23 | | MR. WILGOREN: Objection. |
| 24 | Q | Excuse me? | | 24 | A | They started prior to me getting there |

26 (Pages 98 to 101)

Stephen Brennan 1 18 2006
Patricia Cosgrove v. New Seabury Resources Management

102

1  Q  Do you know if there were discussions with
2     Mr. Kapral about his performance problems?
3        MR. WILGOREN: Objection. Relevance.
4  A  Yes.
5  Q  Yes, there were?
6  A  (Witness nods.)
7  Q  And do you know what the substance of those
8     conversations were?
9        MR. WILGOREN: Objection.
10  A  Quality of work, accuracy of financial
11     documents.
12  Q  Do you know if Mr. Kapral ever received any
13     verbal warnings about his performance?
14        MR. WILGOREN: Objection.
15  A  I believe so, but not -- wasn't there
16     personally.
17  Q  Would that -- would there be a notation of
18     that in his personnel file?
19  A  I would doubt it.
20  Q  Do you know if Mr. Kapral received any
21     written warnings relating to his
22     performance?
23        MR. WILGOREN: Objection.
24  A  I do not know.

103

1  Q  And did you have a meeting with Mr. Kapral
2     to talk about his termination?
3        MR. WILGOREN: Objection.
4  A  I believe I answered that.
5  Q  And the answer was yes?
6  A  Yes.
7  Q  You did.
8     Was there anyone else at that
9     meeting?
10        MR. WILGOREN: Objection.
11  A  I answered that as well. Mark O'Neil.
12  Q  Did Mr. Kapral say anything at the meeting
13     where you terminated him?
14        MR. WILGOREN: Objection.
15  A  He disagreed. He disagreed. I think he
16     said something to the effect of he was
17     signing the separation agreement under
18     duress, and good luck.
19  Q  Was Mr. Kapral's termination characterized
20     as a layoff?
21  A  No, it was a termination. Although we never
22     did replace the position.
23  Q  And currently is there anybody in the
24     position of CFO?

104

1  A  No, there's not.
2  Q  Who performs the responsibilities that
3     Mr. Kapral was to perform as CFO?
4  A  The controller.
5  Q  You mentioned before that Rhonda Rodgers was
6     somebody who had an option of a transfer in
7     2003.
8     Can you explain what that option was?
9  A  We offered her the option to take over the
10     lodging component.
11  Q  And what had her previous position been?
12  A  Membership sales.
13  Q  Did you have a discussion with her giving
14     her that option?
15  A  Yes.
16  Q  Was there anyone else present?
17  A  I don't recall.
18  Q  Do you remember -- did you say anything to
19     Ms. Rodgers at that meeting about the reason
20     for the transfer?
21  A  The new membership director was already in
22     place, which she was aware of. She was a
23     quality individual that we felt could help
24     the team.

105

1  Q  Did you characterize the transfer as a
2     demotion?
3  A  No, lateral.
4  Q  And was it the same pay?
5  A  Yes.
6  Q  And did you consider it comparable
7     responsibilities?
8  A  Probably more.
9  Q  And what was -- did Ms. Rodgers respond to
10     your offer of the transfer at that meeting?
11  A  That her husband's job situation had changed
12     and -- she might have wanted to think about
13     it that night, but when she got back to me
14     the answer was her husband's job situation
15     had changed. He had picked up benefits, and
16     she would be able to have the opportunity to
17     stay home.
18  Q  And what happened after that with
19     Ms. Rodgers?
20  A  That was it.
21  Q  Did she resign?
22  A  I never looked at it that way, but I guess I
23     would say I guess so.
24  Q  How did you look at it?

27 (Pages 102 to 105)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

114

1   Q   What do you mean reporting upward?
2   A   Public company, so we have a CFO in
3       Manhattan, so therefore you don't have to
4       have a CFO locally. It was a duplication of
5       duties.
6   Q   Did Wayne Spencer become the controller
7       after Wayne Kapral was terminated from his
8       position as CFO?
9   A   That's correct, shortly thereafter.
10  Q   Like within a week or so?
11  A   A week, a month, somewhere in that vicinity.
12  Q   Earlier we talked about Rhonda Rodgers and
13      that she was offered another position but
14      didn't take the position?
15  A   Correct.
16  Q   Did you have any discussion with Ms. Rodgers
17      during your conversation about the
18      transfer about her pregnancy or about her
19      request for leave?
20  A   Conversation about it? I don't believe so.
21      I mean, I knew she was pregnant, obviously.
22  Q   So did you mention it at all during this
23      meeting with her?
24  A   Not that I recall.

115

1   Q   Do you know -- did she mention it at all
2       during the meeting?
3   A   In the context of what, I guess is my
4       question.
5   Q   In any context.
6   A   Not that I recall. I mean, there could have
7       been conversation about it, but there's
8       nothing that stands out.
9           MR. WILGOREN: Only testify about
10      what you recall. Don't speculate.
11  Q   Previous to your discussion with Ms. Rodgers
12      about her transfer, did you talk about the
13      transfer with anybody else, about the offer
14      of a transfer?
15  A   Mark O'Neil.
16  Q   Anyone other than Mark O'Neil?
17  A   Not that I recall.
18  Q   Did you and Mark O'Neil talk about
19      Ms. Rodgers' pregnancy?
20  A   Other than the fact that she was pregnant,
21      no.
22  Q   Did you talk about the fact that she was
23      pregnant?
24  A   We were both aware that she was pregnant.

116

1   Q   And did you talk about it?
2   A   We talked about the dates that she would be
3       out.
4   Q   On her maternity leave?
5   A   Yes.
6   Q   And did you talk about that in the same
7       discussion as talking about the transfer of
8       her position?
9   A   No.
10  Q   When was it that you talked with Mr. O'Neil
11      about Ms. Rodgers' maternity leave dates?
12  A   Probably when I realized what the dates
13      were.
14  Q   Would that have been before or after you
15      made the decision to change her position?
16  A   No, the decision to change the position was
17      done before I even knew her.
18  Q   So then also before you knew she was on
19      maternity leave?
20  A   I believe I didn't have knowledge of it at
21      that point. I don't know.
22  Q   Did you at some point talk about how the
23      position transfer would be impacted by the
24      fact that she might be out on maternity

117

1       leave for a period of time?
2   A   No. The position was being replaced with a
3       different body on the membership sales side.
4       That was a foregone conclusion.
5   Q   Her --
6   A   The new --
7   Q   Excuse me.
8           Her original position was being
9       replaced?
10  A   Yes.
11  Q   Okay. Go ahead.
12  A   That was a foregone conclusion. She helped
13      train that position as far as getting that
14      person knowledgeable with the property
15      itself. He took over that position.
16          With that, we said there will be a
17      position for you. Don't know what it is
18      yet, but there will be a position for you.
19          When she came back or was about to
20      come back from maternity leave I believe is
21      the time we had the conversation of the
22      position in lodging.
23  Q   Who was the person who took over her
24      original position?

30 (Pages 114 to 117)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

122

```
1    of the employment  I know this is when
2    it   she would have been -- from the
3    standpoint of the system, this is what it
4    was dated.
5         She may have ended before this.  I'm
6    not sure what the dates were.
7    Q   You said that you think she came in during
8    her maternity leave to talk about the
9    transfer and said she didn't want to take
10   the position.
11        Do you remember if her leave ended at
12   that point when she said she didn't want to
13   take the position or whether she was paid
14   out for the rest of the leave?
15   A   No, she was paid out for the balance.
16   Q   And then she just didn't come back so she
17   was removed from payroll?
18   A   Correct
19   Q   When Michele O'Brien was terminated, you
20   said that her department ended.
21        Was there anybody who came in to
22   replace Ms. O'Brien?
23   A   No.
24   Q   As to -- when we were talking about other
```

123

```
1    people who were terminated, you said you
2    thought some of the kitchen staff were
3    full-time --
4    A   Correct.
5    Q   -- employees.
6         How many full-time kitchen staff were
7    terminated in 2003?
8    A   There were -- first they were laid off, not
9    terminated, at the beginning of 2003 for the
10   slow season, and it would have been two or
11   three, maybe four that went from being
12   full-time year round to the chef being
13   full-time year-round.
14   Q   And were those people who were laid off at
15   the beginning of the slow season --
16        Do you remember if they were hired
17   back as seasonal employees?
18   A   I don't know if all of them were, but the
19   majority were.
20   Q   So most of them were not exactly laid off
21   but reduced from full-time to seasonal?
22   A   They were laid off for a period of anywhere
23   from a month to three months.
24   Q   And you mentioned also that there were some
```

124

```
1    captains who had full-time positions that
2    were ended?
3    A   I believe the captains were reduced from
4    being deemed as full time to being less than
5    full time.  They were -- basically became on
6    call during the off season.
7    Q   Any that just had their position eliminated
8    entirely that you can remember?
9    A   Not that I can think of
10   Q   Other than those kitchen staff and captains,
11   Wayne Kapral, Michele O'Brien and the
12   plaintiff, are there any other full-time
13   employees whose positions were eliminated in
14   2003?
15   A   There could have been.  I believe there was
16   a bartender.  It was the bar manager.  His
17   position was eliminated.  Wasn't replaced.
18        There may have been a year-round
19   assistant food and beverage director that
20   was not brought -- was made not year-round.
21   I believe there was someone on the outside
22   golf staff that was year-round that was
23   eliminated to not be a year-round position.
24   Q   Anything else?
```

125

```
1    A   That's what comes to mind right now.
2    Q   What was the name of the bar manager?
3    A   Tom -- Tommy Sullivan.
4    Q   And was he hired into a seasonal position
5    or --
6    A   No, the position was eliminated.
7    Q   And he stopped working at New Seabury?
8    A   Yes.
9    Q   And then the assistant food and beverage
10   person, do you remember that person's name?
11   A   I don't remember the name.
12   Q   But that person wasn't eliminated, just
13   moved down to seasonal?
14   A   Right.
15   Q   And the same with the outside golf person?
16   A   Yes.
17        (Exhibit No. 8 marked for
18   identification.)
19   BY MS. SCHWAB.
20   Q   Do you recognize the document marked as
21   Exhibit 8?
22   A   I do.
23   Q   What is it?
24   A   It's a termination report.
```

32 (Pages 122 to 125)

126

1  Q   And what is the -- what information's on
2      this termination report?
3  A   Basically it shows the -- anybody that is
4      taken out of the payroll system.
5  Q   Is this a report that you've generated?
6  A   It's a report generated program that was --
7      generated by the payroll person.
8  Q   And here in one corner -- one column is
9      department number?
10 A   Correct.
11 Q   And Department No. 390, do you know what
12     department that is?
13 A   Lodging.
14 Q   And of the people listed in that department,
15     then, on the far column, it says years of
16     service -- years' service?
17 A   Right.
18 Q   And all the people who have zero next to
19     them, what does that zero mean?
20 A   I don't know if that column is actually a
21     relevant column.
22 Q   What do you mean by that?
23 A   I don't know if it actually carries any
24     information to it.

127

1  Q   Might the zero indicate a seasonal employee
2      versus a full-time employee?
3  A   I don't know. It's not a column that I use
4      as a piece of information.
5  Q   When you look down the column, can you
6      identify which of these people would have
7      been seasonal versus full-time?
8  A   Seasonal versus full-time. I may be able to
9      pick out a few, but I believe Marc Verkade
10     at one point was full-time.
11 Q   At one point in 2003?
12 A   At one point in time.
13         (Witness read document.)
14 A   Most of the people during this span of
15     time -- they're getting laid off at this
16     point in time. They're not full-time,
17     year-round.
18 Q   Why do you say that?
19 A   Because they were terminated.
20 Q   But I'm asking you to look through at people
21     who were terminated from full-time positions
22     as opposed to being terminated from seasonal
23     positions.
24 A   Full-time terminations would have happened

128

1      when we first got there, converted to
2      part-time positions.
3  Q   So if somebody was terminated in this fourth
4      quarter of the year and they were
5      necessarily seasonal employees --
6  A   They were probably seasonal employees.
7  Q   Because the termination of full-time
8      employees happened when?
9  A   Really the early part of 2003.
10 Q   And then also in early 2003 happened -- the
11     people whose positions were reclassified
12     from full-time to seasonal?
13 A   Generally happened at that point.
14 Q   So can you identify anybody on this list who
15     was terminated from a full-time position at
16     this time?
17         (Witness read document.)
18 A   Mary Polino.
19         (Witness read document.)
20 Q   Is that it?
21         (Witness read document.)
22 A   I don't recognize anybody else as being
23     full-time from the list.
24 Q   Mary Polino is the person we had spoken of

129

1      earlier to whom you had given a verbal
2      warning and shortly thereafter she resigned?
3  A   Yes.
4  Q   Now, can you look through the termination
5      report and tell me if any of the names are
6      people whose position previous refuse in the
7      year had been changed from full-time to
8      seasonal?
9          I believe you already identified Marc
10     Verkade as one of those people?
11 A   Yes. And I say he -- he could have been --
12 Q   Anyone else?
13 A   There's no one I can say definitively.
14     There's some people from the kitchen that
15     were 40-hour-a-week people, but I don't know
16     that they were necessarily year-round
17     employees.
18 Q   Are there termination reports generated for
19     every quarter of 2003?
20 A   No. This -- this report was generated for
21     the quarter. There may have been some in
22     the past. It's all on hard disk now. This
23     is generated off of a hard disk, and --
24     excuse me.

33 (Pages 126 to 129)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

130

1          This is generated off the system.
2     The system ADP purges periodically, so now
3     the information's on a disk, but it doesn't
4     collate into this program anymore because
5     it's a -- it's 2003.
6          You would have 2004, 2005, 2003 is
7     purged.
8     Q   So you can't run this report again?
9     A   Not this exact report
10    Q   Could you run the reports for the 2004 and
11    2005 quarters?
12    A   I believe so.
13    Q   Can I ask you to provide that information?
14         MR. WILGOREN:  We'll take that under
15    advisement.
16         MS. SCHWAB:  Okay.
17         MR. WILGOREN:  What would the
18    relevancy of that be?
19         MS. SCHWAB:  It's certainly within
20    the scope of discoverable information to
21    find out who was terminated and the reasons
22    for their termination during the years that
23    Mr. Brennan has been there and during the
24    years of the restructure.

131

1          We can debate it after the
2     deposition.  That's fine.
3          MR. WILGOREN:  Fair enough.
4     BY MS. SCHWAB:
5     Q   And is the information in this report
6     preserved in some other way for the entire
7     year of 2003?
8     A   As far as the date and the name, department,
9     file number, that information is on the
10    disk.
11         MS. SCHWAB:  And, again, could I get
12    that information for all of 2003?
13         MR. WILGOREN:  Take under that
14    advisement.
15         MS. SCHWAB:  What do you want to do
16    in terms of timing, breaking for lunch?
17         (Discussion off the record.)
18    BY MS. SCHWAB:
19    Q   What's your understanding about the
20    requirements of the Family Medical Leave
21    Act?
22    A   It's stated in our employee handbook,
23    followed by the company.
24    Q   And do you have any independent

132

1     understanding of the requirements --
2     A   I just look at it as it reads in our
3     handbook.
4     Q   Do you have an understanding of the purpose
5     behind that?
6          MR. WILGOREN:  Objection.  Calls for
7     a legal conclusion.
8     A   I believe it's simply to allow anybody
9     that's affected by pregnancy to be able to
10    have time off with their like type position
11    and salary upon return.
12    Q   And is it your understanding that New
13    Seabury's policy reflects the requirements
14    of the Family and Medical Leave Act?
15    A   Yes.
16         MS. SCHWAB:  I'm going to mark as
17    Exhibit 9.
18         (Exhibit No. 9 marked for
19    identification.)
20    BY MS. SCHWAB:
21    Q   Can you turn to page 36 of the employee
22    handbook and before I get there, can you
23         And before I get there, can you
24    identify -- do you recognize that document?

133

1     A   I do.
2     Q   And what is the document?
3     A   It's the employee handbook, 2002.
4     Q   And is this the most recent incarnation of
5     the handbook?
6     A   No, this is 2002.
7     Q   Is this the incarnation that was in effect
8     in 2003?
9     A   Yes.
10    Q   Have you reviewed this handbook?
11    A   I have.
12    Q   And are you familiar with the policies
13    therein?
14    A   I am.
15    Q   On page 36, there's a section entitled
16    Family and Medical Leave Act.
17         Is this the section that details the
18    requirements of the Family and Medical Leave
19    Act?
20         MR. WILGOREN:  Objection.  Calls for
21    a legal conclusion.
22    A   I would say that's the purpose of it.
23    Q   And under employee eligibility, it lists, To
24    be eligible an employee must have worked for

34 (Pages 130 to 133)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

134

```
 1    a total of 12 months and worked a certain
 2    number of hours.
 3          What's your understanding about
 4    whether seasonal employees are entitled to
 5    FMLA benefits?
 6          MR. WILGOREN: Objection, relevancy.
 7    Objection, calls for a legal conclusion.
 8  A  I don't know.
 9  Q  So if a seasonal employee were to come to
10    you and ask for family and medical leave,
11    what would your response be?
12          MR. WILGOREN: Objection. Calls for
13    speculation.
14  Q  You can answer.
15          MR. WILGOREN: And for a legal
16    conclusion.
17  A  I would have to get the answer from our
18    legal. I don't know.
19          Not something that's ever been posed
20    to me.
21  Q  You've never had a seasonal employee ask
22    for --
23  A  No.
24  Q  -- family and medical leave?
```

136

```
 1    family and medical leave at New Seabury?
 2  A  They basically just request it.
 3  Q  Do they request it to you?
 4  A  It would go to HR, and then ultimately it
 5    would come to me.
 6  Q  Are you the person who has to sign off
 7    finally on somebody's request for leave?
 8  A  Mm-hmm -- yes.
 9  Q  And has it ever happened that you have
10    denied somebody's request for leave?
11  A  No.
12  Q  And what considerations go into what the
13    circumstances of the leave are, whether it's
14    paid or unpaid, how long a leave should be?
15  A  Well --
16          MR. WILGOREN: Objection. Calls for
17    speculation.
18  A  Within the document, it states what they can
19    do, and we just go by that.
20  Q  Have there been any differences between the
21    different leaves that you've granted or do
22    they all have identical circumstances?
23          MR. WILGOREN: Objection. The
24    question is vague.
```

135

```
 1          Is it your understanding -- you also
 2    on page -- let's see, page 39 there's a
 3    maternity leave policy.
 4          Do you see that?
 5  A  I do.
 6  Q  What's the difference between the family and
 7    medical leave section and the maternity
 8    section?
 9  A  I don't know. I never compared the two.
10  Q  Do you know if they both apply to maternity
11    leave or if only one does?
12  A  I don't know. I haven't compared the two.
13          MR. WILGOREN: Objection. The
14    document speaks for itself.
15  Q  How many people have asked for family and
16    medical leave in your tenure at New Seabury?
17  A  They come to mind, Patricia, Rhonda,
18    Michele, Jennifer Perry. Those are the only
19    ones that come to mind.
20  Q  Do you know if anybody's asked for a family
21    and medical leave for something other than a
22    pregnancy?
23  A  Not that I'm aware of.
24  Q  And what's the procedure for asking for a
```

137

```
 1          You can answer if you understand the
 2    question.
 3  A  I don't know what the differences would be
 4    or what you're looking for in that.
 5  Q  Do you know if the length of leave that
 6    you've granted for each person has differed
 7    for different people, how much time each
 8    person gets?
 9  A  Well, you -- each person, you're talking
10    about each of the individuals identified
11    as --
12  Q  Yes.
13  A  I would say that, you know, they could
14    follow what is in the handbook, which also
15    entails their vacation time and other things
16    that could go along with it, any time that
17    they've earned.
18  Q  But the amount of family and medical leave
19    has been the same for each of the four?
20  A  I would assume -- I don't know. I would
21    assume so. Whatever the policy is is how it
22    would have been done.
23  Q  Do you know if there's been any differences
24    in terms of the percentage of pay that
```

35 (Pages 134 to 137)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

**138**

1    different people have gotten?
2    A    I don't believe there would be anything
3    different. It would be whatever the policy
4    states.
5    Q    Does New Seabury set requirements for how
6    frequently somebody has to check in during
7    their leave?
8    A    Not at all.
9    Q    So is there any requirement to call a
10    certain number of times during the leave
11    or --
12    A    There is no.
13    Q    -- as the leave is coming to an end?
14    A    There is not.
15        MR. WILGOREN:  You're talking about
16    in the case of pregnancy leave or --
17        MS. SCHWAB:  Well, he's testified
18    that they're one and the same. There's
19    been -- the only people who have asked for
20    leave have been pregnancy leave, so it
21    doesn't seem to require a differentiation.
22    A    There was -- and I don't know if this
23    pertains to one of the questions you asked.
24        Jeff Fullerton was out for an

**140**

1    A    Aaron Brochu and Jane Henry.
2    Q    Did Mr. Brochu or Ms. Henry get any
3    additional pay for taking on their
4    responsibilities?
5    A    No, no.
6    Q    And when Ms. Perry returned, was she
7    restored to her position as director of
8    catering sales?
9    A    Yes.
10    Q    And what about -- Michele O'Brien we've
11    already discussed.
12        She never actually took the leave; is
13    that correct?
14    A    Correct.
15    Q    Because she just ended her employment?
16    A    The position was eliminated.
17    Q    And Ms. Rodgers did take her leave?
18    A    Yes.
19    Q    But she had been replaced previous to going
20    on her leave?
21    A    Yes.
22    Q    What about Jeff Fullerton? What position
23    did he have when he went out on his first
24    leave?

**139**

1    extended period of time, had -- a couple of
2    times. One for a dependency issue, and,
3    two, he shattered his leg at one point in
4    time.
5        You know, it was extended -- whether
6    it was short-term or long-term disability, I
7    don't know which way it hit, but whatever
8    had transpired, he was out for an extended
9    period of time.
10    Q    Anybody else who's been out on some sort of
11    an extended leave?
12    A    There's none that come to mind.
13    Q    Going through the people that we've
14    discussed, Jennifer Perry, when she went out
15    on leave --
16        What position was she when she went
17    out own leave?
18    A    Director of catering sales.
19    Q    Was her position filled when she left?
20    A    No.
21    Q    Who covered her responsibilities during her
22    absence?
23    A    The other two catering salespeople.
24    Q    Who are they?

**141**

1    A    He's -- I don't know what the exact title
2    is. Warehouse manager, I guess it would be.
3    Q    And was he replaced during his leave?
4    A    He was not.
5    Q    During his first leave?
6        Was he restored to his position as
7    warehouse manager when he returned?
8    A    He was.
9    Q    What about his second leave, was he still
10    warehouse manager?
11    A    Yes.
12    Q    Was he replaced during his leave?
13    A    Yes.
14    Q    Was he returned to his position?
15    A    Yes.
16    Q    Who took on his responsibilities as
17    warehouse manager during his first leave?
18    A    The individuals within the maintenance
19    department all picked up aspects of the job.
20    Q    How many people?
21    A    Two or three.
22    Q    Do you know who they were?
23    A    Dave Hatfield, probably Gary Hurley, or John
24    Shea probably picked up a little bit of it

36 (Pages 138 to 141)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

---

138

1    different people have gotten?
2    A   I don't believe there would be anything
3        different. It would be whatever the policy
4        states.
5    Q   Does New Seabury set requirements for how
6        frequently somebody has to check in during
7        their leave?
8    A   Not at all.
9    Q   So is there any requirement to call a
10       certain number of times during the leave
11       or --
12   A   There is no.
13   Q   -- as the leave is coming to an end?
14   A   There is not.
15       MR. WILGOREN:  You're talking about
16   in the case of pregnancy leave or --
17       MS. SCHWAB:  Well, he's testified
18   that they're one and the same. There's
19   been -- the only people who have asked for
20   leave have been pregnancy leave, so it
21   doesn't seem to require a differentiation.
22   A   There was -- and I don't know if this
23       pertains to one of the questions you asked.
24       Jeff Fullerton was out for an

---

139

1    extended period of time, had -- a couple of
2    times. One for a dependency issue, and,
3    two, he shattered his leg at one point in
4    time.
5        You know, it was extended -- whether
6    it was short-term or long-term disability, I
7    don't know which way it hit, but whatever
8    had transpired, he was out for an extended
9    period of time.
10   Q   Anybody else who's been out on some sort of
11       an extended leave?
12   A   There's none that come to mind.
13   Q   Going through the people that we've
14       discussed, Jennifer Perry, when she went out
15       on leave --
16       What position was she when she went
17   out own leave?
18   A   Director of catering sales.
19   Q   Was her position filled when she left?
20   A   No.
21   Q   Who covered her responsibilities during her
22       absence?
23   A   The other two catering salespeople.
24   Q   Who are they?

---

140

1    A   Aaron Brochu and Jane Henry.
2    Q   Did Mr. Brochu or Ms. Henry get any
3        additional pay for taking on their
4        responsibilities?
5    A   No, no.
6    Q   And when Ms. Perry returned, was she
7        restored to her position as director of
8        catering sales?
9    A   Yes.
10   Q   And what about -- Michele O'Brien we've
11       already discussed.
12       She never actually took the leave; is
13   that correct?
14   A   Correct.
15   Q   Because she just ended her employment?
16   A   The position was eliminated.
17   Q   And Ms. Rodgers did take her leave?
18   A   Yes.
19   Q   But she had been replaced previous to going
20       on her leave?
21   A   Yes.
22   Q   What about Jeff Fullerton? What position
23       did he have when he went out on his first
24       leave?

---

141

1    A   He's -- I don't know what the exact title
2        is. Warehouse manager, I guess it would be.
3    Q   And was he replaced during his leave?
4    A   He was not.
5    Q   During his first leave?
6        Was he restored to his position as
7    warehouse manager when he returned?
8    A   He was.
9    Q   What about his second leave, was he still
10       warehouse manager?
11   A   Yes.
12   Q   Was he replaced during his leave?
13   A   Yes.
14   Q   Was he returned to his position?
15   A   Yes.
16   Q   Who took on his responsibilities as
17       warehouse manager during his first leave?
18   A   The individuals within the maintenance
19       department all picked up aspects of the job.
20   Q   How many people?
21   A   Two or three.
22   Q   Do you know who they were?
23   A   Dave Hatfield, probably Gary Hurley, or John
24       Shea probably picked up a little bit of it

---

36 (Pages 138 to 141)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

154

1   A   I don't know exactly what it was, but
2       basically equal to the other catering
3       salesperson.
4   Q   Was she restored to her previous
5       responsibilities then?
6   A   Yes.
7   Q   When did the demotion to captain take place?
8   A   It was the first quarter of the year.
9   Q   In 2003?
10  A   I believe so.
11  Q   And do you know when she was returned to her
12      previous position?
13  A   It wasn't long, I think by the time we got
14      into the summer.
15  Q   What were the reasons for the temporary
16      demotion?
17  A   The need was justified to have the position.
18  Q   Excuse me?
19  A   The need was justified to have the position
20      as it was.
21  Q   Her original position?
22  A   Yes.
23  Q   So once she was demoted, then you realized
24      we actually do need somebody in this

155

1       position?
2   A   After a period of time, yes.
3           MS. SCHWAB:  I'd like to mark Exhibit
4       11.
5           (Exhibit No. 11 marked for
6       identification.)
7   BY MS. SCHWAB:
8   Q   Do you recognize this document?
9   A   I do.
10  Q   What is it?
11  A   It's Michele O'Brien's affidavit.
12  Q   Okay.
13          MS. SCHWAB:  And I'd just like to
14      note that this was originally an exhibit to
15      the position statement that New Seabury
16      submitted that has previously been marked as
17      an exhibit.
18  Q   Have you read over this affidavit before?
19  A   Not in quite a while, but at one point.
20  Q   Could you read it over now and see if
21      everything is accurate to the best of your
22      knowledge?
23          (Witness read document.)
24  A   I would say it is.

156

1   Q   And in paragraph 4, it says, "I understand
2       that the new management team was charged
3       with cutting the payroll and bringing costs
4       of the operation in line.  They were
5       restructuring the operation and reducing
6       high salaries."
7           Do you know where she would have
8       gotten that understanding?
9   A   She was located where the accounting
10      department was, where payroll was and where
11      HR was.  She knew that Wayne Kapral was
12      eliminated.  She knew accounting was
13      restructured.
14          It's pretty -- pretty evident what
15      was going on.
16  Q   Evident if you were in that region, if you
17      worked in that vicinity?
18  A   Evident if you -- if you worked for the
19      company, it was pretty evident.
20  Q   And did you tell her any of thee things,
21      that the new management team was charged
22      with cutting payroll and bringing costs of
23      the operation in line?
24  A   I don't know if I had or not.

157

1   Q   Do you remember when you first met Patricia
2       Cosgrove?
3   A   No.
4   Q   Do you remember when you first heard of
5       Patricia Cosgrove?
6   A   No.
7   Q   Well, what's your first recollection of
8       either hearing of her or having some
9       interaction with her?
10  A   Probably on the headcount list that we had
11      that I looked at in October or November,
12      prior to my starting, saw the name.
13  Q   And did you -- was it anything other than
14      just seeing a name on a list?
15  A   Name on a list with a department, number of
16      people in the department, made it a
17      question.
18  Q   Excuse me?
19  A   Made it a question for me.
20  Q   What was the question?
21  A   Why we have so many people in this role.
22  Q   And what role was that?
23  A   The cross-over between catering, catering
24      sales and lodging.

40 (Pages 154 to 157)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

154

1   A   I don't know exactly what it was, but
2       basically equal to the other catering
3       salesperson.
4   Q   Was she restored to her previous
5       responsibilities then?
6   A   Yes.
7   Q   When did the demotion to captain take place?
8   A   It was the first quarter of the year.
9   Q   In 2003?
10  A   I believe so.
11  Q   And do you know when she was returned to her
12      previous position?
13  A   It wasn't long, I think by the time we got
14      into the summer.
15  Q   What were the reasons for the temporary
16      demotion?
17  A   The need was justified to have the position.
18  Q   Excuse me?
19  A   The need was justified to have the position
20      as it was.
21  Q   Her original position?
22  A   Yes.
23  Q   So once she was demoted, then you realized
24      we actually do need somebody in this

155

1       position?
2   A   After a period of time, yes.
3           MS. SCHWAB:  I'd like to mark Exhibit
4       11.
5           (Exhibit No. 11 marked for
6       identification.)
7   BY MS. SCHWAB:
8   Q   Do you recognize this document?
9   A   I do.
10  Q   What is it?
11  A   It's Michele O'Brien's affidavit.
12  Q   Okay.
13          MS. SCHWAB:  And I'd just like to
14      note that this was originally an exhibit to
15      the position statement that New Seabury
16      submitted that has previously been marked as
17      an exhibit.
18  Q   Have you read over this affidavit before?
19  A   Not in quite a while, but at one point.
20  Q   Could you read it over now and see if
21      everything is accurate to the best of your
22      knowledge?
23          (Witness read document.)
24  A   I would say it is.

156

1   Q   And in paragraph 4, it says, "I understand
2       that the new management team was charged
3       with cutting the payroll and bringing costs
4       of the operation in line.  They were
5       restructuring the operation and reducing
6       high salaries."
7           Do you know where she would have
8       gotten that understanding?
9   A   She was located where the accounting
10      department was, where payroll was and where
11      HR was.  She knew that Wayne Kapral was
12      eliminated.  She knew accounting was
13      restructured.
14          It's pretty -- pretty evident what
15      was going on.
16  Q   Evident if you were in that region, if you
17      worked in that vicinity?
18  A   Evident if you -- if you worked for the
19      company, it was pretty evident.
20  Q   And did you tell her any of these things,
21      that the new management team was charged
22      with cutting payroll and bringing costs of
23      the operation in line?
24  A   I don't know if I had or not.

157

1   Q   Do you remember when you first met Patricia
2       Cosgrove?
3   A   No.
4   Q   Do you remember when you first heard of
5       Patricia Cosgrove?
6   A   No.
7   Q   Well, what's your first recollection of
8       either hearing of her or having some
9       interaction with her?
10  A   Probably on the headcount list that we had
11      that I looked at in October or November,
12      prior to my starting, saw the name.
13  Q   And did you -- was it anything other than
14      just seeing a name on a list?
15  A   Name on a list with a department, number of
16      people in the department, made it a
17      question.
18  Q   Excuse me?
19  A   Made it a question for me.
20  Q   What was the question?
21  A   Why we have so many people in this role.
22  Q   And what role was that?
23  A   The cross-over between catering, catering
24      sales and lodging.

40 (Pages 154 to 157)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

158

1  Q  What was the headcount list? You said you
2     saw her name on a headcount list before you
3     came.
4        What was that list?
5  A  It was a headcount list.
6  Q  And what information did it have on it?
7  A  Position, name. That's what I can say
8     definitively was on it.
9  Q  Do you know who generated the list?
10 A  I would -- no, not for a fact. I assume it
11    came through accounting.
12 Q  Was it something that you requested?
13 A  It was something that was given to me.
14 Q  Who gave it to you?
15 A  It came from Mark O'Neil.
16 Q  Excuse me?
17 A  It came from Mark O'Neil.
18 Q  And when you saw the headcount list, had a
19    question, any discussions about Ms. Cosgrove
20    at that time?
21 A  Not as a -- just as a number within the
22    department.
23 Q  And what conversations did you have about
24    her as a number?

159

1  A  Within the -- not about her, not what I
2     said. It was about the number of people in
3     the department and what their roles were.
4  Q  And who did you have conversations with?
5  A  Mark O'Neil.
6  Q  And what did you talk about with him
7     relating to the number and the department?
8  A  What the individuals did. Who was
9     responsible for what.
10 Q  Did Mark O'Neil have that information?
11 A  He had a basic summary of the information.
12 Q  Did he go through and explain what each
13    individual did?
14 A  Talked more about what the department did.
15 Q  Any other discussions relating to that
16    department with Mr O'Neil at that time?
17 A  No. It was a -- I mean, all the departments
18    were discussed continuously through the
19    year.
20 Q  When was the next time that you had any
21    other -- Ms. Cosgrove's name came up or you
22    had interaction with her?
23 A  During the budget process -- I'm sure I met
24    her somewhere throughout the process.

160

1        During the budget process, it was
2     reviewed with Jennifer Perry on the
3     department, lodging again was reviewed with
4     Tanya. And they were kind of looking at the
5     synergies there and where the overlap was
6     and that sort of thing.
7  Q  And when was that?
8  A  It would have been February during the
9     budget process.
10 Q  Do you remember what part of February?
11 A  No.
12 Q  When was the next time you ever talked about
13    Ms. Cosgrove or had some interaction with
14    her?
15 A  There was one interaction, I couldn't tell
16    you, when we were looking at this -- I don't
17    know the timing of it but the restructuring
18    of the catering, you know, that would have
19    been included with that, as well as the
20    lodging and taking responsibilities of any
21    of the catering groups that needed lodging
22    to be done through lodging, since that's
23    what that department's for.
24 Q  And do you remember when that might have

161

1     taken place, the discussions about
2     restructuring of catering and lodging?
3  A  February, early March, in that vicinity.
4  Q  At some point did you come to learn that
5     Ms. Cosgrove was pregnant?
6  A  Yes.
7  Q  Do you remember how you learned?
8  A  I think she notified us in some fashion,
9     written in some format.
10    MS. SCHWAB:  This document was
11    produced before, but I'll mark this as
12    Exhibit 12.
13       (Exhibit No. 12 marked for
14    identification.)
15 BY MS. SCHWAB:
16 Q  Do you recognize Exhibit 12?
17 A  I do.
18 Q  What is it?
19 A  It's Patricia's notice of -- to maternity
20    leave.
21 Q  Is this the document you're referring to by
22    which you learned that Ms. Cosgrove was
23    pregnant?
24 A  I can't say that I learned from this

41 (Pages 158 to 161)

Stephen Brennan 1 18 2006
Patricia Cosgrove v. New Seabury Resources Management

166

1    position?
2    A    That I saw it as a duplication of duties.
3         The position wasn't necessary because we
4         already had catering sales to handle
5         function aspects of the business -- the
6         function aspects and the lodging department
7         to handle the booking of the rooms.
8    Q    And what did you talk about with Jennifer
9         Perry relating to the elimination of
10        Ms. Cosgrove's position?
11   A    Was, indeed, the position needed or not.
12   Q    And what did Ms. Perry say?
13   A    It was not needed.
14   Q    Did she elaborate?
15   A    She elaborated to the extent that they could
16        handle the functions, taking care of the
17        clients as they were already doing.
18        There was no additional burden to
19        what they did already.
20   Q    Did you and Ms. Perry talk at all about
21        Ms. Cosgrove being pregnant during that
22        time?
23   A    No.
24   Q    Did you talk about the fact that she was

167

1    going on leave?
2    A    No.
3    Q    Did you -- what did you talk about with Roy
4         Chase with respect to the elimination of
5         Ms. Cosgrove's position?
6    A    Did he -- did he see it affecting the food
7         and beverage operation, which ultimately
8         catering and banquets are part of that
9         operation, in any way that was going to be
10        derogatory to our success.
11   Q    And how did he respond?
12   A    No effect.
13   Q    And did you talk with Mr. Chase at all about
14        Ms. Cosgrove being pregnant?
15   A    No.
16   Q    Did you talking about the fact that she was
17        going on leave?
18   A    No.
19   Q    And what about with Mr. O'Neil, any
20        conversation about Ms. Cosgrove being
21        pregnant?
22   A    No.
23   Q    And --
24   A    Other than the initial that was already

168

1    stated here.
2    Q    And any conversation about her going on
3         leave?
4    A    No.
5    Q    So what did you say to -- and when you
6         talked about --
7         Before talking to Ms. Cosgrove, you
8         said you planned to eliminate her position.
9         Did you come up with any substitute
10        position to put her in at that time?
11   A    At that time, it looked as if there would be
12        the opportunity for an administrative
13        position in catering sales.
14   Q    And can you explain what that position would
15        be?
16   A    It would be an administrative assistant with
17        catering sales.
18   Q    And at what time was that, that looked like
19        that would be available?
20   A    Spring.
21   Q    With whom    before talking to Ms. Cosgrove,
22        with whom did you talk about the
23        administrative assistant position in
24        catering sales?

169

1    A    Would have been the same people, Jennifer
2         Perry, that's correct.
3    Q    And did you talk to all of them about
4         putting Ms. Cosgrove into this position?
5    A    At a minimum, Jennifer and Mark.
6    Q    And what did you say to Mark about that?
7    A    There's another position, obviously will be
8         a lower paying position, but there's a
9         position right now that is available.
10   Q    And what did he say to you about that?
11   A    He said it works.
12   Q    And what about Ms. Perry, what did you say
13        to her about the administrative assistant
14        position?
15   A    Basically the same, seemed to make sense.
16   Q    And what did she say to you?
17   A    Seemed to make sense.
18   Q    And can you elaborate at all about the
19        responsibilities of the administrative
20        assistant in catering sales?
21   A    As with any administrative position, it's
22        basically answering the phone, filing, doing
23        anything that's deemed necessary for the
24        operation.

43 (Pages 166 to 169)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

170

1  Q  And catering sales was Jennifer Perry's
2     department?
3  A  Yes.
4  Q  Who else was in that department?
5  A  Aaron Brochu, Jane Henry.
6  Q  Anyone else?
7  A  Those three.
8  Q  And where was the -- was there a particular
9     location of the department?
10 A  Jane Henry and Aaron Brochu were located
11    upstairs in the country club. Jennifer
12    Perry is on the main floor of the country
13    club.
14 Q  And did you have an idea about where the
15    administrative assistant would sit for the
16    catering sales?
17 A  With -- where Jane and Aaron sat.
18 Q  In a cubicle?
19 A  No. It's an open office.
20 Q  And were there a lot of vacant offices in
21    that area?
22 A  No. It was a vacant office space. The
23    three of them sat in one space.
24 Q  One space?

171

1  A  Yes.
2  Q  Was there a desk already set up there?
3  A  There's a preestablished desk around the
4     perimeter of the office.
5  Q  And were there vacant areas where somebody
6     could be easily placed?
7  A  Yes.
8  Q  So explain how it came that you had a
9     discussion with Ms. Cosgrove about the
10    elimination of her position.
11    Did you contact her to set up a
12    meeting?
13 A  I assume it was just like the -- everybody
14    else that we changed positions with. It was
15    just a conversation had, fairly out and
16    dried, this is what we have, this is what we
17    can do.
18 Q  Do you remember who was at the --
19 A  I believe Roy and -- Roy Chase and Jennifer
20    Perry
21 Q  And do you remember what you said to
22    Ms. Cosgrove about the elimination of her
23    position?
24 A  Just in general that the position was going

172

1     away, and we had a -- an admin position
2     available if she chose to.
3        It would be a cut in pay, but if she
4     chose to, she had the opportunity to take
5     that.
6  Q  Did you explain anything else about what the
7     admin position would be?
8  A  Nothing comes to mind.
9  Q  So just there's an admin position in
10    catering sales?
11 A  She was already located there. She
12    understood what the role was, I would
13    assume.
14 Q  And do you remember it -- what Ms. Cosgrove
15    said at the meeting?
16 A  No.
17       She was disappointed. I remember the
18    emotion, but I don't remember what she said.
19 Q  Do you remember if she accepted the admin
20    position at that point?
21 A  I think she asked if she could think about
22    it.
23 Q  Do you remember if she later accepted the
24    position?

173

1  A  Obviously the letter -- there's another
2     letter that says that she did.
3  Q  At the time did you remember her accepting
4     the position?
5  A  No, not until the letter was brought to my
6     attention after the fact when she returned
7     to work.
8  Q  Did you discuss with Ms. Cosgrove -- did it
9     come up at the meeting that Ms. Cosgrove was
10    planning on going on maternity leave?
11 A  I already know that.
12 Q  But did it come up at the meeting?
13 A  Oh, I have no idea.
14 Q  So you don't remember if there's any
15    discussion on how her leave would effect the
16    fact that she was given this new position?
17 A  No, not during that time, as I said. I
18    mean, I did -- this is what I was doing all
19    the time. It was another person.
20 Q  So you don't remember?
21 A  No.
22       MS. SCHWAB:  Exhibit 13.
23       (Exhibit No. 13 marked for
24    identification.)

44 (Pages 170 to 173)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

174

1   BY MS. SCHWAB:
2   Q   Do you recognize this document?
3   A   Yes.
4   Q   And it's a little cut off. It says, A-N-G-E,
5       but at the bottom where it says "approved
6       by," is that your signature?
7   A   Yes.
8   Q   This position is characterized as a
9       transfer.
10      Would you say that's an accurate
11      characterization of her change of position?
12  A   I would have called it a demotion, but I
13      wasn't worried about the semantics of it.
14  Q   And then down at the bottom, FT is circled.
15      What does that mean?
16  A   It would have been saying full time.
17  Q   So that's a permanent full-time position; is
18      that correct?
19  A   It meant she would be getting 40 hours.
20  Q   But we talked earlier about full time, and
21      you had said full time means somebody who
22      works year round or ten or more months of
23      the year?
24  A   As you can see on this form, you only have

175

1       full-time, part-time or seasonal.
2   Q   Right.
3   A   You could be full-time; you could be
4       full-time seasonal.
5   Q   But wouldn't seasonal be circled if you were
6       a full-time seasonal?
7   A   It could be. It could be any of the above,
8       if you were seasonal or full-time seasonal
9       or you could be part-time seasonal.
10  Q   My understanding --
11  A   When Jennifer finished this out -- filled
12      this out, she obviously circled full-time.
13  Q   And you signed it as --
14  A   Right.
15  Q   -- an approval of the change?
16  A   Right.
17  Q   And full-time on this form means full-time
18      year round?
19  A   On this form, I would say it does.
20  Q   Do you remember in Ms. Cosgrove started
21      assuming the responsibilities of
22      administrative assistant - catering sales
23      after you offered the position to her?
24  A   I don't believe she ever did.

176

1   Q   And what do you remember happening?
2   A   More of a recollection from Monday, goes
3       back to when -- after this discussion, she
4       and Jennifer discussed wrapping up a few
5       things over the next couple of weeks
6       following the conversation on the catering
7       sales side; and before this ever became in
8       effect, she went out on leave, before she
9       ever assumed the duties of it, I should say.
10  Q   And did you ever discuss -- I know, as we
11      talked about on Monday, she went out on
12      leave earlier than anticipated.
13      Did you ever discuss with her how her
14      going out on leave earlier would affect this
15      new position?
16  A   No, I don't believe so.
17  Q   Do you remember discussing that with
18      anybody?
19  A   No -- at the time that we were heading
20      into -- into season, that we had to have
21      somebody cover the position for the season.
22  Q   So while Ms. Cosgrove was on maternity
23      leave, did you hire a replacement for that
24      position?

177

1   A   Yes.
2   Q   Who is that?
3   A   Lauralee Taddeo, I believe the last name is.
4   Q   Do you know what Ms. Taddeo was told about
5       the permanency of the position?
6   A   No idea. Jennifer would have been the one
7       to hire her. I'm sure -- I don't know. I
8       wasn't in the conversation.
9   Q   So you don't know if she was told that she
10      was a replacement for somebody out on leave?
11  A   No.
12  Q   Did you discuss with Ms. Cosgrove at your
13      meeting with her whether the position would
14      be a permanent position, that administrative
15      assistant - catering sales?
16  A   I don't recall that.
17      I will say. This. From the
18      standpoint of the full-time positions that
19      we have -- and I think I stated it before --
20      we assess this every month, every year
21      This year we had another body that
22      was laid off that was a full-time position
23      that it wasn't necessary to keep as
24      full-time even though it was previously.

45 (Pages 174 to 177)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

178

1         MS. SCHWAB: Can we mark Exhibit 14.
2     (Exhibit No. 14 marked for
3     identification.)
4  BY MS. SCHWAB:
5     Q  Do you recognize this document?
6     A  I do.
7     Q  And what is it?
8     A  It's the -- or response to the
9     interrogatories.
10    Q  And can you turn to page 14 of the document?
11    A  Okay.
12    Q  Do you see where it says "signed under the
13    pains and penalties of perjury this 29th day
14    of December 2005"?
15    A  Yes.
16    Q  And there's a signature underneath there.
17       Is that your signature?
18    A  It is.
19    Q  And did you, in fact, sign the document
20    under the pains and penalties of perjury?
21    A  I did.
22    Q  Did you review the document to ensure its
23    accuracy?
24    A  I did.

179

1     Q  Okay.
2        I'm going to have you turn to page 10
3     of the document.
4        Heading up five lines up from the
5     bottom, it says, "At that time I advised the
6     plaintiff that the position being offered
7     was a seasonal position."
8        Do you see that?
9     A  Mm-hmm.
10    Q  But you just testified that you don't
11    remember discussing whether it was seasonal
12    with her?
13    A  Yes.
14    Q  And that the form that you approved
15    indicated that it was full-time, not
16    seasonal; is that correct?
17    A  That's what this shows. I mean, I think at
18    the time we discussed this, I believe that's
19    what I said, but I don't recall for a fact
20    what I said at this point.
21    Q  Do you remember if -- strike that.
22       Can you turn back to Exhibit 9, which
23    is the employee handbook?
24       MR. WILGOREN: Actually, before --

180

1     before you take a look at it, Howard, I
2     noticed that there's no page 40 of the
3     handbook. It just goes from 39 to 41.
4        So I would ask if you could
5     provide -- it looks like it's Bates-numbered
6     that way, too. Maybe it just missed a page
7     in the Xeroxing, but I would ask if you
8     could provide page 40 --
9        MR. WILGOREN: Do you want it now? I
10    might have it.
11       MS. SCHWAB: How about at the end of
12    the day? It's fine.
13    BY MS. SCHWAB:
14    Q  If you could turn to page 16 of the
15    document.
16       You see where it says "employee
17    problems"?
18    A  Yes.
19    Q  Are you familiar with that section of the
20    handbook?
21    A  I read it at one point.
22    Q  And it says, "No employee shall be subject
23    to any harassment by another employee,
24    contractor or vendor associated with New

181

1     Seabury. Therefore, should you perceive
2     that this has occurred to you, you should
3     report the incident to your supervisor
4     immediately so that the established
5     procedures can be put in motion."
6        What's your understanding of when
7     somebody should utilize this procedure of
8     reporting an incident to a supervisor?
9     A  When I believe there's an issue.
10    Q  What types of issues do you think are
11    covered?
12    A  Any issue that they deem necessary.
13    Q  Okay.
14       Well, it says here that "no employee
15    shall be subject to any harassment. Should
16    you perceive that this has occurred to
17    you" --
18       Is it your reading that "this" in
19    that sentence refers to something other than
20    harassment?
21    A  Harassment or if you have a problem.
22    Q  Where does it say that you should report to
23    your supervisor if you have a problem in
24    this section?

46 (Pages 178 to 181)

Stephen Brennan 1 18 2006
Patricia Cosgrove v. New Seabury Resources Management

| 186 | |
|---|---|
| 1 | Q   So you didn't put the established procedures |
| 2 | into place from pages 16 and 17 of the |
| 3 | employee manual? |
| 4 | A   Oh, I certainly let -- |
| 5 | MR. WILGOREN:  Objection. |
| 6 | It assumes facts not in evidence, |
| 7 | that the -- Ms. Cosgrove made a complaint |
| 8 | pursuant to the policy set forth. |
| 9 | MS. SCHWAB:  It says you should |
| 10 | report the incident to your supervisor |
| 11 | immediately, and Mr. Brennan testified |
| 12 | earlier that she reported in the form of |
| 13 | writing a letter saying she wasn't happy |
| 14 | about it. |
| 15 | MR. WILGOREN:  Well, whether |
| 16 | that's -- |
| 17 | MS. SCHWAB:  So I'm asking -- |
| 18 | MR. WILGOREN:  She also reported that |
| 19 | she consulted an attorney and filed with the |
| 20 | Mass. Commission Against Discrimination. |
| 21 | BY MS. SCHWAB: |
| 22 | Q   I -- |
| 23 | A   At that point, I consulted our attorneys. |
| 24 | Q   And did you do anything else to put the |

| 187 | |
|---|---|
| 1 | established procedure into place from the |
| 2 | handbook? |
| 3 | MR. WILGOREN:  Objection. |
| 4 | A   No, there wasn't a reason to. |
| 5 | Q   So that's a no? |
| 6 | A   No, there wasn't a reason to. |
| 7 | MR. WILGOREN:  The answer speaks for |
| 8 | itself. |
| 9 | Q   Are you aware of what position Ms. Cosgrove |
| 10 | was in when she went out on her leave? |
| 11 | A   You'll have to clarify the question. |
| 12 | Q   What position did she hold when she went out |
| 13 | on her leave? |
| 14 | A   I believe it was called conference sales or |
| 15 | conference services or something along those |
| 16 | lines. |
| 17 | Q   And what -- do you remember what pay rate |
| 18 | she was at? |
| 19 | A   I -- |
| 20 | MR. WILGOREN:  Are you talking about |
| 21 | the last day she worked? |
| 22 | Q   When she went out on her leave. |
| 23 | A   When she went out on her leave.  Her |
| 24 | previous rate was $17 an hour.  The new rate |

| 188 | |
|---|---|
| 1 | was going to be $12, I believe. |
| 2 | Q   And do you remember what rate was in effect |
| 3 | during her leave? |
| 4 | A   I don't know. |
| 5 | MR. WILGOREN:  Well, I'm going to |
| 6 | object and move to strike the question |
| 7 | because it assumes facts not in evidence. |
| 8 | She wasn't -- Ms. Cosgrove wasn't |
| 9 | working.  There was no rate in effect at the |
| 10 | time of her leave. |
| 11 | MS. SCHWAB:  There is a rate in |
| 12 | effect for her disability leave.  How does |
| 13 | that assume facts not in evidence? |
| 14 | MR. WILGOREN:  First of all, there's |
| 15 | no evidence about -- |
| 16 | MS. SCHWAB:  Well, my question was |
| 17 | what was her rate when she went out on |
| 18 | leave. |
| 19 | MR. WILGOREN:  Well -- |
| 20 | MS. SCHWAB:  You can -- |
| 21 | BY MS. SCHWAB: |
| 22 | Q   What was her rate the last day before she |
| 23 | went out on leave? |
| 24 | And, Mr. Brennan, is your answer that |

| 189 | |
|---|---|
| 1 | you don't remember? |
| 2 | A   Correct.  That's a little bit different |
| 3 | question. |
| 4 | Q   Earlier we talked about the disability |
| 5 | policy. |
| 6 | Is it the policy that somebody out on |
| 7 | leave for disability or maternity is paid 60 |
| 8 | percent of their salary when they're out on |
| 9 | leave? |
| 10 | A   I believe so.  It's as stated in the |
| 11 | handbook. |
| 12 | Q   Can you turn to page 39 of the handbook, |
| 13 | which is Exhibit 9? |
| 14 | Looking at the section that says |
| 15 | "maternity leave," have I accurately |
| 16 | described the payout policy while someone's |
| 17 | on leave? |
| 18 | (Witness read document.) |
| 19 | MR. WILGOREN:  Well, the document |
| 20 | will speak for itself, so I'll object to |
| 21 | that. |
| 22 | Q   You can answer. |
| 23 | A   If you want to quote it directly out of |
| 24 | this, I would say it's accurate. |

48 (Pages 186 to 189)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

190

```
1    Q    And is that the policy that was, in fact,
2         applied?
3    A    I believe so.
4    Q    Do you know what rate of pay Ms. Cosgrove
5         received in calculating her pay during her
6         leave?
7    A    No idea.
8              MR. WILGOREN:  Actually, that
9         mischaracterizes the policy.  The rate of
10        pay for maternity leave is based on the
11        average weekly salary in accordance with the
12        payroll schedules.
13             That's what the policy states.
14             MS. SCHWAB:  I don't think it's a
15        mischaracterization, but that's fine.
16             Could you mark this as Exhibit 16?
17             (Exhibit No. 16 marked for
18        identification.)
19   BY MS. SCHWAB:
20   Q    Does this document look familiar to you?
21   A    Probably as a journal that Lee O'Shea kept.
22   Q    Is this the type of journal that was kept
23        regularly at New Seabury to record maternity
24        leave?
```

191

```
1    A    I can't say how Lee did it.
2    Q    Did you review Lee's schedules of maternity
3         leave?
4    A    I did not.
5    Q    So would this be a document that you had
6         reviewed?
7    A    No.
8    Q    Up at the top of the document, it says
9         Patricia Cosgrove.  $17; is that correct?
10   A    That's what it says.
11   Q    And then it appears to be -- although you
12        haven't seen it before, it appears to be a
13        document calculating maternity leave?
14   A    That's what it looks like.
15   Q    Reviewing this document, would you conclude
16        from this document that she was paid 60
17        percent of a $17 per hour salary on her
18        maternity leave?
19   A    That would be the appearance.
20   Q    Would it surprise you that she would be paid
21        at $17 an hour -- at a rate based on a $17
22        an hour salary for her maternity leave?
23   A    I guess versus being the $12 an hour?
24   Q    Yes
```

192

```
1    A    I would venture a guess.  It was probably
2         asked which I wanted to do, and I said 17's
3         fine.
4    Q    Do you remember having that conversation?
5    A    Not for a fact, no.
6    Q    You think -- who would have asked you?
7    A    Lee.
8    Q    While Ms. Cosgrove was on maternity leave,
9         did you have any discussions with anybody
10        about what position to return her to when
11        she came back?
12   A    No.
13             Frankly, at that point, I -- I was
14        lost in translation to the fact that she was
15        coming back.
16   Q    So at that point, you didn't expect her to
17        come back?
18   A    Correct.
19   Q    And did you have any discussions about her
20        with anybody during the time she was on
21        leave?
22   A    No.  I mean, my thought was that she was
23        gone.
24   Q    And what was the basis for your feeling that
```

193

```
1         she wasn't coming back?
2    A    I guess I had forgotten about the -- her
3         couple of memos that she had sent; and then,
4         as I said before, normally Lee O'Shea would
5         do a -- you know, a notice, you know, back
6         to me when somebody's maternity was coming
7         up, and it didn't happen.
8    Q    During the time that Ms. Cosgrove was on
9         leave, did you ever receive any messages
10        from Ms. Cosgrove?
11   A    I believe so, yes.
12   Q    How many messages did you receive?
13   A    I have no idea.
14   Q    What do you remember about the messages you
15        received from her?
16   A    That I was given a message that she had
17        called.
18   Q    Do you remember the substance of the
19        message?
20   A    No.
21   Q    Do you remember if you returned her call?
22   A    I don't believe I did.
23   Q    Do you remember thinking anything about why
24        she might have been calling?
```

49 (Pages 190 to 193)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

198

1    Q    Okay.
2         So despite receiving this letter, you
3    didn't believe that Ms. Cosgrove was coming
4    back?
5    A    At this point, this was the first time that
6    I had the understanding that she was coming
7    back; but the timing of this versus when she
8    came back, I don't remember the exact date
9    this was received, but I didn't receive it
10   on the 30th.
11   Q    And you don't remember whether you received
12   it before she came back or not?
13   A    I don't remember the date of it.
14   Q    After receiving this letter on -- or her
15   showing up to work, you at some point became
16   aware she was planning to come back to work,
17   correct?
18   A    Correct.
19   Q    What action did you take once you became
20   aware she was coming back to work?
21   A    I asked Lee to pull her file to see if there
22   was anything in there. There was.
23   Q    Is this before you met with Ms. Cosgrove?
24   A    No, this is the day she came in.

199

1    Q    Okay.
2    A    And at that point, you know, looked at it,
3    told Patricia that -- go home for the day.
4    I need to figure out a place for you.
5    Q    And what did you do to figure out a place
6    for her when she left?
7    A    I -- another girl -- another employee was
8    leaving to go back to school that was doing
9    an administrative position for us, so I was
10   able to plug her into that.
11   Q    And was -- do you know if Lauralee Taddeo
12   was still employed when Ms. Cosgrove came
13   back?
14   A    She might have been a couple more days. She
15   was near the end of the season, so it was,
16   you know, at a time when some of the
17   administrative staff was starting to get
18   laid off.
19   Q    And so how did you -- who did you talk to
20   about putting Ms. Cosgrove in this other
21   position?
22   A    Talked to Lee O'Shea about it. In looking
23   for things to do for her, I talked to Wayne
24   Spencer about it, for any clerical stuff

200

1    that might need to be done.
2         I talked to John Shea, who is our IT
3    person, and he was able to set up a machine
4    and scanner to allow us to give her a
5    project to start on, that we needed to get
6    documents scanned in to eliminate paper.
7    Q    And what was the -- can you describe more
8    about what this position entailed?
9    A    It entailed scanning -- scanning documents,
10   financial documents and membership
11   documents, old existing documents that we
12   needed to maintain permanently, but they
13   were paper files so we were converting them
14   to electronic files.
15   Q    And where was the scanning to take place?
16   A    It was in the offices inside the warehouse
17   where the documents were all stored.
18   Q    How long did you anticipate this project
19   lasting?
20   A    The project is basically an ongoing project.
21   I envisioned -- I don't know, you know, not
22   a definitive period of time but until we
23   really slowed down and finished the layoffs.
24   Q    How would you compare this position to the

201

1    job of administrative assistant in the
2    catering sales department?
3    A    They're both clerical.
4    Q    Any other comparisons?
5    A    They're both basically clerical,
6    administrative positions.
7    Q    Are there differences between the two
8    positions?
9    A    At the point in time when she was working on
10   it, there wasn't a need for answering phones
11   and things of that nature. That wasn't the
12   role or the project, where in catering sales
13   you would be answering phones.
14   Q    So they differed in that way.
15        What about in the work environment,
16   was there a difference in the work
17   environment?
18   A    One's at the country club and one's in an
19   office in the warehouse.
20   Q    And what is the difference between those two
21   locations?
22   A    One's a warehouse and one's a country club.
23   Q    And so what's the -- is a normal warehouse
24   A    The warehouse has -- is a normal warehouse

51 (Pages 198 to 201)

202

1    with three offices in it
2  Q  And what's the country club like?
3  A  The country club is a normal country club
4    with offices in it, meeting space in it and
5    dining space in it, a golf shop in it,
6    locker rooms.
7  Q  How many people work in the country club --
8    at that time how many people worked at the
9    country club?
10  A  It depends on the day.
11  Q  What's the average?
12  A  It depends on the day.
13    Are you talking about a Friday, a
14    Saturday, a Tuesday, a Monday?  What day are
15    you talking about?
16  Q  On a Tuesday.
17  A  On a Tuesday, you probably have -- if
18    there's no events going on -- maybe 10 or
19    12.
20  Q  How about Friday when there are events going
21    on?
22  A  Depending on the time of day, evening time,
23    you could add another 10 to 15 service
24    staff.

203

1  Q  And are there also customers that come into
2    the country club?
3  A  Sure.
4  Q  Every day?
5  A  Most days.
6  Q  So what happened?  You said you found this
7    position scanning documents in an office in
8    the warehouse.
9    What happened next?  Did you meet
10    with Ms. Cosgrove about this position?
11  A  I think she approached me at one point about
12    it.
13  Q  You had told her go home for the day, I'm
14    going to try to figure something out?
15  A  Right.
16    The next day -- the next day, I
17    guess -- this goes back to Monday as the
18    refresher on it.  She went to the -- I told
19    her go to the country club, meet John Shea.
20    John was late for whatever reason
21    that day, and that John would set her up in
22    the warehouse to begin scanning.
23  Q  Before meeting with -- so did you personally
24    meet with Ms. Cosgrove and explain that this

204

1    would be the position that she would be in
2    now?
3  A  I don't believe so.
4  Q  Before she came in, did you discuss -- you
5    mentioned some people you discussed moving
6    her around with
7    Did you have discussions with anyone
8    else about placing her in the position
9    scanning documents in in the warehouse?
10  A  No, that was something that we had a need
11    for and actually filled our requirement.
12  Q  Did you give any consideration to whether
13    the job was similar to the job that she had
14    accepted as administrative assistant in the
15    catering sales department?
16  A  It was absolutely similar.
17  Q  Did you consider whether it was similar?
18  A  It was similar.
19  Q  That's not what I'm asking?
20  A  That is my mind-set.  It was similar.  There
21    was no consideration.  It's the same job
22    class.
23  Q  Well, when you were looking for another job
24    for her, did you think, "I've got to find

205

1    something similar to what she accepted"?
2  A  I needed to have something administrative,
3    administrative type position.
4  Q  Is it your understanding anything that falls
5    under the administrative/clerical category
6    is similar to anything else that falls into
7    that category?
8    MR. WILGOREN:  Objection.  The
9    question's vague.  I don't understand.
10  A  I guess I need a little clarification on
11    what your question is.
12  Q  Did you understand that you could return
13    Ms. Cosgrove to any position that you would
14    categorize as administrative or clerical?
15  A  A like position with like pay.
16  Q  Anything that -- forget about the pay, but
17    anything that you would categorize as
18    administrative, did you think you could put
19    Ms. Cosgrove in that position?
20  A  A like administrative position.
21  Q  So --
22  A  Administrative duties include --
23  Q  Okay.
24    So any administrative position would

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

206

| | |
|---|---|
| 1 | be like in your understanding? |
| 2 | A  Yes. |
| 3 | Q  And at some point, did you learn that |
| 4 | Ms. Cosgrove might have been dissatisfied |
| 5 | with her new position? |
| 6 | A  I think she sent an email or something to |
| 7 | the effect. |
| 8 | Q  And did you take any action in relation to |
| 9 | that? |
| 10 | A  No, that was the position we had. |
| 11 | I know it was an issue with heat or |
| 12 | something at one point. The guys fixed heat |
| 13 | or added heat or something to it. I know |
| 14 | she needed a refrigerator. They brought a |
| 15 | refrigerator to her. |
| 16 | They try to meet what you need. |
| 17 | MS. SCHWAB: Let me mark Exhibit 18. |
| 18 | (Exhibit No. 18 marked for |
| 19 | identification.) |
| 20 | BY MS. SCHWAB: |
| 21 | Q  Do you recognize this document? |
| 22 | A  Yes. |
| 23 | Q  Do you remember receiving it? |
| 24 | A  Vaguely. |

207

| | |
|---|---|
| 1 | Q  And do you remember if you took any action |
| 2 | after you received the document? |
| 3 | A  I don't recall. |
| 4 | Q  Do you recall calling an attorney after you |
| 5 | received it? |
| 6 | A  I would have forwarded it to my attorney. |
| 7 | Q  Do you recall if you contacted Ms. Cosgrove |
| 8 | after receiving the document? |
| 9 | A  I don't recall. |
| 10 | Q  Were you aware of Ms. Cosgrove going to |
| 11 | Tanya Copestick's office to pump breast milk |
| 12 | during the time she was working in the |
| 13 | warehouse? |
| 14 | A  Yes. |
| 15 | Q  How did you become aware of that? |
| 16 | A  I don't know. Someone told me. I don't |
| 17 | know. |
| 18 | Q  Do you remember who might have told you? |
| 19 | A  No. |
| 20 | Q  Do you remember what your reaction was when |
| 21 | you learned? |
| 22 | A  I didn't see it as a big issue. |
| 23 | Q  Did you comment to Ms. Cosgrove about it? |
| 24 | A  I believe I did. |

208

| | |
|---|---|
| 1 | Q  And what do you remember you said? |
| 2 | A  Something to the effect of we're walking a |
| 3 | fine line here. Don't cross the line. |
| 4 | Q  With Ms. Cosgrove, you said that? |
| 5 | A  Yes -- to -- no, not Ms. Cosgrove, |
| 6 | Copestick. I'm sure. |
| 7 | Q  Okay. |
| 8 | And what did you mean when you said |
| 9 | we're walking a fine -- |
| 10 | So you said that -- |
| 11 | A  To Tanya, I'm sorry. |
| 12 | Q  You said, We're walking a fine line right |
| 13 | now, and what else, I'm sorry? |
| 14 | A  Just watch what you say, or something to |
| 15 | that effect. |
| 16 | Q  And what did you mean by that? |
| 17 | A  Basically Patricia had already put us on |
| 18 | notice that she was looking to try to sue |
| 19 | us. |
| 20 | Q  So how were you walking a fine line? |
| 21 | A  We just had to make sure that our ducks were |
| 22 | in a row and that we were doing what we |
| 23 | could to accommodate her. |
| 24 | Q  Did you make any comment to anybody else |

209

| | |
|---|---|
| 1 | about Ms. Cosgrove going to Ms. Copestick's |
| 2 | office to pump breast milk? |
| 3 | A  I don't believe so. |
| 4 | Q  Did you approve the practice? |
| 5 | A  I didn't disapprove. |
| 6 | Q  Were you -- you mentioned before that there |
| 7 | were some complaints from Ms. Cosgrove about |
| 8 | heat in the warehouse and about a lack of a |
| 9 | refrigerator |
| 10 | Were you involved in remedying those |
| 11 | issues? |
| 12 | A  No, I heard about it after the fact. |
| 13 | Q  From whom did you hear about it? |
| 14 | A  Probably John Shea. |
| 15 | Q  And what was your reaction when you heard |
| 16 | about it? |
| 17 | A  That's fine. Glad you got it taken care of. |
| 18 | Q  Were you aware of Ms. Cosgrove's request |
| 19 | that the scanner and file boxes be |
| 20 | relocated? |
| 21 | A  Yes. |
| 22 | Q  And did you do anything to look into whether |
| 23 | that was possible? |
| 24 | A  It made no sense |

53 (Pages 206 to 209)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

210

1   Q   And why did it make no sense?
2   A   From an efficiency standpoint, all the files
3       were in the warehouse.  To move them to be
4       able to scan them didn't make any sense.
5           It's doubling the work for us or the
6       effort of the project when our goal was to
7       eliminate overhead and expenses.
8   Q   Was there available space in the country
9       club where she could have put a scanner and
10      file boxes?
11          MR. WILGOREN:  Objection.  Relevancy.
12  A   Was there space?  Yes.  Did it add
13      efficiency?  No.
14  Q   But isn't it true that Ms. Cosgrove was
15      driving to the -- is it the reception center
16      to pump breast milk anyway; is that correct?
17  A   That's correct.
18  Q   So couldn't she just have put file boxes
19      into her car, driven them over, and instead
20      of going back and forth twice a day, she
21      could have been in the same place for the
22      entire day scanning files?
23          MR. WILGOREN:  Objection.  Calls for
24      speculation.

211

1   Q   What was your answer?  I'm sorry?
2   A   I disagree with you.
3   Q   How do you disagree?
4   A   I simply don't agree that that would be as
5       efficient.
6   Q   And so --
7   A   The focus was to scan files.
8   Q   So you did not consider her request to
9       relocate?
10  A   No, it was considered, but it was not
11      acknowledged as something that we're going
12      to change.
13  Q   And it's because you consider it to be less
14      efficient?
15  A   Yes.  The file boxes were all there.  The
16      file boxes were handed to her from the
17      warehouse people.
18  Q   And you didn't consider whether it would be
19      possible to deliver a shipment of files
20      boxes one time to another location so she
21      could scan them all?
22  A   That would take more time and effort to do
23      than what we had to do this way.
24  Q   That was your assessment of it?

212

1   A   That was my assessment.
2           MS. SCHWAB:  I'd like to mark
3       Exhibit 19.
4           (Exhibit No. 19 marked for
5       identification.)
6   BY MS. SCHWAB:
7   Q   Do you recognize Exhibit 19?
8   A   I do.
9   Q   What is it?
10  A   It's an email from Patricia.
11  Q   Do you remember receiving this email?
12  A   No.
13  Q   You don't?
14  A   I remember -- I mean, now that I read it,
15      but I don't remember getting it.
16  Q   Do you remember the top of the email, she
17      says, "Please also consider a Monday through
18      Friday workweek."
19          Do you remember receiving that
20      request?
21  A   Yes.
22  Q   Do you remember considering that request?
23  A   No.
24  Q   Okay.

213

1           You also say in the email -- in your
2       response to her initial email, you say.
3       "Let's discuss tomorrow."
4           Had you established a meeting before
5       that for the next day?
6   A   I don't believe so.
7   Q   Okay.
8           So you're just basically saying come
9       by and we can talk about it tomorrow?
10  A   Yes.
11  Q   And that's what you mean when you say, Let's
12      discuss tomorrow?
13  A   I would assume that's what I meant.
14  Q   Okay.
15          Between the time that Ms. Cosgrove
16      started at the -- scanning documents in the
17      warehouse and this time when you received
18      her -- when you set up a meeting, basically,
19      to discuss things with her, did you have any
20      discussions with anybody about
21      Ms. Cosgrove's performance?
22  A   John Shea kept tabs on her production, how
23      she was doing.
24  Q   And did you discuss that with him?

54 (Pages 210 to 213)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

| | | 214 |
|---|---|---|
| 1 | A | Yes, he let me know how she was doing. |
| 2 | Q | What did he say? |
| 3 | A | Basically she was doing half the work in |
| 4 | | twice the time as the previous person. |
| 5 | Q | Did you discuss that with anybody else? |
| 6 | A | At the time, I don't believe so. |
| 7 | Q | And did you ever notify Ms. Cosgrove that |
| 8 | | she wasn't working as quickly as the |
| 9 | | previous person? |
| 10 | A | I don't believe so. |
| 11 | Q | Did you ever give her any verbal warning |
| 12 | | about it? |
| 13 | A | No. |
| 14 | Q | Did you have the meeting with Ms. Cosgrove |
| 15 | | on October 31st to discuss the issues raised |
| 16 | | in the email? |
| 17 | A | I don't recall. |
| 18 | Q | Do you ever recall having a face-to-face |
| 19 | | meeting with her about those issues? |
| 20 | A | Not that I recall. Probably did, but can't |
| 21 | | say definitively. |
| 22 | Q | You mentioned the heat and the refrigerator |
| 23 | | issue in the warehouse. |
| 24 | | Were you aware of other |

| | | 215 |
|---|---|---|
| 1 | | dissatisfaction that Ms. Cosgrove had with |
| 2 | | the work environment at the warehouse? |
| 3 | A | My understanding, she didn't like the |
| 4 | | bathroom. |
| 5 | Q | And how did you understand that? |
| 6 | A | Somebody told me. I don't know. |
| 7 | Q | Did you have an understanding of what it was |
| 8 | | she didn't like about it? |
| 9 | A | (Witness shakes head.) |
| 10 | Q | Anything else that you knew she was |
| 11 | | dissatisfied with? |
| 12 | A | No. I think — I think she was just |
| 13 | | dissatisfied because she wasn't located at |
| 14 | | the country club. It wasn't what she |
| 15 | | wanted. |
| 16 | Q | And it wasn't the position she had |
| 17 | | originally accepted? |
| 18 | A | That position was no longer there. |
| 19 | Q | But it wasn't the position she originally |
| 20 | | had accepted? |
| 21 | A | She had accepted an administrative position. |
| 22 | | She was in an administrative position. |
| 23 | Q | Were you aware that she was unhappy that |
| 24 | | there was no phone or email in the |

| | | 216 |
|---|---|---|
| 1 | | warehouse? |
| 2 | A | No. |
| 3 | Q | Did you know she was unhappy -- |
| 4 | A | And I believe, by the way, there were at |
| 5 | | least two phones in the warehouse. One of |
| 6 | | them might have been locked, but the other |
| 7 | | one was not |
| 8 | Q | Do you remember if she was unhappy with the |
| 9 | | isolation in the warehouse? |
| 10 | A | I believe she felt that was an issue, even |
| 11 | | though there were two other people officed |
| 12 | | there. |
| 13 | Q | Do you remember seeing Ms. Cosgrove at the |
| 14 | | conference center at some point in October |
| 15 | | and instructing her that you wanted her back |
| 16 | | down at the warehouse? |
| 17 | A | She had an — took an excessive amount of |
| 18 | | time away from the warehouse. In other |
| 19 | | words, as John Shea said, she was never |
| 20 | | there. |
| 21 | Q | So you do remember saying that to her? |
| 22 | A | I remember saying that. I remember that |
| 23 | | being the issue. |
| 24 | Q | And do you remember addressing that with |

| | | 217 |
|---|---|---|
| 1 | | her? |
| 2 | A | I don't remember it definitively, no. |
| 3 | | With over 300 employees, I'm sorry, I |
| 4 | | don't remember every conversation I have. |
| 5 | Q | After this communication from her about the |
| 6 | | issue with moving the scanner, do you |
| 7 | | remember the next event that happened with |
| 8 | | respect to her position at New Seabury? |
| 9 | A | No. |
| 10 | Q | Do you remember her position ending at some |
| 11 | | point? |
| 12 | A | Yes. |
| 13 | Q | And can you explain how that happened? |
| 14 | A | Basically, the balance of the -- we're |
| 15 | | coming in towards the end of the season, |
| 16 | | heading into the fourth quarter, and |
| 17 | | basically we started accelerating the |
| 18 | | ramp-down on staff. |
| 19 | Q | How did you accelerate the ramp-down? |
| 20 | A | We started the layoffs within the different |
| 21 | | departments. Her position was just one of |
| 22 | | the positions that was laid off for the |
| 23 | | season. |
| 24 | Q | The layoff of seasonal employees? |

55 (Pages 214 to 217)

| 218 | |
|---|---|
| 1 | A  Right. |
| 2 | Q  And you testified before no other permanent |
| 3 | employees were laid off at that time, is |
| 4 | that correct, that you could recall when we |
| 5 | looked at the termination? |
| 6 | A  That I could recall. |
| 7 | But as I also stated, that the |
| 8 | positions were also assessed, and it was a |
| 9 | position that we didn't carry through the |
| 10 | winter. |
| 11 | Q  Did you discuss Ms. -- the termination of |
| 12 | Ms. Cosgrove's position with anybody? |
| 13 | A  I'm sure with Lee O'Shea. I believe Mark |
| 14 | O'Neil was still involved at that point. |
| 15 | Q  What did you say to Ms. O'Shea about it? |
| 16 | A  Just that she would need to do a change of |
| 17 | status report. |
| 18 | Q  And did she say anything in response? |
| 19 | A  Not that I recall. |
| 20 | Q  And what did Mr. O'Neil, what did you say |
| 21 | to him about it? |
| 22 | A  It was just part of the -- the layoff |
| 23 | process. |
| 24 | Q  And did he say anything in response? |

| 220 | |
|---|---|
| 1 | the season, you know, effective that day. |
| 2 | Q  And what did Ms. Perry say? |
| 3 | A  I don't think she said anything. |
| 4 | Q  And how about Ms. Cosgrove? |
| 5 | A  I don't remember what she said |
| 6 | Q  Did you -- before terminating -- before |
| 7 | laying Ms. Cosgrove off, did you think about |
| 8 | any other administrative position that you |
| 9 | could put her into? |
| 10 | A  No, there were none. |
| 11 | Q  Did you think about it? |
| 12 | A  There weren't any to be thought of. We had |
| 13 | eliminated -- continued to eliminate those |
| 14 | positions for the season. |
| 15 | Q  How many people were employed as |
| 16 | administrative assistants at New Seabury at, |
| 17 | say, November 2003? |
| 18 | A  I would say from the October-November range, |
| 19 | maybe five. |
| 20 | Q  And what about in December? |
| 21 | A  There would have been two. |
| 22 | Q  Two? |
| 23 | A  Mm-hmm. |
| 24 | Q  Who were the two in December? |

| 219 | |
|---|---|
| 1 | A  No. |
| 2 | Q  Did you contact an attorney before |
| 3 | terminating Ms. Cosgrove's position? |
| 4 | MR. WILGOREN:  Objection. |
| 5 | A  I can't say definitively. |
| 6 | Q  Did you make the final decision to terminate |
| 7 | Ms. Cosgrove? |
| 8 | A  Yes. |
| 9 | Q  And |
| 10 | A  To do the layoff, you mean? |
| 11 | Q  To terminate her employment. |
| 12 | A  To the layoff. |
| 13 | Q  You would characterize it as a layoff? |
| 14 | A  Yes. |
| 15 | Q  And did you discuss this decision with |
| 16 | Ms. Cosgrove? |
| 17 | A  I informed her. |
| 18 | Q  And what were the circumstances of that? |
| 19 | A  I believe it was myself and Jen Perry, I |
| 20 | believe. |
| 21 | Q  And did you meet in the warehouse? |
| 22 | A  I don't remember where it was. |
| 23 | Q  And what did you say to Ms. Cosgrove? |
| 24 | A  Basically that the position was ending for |

| 221 | |
|---|---|
| 1 | A  Would have been whoever mine was at the |
| 2 | time, which I think at the time was Jean |
| 3 | Civitello, and the other one would have been |
| 4 | whoever the receptionist was at the time. |
| 5 | I want to say Judy Horton, but I |
| 6 | don't remember for a fact if that's who it |
| 7 | was. |
| 8 | Q  Did you indicate to Ms. Cosgrove that you |
| 9 | would contact her if positions became |
| 10 | available in the high season? |
| 11 | A  I don't believe so. I think it was stated |
| 12 | that we'll revisit the positions in the |
| 13 | spring. |
| 14 | Q  Did you -- you told her you would revisit |
| 15 | the positions in the spring? |
| 16 | A  I believe it was pretty standard for us to |
| 17 | say. |
| 18 | Q  And what did you mean by that? |
| 19 | A  That we run advertisements, there's |
| 20 | positions -- if there's positions available, |
| 21 | people can apply. |
| 22 | Q  So you didn't mean that you would contact |
| 23 | people if positions became available? |
| 24 | A  No, people contact us. |

56 (Pages 218 to 221)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

|  | 222 |
|---|---|
| 1 | Q   You testified earlier that you did do that |
| 2 |      with Michele O'Brien? |
| 3 | A   I did, correct |
| 4 | Q   But |
| 5 | A   But that wasn't necessarily at the startup |
| 6 |      of a season.  That was for a particular job. |
| 7 | Q   And did you, in fact, contact Ms. Cosgrove |
| 8 |      at any time after that about positions |
| 9 |      becoming available? |
| 10 | A   I don't believe so. |
| 11 | Q   And do you know if administrative assistant |
| 12 |      positions did become available the next high |
| 13 |      season? |
| 14 | A   I don't believe there were any that were |
| 15 |      necessarily not returning people that had |
| 16 |      been there previously. |
| 17 | Q   What do you mean by not returning people? |
| 18 | A   People that were -- had not already been |
| 19 |      employed at New Seabury. |
| 20 | Q   So at the end of -- how many people came |
| 21 |      back to administrative assistant positions |
| 22 |      in '04? |
| 23 | A   Two. |
| 24 | Q   Two? |

|  | 223 |
|---|---|
| 1 | A   Mm-hmm. |
| 2 | Q   And had those people been laid off at the |
| 3 |      end of the 2003 season? |
| 4 | A   Yes. |
| 5 | Q   Who were those people? |
| 6 | A   Joanie Johnson, and then '04 I think |
| 7 |      Lauralee Taddeo. |
| 8 | Q   So why was it that some people were laid off |
| 9 |      and then called back to work and others were |
| 10 |      just laid off without being called back the |
| 11 |      next season? |
| 12 |      MR. WILGOREN:  Objection.  Assumes |
| 13 |      facts not in evidence.  There's no testimony |
| 14 |      that anyone was called back other than |
| 15 |      Michele O'Brien. |
| 16 |      MS. SCHWAB:  No, he just said Joanie |
| 17 |      Johnson and Lauralee Taddeo |
| 18 | A   They weren't called back.  They came back. |
| 19 |      They call us. |
| 20 | Q   How is it -- |
| 21 | A   They called up and asked when they could |
| 22 |      come back. |
| 23 | Q   Called when to come back or if they could be |
| 24 |      considered for a position? |

|  | 224 |
|---|---|
| 1 | A   No, when they could come back. |
| 2 | Q   So when they were laid off -- let's take |
| 3 |      Joanie Johnson, and let's look back at the |
| 4 |      termination report, which is Exhibit 8, if |
| 5 |      you can find these people on that report. |
| 6 |      I see Lauralee Taddeo on page 2, so |
| 7 |      let's start with her.  She's on page 2 about |
| 8 |      low inches up from the bottom |
| 9 |      Do you see that? |
| 10 | A   Mm-hmm. |
| 11 | Q   So she was laid off it says 10/10/03? |
| 12 | A   Mm-hmm. |
| 13 | Q   When she was laid off, was she told your |
| 14 |      position -- Just call up, your position's |
| 15 |      ready for you at the beginning of next |
| 16 |      season? |
| 17 | A   No.  I would assume it was probably more |
| 18 |      like Check, back with us in the spring. |
| 19 | Q   Check back with us in the spring. |
| 20 |      And then -- |
| 21 | A   It's an at-will environment.  It comes down |
| 22 |      to as simple as that. |
| 23 | Q   Sure. |
| 24 |      But I'm trying to establish if some |

|  | 225 |
|---|---|
| 1 | people when they call up, you immediately |
| 2 | put them back into their position versus |
| 3 | some people who would have to go through an |
| 4 | application process again.  I'm just trying |
| 5 | to be clear about the distinction |
| 6 | Are some people laid off with the |
| 7 | understanding that if they call back, |
| 8 | they'll be put right back into their |
| 9 | position? |
| 10 | A   No, there's some people we repeat.  There's |
| 11 | other people upon the layoff it be noted on |
| 12 | their change form we choose not to hire |
| 13 | back. |
| 14 | Q   And how would that be denoted? |
| 15 | A   It would say don't rehire. |
| 16 | Q   Would you say something to them in the |
| 17 | discussion when they were being laid off |
| 18 | that -- |
| 19 | A   No, no. |
| 20 | Q   Okay |
| 21 | So how was it that Ms. Taddeo knew |
| 22 | she could call up and get her job back in |
| 23 | the spring? |
| 24 |      MR. WILGOREN:  Objection. |

57 (Pages 222 to 225)

Stephen Brennan 1 18 2006
Patricia Cosgrove v. New Seabury Resources Management

| 226 | | 228 | |
|---|---|---|---|
| 1 | Mischaracterizes the evidence. | 1 | MR. WILGOREN: Objection. Relevancy. |
| 2 | A I don't know how she knew what she knew | 2 | A I don't know. I'd have to look. There's |
| 3 | other than she called. | 3 | only one that comes to mind that was a |
| 4 | Q And she was placed back in her position? | 4 | full-time employee that we changed the |
| 5 | A Yes. | 5 | position back to a seasonal factor, and that |
| 6 | Q Now, let's look for Joan Johnson. She seems | 6 | was in '05. |
| 7 | to be on page 4, a little less than halfway | 7 | Q Who is this? |
| 8 | down. | 8 | A Joe Monger. |
| 9 | She was laid off in November 7, '03; | 9 | Q That's the only one that comes to mind? |
| 10 | is that right? | 10 | A That's off the top of my head. |
| 11 | A Appears so. | 11 | Q Is there documentation from which you could |
| 12 | Q And then she called up in the spring and was | 12 | determine how many full-time employees had |
| 13 | put back into her position? | 13 | been laid off since 2003? |
| 14 | A I believe she did. Potentially Scott could | 14 | A It would probably be a file by file, the |
| 15 | have called her and said I need you to start | 15 | entire complement of employees from 2003 |
| 16 | at this point in time. | 16 | forward. |
| 17 | A lot of that would be | 17 | Q And a termination report might give some |
| 18 | weather-dependent, and that would dictate | 18 | indication if someone was terminated during |
| 19 | some of the seasonality | 19 | the first part of the year that might |
| 20 | Q Who could have called back? | 20 | indicate there were a permanent employee? |
| 21 | A The superintendent she works for. | 21 | A Not necessarily, because you have kitchen |
| 22 | Q And you don't know whether that happened or | 22 | staff that gets laid off right after the new |
| 23 | not? | 23 | year. |
| 24 | A No. | 24 | MS. SCHWAB: I'd like to take just a |

| 227 | | 229 | |
|---|---|---|---|
| 1 | Q Was Ms. Cosgrove given an indication one way | 1 | five-minute break. |
| 2 | or another about whether she would be | 2 | (Recess.) |
| 3 | replaced in her position if she called back | 3 | MS. SCHWAB: I have no further |
| 4 | in the spring? | 4 | questions. Thank you for your time. |
| 5 | A I don't believe so. | 5 | MR. WILGOREN: I have a few |
| 6 | Q You don't believe there was any indication? | 6 | questions. |
| 7 | A Either way. | 7 | |
| 8 | Q You mentioned before that the restructure -- | 8 | EXAMINATION |
| 9 | the -- what was the phrase? | 9 | BY MR. WILGOREN: |
| 10 | The turnaround at New Seabury is | 10 | Q You testified, Steve, that before you |
| 11 | coming to a close; is that correct? | 11 | officially started work, you had reviewed |
| 12 | A Nearly complete. | 12 | certain records and documents, including |
| 13 | Q Nearly complete. | 13 | headcounts of employees who were working in |
| 14 | When do you anticipate it will be | 14 | the various departments. |
| 15 | completed? | 15 | Do you recall that testimony? |
| 16 | A When we finish the houses. | 16 | A Yes. |
| 17 | Q And when do you anticipate the houses being | 17 | Q Okay. |
| 18 | finished? | 18 | Had you identified certain jobs that |
| 19 | A Five to six years from now. | 19 | you thought were excessive? |
| 20 | Q We talked about the permanent employees that | 20 | A Early on with the headcount, I had -- this |
| 21 | had been laid off into 2003. | 21 | is before I even went to work there. I |
| 22 | Since 2003, how many employees whose | 22 | used, you know, some of the industry |
| 23 | positions had previously been characterized | 23 | standards in the clubs I was at previously |
| 24 | as full-time permanent have been laid off? | 24 | to start looking at the number -- the |

58 (Pages 226 to 229)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

230

```
1     headcount and the production of the
2     positions. And, you know, it was evident
3     there were a couple of positions we had to
4     change before I even got there.
5   Q   Okay.
6         Was one of those positions the job
7     held by Rhonda Rodgers?
8   A   Yes.
9   Q   And at the time you identified that job, had
10    you had any knowledge that she was pregnant?
11  A   No, that was on production.
12  Q   Okay.
13        I'm sorry?
14  A   It was on production, revenue-generated.  I
15    hadn't met her at that point.
16  Q   What do you mean by it was on
17    revenue-generated?
18  A   The initiation fees in 2002 were in the
19    ballpark of 800,000, which was extremely low
20    for a club with that profile.
21  Q   What did that have to do with Rhonda
22    Rodgers?
23  A   She was responsible for generating the
24    initiation fees through the membership
```

231

```
1     sales.
2   Q   Okay.
3         And had you -- you started on
4     January 28, 2003, correct?
5   A   Correct.
6   Q   Okay.
7         Had you made a decision to replace
8     Rhonda Rodgers before that time?
9   A   Yes. Actually, had started interviewing
10    candidates for that position in early
11    December.
12  Q   In early December when you started
13    interviewing candidates for that position,
14    were you aware that Rhonda Rodgers was
15    pregnant?
16  A   No, I had no idea.
17  Q   And, in fact, did you hire someone to
18    replace her?
19  A   Yes.
20  Q   And that was Mr. Higgins?
21  A   Right.
22  Q   Okay.
23        And when was Mr. Higgins hired for
24    the membership position?
```

232

```
1   A   He had the same start date as I did.
2   Q   January 28, 2003?
3   A   Yes.
4   Q   And as of January 28, 2003 -- well, strike
5     that.
6         At the time you hired Mr. Higgins,
7     did you have any knowledge that Ms. Rodgers
8     was pregnant?
9   A   At that point I did because I was there.
10  Q   Well, at the time you hired Mr. Higgins?
11  A   No, because I hired him previous to getting
12    there.
13  Q   Okay.
14        When did you first have knowledge
15    that Rhonda Rodgers was pregnant?
16  A   When I met her.
17  Q   When was that?
18  A   Around the 28th.
19  Q   Okay.
20        By the way, how did Mr. Higgins do in
21    terms of membership sales? That's golf
22    memberships, correct?
23  A   Golf, tennis. It's country club
24    memberships.
```

233

```
1   Q   Okay.
2   A   In 2003, he generated 1.8 million in sales.
3   Q   Compared to the 800,000 Rhonda had --
4   A   Before, correct.
5   Q   I see. Okay.
6         Now, had you also identified
7     Ms. Cosgrove's position as one that may be
8     redundant?
9   A   It was a duplication of responsibilities,
10    yes.
11  Q   When did you first identify that as a
12    position that may involve duplication of --
13  A   The initial concern was the number of people
14    within that -- what I deemed that category,
15    and then confirmation just through
16    conversations with O'Neil that there was, in
17    fact, people booking lodging, people booking
18    catering already.
19  Q   And when you made that initial
20    determination, was that part of the review
21    you did before coming on board on
22    January 28, 2003?
23  A   Yes. I actually started on a plane in
24    November.
```

59 (Pages 230 to 233)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

234

1   Q   Okay.
2           And at the time that you started --
3       you were first identified --
4           That was the first time you
5       identified the position held by Ms. Cosgrove
6       as one that may be redundant?
7   A   Yes.
8           MS. SCHWAB. Objection. Asked and
9       answered.
10  Q   And at that time, had you had any knowledge
11      that Ms. Cosgrove was pregnant?
12  A   I had no idea at that point.
13  Q   And you saw the memo dated February 2nd.
14          Was that the first time you had
15      knowledge that Ms. Cosgrove was pregnant?
16          MS. SCHWAB. Objection. Asked and
17      answered.
18  Q   Go ahead.
19  A   First written notification. I may have been
20      told prior to that.
21  Q   Okay.
22          Now, I think you testified that it
23      was evident to employees working for the
24      company that the company was trying to bring

235

1       in costs and cut payroll?
2   A   Yes.
3   Q   How -- what makes you say that it was
4       evident to employees working for New Seabury
5       that the company was trying to bring down
6       costs -- bring costs in line and cut
7       payroll?
8   A   Well, when you just look at the comparative
9       sheet. '03-'04, the number of bodies that
10      came out the first quarter that were taken
11      off payroll, people knew the guy beside --
12      the person beside them may or may not be
13      there the next day.
14  Q   When you picked up the phone and you asked
15      an employee to come to your office, did you
16      get a sense as to what concerns that
17      employee may have at that time in early
18      2003?
19          MS. SCHWAB. Objection. Calls for
20      speculation.
21  A   People were generally nervous.
22  Q   Why was that?
23  A   Because they thought they may be next
24  Q   Next for?

236

1   A   For a layoff or termination.
2   Q   I see.
3           Was that happening with some
4       frequency in the first part of 2003?
5   A   Yes.
6   Q   Now, you testified that you had discussions
7       with Jen Parry and Roy Chase about
8       Ms. Cosgrove's job duties prior to your
9       making the decision to eliminate her
10      position?
11  A   Correct.
12  Q   Okay.
13          What did Jen Parry tell you about
14      Ms. Cosgrove's job duties?
15          MS. SCHWAB. Objection. Asked and
16      answered.
17  A   The primary function revolved around booking
18      the lodging units for groups of anything
19      over ten rooms. Rooms was the major scope
20      of her work. At that point, having a
21      lodging department. I saw it as duplication.
22  Q   And did they say any was -- was that the same
23      report you received from Mr. Chase?
24  A   Yes. The question to Roy, Will this effect

237

1       the overall food and beverage operation in
2       any fashion?
3   Q   Did Ms. Chase or Ms. Parry or both report to
4       you what, if anything, Ms. Cosgrove's
5       function was in handling a group coming to
6       New Seabury after she booked the lodging?
7           MS. SCHWAB. Objection. Vague.
8   A   What they described to me was it was very
9       little interaction once the rooms were
10      booked. There was rooming lists and things
11      of that nature, which is pretty basic
12      factors. It's done within the lodging
13      department anyway at this point.
14  Q   Now, what was -- you testified that the
15      company was losing thousands -- hundreds of
16      thousands of dollars in lodging.
17          What was that time frame where those
18      losses were occurring?
19  A   From the time we acquired it, which was '98
20      '99, 2000, you know, up until -- well, 2004,
21      it was losing.
22  Q   So was that hundreds of thousands of dollars
23      over that period of time or per year?
24  A   No, per year.

60 (Pages 234 to 237)

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

238

```
1    Q    Okay.
2              Now, just to clarify, there were a
3         number of changes in the golf department.
4         Were there any jobs in the golf department
5         that were eliminated and not refilled
6         thereafter in 2003?
7    A    Well, with the demotion of Scott Nickerson
8         out of the director of golf position and the
9         demotion of Bob McGraw to director of
10        instruction from head golf pro, the director
11        of golf became -- director of golf/head golf
12        professional, became one position.
13   Q    Two positions combined into one?
14   A    Right.
15   Q    What was the cost savings on that?
16   A    I want to say it was about $65,000 annually.
17   Q    Just to clarify, what was the -- when
18        Ms. Cosgrove was returned to work around
19        October 7, 2003, what position was she put
20        in?
21   A    Administrative assistant.
22   Q    That was the same job title that she had
23        accepted prior to her pregnancy leave of
24        absence?
```

239

```
1    A    Administrative assistant.
2    Q    Now, you testified that Lauralee Taddeo
3         filled the administrative position in the
4         conference sales department.
5              Do you recall that?
6    A    Yes.
7    Q    Okay.
8              What was your -- was that
9         administrative position a full-time
10        position, a seasonal position, a year-round
11        position?
12             What was it?
13   A    It was a seasonal position that ends in
14        October.
15   Q    Had it always been a seasonal position?
16   A    Since I had been there.
17   Q    Okay.
18             Now, let me call your attention to
19        Deposition Exhibit No. 8, second page, where
20        Lauralee Taddeo --
21             It's reflected she was laid off on
22        October 10, 2003?
23   A    On or about. That's when it hit the actual
24        system.
```

240

```
1    Q    So it may have been a few days earlier?
2    A    Could have been a couple of days earlier.
3         It would have been around that time,
4         generally.
5    Q    Okay.
6              Now, that would have been within a
7         couple of days after Ms. Cosgrove returned
8         to work?
9    A    That's correct.
10   Q    Why was Ms. Taddeo laid off?
11             MS. SCHWAB: Objection.
12   A    The seasonality of the work. The
13        seasonality of the work. Basically the
14        events have stopped, the administrative
15        function isn't needed anymore because the
16        salespeople can do it themselves.
17   Q    Okay.
18             After she was -- Ms. Taddeo was laid
19        off, was anyone hired to replace her for --
20        at that time?
21   A    No. Winter months, it's a vacant position.
22   Q    I see. Okay.
23             Now, there was some testimony about
24        accommodations that were made to
```

241

```
1         Ms. Cosgrove at her request, including being
2         allowed to go to the administrative offices
3         to pump her breast milk, being allowed to go
4         to the administrative offices or the country
5         club to use the restroom facilities, and
6         what wasn't mentioned, being allowed to go
7         to the country club to -- for meals.
8              Did you have any objection to any of
9         those accommodations?
10             MS. SCHWAB: I have an objection to
11        the question because it mischaracterizes the
12        testimony and assumes facts not in evidence.
13             He didn't say that he accommodated
14        her with the breast milk. He said he knew
15        about it.
16             MR. WILGOREN: Okay.
17             MS. SCHWAB: And the rest of the
18        stuff hasn't been discussed at all day.
19             MR. WILGOREN: Okay.
20   BY MR. WILGOREN:
21   Q    Well, you knew that Ms. Cosgrove was going
22        to the administration office to pump her
23        breast milk?
24   A    Yes.
```

61 (Pages 238 to 241)

# O'BRIEN&LEVINE

### Court Reporting Services

CONFIDENTIAL

CONFIDENTIAL



YOUR BOSTON CONNECTION...WORLDWIDE

## Patricia Cosgrove v. New Seabury Resources Management, Inc.

Transcript of the Testimony of:

# Mark O'Neil

# February 14, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

CONFIDENTIAL

CONFIDENTIAL

Linda L. Guglielmo  1-17996

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

| 10 | |
|---|---|
| 1 | manage or act as an owner's representative for |
| 2 | their facility to oversee and manage the daily |
| 3 | operational duties of the staff or the club, |
| 4 | depending on what specific property was. |
| 5 | Q. And would the management -- would golf course |
| 6 | management involve staffing -- managing staffing? |
| 7 | A. Typically, yes. |
| 8 | Q. What type of involvement would you have in that? |
| 9 | A. We would have the daily oversight for |
| 10 | basically the labor and personal staffing of the |
| 11 | club or clubs. Usually we would oversee some form |
| 12 | of on-site manager. Typically it would be a |
| 13 | general manager that would report to us and we |
| 14 | would manage the facility through that individual, |
| 15 | using that person's contacts. |
| 16 | Q. Would your involvement in staffing also involve |
| 17 | restructuring of staffing, layoffs or moving |
| 18 | people around? |
| 19 | A. It could possibly. |
| 20 | Q. In what situations would it involve that? |
| 21 | A. If we were retained by, as an example, an |
| 22 | owner of a club, to potentially review the current |
| 23 | staffing plan of the facility and make our |
| 24 | representations, and/or implement changes we would |

| 11 | |
|---|---|
| 1 | do. |
| 2 | Q. And has that happened that you've been retained to |
| 3 | review staffing by a club? |
| 4 | A. As part of an overall service, yes. |
| 5 | Q. With what clients? |
| 6 | A. Probably the majority of clients that we have |
| 7 | worked for, usually staffing and staffing review |
| 8 | is one component of the service we offered, very |
| 9 | common, that's part of our management task. |
| 10 | Q. As a general matter, when you undertake a staffing |
| 11 | review of a facility, what types of -- what type |
| 12 | of information do you convey to the employees of |
| 13 | the facility about the staffing review? |
| 14 | A. Usually most of our communication and |
| 15 | relationship is primarily dealt through general |
| 16 | manager, and then it would be that person's |
| 17 | responsibility to do the line level or front line |
| 18 | management communication. |
| 19 | Q. Do you give the general manager instruction on how |
| 20 | to go about that? |
| 21 | A. Guidance, yes. |
| 22 | Q. And what type of guidance would you give? |
| 23 | A. Typically a GM, general manager, would review |
| 24 | potential memos, notices, ways in which they would |

| 12 | |
|---|---|
| 1 | handle restructuring with us and we would |
| 2 | communicate back and forth and provide guidance, |
| 3 | suggestions, you know, professional level input as |
| 4 | to decisions that were made or communications that |
| 5 | were made. |
| 6 | Q. When you started in 2000, how many clients did you |
| 7 | have in 2000? |
| 8 | MR. WILGOREN: Objection. |
| 9 | THE WITNESS: When we started the |
| 10 | business? |
| 11 | MS. SCHWAB: Yes. |
| 12 | A. When we started the business, we had no |
| 13 | clients. |
| 14 | Q. In the year 2000, how many clients did you have? |
| 15 | A. Honestly, I would have to review my records. |
| 16 | We've had many clients since that time. Some |
| 17 | large, some small. So I can't recall exactly how |
| 18 | many. |
| 19 | Q. Can you approximate? |
| 20 | A. Two to four. |
| 21 | Q. How many large clients did you have in 2000? |
| 22 | THE WITNESS: What's large? |
| 23 | MS. SCHWAB: You tell me, what would |
| 24 | constitute large. |

| 13 | |
|---|---|
| 1 | A. You said large and small. Every client in |
| 2 | our corporation is looked at as a large client. |
| 3 | So it could be someone that could be as simple as |
| 4 | a $10,000 consulting agreement or a $100,000 |
| 5 | management agreement. We were obviously trying to |
| 6 | build our business at that time and retain -- the |
| 7 | larger client the better, as everyone in this room |
| 8 | is trying to do. |
| 9 | Q. Let's talk about New Seabury, when I refer to New |
| 10 | Seabury, I mean New Seabury Resources Management. |
| 11 | When did you first come into contact with somebody |
| 12 | at New Seabury? |
| 13 | MR. WILGOREN: Objection. You can |
| 14 | answer. |
| 15 | A. I can't recall the exact date but I believe |
| 16 | it was some time in the summer of 2002. |
| 17 | Q. Who contacted you? |
| 18 | A. Wayne Kapral. |
| 19 | Q. What was the conversation that you had with Mr. |
| 20 | Kapral? |
| 21 | A. Wayne had become aware, and I'm not sure how, |
| 22 | of our company and the services we offered and was |
| 23 | interested in discussing the possibility of a |
| 24 | management consulting agreement between Essex Golf |

4 (Pages 10 to 13)

CONFIDENTIAL                                        CONFIDENTIAL

Mark O'Neil 2-14-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

14

1    and New Seabury.
2    Q.  What happened next?
3    A.  I met with -- several phone conversations
4    with Wayne, first of all, and then I visited the
5    site to meet with him personally at New Seabury.
6    Q.  When did that take place?
7    A.  Summer of 2002, I believe late summer.
8    Q.  And what happened at that meeting?
9    A.  Obviously, I was questioning Wayne as to what
10   he was looking for and what type of consultation
11   agreement he was looking for, and he conveyed to
12   me that New Seabury was owned by American Real
13   Estate Partners out of New York and that Wayne's
14   primary background and experience was not in
15   facility or operational manager at the resort
16   level and that his primary background, if I'm
17   correct, was in finance or financial matters.  And
18   they were looking for someone to come in and
19   support their efforts at improving the operational
20   profitability of New Seabury.
21   Q.  At that meeting did you and Mr. Kapral talk at all
22   about staffing?
23           THE WITNESS:  At that specific
24   meeting?

15

1           MS. SCHWAB:  Yes.
2    A.  I'm sure there was a cursory discussion about
3    it.  I do not remember specific individuals,
4    positions or anything of that nature.
5    Q.  Was there anyone else at the meeting?
6    A.  I don't believe so.
7    Q.  Did you meet other people when you were at the
8    facility at that first meeting?
9    A.  Yes, did.  I'm sure I was introduced to
10   numerous people.  I can't specifically remember
11   who I met, other than I did meet, I believe Scott
12   Nickerson who was the golf course
13   superintendent -- I'm sorry, at that time was
14   director of golf.  I'm sure I met other
15   individuals in the organization.  I specifically
16   can't remember who they might be.
17   Q.  After that first meeting with Mr. Kapral, what
18   happened next?
19   A.  To the best of my recollection, I believe I
20   was asked to provide some form of management
21   proposal, which I'm sure I created a management
22   proposal with a fee structure typical to any
23   management consulting agreement, and I furnished
24   that to Wayne Kapral.

16

1           (PLAINTIFF'S EXHIBIT 1
2           MARKED FOR IDENTIFICATION)
3    Q.  You're looking at Exhibit Number 1.  Do you
4    recognize that document?
5    A.  Yes, I do.
6    Q.  What is it?
7    A.  It's a proposal for the club management for
8    New Seabury.
9    Q.  I notice that this document is not signed, but
10   does that look like the management proposal that
11   you were just discussing?
12   A.  No.  This is not the proposal I was just
13   referring to.
14   Q.  Okay.  How do you know this is not that proposal?
15   A.  Because this is not a consulting proposal.
16   This was for the overall management of the
17   facility, of the club.
18   Q.  So, this would have been after you were already
19   retained?
20   A.  Correct.
21   Q.  So, you came up with I think you also called it a
22   management proposal, discussing what you would --
23   what your relationship would be with New Seabury
24   after you met with Mr. Kapral; is that correct?

17

1           THE WITNESS:  What we were referring
2    to initially?
3           MS. SCHWAB:  Yes.
4    A.  Yes, a consulting agreement.
5           MS. SCHWAB:  I'm going to mark
6    Exhibit 2.
7           (PLAINTIFF'S EXHIBIT 2
8           MARKED FOR IDENTIFICATION)
9    Q.  Do you recognize Exhibit 2?
10          MR. WILGOREN:  Take your time and
11   look through the whole document.
12          THE WITNESS:  What was the question?
13   Q.  Do you recognize the document?
14   A.  Yes.
15   Q.  I notice this document is signed in June 2003, so
16   I presume this is not the initial consulting
17   agreement; is that correct?
18   A.  No.  This was not the initial document that
19   we referred to earlier.
20   Q.  Does this resemble the initial document in terms
21   of structure?
22   A.  No.  Once again, this being a management
23   agreement as opposed to a consulting proposal.
24   Q.  So, after you presented the initial consulting

O'Brien & Levine Court Reporting Services
888.825.DEPO(3376) * www.court-reporting.com

Case 1:05-cv-10791-GAO    Document 25-4    Filed 06/12/2006    Page 4 of 16

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

**18**

1    proposal, what happened next?
2    A   I believe I was then contacted by the
3    president of a American Real Estate Holdings in
4    New York to discuss the agreement -- I'm sorry, to
5    discuss the proposal.
6    Q.  About when would that have been?
7    A   To the best of my recollection, August 2002.
8    Q.  And the president, is that Albo Antenucci?
9    A   Albo Antenucci.
10   Q.  What happened during that conversation?
11   A   I can't recall the specifics of the
12   conversation, but I remember in general Albo asked
13   me to expand on the types of things I would cover
14   in a proposal, and at that time that was I believe
15   our first discussion about the possibility of
16   performing a more detailed operational audit is
17   what it's called in the industry.
18   Q.  What's a detailed operational audit?
19   A   Basically it's when you retain a firm like an
20   Essex Golf or someone in that capacity to review
21   the operation from top to bottom or in fairly
22   strong detail, department by department and
23   essentially to gather information, review the
24   details and the data and then make a

**19**

1    recommendation to whoever retained you to perform
2    the operation on audit.
3    Q.  Had you conducted operation audits on other
4    facilities previous to this?
5    A   In one form or another, yes.
6    Q.  Can you give me examples of facilities for which
7    you've consulted operational audits?
8    A   Yes.  Tournament Players Club, River
9    Highlands in Cromwell, Connecticut, Tournament
10   Players Club at Avenel in Washington, D.C. or
11   Potomac, Maryland.  Tournament Players Club at
12   Scottsdale, in Scottsdale, Arizona.  And then
13   anywhere from 10 to 20 additional clubs over the
14   period of 1990 to 2000.
15   Q.  Tournament Players Club, did you conduct
16   operational audits for those facilities through
17   Essex Golf Club?
18   A   No.  I was acting in the role as an employee
19   of the PGA Tour.
20   Q.  With Essex Golf Club previous to New Seabury had
21   you conducted operational audits?
22   A   I don't recollect any specific operational
23   audits.  No.
24   Q.  During this conversation you had with Mr.

**20**

1    Antenucci, did you and he talk at all about
2    staffing at New Seabury?
3    A   Yes.  We talked about only one, two or three
4    specific positions.
5    Q.  What positions were those?
6    A   We specifically discussed Wayne Kapral.
7             MR. WILGOREN: Can we mark any
8    portions of the transcript based on the
9    confidentiality agreement we have talking about
10   individuals who are or were employees of New
11   Seabury Resources including Mr. Kapral.
12            MS. SCHWAB: Why don't you just do it
13   when you're reviewing the transcript to read and
14   sign.  You have a confidentiality agreement that
15   both of us have signed.
16            MR. WILGOREN: Why don't we consider
17   the entire transcript as a confidential document
18   pursuant to the confidentiality agreement.
19            MS. SCHWAB: Pursuant to that
20   agreement, that's fine.
21   Q.  Other than Wayne Kapral, what other positions did
22   you discuss?
23   A   I believe we discussed Scott Nickerson.  I
24   can't remember any other individuals.  Those were

**21**

1    the two highest level individuals at the site at
2    that time.  So that would be very common to
3    discuss the higher level management positions.
4    Q.  What did you and Mr. Antenucci discuss relating to
5    Wayne Kapral?
6    A   Mr. Antenucci specifically gave me direction
7    or provided me with direction regarding his
8    request to review Mr. Kapral's abilities during
9    the course of action and during the course of my
10   management consultation agreement.
11   Q.  Anything more specific than that?
12   A   He had concerns whether one had the ability,
13   knowledge, experience to manage the facility and
14   be able to generate the return on the investment
15   that American Real Estate Holdings had made.
16   Q.  Did you and Mr. Antenucci discussion any specific
17   goals with respect to Mr. Kapral putting him into
18   a different position or anything like that?
19   A   In the initial discussion we had, I don't
20   believe so.
21   Q.  And what about Scott Nickerson, what discussions
22   did you have about him?
23   A   Similar in the sense of Albo wanted me to
24   either verify or not verify that Scott was capable

6 (Pages 18 to 21)

CONFIDENTIAL    Mark O'Neil 2-14-2006    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

**22**

1  of fulfilling the role that he had been put into
2  also.
3  Q  Other than those two specific individuals, did you
4  have any discussions about specific departments at
5  New Seabury?
6  THE WITNESS: During that
7  discussion?
8  MS. SCHWAB: Yes.
9  A. I don't believe so.
10  Q.  How about any discussions generally about seasonal
11  employees?
12  A. I don't believe so.
13  Q.  And after that initial discussion with Mr.
14  Antenucci what happened next?
15  A.  To the best of my recollection, I believe
16  Albo then asked me to forward a copy of the
17  management proposal, consulting proposal to him
18  and that they would like to get me started and be
19  involved in the review of the club at that time.
20  Q.  And what happened after that?
21  A.  Upon consummation of an agreement, I then
22  began making regular and periodic trips to the
23  club, regular and frequent telephones, I began
24  reviewing internal documents that were provided to

**23**

1  me and essentially began the terms and conditions
2  of the consulting agreement.
3  Q.  When did that begin?
4  A  I believe in late August 2002. I can't be
5  sure of the exact date, but I feel confident it
6  was in that general time frame within 30 days.
7  Q.  What did you do during your trips to the facility?
8  A.  Typically I would spend most of my time in
9  the first trip, the first several trips with Wayne
10  reviewing the facility because it's very hard to
11  make operational judgments without first having a
12  very good handle on the physical facility itself.
13  So the first several trips were looming the
14  magnitude of the property, where things were,
15  where departments were located, how the golf
16  course related to the clubhouse and in the other
17  buildings within the resort.
18  Q.  Starting in August, how frequently would you visit
19  the facility?
20  A.  I believe I was there at least once a week on
21  a regular basis.
22  Q.  And from August until what period?
23  MR. WILGOREN: Objection.
24  THE WITNESS: Can you be more

**24**

1  specific under the consulting agreement?
2  Q.  Okay. It sounds like in August you started on
3  assessment of the facility?
4  A.  Right.
5  Q.  Was there a certain period during which that
6  assessment lasted?
7  A.  Yes, there was.
8  Q  How long was that?
9  A.  Approximately December.
10  Q.  And between August and December how frequently did
11  you visit the facility?
12  A.  In general, I'm there at least once a week
13  and most trips were two days in length with one
14  overnight stay.
15  Q.  And after the initial visits with Mr. Kapral,
16  trying to get a feel for the facility, what other
17  things did you do when you visited?
18  A.  I would -- I spent a lot of time reviewing
19  financial documents, reviewing club documents and
20  data that was generated at the club including
21  membership structures, membership categories for
22  club membership, food and beverage operation,
23  lodging operations, golf course maintenance
24  operations and daily activities. The golf club

**25**

1  operations and daily activities. Really, all
2  facets of each department's operational structure
3  and operational activities.
4  Q.  And what types of things did you do relating to
5  evaluating staffing at New Seabury?
6  THE WITNESS: Specifically to
7  evaluating staffing?
8  MS. SCHWAB: Yes.
9  A  It usually was comprised of first reviewing a
10  departmental staffing plan with Wayne Kapral and
11  oftentimes it then included meeting with the
12  department manager if there was one to review the
13  specifics of that department.
14  Q.  At that time did you identify departments that
15  could use reorganization or restructure?
16  A.  Yes.
17  Q.  And what departments were those?
18  A.  Golf course maintenance, golf operations,
19  general and administrative, food and beverage,
20  membership, and New Seabury had a unique
21  department for lack of a better term, it was
22  called facilities or facilities management.
23  Q.  Any other departments?
24  A.  I think that's all of them.

7 (Pages 22 to 25)

CONFIDENTIAL                    CONFIDENTIAL

26

1   Q   Are there any left?
2     A.   I don't think so. I tried to make sure I
3   listed every department.
4   Q.   During this period from about August 2002 to
5   December 2002, did you produce any documents
6   relating to your assessment of New Seabury?
7     A.   Produce, meaning formalize documents that
8   would have been reviewed by someone else?
9        MS. SCHWAB: Yes.
10     A.   Yes. I produced towards the end of that
11   agreement an operational audit review document for
12   the ownership of the resort.
13   Q.   Anything else?
14     A.   I'm sure there were other documents that were
15   produced but nothing that was produced explicitly
16   for review by the owner that I can remember. I'm
17   sure I had notes and things like that.
18   Q.   And during that time did you conduct an assessment
19   of the two positions that you and Mr. Antonucci
20   had discussed Mr. Kapral's and Mr. Nickerson's
21   positions?
22     A.   Yes. That was -- Mr. Kapral was really an
23   ongoing review as we went through the other
24   process. Unbeknownst to Mr. Kapral, I was

27

1   obviously, while reviewing departmental structures
2   and operational efficiencies. I was also at the
3   same time reviewing his abilities and knowledge of
4   those positions.
5   Q.   And what were your conclusions during that period?
6        THE WITNESS: With regards to
7   Mr. Kapral or specific departments?
8        MS. SCHWAB: With regards to
9   Mr. Kapral.
10     A.   Mr. Kapral if my mind or in my professional
11   opinion was knowledgeable in the areas of
12   financial management and accounting; however, his
13   experience and knowledge of daily operations and
14   resort and/or golf club management was lacking.
15   Q.   What about Mr. Nickerson?
16     A.   Scott was, previously to my arrival or
17   involvement with New Seabury, was functioning in
18   the role of golf course superintendent. I thought
19   in that role his knowledge which would be
20   commensurate with that role was fine, excellent
21   However, Scott, prior to my involvement, and I'm
22   not sure of the exact date was promoted into the
23   position called director of golf which was then
24   responsible for not only the golf course

28

1   maintenance and management of the turf conditions
2   and the playing -- the golf course, also became
3   responsible for the oversight of the golf
4   operation which included the retail store, golf
5   professional staff, and things that are normally
6   under the jurisdiction of either a golf
7   professional trained PGA professional or general
8   manager.
9     I felt that Scott's experience was excellent
10   with golf course maintenance but was lacking in
11   the area of golf operations in general,
12   explicitly, the retail components and the
13   operational side of the business.
14   Q.   Were there any other specific positions other than
15   those two that you identified as in need of
16   restructuring or some sort of reorganization,
17   during that period?
18        MR. WILGOREN: Objection. Which
19   period?
20        MS. SCHWAB: During the period of
21   approximately August to December 2002.
22     A.   During that time frame when I was reviewing
23   all departments, in addition to those two specific
24   positions. I felt there was numerous areas of

29

1   restructuring required and reorganization required
2   within most of the other departments.
3   Q.   And any specific positions?
4     A.   Numerous. Which department would you want to
5   start with?
6        MS. SCHWAB: Let's start with golf
7   maintenance.
8     A.   With golf maintenance, I felt that the
9   appropriate staffing levels would have been to
10   have more of what would be considered typical
11   structure which would be a golf course
12   superintendent overseeing the operations of the
13   department, potentially one or two assistant
14   superintendents with specific duties and
15   responsibilities for various portions of the golf
16   course maintenance budget. And a golf course
17   mechanic, and then the staffing or what we
18   normally call the operators or front line staffing
19   below that. At the time of reviewing that
20   department, it appeared to me in my review that
21   there were some gross inefficiencies taking place
22   within golf course maintenance which led to higher
23   than normal labor costs.
24   Q.   And what about golf operations?

8 (Pages 26 to 29)

30

1　A　Golf operations, which is normally considered
2　in the industry the inside part of the business, I
3　felt that there was a gentleman named Bob McGraw
4　who had been promoted to the head golf
5　professional position and was really functioning
6　in a different role completely. He was really
7　functioning in the role of director of instruction
8　because I believe if I'm correct, 75 percent or
9　more of his time was spent providing instruction
10　lessons to members and non-members. He really did
11　not have the oversight and daily responsibility
12　for the retail operation and some of the other
13　specific duties, cart maintenance, outside
14　operations where people pull up and, you know, you
15　take the bag and direct them.
16　　I felt that there were other people within
17　that department that did not have clearly defined
18　duties and responsibilities and seemed like there
19　was numerous redundancies in what certain people
20　were doing, and I felt there, once again, that the
21　labor costs relative to the amount of
22　responsibilities and duties that were undertaken
23　by the department as well as the revenue that was
24　generated in an area such as retail golf shop  I

31

1　felt the labor was excessive for the product that
2　was being delivered.
3　Q　What about in general and administrative?
4　A　Under the G & A department, it was clear that
5　they were overstaffed in many areas, there was
6　many inefficiencies taking place within that
7　department. There was numerous people performing
8　to me what seemed to be like tasks and in
9　comparison to other clubs of a similar size,
10　nature, revenue, magnitude, that they were
11　overstaffed in numerous areas.
12　Q　And food and beverage?
13　A　Food and beverage was an extremely difficult
14　department to evaluate only because there are
15　several outlets that fall under the food and
16　beverage heading. There is the main clubhouse,
17　there is the Popponesett Inn, snack bar, beverage
18　cart. So, in that department also there appeared
19　to me to be a lack of direction and lack of
20　defined duties and responsibilities.
21　Q　And membership?
22　A　Membership at a club like New Seabury which
23　was in a membership sales mode, as are most clubs
24　at the time, I originally reviewed the department,

32

1　I also felt that although the membership
2　department had a couple of competent individuals,
3　that their skills were probably not commensurate
4　with what their tasks and duties were. So I felt
5　there was opportunities there to make changes,
6　too.
7　Q　And facilities management?
8　A　Facilities management was unique in that for
9　many years prior to my arrival, they were
10　responsible for a much larger area and number of
11　facilities and that had been reduced over the
12　years, and it was my observation that the staffing
13　levels and duties and responsibilities had not
14　been proportionally reduced as the number of
15　facilities they managed had been reduced. So I
16　felt there was some inefficiencies there also.
17　Q　Did you put your conclusions that we've just
18　discussed, into your operational audit?
19　A　I believe so in summary form.
20　Q　In producing the operational audit was your goal
21　to give full assessment of all the changes you
22　anticipated should be made at New Seabury?
23　A　I was really charged with the task of
24　reviewing the daily operation of the resort and

33

1　making limited recommendations as to things I
2　thought would be wise to improve.
3　Q　But was your plan to give a complete assessment at
4　that time?
5　A　A complete assessment in detail would have
6　required – a resort of that level, much more time
7　than I was given
8　Q　So, with respect to the staffing restructuring
9　that we discussed before happened, would you say
10　that you had a fairly complete understanding of
11　what needed to be done to restructure in those
12　departments?
13　A　I made an assessment based on my visits and
14　review of the club of what I thought were
15　appropriate adjustments that should be made.
16　　MS. SCHWAB: I want to get to the
17　operational audit in a minute, but first I want to
18　mark another Exhibit 3.
19　　　(PLAINTIFF'S EXHIBIT 3
20　　　MARKED FOR IDENTIFICATION)
21　Q　Do you recognize Exhibit 3?
22　A　Yes.
23　Q　This document is not signed, but does this look
24　like the letter that you would have sent to

9 (Pages 30 to 33)

38

1    A.  It appears to, without going through it in
2    detail, it appears to be.
3    Q   And this is a document that you personally
4    prepared?
5    A.  Yes.
6    Q.  Did you have any help preparing it?
7    A.  I may have had help doing the word
8    processing, things like that, administrative
9    support.
10   Q.  But substantively?
11   A.  No.  Substantively, this was my review and my
12   work.
13   Q   Unfortunately, the pages are not numbered, so
14   you're going to have to bear with me as I ask
15   questions.  I have numbered my pages and what I
16   have with operational audit results being Page 1,
17   Page 5 after that.  If that's one what would be
18   Page 5 starting with Professionals.  You list,
19   "The following minimum staff changes."  What do
20   you mean by staff changes there?
21   A.  I believe I was referring to that these
22   positions would require some form of change,
23   alteration, restructuring, something along —
24   something that would be considered a change in

39

1    their duties and responsibilities, the position in
2    general or further review.
3    Q   So, it could mean adding or eliminating?
4    A.  Um-hum.
5        MR. WILGOREN: You need to say yes.
6    A.  Yes.
7    Q   At the time who was the general manager, COO?
8    A.  At this time that would have been Wayne
9    Kapral.
10   Q   And director of golf?
11   A.  That would have been Scott Nickerson.
12   Q.  Who was director of membership sales at the time?
13   A.  At that time would have been Rhonda Rodgers.
14   Q   Corporate sales manager?
15   A.  I can't recall if there was one.
16   Q   Banquet manager?
17   A.  I believe that would have been Jennifer.
18   Jennifer Perry.
19   Q.  And possible food and beverage director, that
20   sounds like a position that was to be added
21   potentially?
22   A.  I can't recall if there was an individual in
23   that position at that time, or it was the
24   possibility of either adding someone.

40

1    Q.  Okay.  We've spoken about Mr. Kapral and
2    Mr. Nickerson.  What changes did you contemplate
3    with respect to Rhonda Rodgers' position?
4    A.  Rhonda was very capable and competent at,
5    what I would call management relations, but the
6    duty of this position was primarily to retain new
7    members or to obtain new members, and I felt that
8    Rhonda did not have the, necessarily, the
9    prospecting and sales execution skills necessary
10   to increase the number of members.
11   Q.  And corporate sales manager, do you remember what
12   changes were made with respect to that position?
13   A.  I believe, to the best of my knowledge, we
14   recruited someone for this position.  So I don't
15   think at this time there was someone performing
16   that function.
17   Q.  How did you go about recruiting someone for that
18   position?
19   A.  I don't remember the specifics, but usually
20   it is through some form of targeted employment ad
21   in either an industry specific periodical, could
22   have been something as general as an ad in the
23   Boston Globe.  I don't remember specifically how
24   we tried to attract a person for that.

41

1    Q.  Was there any thought about hiring internally for
2    the corporate sales manager?
3    A.  I don't remember specifically to this
4    position, no.
5    Q.  Generally, when new positions come up, were there
6    efforts to hire internally?
7    A.  In general, our company's philosophy to first
8    look internally to see if there is an available
9    candidate prior to going outside the company, yes.
10   Q.  With respect to Jennifer Perry's position, what
11   changes did you think needed to be made?
12       THE WITNESS:  With respect to her
13   specific position?
14       MS. SCHWAB:  Yes.  She's listed under
15   one of the minimum staff changes.
16   A.  I can't remember anything specific to her.
17   It would be conjecture for me to try to think of
18   specific things to her.
19   Q   Do you know why her position would have been
20   listed as one of the minimum staff changes?
21   A.  I believe that that was a position that we
22   were considering altering the compensation
23   structure to be more incentive-based versus
24   salary-based, I believe.

11 (Pages 38 to 41)

Mark O'Neil 2-14-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

62

1       MS. SCHWAB: Yes.
2    A.  No. I do not.
3    Q   Do you know who would have told her that her
4        position was being eliminated?
5    A.  I don't know for fact but typically --
6           MR. WILGOREN: Don't guess.
7    A.  I don't know.
8    Q   Typically, who would be involved in that type of
9        discussion?
10          MR. WILGOREN. Objection. Calls for
11       speculation.
12   A.  Normally, that function would be the duty of
13       the general manager.
14   Q.  And that's Steve Brennan?
15   A.  Yes.
16   Q.  Going back to Exhibit 6, the next paragraph on
17       Page 9 says, "Wayne Kapral's last day will be
18       3-7-03." Were you involved in the decision that
19       Mr. Kapral's last day would be March 7th, '03?
20   A.  I was aware that his last day would be
21       3-7-03.
22   Q.  How did you become aware of that?
23   A.  Through Mr. Antenucci.
24   Q.  And what did Mr. Antenucci tell you about that?

63

1    A.  Mr. Antenucci had a discussion with Wayne
2        Kapral about his termination.
3    Q.  What did he tell you about it?
4    A.  That he told me that Wayne was terminated.
5    Q.  Anything else?
6    A.  Superlative -- expletive.
7    Q.  Anything else substantive?
8    A.  Not that I can remember.
9    Q.  Prior to that, had you had any discussions with
10       anyone about the possible termination of
11       Mr. Kapral?
12   A.  Yes, I had discussions --
13          MR. WILGOREN: Objection -- okay,
14       strike that.
15   A.  I had discussions with both Mr. Antenucci and
16       Mr. Brennan about eliminating Wayne's position.
17   Q.  And terminating Mr. Kapral?
18   A.  My discussions were more relative to
19       elimination of the position.
20   Q.  The position of CFO?
21   A.  Yes.
22   Q.  And what discussions did you have with Mr. Brennan
23       about that?
24   A.  Clearly New Seabury did not require the

64

1        resources of a, quote/unquote, CFO and a corporate
2        controller, and we had both of those positions in
3        place, and I felt that a CFO was not a required
4        position for a club of that magnitude.
5    Q.  And what did you talk -- what did you discuss with
6        Mr. Antenucci about eliminating the CFO position?
7    A.  Same general type of discussion, that there
8        was redundancy in those two positions, and that
9        one or the other needed to be eliminated.
10   Q.  During the period of January 1st to February 28,
11       2003, do you remember if you ever met Ms.
12       Cosgrove?
13   A.  Specifically, I do not remember.
14   Q.  Do you remember ever having any discussions about
15       Ms. Cosgrove specifically?
16          MR. WILGOREN: Objection. What time
17       frame?
18          MS. SCHWAB: During the period of
19       January 1st to February 28th, 2003.
20   A.  No. I don't recall any specific discussions
21   Q.  Do you remember her name ever coming up in
22       discussion in that period?
23   A.  I'm sure it did. I just do not remember any
24       specific discussions relative to Patricia, no.

65

1    Q.  At the end of this period, January -- on February
2        28th, 2003, had there been -- had any termination
3        employees at New Seabury been terminated that
4        you're aware of?
5    A.  You would have to be more specific. I can't
6        remember. I can't remember specifically who or
7        who had not been terminated. There was over
8        several hundred employees at New Seabury, so...
9    Q.  Over several hundred employed there?
10   A.  Yes. There was at least a couple of hundred
11       people employed at New Seabury.
12   Q.  During the time that you worked at New Seabury,
13       would you have been aware of people in permanent
14       positions being terminated?
15          MR. WILGOREN: Objection.
16       Characterization of permanent. There has been no
17       testimony about permanent positions.
18          THE WITNESS: What does "permanent"
19       mean?
20   Q.  What's your understanding of what permanent means?
21          MR. WILGOREN: Objection.
22   A.  In my industry, there is no such thing as a
23       permanent employee.
24   Q.  Were you aware that at New Seabury certain

17 (Pages 62 to 65)

**78**

1   general?

2      MS. SCHWAB: Yes

3    A.   Numerous documents that looked just like

4   this. Tens of hundreds of documents like this,

5   this specific document. No. Documents like this

6   in general, many, yes.

7      (PLAINTIFF'S EXHIBIT 15

8      MARKED FOR IDENTIFICATION)

9    Q.   Do you recognize Exhibit 15?

10    A.   Specifically no. In general, yes.

11    Q.   What is it in general?

12    A.   In general, this also looks like a document

13   that was produced by New Seabury's accounting

14   system, and it's written with 2003 on the top, but

15   it appears to be a 2002 document.

16    Q.   Do you know why it would say 2003 on the top?

17    A.   Do I know why, no.

18      MS. SCHWAB: Exhibit 16.

19      (PLAINTIFF'S EXHIBIT 16

20      MARKED FOR IDENTIFICATION)

21    Q.   Do you recognize this document?

22    A.   Yes.

23    Q.   What is it?

24    A.   This appears to be a document that was

**79**

1   created out of my office that discussed the F & B

2   reorganization at New Seabury.

3    Q.   Do you know when this document would have been

4   produced?

5    A.   Specifically, no. In general, in conjunction

6   with the 2003 budget preparation.

7    Q.   When was the 2003 budget prepared?

8    A.   Some time in the time frame of beginning

9   December and going into January and maybe into

10   February 2003.

11    Q.   What does this document show?

12    A.   Page 1 appears to be a current versus

13   proposed incentive structure for the food and

14   beverage department. Page 2 appears to be a

15   quarterly breakdown of incentive for the food and

16   beverage banquet sales department. Page 3 appears

17   to be similar to Page 1 with minor changes

18    Q.   Do you know why there would be two different F & B

19   departmental reorganizations with slightly

20   different numbers?

21    A.   Let's take a look. Looks to me there were

22   some minor modifications made on base salary and

23   that's really the only difference, that I can see.

24    Q.   What do you remember about the discussions or

**80**

1   plans that went into producing this

2   reorganization?

3    A.   I remember early on in the operational audit,

4   I felt that the food and beverage sales department

5   needed some reorganization. I immediately

6   questioned in reviewing the department the

7   redundancy in positions for some of the slots so

8   I'm sure that's what precipitated this

9    Q.   Do you remember having any discussions about

10   specific positions to be eliminated or

11   restructured?

12    A.   I remember specifically asking why do we have

13   three sales managers in addition to the

14   departmental sales manager, yes.

15    Q.   And it appears from this chart that the pay

16   structure as to Roy, Jennifer and Aaron is changed

17   from the current to proposed, Page 1?

18    A.   It appears that through my experience, this

19   would suggest that their base salary was being

20   lowered and their incentive was being altered.

21   So, as I maybe stated earlier, we were trying to

22   get to more of an incentive-based program as

23   opposed to a heavily-weighted based salary

24   program.

**81**

1    Q.   Do you know if you had any discussions with either

2   Roy, Jennifer or Aaron prior to producing this

3   document?

4    A.   No, I don't believe so.

5    Q.   Earlier I think you said Aaron, Jane and Patricia

6   were all sales or catering managers, is that the

7   position that you had, earlier you had said there

8   were three people doing --

9    A.   Earlier, as in just a minute or so ago, yes.

10    Q.   And what was the position, I'm sorry?

11    A.   I believe they were either food and beverage

12   sales managers or catering and food and beverage

13   and somewhat interchangeable.

14    Q.   In this proposed structure, Jane has a base

15   salary, it says the same, with no incentives but

16   Aaron's pay structure is changed. Do you remember

17   why the difference between the those two

18   positions?

19    A.   To the best of my recollection, we were

20   transitioning Jane into a non-sales position but

21   more of an executive management position which is

22   not an incentive-based one.

23    Q.   And then as to Patricia, you have no proposed

24   salary as to her, do you remember why that is?

21 (Pages 78 to 81)

82

1    A   I believe that was one of the positions that
2    we had targeted during the budget process at
3    elimination because of the redundancy of the sales
4    team.
5    Q.   And is this a position that you would have
6    mentioned in any of the documents that we
7    discussed before, the operational audit or the
8    memos to Mr. Antonucci?
9         MR. WILGOREN: Objection.  I think he
10   did in fact testify as to this position.
11        MS. SCHWAB: You can answer.
12        MR. WILGOREN: As part of the
13   operational audit and maybe some other documents.
14        THE WITNESS:  I'm sorry, can you ask
15   it again?
16        (QUESTION READ)
17   A.   I would assume that this -- the restructuring
18   of the food and beverage sales department as one
19   of the items that were brought up in the
20   operational audit.  I believe I questioned the
21   redundancy early on.
22   Q.   Do you know if the operational audit would have
23   contemplated the elimination of one of the
24   positions?

83

1    A.   I'm not sure.  We'd have to look.
2    Q.   Let's go back to Exhibit 5.  Can you point to what
3    it said about either the restructure of the
4    department and/or the elimination of Patricia's
5    position.
6    A.   I would give you a page number, but there's
7    no page number, food and beverage department,
8    banquet catering.
9         MS. SCHWAB: I've got it
10   A.   Under the second paragraph, recommendations,
11   restructure of the sales and banquet team is
12   recommended, and in the final sentence of that
13   paragraph, I put there is not a need for three
14   banquet managers.
15   Q.   Now would that be the only discussion of the
16   potential elimination of one of the banquet
17   manager positions?
18   A.   It appears that's the only discussion in this
19   document, yes.
20   Q.   We talked before about discussions that you and
21   Mr. Brennan had about trying to retain Ms. Rodgers
22   in some capacity after you said her position would
23   be eliminated.  Do you remember having any similar
24   discussions about Ms. Cosgrove?

84

1    A.   In all due respect to Patricia, not that that
2    position wasn't important, but I don't remember
3    the specifics of any discussions related to
4    Patricia.
5    Q.   Do you remember whether Ms. Cosgrove's position
6    was eliminated?
7    A.   No, I don't.
8    Q.   Do you know whether she was ever offered another
9    position?
10   A.   I don't.
11        MS. SCHWAB: We'll mark Exhibit 17.
12        (PLAINTIFF'S EXHIBIT 17
13        MARKED FOR IDENTIFICATION)
14   Q.   This is another document that you produced to us.
15   Do you recognize this document?
16        THE WITNESS:  You stated that I
17   produced this?
18        MS. SCHWAB: Yes
19   A.   I don't remember this document.
20   Q.   Do you know if you've ever seen it before?
21   A.   Yes.  I have seen this document about.
22   Q.   When did you see it?
23   A.   I believe the first time I saw this was
24   within the last two weeks.

85

1    Q.   Do you remember where you saw it?
2    A.   I believe this is a document that was -- that
3    was reviewed during our review and searching for
4    documents relative to this deposition.
5    Q.   So, would it have been a document you came upon in
6    your office?
7    A.   It could very well have been in my files,
8    yes.  Can I clarify that?
9         MS. SCHWAB: Sure.
10   A.   If you stated this was a document that was
11   delivered from our office, then I'm assuming that
12   it came out of our files.
13   Q.   So you testified earlier that you don't know
14   whether Ms. Cosgrove's position was eliminated?
15   A.   I don't recall
16   Q.   In 2003, do you remember ever having any
17   discussions about Ms. Cosgrove with anyone?
18        THE WITNESS:  About Patricia
19   specifically?
20        MS. SCHWAB: Yes.
21        MR. WILGOREN: You're asking about
22   her or her position?
23        MS. SCHWAB: About Ms. Cosgrove.
24   A.   I remember having cursory discussions with

22 (Pages 82 to 85)

94

1  A. My experience in the industry is that there
2  are certain duties and responsibilities assigned
3  to each position. When I review those position in
4  a departmental structure, I determine what I think
5  are appropriate time constraints and the duties
6  that are assigned for a average work week, and I
7  felt that there was an excessive amount of labor
8  costs being incurred for not enough duties and
9  responsibilities being provided.
10 Q. And as a result of identifying those positions,
11 were all or any of those positions eliminated, to
12 your knowledge?
13 A. I believe -- we know Michelle's position was
14 eliminated. I believe one accounting clerk
15 position or accounting manager, they call them,
16 was eliminated. Obviously, the whole CFO,
17 controller issue was reviewed, and we ended up
18 just having a corporate controller which was Wayne
19 Spencer, to the best of my knowledge. I can't
20 remember any of the other details.
21 Q. Did you identify -- at the time you identified the
22 position held by -- this insurance position held
23 by Ms. O'Brien, were you aware that she was
24 pregnant?

95

1  A. No.
2  Q. And how about in the banquet and sales area,
3  conference sales area, what position or positions
4  did you identify as being redundant?
5  A. As you noticed in the operational audit, I
6  thought there was redundancy in the fact that they
7  had three, if not four, sales managers.
8  Q. I see. And did you identify any particular one of
9  those three or four positions as being redundant?
10 A. It seemed that the lodging component in
11 banquet sales was a duplication of efforts between
12 the lodging department; that was one. And there
13 were two catering sales managers, and I was not
14 confident that one could not have done the job.
15 Q. I see. When you identified the conference sales
16 manager or the catering sales manager position,
17 that's a position held by Ms. Cosgrove; did you
18 learn that?
19        MS. SCHWAB: Objection.
20        THE WITNESS: Did I learn that --
21 Q. The position that was doing the lodging for the
22 conference sales?
23 A. That was the position Patricia held, yes, but
24 I was judging all those things in the audit on the

96

1  position, not on the personality or the person in
2  the position.
3  Q. Was that the position you were suggesting in the
4  management audit as the one that should be
5  eliminated?
6        MS. SCHWAB: Objection. The document
7  speaks for itself. We've already reviewed what it
8  says.
9  A. I believe the audit refers to that, yes.
10 Q. And when did you first start questioning the
11 redundancy of that position held by Ms. Cosgrove?
12        MS. SCHWAB: Objection. Asked and
13 answered.
14 A. In the same audit in August, September,
15 October, November.
16 Q. In the August to December '02 time frame, did you
17 seek out information as to what the individual in
18 that position you identified as redundant in the
19 catering sales, the lodging position, what that
20 person did?
21        MS. SCHWAB: Objection.
22 Q. What job duties?
23 A. I believe as part and parcel to the
24 operational audit, any of those key positions,

97

1  including that one would have been reviewed, yes.
2  Q. And in reviewing those positions, did you compare
3  the functions of the individual in that position
4  as against the individual -- in that position was
5  performing as compared to the functions of the
6  other individuals in the same job title?
7        MS. SCHWAB: Objection.
8  A. The -- I can't remember the specific job
9  titles, but I remember there was specific duties
10 and responsibilities that each one of those
11 positions was in charge of or responsible for.
12 Q. Okay. Were certain of those responsibilities
13 including the managing of events from start to
14 finish?
15        MS. SCHWAB: Objection. Foundation.
16 A. I believe so.
17 Q. And who would be involved in those activities of
18 handling an event from start to finish?
19        MS. SCHWAB: Objection. Foundation.
20        MR. WILGOREN: If you know.
21 A. I believe Jennifer Perry and I know Aaron
22 did.
23 Q. Aaron Brochu. How about Jane Henry?
24 A. Jane, I believe was, but Jane was wearing

25 (Pages 94 to 97)

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

114

1   Estate have a goal of selling off these units?
2   A.  They had a goal of --
3           MS. SCHWAB: Objection.
4   A  -- selling many of the units.  Was it their
5   intent to sell all of them?  You'd have to ask
6   them.  They were selling the units on a regular
7   basis.
8   Q.  Which was better for American Real Estate, more
9   profitable, holding the units for rental or
10  selling the units?
11          MS. SCHWAB: Objection.  Foundation.
12          MR. WILGOREN: If you know.
13  A.  They clearly indicated to me that with the
14  real estate values increasing the way they did on
15  the Cape, that these units were more valuable as
16  sales units than rental units.
17  Q.  That being the case, how did that impact on the
18  number of units available for groups that wanted
19  to have lodging as a component of their event at
20  New Seabury?
21  A.  It was slowly decreasing.
22          MS. SCHWAB: Excuse me.  Can we go
23  off the record.
24          (BRIEF RECESS)

115

1   Q.  Now, as part of your operational audit, did you
2   make any recommendation with respect to the
3   functions of that department?
4           MS. SCHWAB: Objection.  What
5   department?
6           MR. WILGOREN: Lodging department.
7           MS. SCHWAB: Objection.  Document
8   speaks for itself.  Asked and answered previously.
9           THE WITNESS: Let's see.
10          (WITNESS PERUSING DOCUMENTS)
11  A  There were numerous recommendations I made
12  for the lodging department as outlined in the
13  audit.
14  Q.  Did you review the number of employees in the
15  lodging department as part of your audit?
16  A.  I don't recall typically, yes.
17  Q.  Now, counsel asked you about -- or you testified
18  previously about the elimination of the CFO
19  position, and I believe you testified that was a
20  redundant position --
21  A.  Yes.
22  Q.  -- in this operation.  What was -- are you aware,
23  was there any cost savings as a result of the
24  elimination of that position?

116

1           MS. SCHWAB: Objection.  Foundation.
2   A.  Yes.  Obviously, there was.
3   Q.  Do you know how much?
4   A.  It was at least -- it was significant because
5   that was a highly-paid position with obviously all
6   the ancillary expenses that are tied to it.  So
7   you have a base salary, any incentives, we have
8   the payroll taxes, any benefits.  So, probably
9   anywhere from 100 to $200,000 would be my guess,
10  without reviewing the details.
11  Q.  Okay.  Now, the position, the real
12  estate/insurance position that was eliminated.
13  When did you make that determination that that
14  position was redundant and should be eliminated?
15          MS. SCHWAB: Objection.  Asked and
16  answered several times.
17  A.  That position was initially reviewed during
18  the operational audit extensive reviewed as we
19  took over management.
20  Q.  As part of the budgeting process?
21  A.  As part of the budgeting process, yes.
22  Q.  What was the cost savings in that position, do you
23  remember?
24  A.  I can't remember the specific salary

117

1   structure, but I believe it was under $100,000.
2   Q.  And you made a determination, as you testified,
3   that Ms. Rodgers, although a very valuable
4   employee, did not have the skillset necessary to
5   be effective as the director of membership sales;
6   is that correct?
7           MS. SCHWAB: Objection.  Asked and
8   answered.
9   A.  That would be correct.
10  Q.  In reviewing the membership sales operation, how
11  many employees were, prior to the restructure --
12  prior to removing Ms. Rodgers from that position,
13  how many employees were in that position?
14          MS. SCHWAB: Objection.  Foundation.
15  A.  During the operational audit period or late
16  2002, I believe it was two employees.
17  Q.  In addition to Ms. Rodgers, who was the other
18  employee?
19  A.  Mary, I can't remember her last name.
20  Q.  What was her position?
21          THE WITNESS: Mary's position?
22          MR. WILGOREN: Yes.
23  A.  For lack of better term, administrative
24  support.

30 (Pages 114 to 117)

O'Brien & Levine Court Reporting Services
888-825-DEPO(3376) * www.court-reporting.com

118

1 Q. Membership assistant?
2 A. Membership assistant. That probably was it.
3 MS. SCHWAB: Objection.
4 Q. What happened, if anything, to Mario's position?
5 A. If I remember correctly, we transitioned Mary
6 to an administrative position within G & A.
7 Q. Was her position filled, the membership assistant?
8 A. I don't believe so.
9 Q. Do you know whether that engendered any cost
10 savings?
11 MS. SCHWAB: Objection.
12 A. Whatever her wage base was, plus her other
13 related costs.
14 Q. If I told you 40 to $45,000?
15 A. That sounds appropriate.
16 MS. SCHWAB: Objection. His
17 testimony is clearly not the best evidence on
18 this.
19 Q. And Ms. Rodgers was replaced by Bob Higgins?
20 A. Yes, Bob Higgins is now or was then brought
21 on as membership development.
22 Q. And I believe you testified on direct that you
23 recruited him for that position?
24 A. Yes.

119

1 Q. Okay. When did you start recruiting Mr. Higgins
2 for the director of membership sales?
3 A. I believe, to the best of my recollection, it
4 would have been in the December time frame.
5 Q. December 2002?
6 A. I believe so, that's when the process began.
7 Q. At that time in December 2002 were you aware Ms.
8 Rodgers was pregnant?
9 A. No.
10 Q. By recruiting Mr. Higgins for the director of
11 membership sales had you already made the decision
12 to remove Ms. Rodgers from that position in
13 December 2002?
14 MS. SCHWAB: Objection. Asked and
15 answered.
16 A. I believe we had made the determination at
17 that point that Rhonda was not the most
18 appropriate person for that position. That her
19 skillset could have been best used someplace else.
20 Q. Okay. And when you hired Mr. Higgins, did you
21 give him -- did you have a conversation with him
22 about the functions of his position?
23 A. Sure.
24 Q. Okay. And what did you tell him?

120

1 MS. SCHWAB: Objection. This line of
2 questioning is irrelevant.
3 A. His primary goal was to recruit and retain
4 new members.
5 Q. Did you tell him the employee compliment of the
6 department had previously been two people?
7 A. I don't remember specifically saying that,
8 no, but I would assume he --
9 MS. SCHWAB: Objection. Please let
10 the witness finish answering your question.
11 A. I would assume he knew or was aware, but I
12 can't be sure of that.
13 Q. Did you tell him whether or not he would have an
14 assistant on an ongoing basis?
15 A. I believe we told him at that time that he
16 would get administrative support from the
17 receptionist as opposed to sales assistant.
18 Q. Did you tell him who would be performing the
19 functions previously performed by the membership
20 assistant?
21 A. I believe that was the receptionist and/or
22 the administrative assistant in G & A.
23 Q. Did you tell Mr. Higgins when he was hired that he
24 would do the selling and paperwork?

121

1 A. I believe --
2 MS. SCHWAB: Objection.
3 A. I believe that was part of his job duties and
4 responsibilities.
5 Q. Now, you were asked a number of questions about
6 various departments that you reviewed by the
7 plaintiff's attorney. She didn't ask you about
8 the catering sales department, however, and the
9 staffing levels.
10 MS. SCHWAB: Objection. That's a
11 mischaracterization. I did ask about that
12 department.
13 Q. Let me call your attention to Exhibit Number 7, in
14 particularly the second paragraph, quote, "As I
15 have discussed with you previously, I would
16 suggest that Michelle's position be eliminated,
17 the effective TBD." Did you have discussions with
18 Mr. Antenucci prior to February 27, 2003 with
19 respect to the elimination of Michelle O'Brien's
20 position?
21 MS. SCHWAB: Objection. Document
22 speaks for itself.
23 A. I don't recall specifics, but clearly this
24 document suggests that was the case

31 (Pages 118 to 121)

CONFIDENTIAL

Mark O'Neil 2-14-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc

CONFIDENTIAL

126

1  Q.  Late 2002?
2  A.  Late 2002.
3  Q.  Okay.  And in connection with the budgeting
4  process for 2003, did you involve Mr. Brennan in
5  that process in 2002?
6  A.  Yes.  I would have supplied him with
7  information that I had received from the club.  I
8  believe I probably asked him to review it and give
9  me his input or feedback on it.
10  Q.  Well, let me call your attention to deposition
11  Exhibit Number 15.  Is that a document that you
12  would have provided to Mr. Brennan as part of the
13  budget review process for 2003?
14  MS. SCHWAB: Objection.  The witness
15  already testified that he did not produce this
16  document and that maybe New Seabury did.
17  MR. WILGOREN: You can answer.
18  THE WITNESS:  The question was did I
19  provide this to Steve?
20  MR. WILGOREN: Yes.
21  A.  I could have.
22  Q.  Now, there's certain handwritten notes, do you
23  know who made those notes?
24  A.  The one on the first page, 2003, I don't

127

1  know.  The other handwritten numbers, some appear
2  to be mine -- most appear to be mine.  Several
3  others do not appear to be mine.  No guarantee.
4  Q.  Well, let me call your attention to the third
5  page.  There's a question mark four lines down,
6  did you make that notation?
7  MS. SCHWAB: Objection.
8  A.  Couldn't tell you.
9  MS. SCHWAB: If you ask him about his
10  handwriting, that's fine, any other questions I
11  object.  He already testified he doesn't remember
12  specifically receiving this document or what the
13  document is.
14  MR. WILGOREN: You can object
15  Q.  Do you know why that question mark would appear at
16  the end next to Mr. Fullerton's position?
17  MS. SCHWAB: Same objection.
18  A.  I can only surmise that it was questioning
19  the amount or the position.
20  Q.  You previously testified you would question the
21  director of facilities position because -- in
22  terms of its competitiveness with the industry
23  because of the reduction in the amount of
24  facilities at New Seabury?

128

1  MS. SCHWAB: Objection.  Asked and
2  answered.
3  A.  In general, this department appeared to be
4  rather ostensibly overstaffed, from my experience.
5  Q.  Let me call your attention to the fifth page of
6  the document.  Do you recognize the handwriting on
7  this page?
8  A.  Those appear to be mine.
9  Q.  Can you describe what the significance of the
10  handwritten notations in the last column appear to
11  be?
12  MS. SCHWAB: Objection.  Foundation.
13  A.  Those appear to be my recommendations for
14  what I think those positions would warrant as far
15  as staffing dollars.
16  Q.  Now, the last line there's a slash through the
17  amount and a zero next to that.  Can you explain
18  that notation?
19  MS. SCHWAB: Objection.  Foundation
20  A.  My guess was I assumed or I would propose
21  that it was an unnecessary position.
22  Q.  That would be which, the seasonal --
23  A.  In this case, landscape senior, whatever that
24  meant.

129

1  Q.  Flip two pages further on, there appears to be a
2  notation in the column at the far right, zero.
3  Can you explain that, that's next to the position
4  held by Ms. Cosgrove?
5  MS. SCHWAB: Objection.  He hasn't
6  testified whether he recognizes the handwriting.
7  Q.  Do you recognize the handwriting?
8  A.  It appears to be mine
9  Q.  Can you explain the significance of why you would
10  have written this a zero next to that?
11  A.  Similar to other positions, it looked like
12  one that I had targeted for being unnecessary.
13  Q.  Okay.  And that was part -- that was done as part
14  of the budgeting process in December 2002?
15  MS. SCHWAB: Objection.  Again, he
16  testified he doesn't know when this document is
17  from.
18  A.  Normally that would be part of the budget
19  projection is to look at past wage levels and
20  scales, and I can assume that's what was going on
21  here.
22  Q.  When did you engage in the budgeting process for
23  New Seabury for 2003?
24  MS. SCHWAB: Objection.  Asked and

33 (Pages 126 to 129)

CONFIDENTIAL                                                                CONFIDENTIAL

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

130

```
1    answered.
2    A.  We began in December of 2002 and continued
3    through January 2003.
4    Q   At that time did you have any knowledge as to
5    whether Ms. Cosgrove was pregnant?
6            MS. SCHWAB: Objection.
7    A.  No, I didn't.
8    Q.  There is a question mark, do you recognize who
9    wrote that?
10   A.  I would assume that would be me.
11   Q.  That's next to the sous-chef. Do you have an
12   explanation why you would put a question mark next
13   to the sous-chef?
14           MS. SCHWAB: Objection. Foundation.
15   A.  I can assume it meant, if you look at this,
16   it was a higher paid position than the chef.
17   Typically a sous-chef is similar to an assistant.
18   So, my guess is, logical question as to what's
19   the -- what's going on with the sous-chef being
20   the highest paid person.
21   Q.  As part of the budgeting process did you create
22   certain models of staffing levels?
23   A.  Typically when you budget, you determine what
24   staffing levels are going to be, if that's what
```

132

```
1    Q.  And proposed it has N/A. What is the significance
2    of that?
3            MS. SCHWAB: Objection. Asked and
4    answered.
5    A.  I would assume that that was a position that
6    was targeted for elimination.
7    Q   And this document was done in part of the
8    budgeting process in December 2002 or January
9    2003?
10           MS. SCHWAB: Objection. He has
11   testified previously he assumed it would have been
12   but did not definitely say that's when it was
13   produced.
14   A.  I assumed it would have been, but I wasn't
15   definitely -- what she said.
16           MS. WILGOREN: Thank you for
17   testifying. We'll swear you in, Ms. Schwab.
18           (DEFENDANT'S EXHIBIT 19
19           MARKED FOR IDENTIFICATION)
20   Q.  Do you have before you what's been marked as
21   Exhibit Number 19. Do you recognize this
22   document?
23   A.  It appears to be a food and beverage
24   departmental organizational chart.
```

131

```
1    you mean by models, yes.
2    Q.  And calling your attention to Exhibit Number 16,
3    is that one such model that you prepared as part
4    of the budgeting process in December of 2002 or
5    January 2003?
6            MS. SCHWAB: Objection. I don't
7    believe the witness referred to them as models.
8            MR. WILGOREN: I'm asking him if this
9    is such a model that he previously testified to.
10   A.  This appears to be an outline of food and
11   beverage departmental reorganization and their
12   associated costs.
13   Q.  This was prepped by you --
14   A.  This one here was.
15   Q.  -- as part of the budgeting process?
16   A.  I would assume this was part of the 2003
17   budget.
18   Q.  Next to Patricia it has current base, 35,360.
19   What was that number, do you know?
20   A.  I'm assuming that was her --
21           MS. SCHWAB: Objection. Document
22   speaks for itself.
23   A.  I'm assuming it was her base salary at that
24   time.
```

133

```
1.   Q.  Do you know who created this?
2    A.  No, I don't.
3    Q   Does it look like a model you would have created?
4    A.  Probably.
5    Q   This came from documents under your custody and
6    control?
7    A.  I believe so.
8    Q.  Okay. Would this document, that's something that
9    could have been created by you as part of the
10   budgeting process?
11   A.  Most likely, yes.
12   Q.  Well, for Ms. Schwab's benefit can we decipher it.
13   What does it say in the --
14   A.  Steve Brennan, general manager/COO
15   Q.  Let's go down the list.
16   A.  Roy Chase, food and beverage director.
17   Reporting to Roy would have been Josh Zimira, the
18   chef. Kitchen staff reported to Josh. P. Packard
19   was assistant F & B manager with the service staff
20   reporting to her. J. Henry was another assistant
21   F & B with service staff reporting to her.
22   Jennifer Perry, director of F & B sales, sales
23   assistant to be determined. Aaron is a food and
24   beverage sales manager, and Marion Lent is the
```

34 (Pages 130 to 133)



**PAYROLL CHANGE NOTICE**

and

**NEW HIRE AUTHORIZATION**



Today's Date: _1-15-03_

Dept. #: _510_     Dept. Name: _Golf Operations_

Effective Date: _1-20-03_ ✓

Employee/New Hire Name: _Robert M°Graw_

Social Security Number _____

Employee File Number: _____

**Reason For Change(s):**

| | | | |
|---|---|---|---|
| ☐ | New Hire | ☐ | Probationary Period Completed |
| ☐ | Re-hire | ☐ | Length of Service Increase |
| ☐ | Promotion | ☒ | Re-evaluation of Exisiting Position |
| ☐ | Demotion | ☐ | Resignation |
| ☐ | Transfer | ☐ | Termination (Reason, see other below) |
| ☐ | Merit Increase | ☐ | Layoff |
| | | ☐ | Eligible for Rehire (Y or N, see other below for explanation) |

☐ Leave of Absence    From: _____    To: _____
(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☒ Other (details) _____

_____

_____

| | | | |
|---|---|---|---|
| ☐ | Department | | |
| ☒ | Position | _Head Golf Prof_ | _Dir. of Instruction_ |
| ☒ | Rate | _2230.77_ | _1346.15_ |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:    Yes ✓    No    Signed Policy Attached:

Change Authorized By: _____    Date: _____

Change Approved By: _[signature]_    Date: _1-15-03_

CONFIDENTIAL

030



2003

CONFIDENTIAL

2003

85,750

CONFIDENTIAL

**2002 Manpower Plan**

FLOW

For the Fiscal Year Ending 12/31/02

| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FY Ops F & B** | | | | | | | | | | | | | |
| Monthly Payroll Tier 1 | $42,780 | $42,780 | | | | | | | | | | | |
| Manpower Count | 17.5 | 17.5 | | | | | | | | | | | |
| **Operation F & B** | | | | | | | | | | | | | |
| Monthly Payroll Tier 1 | $4,938 | $4,938 | | | | | | | | | | | |
| Manpower Count | 1.3 | 1.3 | | | | | | | | | | | |
| **Manpower Totals** | | | | | | | | | | | | | |
| Monthly Payroll Totals | $16,430 | $16,430 | | | | | | | | | | | |
| Manpower Count | 5.0 | 5.0 | | | | | | | | | | | |
| **Operations** | | | | | | | | | | | | | |
| Monthly Payroll Totals | $38,530 | $38,530 | | | | | | | | | | | |
| Manpower Count | 11.0 | 11.0 | | | | | | | | | | | |
| Monthly Payroll Totals | $3,540 | $3,540 | | | | | | | | | | | |
| Total Manpower Count | 1.0 | 1.0 | | | | | | | | | | | |
| **Total Monthly Payroll Totals** | | | | | | | | | | | | | |
| Monthly Payroll Totals | $14,000 | $14,000 | | | | | | | | | | | |
| Manpower Count | 4.0 | 4.0 | | | | | | | | | | | |
| **Maintenance Operations** | | | | | | | | | | | | | |
| Monthly Payroll Totals | $16,430 | $16,430 | | | | | | | | | | | |
| Manpower Count | 5.0 | 5.0 | | | | | | | | | | | |
| **Administration** | | | | | | | | | | | | | |
| Monthly Payroll Totals | $27,792 | $27,792 | | | | | | | | | | | |
| Manpower Count | 7.5 | 7.5 | | | | | | | | | | | |
| **Housekeeping Services** | | | | | | | | | | | | | |
| Monthly Payroll Totals | $8,333 | $8,333 | | | | | | | | | | | |
| Manpower Count | 2.0 | 2.0 | | | | | | | | | | | |
| **Total Generated Payroll** | | | | | | | | | | | | | |
| Monthly Payroll Totals | $175,148 | $176,148 | | | | | | | | | | | |
| Total Manpower Count | 54.0 | 55.0 | | | | | | | | | | | |

2003

CONFIDENTIAL

CONFIDENTIAL

2003

CONFIDENTIAL

2003

CONFIDENTIAL

CONFIDENTIAL

Brennan H

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PATRICIA COSGROVE,

Plaintiff,

v.

NEW SEABURY RESOURCES
MANAGEMENT, INC.,

Defendant.

**Civil Action No.
1:05-CV-10791-GAO**

### DEFENDANT NEW SEABURY RESOURCES MANAGEMENT, INC.'S
### RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Now comes Defendant New Seabury Resources Management, Inc. ("NSRM"), by its attorney, Howard I. Wilgoren, Pursuant to FED. R. CIV. P. 33, and hereby answers and objects to Plaintiffs First Set of Interrogatories as follows:

### QUALIFICATIONS AND GENERAL OBJECTIONS

A. NSRM objects to the Interrogatories to the extent that the Interrogatories seek to impose a duty on NSRM beyond that required by the Federal Rules of Civil Procedure.

B. NSRM further objects to the Interrogatories to the extent that the Interrogatories seek:

    (1)    information that represents attorney work product;

    (2)    information that is protected by the attorney-client privilege or any other applicable privilege;

(3) information that has been prepared in anticipation of litigation at the request of counsel;

(4) information concerning matters of public record;

(5) the residential address, or any other private, confidential or sensitive information of any current or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action; and

(6) information that requires NSRM to draw a legal conclusion.

C. NSRM objects generally to the Interrogatories to the extent that they seek confidential commercial information of a proprietary nature concerning NSRM'S business practices, relationships, or trade secrets, or those of its customers, subcontractors and affiliates. NSRM will produce such information, if at all, upon entry of an appropriate form of protective order or confidentiality agreement only.

D. Each response to each Interrogatory is subject to these General Objections. NSRM relies upon and asserts any and all such privileges, and any disclosure of privileged information is inadvertent and is not to be deemed a waiver thereof.

E. NSRM objections and responses to the Interrogatories are based upon information now known to NSRM. NSRM has not completed its discovery or preparation for trial in this action. The responses set forth herein are made without waiving the following:

2

(1)    The right to object on the grounds of competency, privilege, relevance, materiality or any other proper ground to the use of any material produced herein, in whole or in part, for any purpose, in any subsequent proceeding in this action or in any other action;

(2)    The right to object on any and all proper grounds, at any time, to other requests or other discovery procedures involving or relating to the subject matter of the requests responded to herein; and

(3)    The right, at any time, to revise, correct, modify, supplement or clarify any of the responses provided herein.

All of NSRM'S responses are made subject to the foregoing objections and qualifications.

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1:

Please state the name, business address and the title at New Seabury of the person(s) answering these interrogatories on behalf of Defendant.

### RESPONSE NO. 1:

NSRM objects to Interrogatory No. 1 on the grounds that it seeks the residential address and other private, confidential and/or sensitive information of a current employee or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action. Subject to and without waiving the general or specific objections NSRM responds as follows:

Name:       Stephen T. Brennan

Business Address;   20 Red Brook Road, Mashpee, Massachusetts 02649

3

Title:   General Manager/Chief Operating Officer

## INTERROGATORY NO. 2:

Please identify every person who has become pregnant at during employment at New Seabury or who was pregnant when she began working at New Seabury over the past ten years and for each please state: (a) name; (b) current or last known home address and phone number; (c) dates of employment; (d) positions held; (e) salary (include all changes in salary with dates); and (f) if the person is no longer working for New Seabury, state the reason for the separation of employment, and state whether the separation was voluntary or involuntary.

## RESPONSE NO. 2:

NSRM objects to Interrogatory No. 2 on the ground that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. NSRM further objects to Interrogatory No. 2 on the grounds that it calls for the production of private confidential and/or sensitive information of a current or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action. NSRM further objects to Interrogatory No. 2 to the extent that it calls for the production of information that is subject to the attorney – client privilege, protection of attorney work product or any other privilege recognized under law. Subject to and without waiving the general or specific objections, NSRM responds as follows:   NSRM has identified six individuals who have requested a leave of absence due to pregnancy. NSRM does not maintain any other records pertaining to whether or not any employee became

4

pregnant during employment at NSRM or who was pregnant when said employee began working at NSRM. Further answering Plaintiff advised NSRM that she was pregnant on or about February 2, 2003. She was granted a leave of absence from May 11, 2003 through October 7, 2003 and provided with short term disability payments of sixty (60%) of her gross wages during the period of her leave of absence. She was employed from February 20, 1999 through October 31, 2003 when she was laid off.

## INTERROGATORY NO. 3:

Please identify every person who has taken leave from New Seabury over the past ten years because of a pregnancy, a spouse's or partner's pregnancy, or the recent birth of a child and for each please state: (a) name; (b) current or last known home address and phone number; (c) dates of employment; (d) positions held; (e) salary (include all changes in salary with dates); (f) dates and length of pregnancy and/or family leave; and (g) position and salary upon returning from pregnancy and/or family leave.

## RESPONSE NO. 3:

NSRM objects to Interrogatory No. 3 on the ground that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. NSRM further objects to Interrogatory No. 3 on the grounds that it calls for the production of private confidential and/or sensitive information of a current or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action. NSRM further objects to Interrogatory No. 2 to the extent that it calls for the production of information that is

5

subject to the attorney – client privilege, protection of attorney work product or any other privilege recognized under law. Subject to and without waiving the general or specific objections, NSRM responds as follows: I have identified six individuals who have taken leave from NSRM since 1998 because of pregnancy. Of these six individuals one was the Plaintiff whose dates of employment are set forth in response to the preceding interrogatory. I have no knowledge of the dates and length of her pregnancy. I did receive a copy of a memorandum from Ms. Cosgrove dated February 3, 2003 requesting maternity leave. At the time her leave of absence commenced she held the position of Administrative Assistant which paid $12.00 per hour. Ms. Cosgrove returned to the same position and received the same rate of pay upon her return from pregnancy leave.

## INTERROGATORY NO. 4:

Please identify every person who has been demoted or transferred to another position with the same or lower salary or benefits at New Seabury over the past ten years and for each please state: (a) name; (b) current or last known home address and phone number; (c) dates of employment; (d) positions held; (e) salary (include all changes in salary with dates); (f) reasons for transfer or demotion; and (g) if the person is no longer working for New Seabury, state the reason for the separation of employment, and state whether the separation was voluntary or involuntary.

## RESPONSE NO. 4:

NSRM objects to Interrogatory No. 4 on the ground that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of

6

admissible evidence. NSRM further objects to Interrogatory No. 4 on the grounds that it calls for the production of private confidential and/or sensitive information of a current or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action. NSRM further objects to Interrogatory No. 2 to the extent that it calls for the production of information that is subject to the attorney – client privilege, protection of attorney work product or any other privilege recognized under law. Subject to and without waiving the general or specific objections, NSRM responds as follows: Since my employment with NSRM commencing on January 28, 2003 I am aware that in addition to Ms. Cosgrove I demoted, transferred and/or eliminated numerous full time as well as seasonal positions. In particular I am aware that five additional full time employees were demoted, transferred and/or had their jobs eliminated. Of those five employees three of them were men. During my first month of employment approximately forty one (41) positions were eliminated. By the time Ms. Cosgrove's position was eliminated in early May 2003 the employee complement was reduced by fifty three (53) employees when compared to the same pay period during the prior year. In addition at that time I concluded that seasonal employees in layoff status would not be recalled.

## INTERROGATORY NO. 5:

Please identify every person who has terminated employment with New Seabury over the past ten years, whether voluntarily or involuntarily, and for each please state: (a) name; (b) current or last known home address and phone number; (c) dates of employment; (d) positions held; and (e) the reason for the

termination of employment, and whether the termination was voluntary or involuntary.

### RESPONSE NO. 5:

NSRM objects to Interrogatory No. 5 on the grounds that it is overly broad, unduly burdensome, vague and not reasonably calculated to lead to the discovery of admissible evidence. NSRM further objects to Interrogatory No. 5 on the grounds that it calls for the production of private confidential and/or sensitive information of a current or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action. NSRM further objects on the grounds that information on voluntary terminations is not reasonably calculated to lead to the discovery of admissible evidence and information on involuntary terminations is not tied in some fashion to a request for a Family and Medical Leave, or gender.

### INTERROGATORY NO. 6:

For each person identified in response to Interrogatory No. 5, please identify any severance package or other benefit conferred on the person by New Seabury relating to the termination of employment with New Seabury.

### RESPONSE NO. 6:

NSRM objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, vague and not reasonably calculated to lead to the discovery of admissible evidence. NSRM further objects to Interrogatory No. 6 on the grounds that it calls for the production of private confidential and/or sensitive information of a

current or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action.

### INTERROGATORY NO. 7:

Please identify all persons who may have information relating to the Eighth and Ninth Affirmative Defenses in New Seabury's Answer to the Complaint, and for each person please state: (a) name; (b) current or last known home address and phone number; (c) relationship to New Seabury and dates of relationship; and (d) the information that the person has relating to New Seabury's Eighth and Ninth Affirmative Defenses, including information about the decision to demote then terminate Plaintiff and other employment- and staffing-related decisions made by New Seabury in 2002 through 2004.

### RESPONSE NO. 7:

NSRM objects to Interrogatory No. 7 on the grounds that it is vague and ambiguous and calls for a legal conclusion. Subject to and without waiving the general and specific objections, NSRM responds as follows: I have information relating to the decision to demote and subsequently lay off the Plaintiff. Specifically, commencing in the fall of 2002 Mark O'Neil, Sr., of the Essex Group, LLC, was reviewing the entire NSRM employee complement to determine whether jobs were necessary, and if so, whether the compensation for each such job was related to the duties of the job. Particular jobs, including the Conference Sales Manager position held by Plaintiff at the time were identified as unnecessary. When I commenced employment with NSRM I continued the

9

process started by Mr. O'Neil. I made the decision on or about April 28, 2003 to eliminate the position of Conference Sales Manager held by the Plaintiff. I made this decision for several reasons. First the sole function of the job held by the Plaintiff was to book lodging for groups that were using our facility for functions. Once Plaintiff completed that assignment, she forwarded the client to the Catering Department who booked function rooms and took care of all other aspects of the client's function. Inasmuch as NSRM had a Lodging Department it seemed to me that employees of that department could book the lodging rooms related to a function being held on the premises. Accordingly, I determined that there was no need for a lodging reservation function in the Catering Department and decided to eliminate the position. In addition we were rapidly decreasing the number of lodging rooms that we had available and there was a decreasing need for a separate individual to book lodging that was associated with a function. NSRM has seen a decrease in lodging rooms from 180 units to only 25 at the present time. In addition the employee complement of the Lodging Department has been reduced from eight employees to only one at the present time. The position held by the Plaintiff was eliminated and has never been filled. I also made the decision to lay off the Plaintiff. When Plaintiff's job was eliminated she was offered a position as an Administrative Assistant. At that time I advised the Plaintiff that the position being offered was a seasonal position. Plaintiff accepted that position with that understanding. Plaintiff was laid off due to lack of work on October 31, 2003. NSRM operates a seasonal business. As such the employee complement was reduced from a peak of 339 employees for the pay

10

period ending August 8, 2003 to just 89 employees by the last pay period of the year. Two other non – pregnant Administrative Assistants were laid off at about the same time as Plaintiff. The layoff of Plaintiff as well as the other 250 employees was done for legitimate and substantial business reasons. That is, these employees were laid off due to the seasonal nature of the business and in order to reduce payroll costs. Layoffs occurred in every department across the board. Employees were laid off without regard to their status in any protected class. Men were also laid off and of course employees who were not pregnant were also laid off. These layoffs occur annually in the hospitality industry, including at New Seabury.

### INTERROGATORY NO. 8:

Please identify each person (not already identified in response to Interrogatory No. 7) who may have information relating to the claims and defenses in this case, including information regarding Plaintiff's work and job performance at New Seabury, decisions made relating to Plaintiff's employment at New Seabury, including hiring, promotions, demotions, and termination, and for each such person please state: (a) name; (b) current or last known home address and phone number; (c) whether the person worked or works at New Seabury, positions held, and dates of employment; and (d) the information the person may have relating to the claims and defenses in this case.

### RESPONSE NO. 8:

NSRM objects to Interrogatory No 8 on the grounds that it is overly broad, unduly burdensome and vague. NSRM further objects to Interrogatory No. 8

11

on the grounds that it calls for the production of private confidential and/or sensitive information of a current or former employee of NSRM other than the Plaintiff because such information is private and not relevant to this action. Subject to, and without waiving the general or specific objections, NSRM responds as follows: See NSRM'S Rule 26(a) disclosures and the Plaintiff's Rule 26(a) disclosures. Further, Mark O'Neil, who NSRM engaged as a consultant engaged in a review of each department to assess the level of wages paid in relation to the industry. In addition, they were looking to measure the volume of business versus productivity and determine the number of employees necessary to generate the business revenue.

## INTERROGATORY NO. 9:

Please describe all employment policies at New Seabury, including but not limited to any policies regarding employee evaluation, promotion, demotion, and termination; layoff; severance; family or medical leave, vacation, and vacation pay. For each such policy, please state whether the policy is in writing.

## RESPONSE NO. 9:

NSRM objects to Interrogatory No 9 on the grounds that it is overly broad, unduly burdensome and vague. Subject to, and without waiving the general or specific objections, NSRM responds as follows: All policies regarding employee evaluation, promotion, demotion, and termination; layoff; severance; family or medical leave; vacation and vacation pay, if any, are contained in the Employee Handbook provided to Plaintiff as part of NSRM'S initial document disclosure and are Bates Stamp numbered 109 – 153.

12

**INTERROGATORY NO. 10:**

Please identify each and every discrimination complaint made against New Seabury or individuals employed by New Seabury, whether formal or informal, whether the complaint was made internally or was filed with a governmental agency or court, and for each such complaint please state: (a) the name of the complainant and current or last known home address and phone number; (b) the name, address and phone number for any attorney who represented the complainant; (c) whether the complaint was filed and if so in what forum(s); (d) whether there were any findings, rulings, or dispositions of any nature related to the complaint; and (e) whether the complaint was resolved and if so please describe the terms of its resolution.

**RESPONSE NO. 10:**

NSRM objects to Interrogatory No. 10 on the grounds that it is overly broad, unduly burdensome with respect to time and not reasonably calculated to lead to the discovery of admissible evidence. NSRM further objects to Interrogatory No. 10 on the grounds that it is vague and ambiguous with respect to the phrase "complaint made." NSRM further objects to Interrogatory No. 10 to the extent that it calls for the production of information that is subject to the attorney – client privilege, protection of work product or any other privilege recognized under the law. Subject to, and without waiving the general or specific objections, NSRM responds as follows: NSRM has never received complaints for violation of the Family and Medical Leave Act, other than the present action. No complaint made

13

against NSRM based on pregnancy discrimination in the past five years. I have no information that any complaints based on pregnancy discrimination have ever been made against NSRM.

Signed under the pains and penalties of perjury this day of December 2005.

STEPHEN T. BRENNAN

As to Objections:
**NEW SEABURY RESOURCES MANAGEMENT, INC.,**

By its Attorney

HOWARD I WILGOREN,
6 Beacon Street,
Suite 700
Boston, MA 02108
(617) 523 – 5233
BBO No. 527840

Dated: December 2005

14

## CERTIFICATE OF SERVICE

I, hereby certify that on this 29TH day of December 2005, a copy of the foregoing document was served on the Plaintiff by mailing a of a copy of same, by first class mail, postage prepaid, to her Attorneys, Shannon Liss – Riordan, Esquire, Hillary Schwab, Esquire, Pyle Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, 5th Floor, Boston, MA 02108

Howard I. Wilgoren

**SEALED   DOCUMENT**