# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
PATRICIA COSGROVE,                        )
                        Plaintiff,        )
                                          )
           v.                             )
                                          )
NEW SEABURY RESOURCES                     )        **Civil Action No.**
         MANAGEMENT, INC.,                )        **1:05-cv-10791-GAO**
                                          )
                        Defendant.        )
_____ )

**PLAINTIFF PATRICIA COSGROVE'S STATEMENT OF MATERIAL FACTS AS
TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1, Plaintiff Patricia Cosgrove responds to the

Concise Statement of Undisputed Material Facts of Defendant New Seabury

Resources Management, Inc. and states additional material facts as to which

there exists a genuine issue to be tried, as follows:

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

**I.     COSGROVE'S DEMOTIONS AND EVENTUAL TERMINATION.**

**A.     Cosgrove's Announcement of Pregnancy and Intention to Take
         Maternity Leave.**

1.     Starting in approximately June 1999, Plaintiff Patricia Cosgrove

held the position of Conference Sales Manager at New Seabury.  Schwab Aff.

Ex. A (Cosgrove Aff. ¶ 3).

2.     Cosgrove's duties as Conference Sales Manager included

providing the following services for groups of ten people or more:  soliciting

potential customers through telemarketing and targeted promotions; meeting with

prospective clients and showing them the facilities; reserving function space,

meeting space, and lodging; communicating with clients and other departments

at New Seabury regarding group events; monitoring the status of payments and

execution of contracts relating to group sales; and attending off-site sales

meetings, trade shows, and meetings of the Cape Cod Hospitality Marketing

Association.  Schwab Aff. Ex. P (Cosgrove Dep. at 51, 53-54, 59-60, 62-63).

3.     When Cosgrove informed New Seabury about her pregnancy on or

about February 3, 2003, she invoked her rights under the Family and Medical

Leave Act (FMLA).  Schwab Aff. Ex. C (2/3/03 letter).

4.     Specifically, Cosgrove stated:  "I am entitled to a twelve week

leave, which upon return I am entitled to the same position I left, or a similar

position with the same level, pay and length of service."  Schwab Aff. Ex. C.

5.     In her letter, Cosgrove accurately characterized the maternity leave

policy at New Seabury.  Schwab Aff. Ex. Q (Brennan Dep. at 163).

6.     When Cosgrove informed Brennan about her pregnancy and her

request for maternity leave, he responded, "unless you are like my wife . . . and

don't ever go back to work."  Schwab Aff. Ex. P (Cosgrove Dep. at 142).

7.     Brennan's wife did not go back to work after having their first child.

Schwab Aff. Ex. Q (Brennan Dep. at 31).

**B.     Cosgrove's Demotion from Conference Sales Manager to Administrative Assistant in the Catering Sales Department.**

8.     In late April 2003, Brennan informed Cosgrove that her position as

Conference Sales Manager was being eliminated and offered her a position as

Administrative Assistant in the Catering Sales Department at a reduced rate of

pay:  Cosgrove had earned $17 per hour as Conference Sales Manager, and her

pay rate as Administrative Assistant in the Catering Sales Department was to be $12 per hour. Schwab Aff. Ex. A (Cosgrove Aff. ¶¶ 4, 7, 8); Schwab Aff. Ex. Q (Brennan Dep. at 168-69, 187-88).

9.    The Administrative Assistant position in the Catering Sales Department was a full-time, year-round position. Schwab Aff. Ex. A (Cosgrove Aff. ¶ 9); Schwab Aff. Ex. D (Payroll Change form, 5/11/03); Schwab Aff. Ex. Q (Brennan Dep. at 175).

10.    The position of Administrative Assistant in the Catering Sales Department was described as a full-time year-round position on personnel forms. Schwab Aff. Ex. D (Payroll Change form, 5/11/03); Schwab Aff. Ex. Q (Brennan Dep. at 175).

11.    No one at New Seabury ever indicated to Cosgrove that the Administrative Assistant position was seasonal and/or that she may be laid off at the end of the season. In fact, when Brennan offered Cosgrove the position of Administrative Assistant in the Catering Sales Department, he told her that the position was a full-time, year-round position. Schwab Aff. Ex. Q (Brennan Dep. at 172, 177); Schwab Aff. Ex. B (Second Cosgrove Aff. ¶¶ 2-3).

12.    By letter to Brennan dated May 2, 2003, Cosgrove accepted the position of Administrative Assistant in the Catering Sales Department. Schwab Aff. Ex. E (5/2/03 letter); Schwab Aff. Ex. Q (Brennan Dep. at 173).

13.    Cosgrove also stated that she wanted to remain in her position as Conference Sales Manager and to return to that position at the end of her maternity leave. Schwab Aff. Ex. E (5/2/03 letter).

14.    Cosgrove also stated that she believed that the elimination of her position constituted pregnancy discrimination and was being done because of her intention to take maternity leave.  Schwab Aff. Ex. E (5/2/03 letter).

15.    Finally, Cosgrove informed Brennan that she intended to file a complaint with the Massachusetts Commission Against Discrimination.  Schwab Aff. Ex. E (5/2/03 letter).

16.    After Cosgrove's May 2 letter, she had a meeting with Brennan and Jennifer Perry, Director of Catering Sales, in which Brennan reiterated that Cosgrove's position as Conference Sales Manager was being eliminated and that Cosgrove was being offered the position of Administrative Assistant in the Catering Sales Department.  Schwab Aff. Ex. P (Cosgrove Dep. at 165).

17.    At that meeting, Cosgrove stated that she would accept the position of Administrative Assistant in the Catering Sales Department and that she intended to return to that position after her maternity leave.  Schwab Aff. Ex. P (Cosgrove Dep. at 166).

18.    Due to complications in her pregnancy, Cosgrove was required to begin her FMLA leave on approximately May 11, 2003.  Schwab Aff. Ex. A (Cosgrove Aff. ¶ 6).

19.    Cosgrove continued in her duties as Conference Sales Manager and at the pay rate for Conference Sales Manager until she went on maternity leave.  Schwab Aff. Ex. A (Cosgrove Aff. ¶ 11); Schwab Aff. Ex. R (Perry Dep. at 69-70); Schwab Aff. Ex. Q (Brennan Dep. at 176).

20.    Per New Seabury policy, Cosgrove received disability pay at 60% of her salary while she was on leave.  Schwab Aff. Ex. Q (Brennan Dep. at 191).

21.    The pay rate used to calculate Cosgrove's disability pay during her leave was the rate of $17 per hour.  Schwab Aff. Ex. Q (Brennan Dep. at 191); Schwab Aff. Ex. F (Cosgrove disability pay calculation); Schwab Aff. Ex. R (Perry Dep. at 69).

22.    Before Cosgrove went out on leave, her supervisor Jennifer Perry asked her to prepare a document listing her duties as Administrative Assistant in the Catering Sales Department.  Schwab Aff. Ex. P (Cosgrove Dep. at 208, 210).

23.    The purpose of the document was to inform Cosgrove's temporary replacement during her leave of her job responsibilities.  Schwab Aff. Ex. P (Cosgrove Dep. at 208).

24.    Cosgrove prepared the document and posted it in the sales office and gave a copy to Jennifer Perry.  Schwab Aff. Ex. P (Cosgrove Dep. at 210); Schwab Aff. Ex. G (Administrative Assistant position description).

25.    All responsibilities listed in the document generated by Cosgrove would be performed by the Administrative Assistant in the Catering Sales Department—namely, checking emails and telephone messages for that department; sending out wedding packages; distributing documents to and managing schedules of employees in the Catering Sales Departments; working with contracts, event orders, invoices and refunds for catering events and updating calendars and wedding lists.  Schwab Aff. Ex. R (Perry Dep. at 50).

26.      Additionally, the job responsibilities of the Administrative Assistant in the Catering Sales Department included meeting with clients and doing site visits.  Schwab Aff. Ex. R (Perry Dep. at 50).

27.      Lauralee Taddeo was hired as a temporary replacement for Cosgrove in the position of Administrative Assistant in the Catering Sales Department while Cosgrove was out on maternity leave.  Schwab Aff. Ex. Q (Brennan Dep. at 176-77); Schwab Aff. Ex. B (2nd Cosgrove Aff. ¶ 4).

28.      Lauralee Taddeo's end date as Administrative Assistant in the Catering Sales Department was based on when it was anticipated that Cosgrove would return from her maternity leave, with the understanding that Cosgrove would be restored to the position at that time.  Schwab Aff. Ex. B (2nd Cosgrove Aff. ¶¶ 4-5).

**C.    Cosgrove's Return from Maternity Leave, Placement in Nonequivalent Position, and Eventual Termination.**

29.      Cosgrove returned to work at New Seabury on the day that her leave elapsed, October 7, 2003.  Schwab Aff. Ex. P (Cosgrove Dep. at 191-93).

30.      Prior to returning, Cosgrove called Brennan to confirm that she was returning on October 7.  Schwab Aff. Ex. P (Cosgrove Dep. at 192-93).

31.      When Cosgrove called Brennan, his assistant answered, and Cosgrove left a message that she would be returning from maternity leave on October 7 and requested that he call her back to confirm.  Schwab Aff. Ex. P (Cosgrove Dep. at 193).

32.      Brennan never returned Cosgrove's call.  Schwab Aff. Ex. P (Cosgrove Dep. at 193); Schwab Aff. Ex. Q (Brennan Dep. at 193).

6

33.    Brennan also received a letter from Cosgrove's attorney dated September 30, 2003, which informed him that Cosgrove intended to return to work the following week.  Schwab Aff. Ex. Q (Brennan Dep. at 195-96); Schwab Aff. Ex. H (9/30/03 letter).

34.    The letter from Cosgrove's attorney stated that "Ms. Cosgrove's demotion and the elimination of her position constituted sex and pregnancy discrimination" and violated the Massachusetts Maternity Leave Act.  Schwab Aff. Ex. H (9/30/03 letter).

35.    The letter from Cosgrove's attorney enclosed a Charge of Discrimination alleging that New Seabury's actions against Cosgrove constituted sex and pregnancy discrimination and violated the Massachusetts Maternity Leave Act, to be filed with the Massachusetts Commission Against Discrimination the following week.  Schwab Aff. Ex. H (9/30/03 letter).

36.    Despite having received a telephone message from Cosgrove and the letter from her attorney stating that she was returning to work, Brennan claimed to believe that Cosgrove "was gone" and was not going to return to work. Schwab Aff. Ex. Q (Brennan Dep. at 192-97).

37.    Cosgrove was not restored to her position as Conference Sales Manager or to the position of Administrative Assistant for the Catering Sales Department when she returned from her FMLA leave.  Schwab Aff. Ex. A (Cosgrove Aff. ¶ 12).

38.    When Cosgrove arrived for work on October 7, 2003, Brennan told her, "we have nothing for you."  Schwab Aff. Ex. P (Cosgrove Dep. at 194).

39.    Despite acknowledging that Cosgrove had accepted the position of Administrative Assistant in the Catering Sales Department, Brennan stated that the position was not available anymore.  Schwab Aff. Ex. P (Cosgrove Dep. at 195).

40.    Instead, Brennan placed Cosgrove in the position of spending all day scanning documents that New Seabury wanted converted to electronic files. Schwab Aff. Ex. Q (Brennan Dep. at 200); Schwab Aff. Ex. P (Cosgrove Dep. at 197).

41.    The project of scanning documents was an ongoing project at New Seabury, with no set end date.  Schwab Aff. Ex. Q (Brennan Dep. at 200).

42.    The work scanning documents was monotonous, slow, and tedious, and Cosgrove worked in isolation for most of the day in the warehouse.  Schwab Aff. Ex. A (Cosgrove Aff. ¶¶ 13, 16); Schwab Aff. Ex. P (Cosgrove Dep. at 199, 203); Schwab Aff. Ex. Q (Brennan Dep. at 216).

43.    Brennan claimed that any position categorized as administrative would be similar to any other administrative position at New Seabury.  Schwab Aff. Ex. Q (Brennan Dep. at 205-06).

44.    Brennan claimed that the warehouse position was similar to Cosgrove's position as Administrative Assistant in the Catering Sales Department because both were categorized as administrative positions.  Schwab Aff. Ex. Q (Brennan Dep. at 205-06).

45.    Cosgrove's attorney sent another letter to Brennan dated October 8, 2003, stating that New Seabury's actions in failing to return Cosgrove to her

position as Administrative Assistant in the Catering Sales Department constituted unlawful retaliation and discrimination.  Schwab Aff. Ex. Q (Brennan Dep. at 206-07); Schwab Aff. Ex. I (10/8/03 letter).

46.    Because there was no suitable place for Cosgrove to pump her breastmilk in the warehouse, her co-worker Tanya Copestick offered Cosgrove the use of her office to pump her breastmilk.  Schwab Aff. Ex. P (Cosgrove Dep. at 27).

47.    When Brennan learned that Copestick was letting Cosgrove use her office to pump breastmilk, he said to Copestick, "we're walking a fine line here as a company, so watch what you say."  Schwab Aff. Ex. Q (Brennan Dep. at 207-08); Schwab Aff. Ex. P (Cosgrove Dep. at 231).

48.    Brennan made that comment to Copestick because, in his words, Cosgrove had already informed New Seabury that she was looking to try to sue the company.  Schwab Aff. Ex. Q (Brennan Dep. at 208).

49.    Brennan terminated Cosgrove's employment at New Seabury on approximately October 31, 2003, effective that day.  Schwab Aff. Ex. A (Cosgrove Aff. ¶ 22); Schwab Aff. Ex. P (Cosgrove Dep. at 221-22); Schwab Aff. Ex. Q (Brennan Dep. 219-20).

50.    Before Brennan informed her of her termination on October 31, 2003, Cosgrove had received no warning that she might be laid off or terminated. Schwab Aff. Ex. B (2nd Cosgrove Aff. ¶ 8).

### IV.    REPLACEMENT OF COSGROVE AFTER TERMINATION

51.    In spring 2004, Lauralee Taddeo was rehired as Administrative Assistant for the Catering Sales Department, and she worked in that position until October or November 2004.  Schwab Aff. Ex. R (Perry Dep. at 10).

52.    Since approximately January 2005, an individual has been employed in the full-time, year-round position of Assistant Catering Sales Manager in the Catering Sales Department, combining the responsibilities of Administrative Assistant and Sales Manager.  Schwab Aff. Ex. R (Perry Dep. at 6-9).

### V.    RESTRUCTURE OF NEW SEABURY IN 2002-2003.

53.    The so-called "restructure" at New Seabury in 2002 and 2003 primarily affected seasonal employees.  There were approximately seven year-round employees whose jobs were eliminated or changed as a result of the restructure.

54.    All terminations of year-round employees in connection with the restructure occurred in early 2003.  Schwab Aff. Ex. Q (Brennan Dep. at 128).

### A.    Restructure of Golf Department

55.    There was a restructure of the Golf Department at New Seabury which involved the demotion of three employees to different positions within the Golf Department and the hiring of one new employee.

56.    Specifically, Brennan demoted Robert McGraw from Head Golf Professional to Director of Instruction in the spring of 2003.  McGraw was first

offered the option of staying in the Head Golf Professional position, but he was not interested. Schwab Aff. Ex. Q (Brennan Dep. at 71, 86-87).

57.    Brennan replaced Robert McGraw as Head Golf Professional with an external hire, Brendan Reilly. Schwab Aff. Ex. Q (Brennan Dep. at 69, 72).

58.    Scott Nickerson was demoted from Director of Golf to Golf Course Superintendent in approximately January 2003. Schwab Aff. Ex. J (position change documents).

59.    However, Nickerson had originally been Golf Course Superintendent and had only taken the Director of Golf position at New Seabury's request, and he wanted to return to his position as Golf Course Superintendent. Schwab Aff. Ex. Q (Brennan Dep. at 69, 89-90, 93-96).

60.    After Nickerson was returned to the position of Golf Course Superintendent, Daniel Stone was demoted from Golf Course Superintendent to Assistant Golf Course Superintendent in late February 2003. Schwab Aff. Ex. Q (Brennan Dep. at 69, 97-98).

61.    The restructure of the Golf Department resulted in a staffing increase from three to four full-time year-round positions in that department.

**B.    New Seabury's Actions with Other Pregnant Employees**

62.    Wayne Kapral was demoted from General Manager to Chief Financial Officer and then ultimately terminated. Schwab Aff. Ex. Q (Brennan Dep. at 84).

63.    Shortly after Kapral was terminated as Chief Financial Officer, Brennan replaced him with Wayne Spencer as Controller and Phyllis D'Eramo as Assistant Controller.  Schwab Aff. Ex. Q (Brennan Dep. at 84, 113-14).

64.    In 2003, Brennan removed Rhonda Rodgers from her position as Membership Director and replaced her with Robert Higgins, an external hire. Schwab Aff. Ex. Q (Brennan Dep. at 69-70, 85, 117-18); Schwab Aff. Ex. L (Rodgers Payroll Change form, 5/12/03).

65.    Rhonda Rodgers was pregnant when she was replaced, and Brennan knew that she was pregnant when he made the decision to replace her. Schwab Aff. Ex. Q (Brennan Dep. at 114).

66.    Rhonda Rodgers requested maternity leave on approximately January 15, 2003, and her termination occurred on approximately May 12, 2003. Schwab Aff. Ex. K (Rodgers 1/15/03 mem.), Ex. L (Rodgers Payroll Change form, 5/12/03).

67.    Brennan terminated Michele O'Brien's position in real estate sales and reassigned her responsibilities to the Assistant Controller in approximately late winter 2003.  Schwab Aff. Ex. Q (Brennan Dep. at 107).

68.    O'Brien was pregnant when she was terminated, and Brennan knew that she was pregnant when he made the decision to terminate her. Schwab Aff. Ex. Q (Brennan Dep. at 109).

69.    Michele O'Brien requested maternity leave on approximately February 14, 2003, and her termination occurred on approximately March 10,

2003. Schwab Aff. Ex. M (O'Brien 1/14/03 mem.), Ex. N (O'Brien Payroll Change form, 3/10/03).

70.     Cosgrove's position as Conference Sales Manager was eliminated in approximately April 2003. Schwab Aff. Ex. Q (Brennan Dep. at 168-69).

71.     Brennan hired Marian Lent as a salesperson in late 2002. Schwab Aff. Ex. Q (Brennan Dep. at 75).

72.     Lent was an external hire, and Brennan did not attempt to hire internally for her position. Schwab Aff. Ex. Q (Brennan Dep. at 75-76).

73.     These restructures resulted in no reduction in the number of full-time, year-round employees because each terminated or demoted employee was replaced by a new hire or promotion: Kapral's duties as CFO were taken over by Spencer as Controller; Rodgers was replaced by Higgins as Membership Director; O'Brien's duties in real estate were taken over by D'Eramo as Assistant Controller; and Cosgrove's duties in sales were taken over by Lent.

74.     The only other full-time, year-round employees whose jobs were changed in 2003 were in the kitchen department or the food and beverage department. Schwab Aff. Ex. Q (Brennan Dep. at 123-25).

III.    **COSGROVE'S RESPONSIBILITIES AS CONFERENCE SALES MANAGER AND THE REASSIGNMENT OF THOSE RESPONSIBILITIES.**

75.     Cosgrove's responsibilities as Conference Sales Manager included making sales through cold-calling, mailings, targeted promotions, and other creative methods of drawing new clients. Schwab Aff. Ex. P (Cosgrove Dep. at 51-52, 59).

76.    Cosgrove's responsibilities as Conference Sales Manager also included meeting with prospective clients, showing them the facilities, and arranging and performing site inspections of the property with prospective clients. Schwab Aff. Ex. P (Cosgrove Dep. at 51, 59-60); Schwab Aff. Ex. R (Perry Dep. at 31-32); Schwab Aff. Ex. O (Sales Manager position description).

77.    Cosgrove's responsibilities as Conference Sales Manager also included reserving function space, meeting space, and lodging for groups of ten people or more.  Schwab Aff. Ex. P (Cosgrove Dep. at 53-54).

78.    Cosgrove's responsibilities as Conference Sales Manager also included communicating with clients and other departments at New Seabury regarding group events.  Schwab Aff. Ex. R (Perry Dep. at 32-34); Schwab Aff. Ex. O (Sales Manager position description).

79.    Cosgrove's responsibilities as Conference Sales Manager also included monitoring the status of payments and execution of contracts relating to group sales.  Schwab Aff. Ex. R (Perry Dep. at 33); Schwab Aff. Ex. O (Sales Manager position description).

80.    Cosgrove's responsibilities as Conference Sales Manager also included attending off-site sales meetings, trade shows, and meetings of the Cape Cod Hospitality Marketing Association.  Schwab Aff. Ex. P (Cosgrove Dep. at 59, 63).

81.    All of Cosgrove's responsibilities, with the exception of the attendance at off-site meetings and trade shows, have been reassigned to other

employees in the Catering Sales Department. Schwab Aff. Ex. R (Perry Dep. at 31-36).

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Admitted.

2. Disputed. As Conference Sales Manager, Cosgrove provided a range of services for groups of ten people or more, including: soliciting potential customers through telemarketing and targeted promotions; meeting with prospective clients and showing them the facilities; reserving function space, meeting space, and lodging; communicating with clients and other departments at New Seabury regarding group events; monitoring the status of payments and execution of contracts relating to group sales; and attending off-site sales meetings, trade shows, and meetings of the Cape Cod Hospitality Marketing Association. Plaintiff's Statement of Additional Material Facts (PSAMF), *supra*, ¶¶ 2, 75-81.

3. Admitted. However, all employment-related decisions at New Seabury are subject to the requirements of antidiscrimination laws and the Family and Medical Leave Act.

4. Admitted.

5. Disputed. Cosgrove was treated differently by New Seabury after announcing her pregnancy, and there were adverse consequences from her announcement. Specifically, approximately two months after Cosgrove notified the general manager at New Seabury that she was pregnant, she was demoted from Conference Sales Manager to Administrative Assistant in the Catering

Sales Department and her salary was reduced from $17 per hour to $12 per hour. Additionally, when Cosgrove returned from her pregnancy leave, she was not returned to either the Conference Sales Manager position or to the Administrative Assistant position but was required to spend all day in a warehouse scanning documents. PSAMF, *supra*, ¶¶ 8, 37, 40.

6.      Admitted.

7.      Admitted that New Seabury operates a seasonal business. However, the high season runs from April or May to October or November. Schwab Aff. Ex. R (Perry Dep. at 10). Admitted that the employee complement increases during the high season, but most of New Seabury's seasonal employees are employed in food service and/or in connection golf course. Schwab Aff. Ex. Q (Brennan Dep. at 44-50).

8.      Admitted that there were more than 100 lodging units in 2002 and that there were approximately twenty units available "on a given day" in 2005, but disputed that that means there has been a reduction of 80 lodging units in that time period. Schwab Aff. Ex. Q (Brennan Dep. at 50).

9.      Admitted that New Seabury had a "Villa Rental Program" that ended at the end of 2003. However, the decision to end this program was not made until the fall of 2003, several months after Cosgrove was removed from her position as Conference Sales Manager. Schwab Aff. Ex. Q (Brennan Dep. at 61-62).

10.      Admitted.

11.    Admitted that lodging is now a break-even operation and used to lose money, but disputed as to the reason for this change.  Schwab Aff. Ex. Q (Brennan Dep. at 50-51).

12.    Admitted that New Seabury operates a seasonal business. However, the high season runs from April or May to October or November. Schwab Aff. Ex. R (Perry Dep. at 10).  Admitted that the employee complement increases during the high season, but most of New Seabury's seasonal employees are employed in food service and/or in connection golf course. Schwab Aff. Ex. Q (Brennan Dep. at 44-50).  Admitted that New Seabury's employee complement on July 26, 2002, was 384 employees, and its employee complement was 124 employees on January 10, 2003.

13.    Admitted.

14.    Admitted.  However, New Seabury had 85 employees in January 2004 and more than 100 employees in April 2004.  Def.'s Ex. 6.

15.    Admitted.  However, New Seabury is bound not just by the policies in its handbook, but also by state and federal antidiscrimination and family leave laws.

16.    Disputed.  O'Neil was hired by New Seabury to conduct an operational audit, which included reviewing financials and attempting to increase profitability.  Schwab Aff. Ex. S (O'Neil Dep. at 18-19); Schwab Aff. Ex. Q (Brennan Dep. at 77).

17.    Disputed that the initial discussion with O'Neil involved a review of employee staffing levels.  Schwab Aff. Ex. S (O'Neil Dep. at 14-15).

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted that O'Neil identified possible staffing changes, but none of the changes related to Cosgrove's position.  Schwab Aff. Ex. S (O'Neil Dep. at 27-33, 38-42).

22.     Disputed.  O'Neil recommended recruitment of a new Director of Membership Development and a member relations administrator.  Def.'s Ex. 9 at 23.

23.     Admitted.

24.     Admitted that Brennan reviewed a headcount list, but disputed that the list described the functions performed by each individual.  The list stated only employees' names and positions.  Schwab Aff. Ex. Q (Brennan Dep. at 158).

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.  However, the Director of Golf Operations, Scott Nickerson, had held that position temporarily and only at the request of New Seabury management, and he asked to be returned to his previous position as Golf Course Superintendent.  Additionally, Robert McGraw, the Head Golf Professional, was offered the option of remaining in his position but preferred to take the position of Director of Instruction.  PSAMF, *supra*, ¶¶ 56, 59.

29.     Admitted.  However, Brennan increased the employee complement in the Golf Department from three to four employees, because he externally hired Brendan O'Reilly to replace Robert McGraw as Head Golf Professional and retained the other three employees in different positions.  PSAMF, *supra*, ¶¶ 55-61.

30.     Disputed that the close of the restaurant for six weeks was to reduce costs; it was to enable the chef to determine how to make the restaurant more efficient.  Disputed that the close of the restaurant included laying employees off.  Schwab Aff. Ex. Q (Brennan Dep. at 78-79).

31.     Disputed.  There is no citation to evidence in the record.  In fact, the discussions with department heads regarding budget proposals were ongoing.  Schwab Aff. Ex. Q (Brennan Dep. at 80).

32.     Admitted that the Chief Financial Officer position was eliminated.  However, that position was replaced by a Controller and an Assistant Controller.  Schwab Aff. Ex. Q (Brennan Dep. at 84, 113-14).

33.     Admitted.

34.     Admitted.

35.     Admitted.

36.     Admitted only that "[t]here may have been a year-round assistant food and beverage director that . . . was made not year round" and that Brennan "believe[s] there was someone on the outside golf staff that was year-round that was eliminated to not be a year-round position."  Schwab Aff. Ex. Q (Brennan Dep. at 124).

37.     Disputed.  O'Neil did not recommend the elimination of one of the three sales managers.  He recommended "[a] restructuring of the sales and banquet team" and recommended that a "[d]edicated catering sales manager. . . be utilized."  Schwab Aff. Ex. S (O'Neil Dep. at 44-45).

38.     Admitted that O'Neil identified the Food and Beverage Department as in need of reorganization.  Disputed that Cosgrove's position was specifically identified as being redundant.  Schwab Aff. Ex. S (O'Neil Dep. at 79-81).

39.     Admitted.

40.     Admitted.

41.     Admitted that the reorganization model contained no salary for Cosgrove.  Disputed that Cosgrove's position specifically had been targeted for elimination because of redundancy.  Schwab Aff. Ex. S (O'Neil Dep. at 81-82).

42.     Disputed.  O'Neil did not identify the cited document as part of the budget review process, did not confirm what the notation next to Cosgrove's position meant, when it was made, or by whom, and did not state that the notation was made before O'Neil knew that Cosgrove was pregnant.  Schwab Aff. Ex. S (O'Neil Dep. at 129-30).

43.     Disputed.  Brennan had a question about the catering sales department when he reviewed the headcount.  Schwab Aff. Ex. Q (Brennan Dep. at 157).

44.     Admitted.  However, those conversations took place in February 2003, shortly after Cosgrove had informed Brennan of her pregnancy and intention to take maternity leave.  PSAMF, *supra*, ¶ 3.

45.    Disputed that these discussions were between Brennan and O'Neil.

46.    Disputed that Perry told Brennan that Cosgrove's position was not needed.  Schwab Aff. Ex. R (Brennan Dep. at 236).  Moreover, Perry would not have known about all of Cosgrove's duties, as Cosgrove essentially managed herself and did not require supervision from Perry.  Schwab Aff. Ex. R (Perry Dep. at 26).

47.    Admitted.  However, the conversation between Brennan and Chase occurred after Brennan was already aware that Cosgrove was pregnant. PSAMF, *supra*, ¶ 3.

48.    Admitted that no one took over the title of Conference Sales Manager after Cosgrove was demoted.  However, Brennan externally hired a salesperson in late 2002.  Additionally, an Assistant Catering Sales Manager has been hired since Cosgrove's termination.  The duties of both of these positions overlap with Cosgrove's duties as Conference Sales Manager.  PSAMF, *supra*, ¶¶ 52, 71, 72.

49.    Admitted only that Cosgrove contests her demotion and termination.

50.    Admitted that Brennan decided to demote Cosgrove from Conference Sales Manager to Administrative Assistant in the Catering Sales Department.

51.    Disputed.  The duties of Administrative Assistant in the Catering Sales Department consisted of the following:  checking emails and telephone messages for that department; sending out wedding packages; distributing

documents to and managing schedules of employees in the Catering Sales Departments; working with contracts, event orders, invoices and refunds for catering events; meeting with potential clients; and doing site visits. PSAMF, *supra*, ¶¶ 25-26.

52.    Disputed. Admitted that Brennan informed Cosgrove that she was being demoted from Conference Sales Manager to Administrative Assistant in the Catering Sales Department, at a pay rate of $12 per hour. Disputed that Brennan advised Cosgrove that the job would be seasonal. In fact, the position was designated as a full-time, year-round position. PSAMF, *supra*, ¶¶ 9-11.

53.    Disputed. The position of Administrative Assistant in the Catering Sales Department that was offered to Cosgrove was a full-time, year-round position. PSAMF, *supra*, ¶¶ 9-11.

54.    Disputed. Brennan asked if Cosgrove would work a Tuesday through Saturday schedule. Schwab Aff. Ex. P (Cosgrove Dep. at 150).

55.    Disputed. The position of Administrative Assistant in the Catering Sales Department that was offered to Cosgrove was a full-time, year-round position. PSAMF, *supra*, ¶¶ 9-11.

56.    Admitted.

57.    Disputed. The position of Administrative Assistant in the Catering Sales Department was originally offered to Cosgrove to begin on May 6, 2003. Schwab Aff. Ex. P (Cosgrove Dep., Ex. 10). Brennan then agreed that Cosgrove should continue in her responsibilities as Conference Sales Manager for another

week and begin as Administrative Assistant in the Catering Sales Department on May 12, 2003. Schwab Aff. Ex. A (Cosgrove Aff. ¶ 11).

58.  Admitted.

59.  Admitted.  Brennan also agreed that Cosgrove should continue in her current position until May 12, 2003.  Schwab Aff. Ex. A (Cosgrove Aff. ¶ 11). Additionally, Cosgrove went out on early maternity leave due to complications in her pregnancy.  PSAMF, *supra*, ¶ 18.

60.  Admitted that Cosgrove accepted the position of Administrative Assistant in the Catering Sales Department.

61.  Admitted.  However, Cosgrove's condition worsened, requiring her to leave work earlier than she had anticipated.  Schwab Aff. Ex. P (Cosgrove Dep. at 176-78); PSAMF, *supra*, ¶ 18.

62.  Admitted that Cosgrove took leave pursuant to New Seabury policy and that she returned to work on the day that her leave elapsed.  PSAMF, *supra*, ¶¶ 5, 29.

63.  Admitted.

64.  Admitted.

65.  Admitted.

66.  Admitted.

67.  Admitted that Lauralee Taddeo filled in for Cosgrove in the position of Administrative Assistant in the Catering Sales Department while Cosgrove was on leave, with the understanding that Cosgrove would take over for Taddeo when she came back from leave.  PSAMF, *supra*, ¶ 27.

68.     Disputed.  The position of Administrative Assistant in the Catering Sales Department offered to Cosgrove was a full-time, year-round position. Taddeo's end date in October 2003 was based on the anticipated date when Cosgrove would return from her maternity leave, with the understanding that Cosgrove would return to the position at that time.  PSAMF, *supra*, ¶¶ 9-11, 27-28.

69.     Disputed.  Cosgrove remained in the position and pay rate of Conference Sales Manager until her return from maternity leave.  PSAMF, *supra*, ¶¶ 19-21.

70.     Disputed.  At Perry's request, Cosgrove generated a job description for the position of Administrative Assistant in the Catering Sales Department before she went out on maternity leave.  All of the duties listed on this job description are performed by the Administrative Assistant in the Catering Sales Department.  The duties of the Administrative Assistant in the Catering Sales Department also included meeting with potential clients and doing site visits. PSAMF, *supra*, ¶¶ 22-26.

71.     Admitted.  However, Cosgrove called Brennan before October 7, 2003, to inform him that she was returning to work on that date, and Brennan did not return Cosgrove's call.  Cosgrove's attorney also sent Brennan a letter on September 30, 2003, informing him that Cosgrove was planning to return to work the following week.  PSAMF, *supra*, ¶¶ 30-33.

72.     Admitted.  However, there was no requirement at New Seabury that an employee returning from maternity leave notify her supervisor.  It is the

responsibility of Lee O'Shea in Human Resources to inform Brennan that an individual is returning from leave. Cosgrove notified O'Shea that she was returning on October 7, 2003. Cosgrove and her attorney also informed Brennan that she was returning on October 7, 2003. Schwab Aff. Ex. Q (Brennan Dep. at 138, 142-43); Schwab Aff. Ex. P (Cosgrove Dep. at 191); PSAMF, *supra*, ¶¶ 30-33.

73.     Disputed. Cosgrove was not given the position of Administrative Assistant in the Catering Sales Department when she came back from her leave. She was given the job of scanning documents all day in a warehouse. PSAMF, *supra*, ¶¶ 37-40.

74.     Admitted.

75.     Admitted.

76.     Disputed. In fact, since Cosgrove was terminated, a new full-time, year-round position of Assistant Catering Sales Manager has been created in the Catering Sales Department which combines administrative and sales duties for the Catering Sales Department. PSAMF, *supra*, ¶ 52.

77.     Disputed. Brennan believed that both positions were clerical positions but noted that one position was in the country club and the other was in a warehouse. Schwab Aff. Ex. Q (Brennan Dep. at 200-02).

78.     Admitted.

79.     Disputed. Cosgrove did not know what Robin Almedia's job classification was. Schwab Aff. Ex. P (Cosgrove Dep. at 198).

80.     Admitted.  However, Shea was rarely in his office in the warehouse, and Cosgrove spent most of the day in isolation.  Schwab Aff. Ex. P (Cosgrove Dep. at 203, 214); Schwab Aff. Ex. Q (Brennan Dep. at 216); PSAMF, *supra*, ¶ 42.

81.     Disputed.  Cosgrove was required to walk through the warehouse to access her office, to use the bathroom, to receive deliveries, and to use the copy machine.  Schwab Aff. Ex. P (Cosgrove Dep. at 200-02, 207).

82.     Admitted.  However, there were rarely in their offices in the warehouse, and Cosgrove spent most of the day in isolation.  Schwab Aff. Ex. P (Cosgrove Dep. at 203, 214); Schwab Aff. Ex. Q (Brennan Dep. at 216); PSAMF, *supra*, ¶ 42.

83.     Disputed.  Admitted that Cosgrove had to go to Tanya Copestick's office to pump breastmilk, because there was not a location in the warehouse where she could do it.  The only bathroom in the warehouse was unisex and dirty.  Disputed that it took Cosgrove 15 to 30 minutes or longer to pump.  It took approximately 15 to 20 minutes each time.  Schwab Aff. Ex. A (Cosgrove Aff. ¶ 19, photograph 6); Schwab Aff. Ex. P (Cosgrove Dep. at 27, 202).

84.     Disputed.  Admitted that Cosgrove was permitted to use the restroom facilities outside the warehouse, because the only bathroom in the warehouse was unisex and dirty.  Schwab Aff. Ex. A (Cosgrove Aff. ¶ 19, photograph 6); Schwab Aff. Ex. P (Cosgrove Dep. at 27, 202-03).  Disputed that she went to the Clubhouse on a daily basis for her lunch and other breaks.  Cosgrove went to the Country Club building only when necessary to pump

breastmilk and occasionally to use the bathroom or to purchase lunch from the kitchen/dining room. Schwab Aff. Ex. B (2nd Cosgrove Aff. ¶ 6).

85.    Disputed. Cosgrove was given a key to the door separating her office from the warehouse, but she was not given a key to the warehouse itself. She had to walk through the warehouse to access this interior door. Moreover, Cosgrove did have to go into the warehouse to access her office, to use the bathroom, to receive deliveries, and to use the copy machine. Schwab Aff. Ex. B (2nd Cosgrove Aff. ¶ 7); Schwab Aff. Ex. P (Cosgrove Dep. at 200-02, 207).

86.    Admitted that Cosgrove was eventually provided with a refrigerator, but there was no refrigerator in the warehouse for the first one or two weeks that she worked there. Schwab Aff. Ex. P (Cosgrove Dep. at 205).

87.    Admitted. However, for approximately the first week that Cosgrove worked there, the heat was not working in the warehouse. Schwab Aff. Ex. P (Cosgrove Dep. at 227).

88.    Disputed.

89.    Disputed. Cosgrove was terminated from her position on October 31, 2003, effective that day. She was not told beforehand that she may be let go, and the scanning project that she was working on was ongoing. PSAMF, *supra*, ¶¶ 41, 49-50.

90.    Admitted that Brennan made those statements. However, the project on which Cosgrove was working was ongoing and did not need to end at the end of the season. PSAMF, *supra*, ¶ 41.

91.    Disputed as to layoffs in October 2006.

92.    Admitted.

93.    Admitted.

94.    Disputed.  Rodgers was replaced as Membership Sales Director shortly after New Seabury learned that she was pregnant.  PSAMF, *supra*, ¶¶ 64-66.

95.    Disputed.  Brennan knew that Rodgers was pregnant when he made the decision to replace her.  PSAMF, *supra*, ¶¶ 65-66.

96.    Admitted.

97.    Disputed that the job offered to Rodgers was similar to her previous job.  Her former position was as Director of Membership Sales, and the position offered was in the lodging department.  Schwab Aff. Ex. Q (Brennan Dep. at 104).

98.    Admitted.

99.    Admitted.  However, Brennan knew that O'Brien was pregnant when he eliminated her position, and her position was eliminated within approximately one month after she informed Brennan that she was pregnant.  Many of her duties were taken over by another individual who had been placed in the newly created position of Assistant Controller.  PSAMF, *supra*, ¶¶ 67-69.

100.    Disputed.  Many of O'Brien's duties were taken over by another individual who had been placed in the newly created position of Assistant Controller.  PSAMF, *supra*, ¶ 66.

Respectfully submitted,

PATRICIA COSGROVE,
By her attorneys,


__s/Shannon Liss-Riordan_____
Shannon Liss-Riordan, BBO #640716
Hillary Schwab, admitted *pro hac vice*
PYLE, ROME, LICHTEN, EHRENBERG
    & LISS-RIORDAN, P.C.
18 Tremont Street, 5th Floor
Boston, MA 02108

Dated:  July 14, 2006       (617) 367-7200


## CERTIFICATE OF SERVICE

     I hereby certify that on July 14, 2006, I caused a copy of this document to be served by electronic filing on Howard I. Wilgoren, 6 Beacon Street, Suite 700, Boston, MA 02108, counsel for the defendant.


__s/Hillary Schwab_____
Hillary Schwab, Esq.