UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

PATRICIA COSGROVE,                                )
                          Plaintiff,              )
                                                  )
        v.                                        )
                                                  )
NEW SEABURY RESOURCES                             )     Civil Action No.
        MANAGEMENT, INC.,                         )     1:05-cv-10791-GAO
                                                  )
                          Defendant.              )
_____ )

**AFFIDAVIT OF HILLARY SCHWAB, ESQ. REGARDING EXHIBITS TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

        I, Hillary Schwab, Esq., under oath, hereby state as follows:

        1.      I am an attorney in the law firm of Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C. and counsel to Plaintiff Patricia Cosgrove in this matter.

        2.      I hereby certify that the exhibits attached to my affidavit are true and accurate copies of the original documents.  I am unaware of any objection to the authenticity or admissibility of these exhibits.  The exhibits are as follows:

        <u>Exhibit A</u>:    Affidavit of Patricia Cosgrove, dated June 8, 2006;

        <u>Exhibit B</u>:    Second Affidavit of Patricia Cosgrove, dated July 12, 2006;

        <u>Exhibit C</u>:    Memorandum from Cosgrove to Brennan, dated Feb. 3, 2003 (Exhibit 12 to Brennan deposition);

        <u>Exhibit D</u>:    Payroll Change Notice and New Hire Authorization, Patricia Cosgrove, May 11, 2003 (Exhibit 13 to Brennan deposition);

        <u>Exhibit E</u>:    Letter from Cosgrove to Brennan, dated May 2, 2003 (Exhibit 15 to Brennan deposition);

Exhibit F:    Patricia Cosgrove disability pay calculation (Exhibit 16 to Brennan deposition);

Exhibit G:    Administrative Assistant position description (Exhibit 3 to Perry deposition);

Exhibit H:    Letter from Carlin to Brennan, dated Sept. 30, 2003 (Exhibit 17 to Brennan deposition);

Exhibit I:    Letter from Carlin to Brennan, dated Oct. 8, 2003 (Exhibit 17 to Brennan deposition);

Exhibit J:    Documents relating to position changes of Dan Stone, Scott Nickerson, and Robert McGraw (Exhibit 2 to Brennan deposition);

Exhibit K:    Memorandum from Rodgers to O'Neil, Jan. 15, 2003 (Exhibit 6 to Brennan deposition);

Exhibit L:    Payroll Change Notice and New Hire Authorization, Rhonda Rodgers, May 12, 2003 (Exhibit 7 to Brennan deposition);

Exhibit M:    Memorandum from O'Brien to Brennan, Feb. 14, 2003 (Exhibit 3 to Brennan deposition);

Exhibit N:    Payroll Change Notice and New Hire Authorization, Michelle O'Brien, March 10, 2003 (Exhibit 5 to Brennan deposition);

Exhibit O:    Sales Manager position description (Exhibit 1 to Perry deposition);

Exhibit P:    Relevant pages of the deposition of Patricia Cosgrove, Jan. 16, 2006;

Exhibit Q:    Relevant pages of the deposition of Stephen Brennan, Jan. 18, 2006;

Exhibit R:    Relevant pages of the deposition of Jennifer Perry, April 7, 2006; and

Exhibit S:    Relevant pages of the deposition of Mark O'Neil, Feb. 14, 2006.

Signed under the pains and penalties of perjury this 14th day of July, 2006.


　　　　　　　　　　　__s/Hillary Schwab_____
　　　　　　　　　　　Hillary Schwab

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2006, I caused a copy of this document and accompanying exhibits to be served by electronic filing on Howard I. Wilgoren, 6 Beacon Street, Suite 700, Boston, MA 02108, counsel for the defendant.


　　　　　　　　　　　__s/Hillary Schwab_____
　　　　　　　　　　　Hillary Schwab, Esq.

EXHIBIT A

TAMACS

Summary Judgment

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PATRICIA COSGROVE, | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| NEW SEABURY RESOURCES | ) |
| MANAGEMENT, INC., | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**Civil Action No.**
**1:05-cv-10791-GAO**

## AFFIDAVIT OF PATRICIA COSGROVE

I, Patricia Cosgrove, depose and state as follows:

1.      I am the Plaintiff in the above-referenced matter.  This affidavit is based on my personal knowledge.

2.      I began working as an Account Executive at New Seabury Resources Management, Inc. (New Seabury) in April 1999.

3.      I was promoted to the position of Conference Sales Manager in approximately June 1999.

4.      In 2003, my rate of pay as Conference Sales Manager was $17 per hour.

5.      In February 2003, I requested a twelve-week maternity leave pursuant to the Family and Medical Leave Act, to begin on or about July 30, 2003.

6.      Due to complications in my pregnancy, I was required to begin my FMLA leave on approximately May 11, 2003.

7.    Shortly before I went out on FMLA leave in May 2003, in a meeting with General Manager Stephen Brennan, Jennifer Perry, Director of Catering Sales at New Seabury, and Roy Chase, Director of Food and Beverage at New Seabury, I was told that the Conference Sales Manager position was being eliminated and was offered the position of Administrative Assistant for the Catering Sales Department.

8.    The rate of pay for the position of Administrative Assistant for the Catering Sales Department was $12 per hour.

9.    The position of Administrative Assistant for the Catering Sales Department that was offered to me was a full-time year-round position.

10.    I accepted the position of Administrative Assistant for the Catering Sales Department in May 2003.

11.    However, I continued in my duties as Conference Sales Manager and at the pay rate of $17 per hour until I went on maternity leave.

12.    When I returned to work at New Seabury after my maternity leave, I was not restored to my position as Conference Sales Manager or to the position of Administrative Assistant for the Catering Sales Department.

13.    Instead, I was placed in a warehouse all day scanning documents. The work was monotonous, slow, and tedious.

14.    The warehouse was a typical warehouse, with machinery and equipment all around.  Attached photographs 1 and 2 depict the warehouse.

2

15.    Attached photographs 3, 4, and 5 depict the Country Club facility in which my office would have been located for the position of Administrative Assistant for the Catering Sales Department.

16.    I worked in isolation for most of the day in the warehouse.

17.    In the position of Administrative Assistant in the Catering Sales Department, I would have been around other employees all day, communicating with my co-workers, supervisors, and clients.

18.    I would have been supervised by Jennifer Perry in the position of Administrative Assistant in the Catering Sales Department, with whom I would have worked closely.

19.    There was only one bathroom in the warehouse, which was dingy and dirty and which I was required to share with my male co-workers who also worked in the warehouse. Attached photograph 6 depicts the bathroom in the warehouse.

20.    For the first one to two weeks that I was working at the warehouse, there was no refrigerator at the warehouse in which I could store my breastmilk. There was a refrigerator at the Country Club in which I could have stored my breastmilk if I had been working in the position of Administrative Assistant for the Catering Sales Department.

21.    My rate of pay while working in the warehouse was $12 per hour.

22.    My employment at New Seabury was terminated on approximately October 31, 2003.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at East Falmouth, Massachusetts, this 5 day of June, 2006.

Patricia Cosgrove
Patricia Cosgrove

## PHOTOGRAPH 1





## PHOTOGRAPH 2



PHOTOGRAPH 3



PHOTOGRAPH 4



## PHOTOGRAPH 5



## PHOTOGRAPH 6



PHOTOGRAPH 7



# Exhibit B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PATRICIA COSGROVE,                        )
                    Plaintiff,      )
                                     )
          v.                    )
                                     )
NEW SEABURY RESOURCES                )    **Civil Action No.**
    MANAGEMENT, INC.,                      )    **1:05-cv-10791-GAO**
                                     )
                   Defendant.      )
                                     )

## SECOND AFFIDAVIT OF PATRICIA COSGROVE

I, Patricia Cosgrove, depose and state as follows:

1.     I am the Plaintiff in the above-referenced matter. This affidavit is based on my personal knowledge.

2.     When Stephen Brennan offered me the position of Administrative Assistant in the Catering Sales Department, he told me that the position was a full-time, year-round position.

3.     No one at New Seabury ever informed me that the position of Administrative Assistant in the Catering Sales Department was seasonal and/or that I might be laid off at the end of the season.

4.     It was my understanding that Lauralee Taddeo was to fill in as Administrative Assistant in the Catering Sales Department as a temporary replacement for me while I was on maternity leave. I understood that I would be returned to the position when I came back from maternity leave.

5.    Lauralee Taddeo's end date as Administrative Assistant in the Catering Sales Department was based on the anticipated date when I would return from my maternity leave.

6.    When I returned from maternity leave and was placed in the warehouse scanning documents, I did not go to the Country Club building on a daily basis for my lunch and for breaks. I went to the Country Club building only when necessary to pump breastmilk and occasionally to use the bathroom or to purchase lunch from the kitchen/dining room.

7.    I was never given a key to a door leading directly from the parking lot to my office in the warehouse. I was given one key—to the interior door separating my partitioned office from the warehouse. To get to that door, I had to walk through the warehouse itself.

8.    Before Stephen Brennan informed me of my termination on October 31, 2003, I had not been informed that I might be laid off or terminated.

I declare under penalty of perjury that the foregoing is true and correct. Executed at East Filmuth, Massachusetts, this 12 day of July, 2006.

Patricia Cosgrove
Patricia Cosgrove

2

# Exhibit C



# New Seabury® Cape Cod



## MEMORANDUM

**Date:** February 3, 2003

**To:** Steve Brennan, General Manager

**Cc:** Mark J. O'Neil, Sr.

**From:** Patricia A. Cosgrove

**Re:** Maternity Leave

I hereby request maternity leave on or about July 30, 2003.
It is my understanding, based on the Employee Handbook (Maternity Leave, pg. 39 & 40), I am eligible for paid leave and will receive 60% of my average weekly salary, paid in accordance with Company payroll schedule for a period of eight weeks.  I am entitled to a twelve week leave, which upon return I am entitled to the same position I left, or a similar position with the same level, pay and length of service.

_Patricia A. Cosgrove_                    2·3·03

Patricia A. Cosgrove
Conference Sales Manager                date

_Steve Brennan_                    2-3-03

Steve Brennan                date
General Manager

0340

CONFIDENTIA

New Seabury Properties 98-1, LLC • New Seabury Properties 98-2, LLC • New Seabury Development, LLC
New Seabury Properties, LLC • New Seabury Resource Management, Inc. • Architectural Review Committee
Post Office Box 549, 155 Rock Landing Road, Mashpee, MA 02649-0549 • Phone: 508 477 9111 • Fax: 508 477 9790 • http://www.newseabury.com

# Exhibit D



Δ π EXHIBIT 13
Deponent Brennan
Date 4 16 06   Rptr JR
WWW.DEPOBOOK.COM

 ESSEX Group

# PAYROLL CHANGE NOTICE

and

# NEW HIRE AUTHORIZATION

 NEW SEABURY

Today's Date: **5/11/03**

Dept. #: **423**    Dept. Name: **Catering**

Effective Date: **5/11/03**

Employee/New Hire Name: **Patricia Cosgrove**

Social Security Number: **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**

Employee File Number: **793**

**Reason For Change(s):**

| | |
|---|---|
| ☐ New Hire | ☐ Probationary Period Completed |
| ☐ Re-hire | ☐ Length of Service Increase |
| ☐ Promotion | ☐ Re-evaluation of Exisiting Position |
| ☐ Demotion | ☐ Resignation |
| ☒ Transfer | ☐ Termination (Reason, see other below) |
| ☐ Merit Increase | ☐ Layoff |
| | ☐ Eligible for Rehire (Y or N, see other below for explanation) |

☐ Leave of Absence    From: _____    To: _____
(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☐ Other (details)

_____

_____

| | | FROM | TO |
|---|---|---|---|
| ☐ | Department | 423 | 423 |
| ☐ | Position | Conf Slo mgr. | Adm. Ass.t |
| ☐ | Rate | 17.00 | 12.00 |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:    Yes    No    Signed Policy Attached: _____

Change Authorized By: **J. Perry.**    Date: **5/11/03.**

Change Approved By: _____    Date: _____

# Exhibit E



Patricia A. Cosgrove
480 Old Meeting House Road
East Falmouth, MA 02536


May 2, 2003


Mr. Steve Brennan
General Manager
New Seabury Properties
155 Rock Landing Road
Mashpee, MA  02649

Dear Steve,

As you know, I am happy with my current position as Conference Sales Manager and would like
to remain in this position. I plan to take a 12-week maternity leave beginning on or about July
30, 2003, and would like to return to my current position at the end of my leave.

You informed me on April 28th, however, that my position was being eliminated. I do not
understand the reason for this change because the duties I perform are still obviously needed
by the Resort. I can only surmise that this change is being made because of my pregnancy and
intention to take maternity leave. I am aware that two other women, Rhonda Rodgers and
Michele O'Brien, have also recently had their positions changed or eliminated while they were
pregnant. These actions to all three of us seem to be pregnancy discrimination.

You have offered to me a position as Administrative Assistant beginning May 6th. This position
would be a demotion, since it would mean an approximate 30% pay reduction and would
require a change in my schedule. I cannot afford this loss of income and the schedule change
would be very difficult for me. However, I also cannot afford to be unemployed, so I will take
this position if it is the only choice I have.

I am planning to file a complaint of discrimination with the Massachusetts Commission Against
Discrimination. Please let me know if I can remain in my current position, or if I will have to take
the demotion, in which case I will retain an attorney to represent me in my discrimination claim.


Sincerely,

Patricia A. Cosgrove
Patricia A. Cosgrove

# Exhibit F

Δ π EXHIBIT 16
Deponent Brennan
Date 1/8/06 Rptr JR
WWW.DEPOBOOK.COM

7/14 Baby    (Oct 6
                    Petition)
Patricia Cosgrove   #17.02

| W/E | | | | MAT. 60% | Pd | Date Pd | |
|---|---|---|---|---|---|---|---|
| 2) 7/19/03 | 5 Days VAC | ✓ | | | 680 – | 7/25/03 | |
| 7/26/03 | 5 Days VAC | | | | 680 – | 8/8/03 | |
| 7) 8/2/03 | 5 MAT | ✓ | | 680 | 408 – | 8/8/03 | |
| ) 8/9/03 | 5 MAT | ✓ | | 680 | 816 | 8/22/03 | |
| 2) 8/16/03 | 5 MAT | ✓ | | 680 | | | |
| ) 8/23 | 5 MA | ✓ | | 680 | | | |
| ) 8/30 | 5 MAT | ✓ | | 680 | 816 | 9/5 | |
| 2) 9/6 | 5 MAT | ✓ | | 680 | | 9/19 | |
| ) 9/13 | 5 MAT | ✓ | | 680 | 816 | | |
| ) 10/4 | 5 MAT | ✓ | | 680 | 408 | 10/19 | |

# Exhibit G

*Kerry*

EXHIBIT NO. 3

D. RUMSON

## <u>Administrative Assistant</u>

Check email

Check phone messages

Make Call backs

Send out Wedding Packages

Distribution, usually on Tuesdays, copies to:

   Kitchen – 2 copies, Joe/Neil, Roy, Amy, John Shea, Jean,

   Kathy, Meg, Tanya, EO Book, & Extra Copy

Any missing EO's should be emailed to all of the above, Josh & 2 hard

copies to the kitchen and a copy for the EO Book

On Tuesday copy the event sheets from the book that have changes &

give to Jean & Kathy – so they can update the reader board

Keep up with the supplies for the sales department

Manager's Schedule – email to: Steve Brennan, Tanya , Jean,

Sales Dept. and Post in Sales office, Jennifer's Office and Kitchen

Do Checks – attach grad sheets

Contracts

Event Orders

Invoices

Refunds

Update the calendar, big book & wedding list – weddings

# Exhibit H



# PYLE, ROME, LICHTEN & EHRENBERG, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles

Telephone (617) 367-7200
Fax (617) 367-4820

Lara A. Sutherlin
Jennifer B. Rieker
Alison D. Morantz
M. Amy Carlin

*Also admitted in Maine
**Also admitted in New York

September 30, 2003

Steven Brennan, General Manager
New Seabury Properties
155 Rock Landing Road
Mashpee, MA 02649

RE:   Patricia Cosgrove

Dear Mr. Brennan:

Our law firm has been retained by Patricia Cosgrove in connection with her employment at New Seabury Properties.

Based on the facts as we understand them, Ms. Cosgrove's demotion and the elimination of her position constituted sex and pregnancy discrimination, in violation of Massachusetts General Laws 151B § 4, and with violations of Mass. Gen. Law. Ch. 149 § 105D, the Massachusetts Maternity Leave Act.

As you are certainly aware, Ms. Cosgrove's maternity leave ends next week. Accordingly, Ms. Cosgrove plans to return to work next week to the Administrative Assistant position to which she was demoted, however, this is only because New Seabury Properties has made it clear this is her only option if she wishes to continue working.

Enclosed is a copy of the Charge of Discrimination we are filing on Ms. Cosgrove's behalf with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission. We intend to file this Charge next Wednesday, October 8, 2003.

PYLE, ROME, LICHTEN & EHRENBERG, P.C.

Mr. Steven Brennan
September 30, 2003
Page 2 of 2

Please call me if you would like to discuss this matter.

Sincerely,

M. Amy Carlin

Enclosure
cc:    Shannon Liss-Riordan, Esq.
       Patricia Cosgrove

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form.

☐ EEOC

## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
(State or local Agency, if any) ___ and EEOC

| NAME (Indicate Mr., Ms., or Mrs.) | HOME TELEPHONE NO. (Include Area Co |
|---|---|
| Patricia Cosgrove | (508) 548-3311 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 480 Old Meeting House Road | East Falmouth, MA 02536 | Barnstable |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS. | TELEPHONE NUMBER (Include Area Code |
|---|---|---|
| New Seabury Properties | | (508) 477-9111 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| The Club at New Seabury, P.O. Box 549, 155 Rock Landing Road, Mashpee, MA 02649-0549 | |

| NAME | TELEPHONE NUMBER (Include Area Code |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)).

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ AGE  ☐ RETALIATION  ☒ OTHER(Specify) Pregnancy

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)  Ongoing

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

SEE ATTACHMENT A

8089

MY COMMISSION EX 4-23-04

☒ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing

NOTARY - (When necessary to meet State and Local Requirements)
Dawnmarie Guthrie
I swear or affirm that I have read the above charge and that it

## ATTACHMENT A

Complainant is a woman who worked as a Sales Manager for New Seabury Properties in Mashpee, Massachusetts. Shortly after announcing that she was pregnant, Complainant's employer told her she would be demoted. While Complainant was out on pregnancy/maternity leave, she was in fact demoted. In the last year, two other women at the company have had their positions changed or eliminated while they were pregnant. While Complainant agreed under protest to accept the demotion, she alleges that the elimination of her position and her demotion were discriminatory.

Complainant charges New Seabury Properties with discrimination on the basis of sex and pregnancy in violation of Mass. Gen. Law. Ch. 151B § 4, and with violations of Mass. Gen. Law. Ch. 149 § 105D, the Massachusetts Maternity Leave Act.

# Exhibit I

Δ π EXHIBIT 18
Deponent Brennan
Date 1/8/04 Rpt. 52
WWW.DEPOBOOK.COM

## PYLE, ROME, LICHTEN & EHRENBERG, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles

Lara A. Sutherlin
Jennifer B. Rieker
Alison D. Morantz
M. Amy Carlin

*Also admitted in Maine
**Also admitted in New York

Telephone (617) 367-7200
Fax (617) 367-4820

October 8, 2003

Stephen Brennan, General Manager
New Seabury Properties
20 Red Brook Road
Mashpee, MA 02649

RE:   Patricia Cosgrove

Dear Mr. Brennan:

    We have not heard from you in response to our correspondence dated September 30, 2003, which enclosed a copy of the Charge of Discrimination we are filing on Ms. Cosgrove's behalf with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission. However, we understand from Ms. Cosgrove that you may not have received it, and we are attaching both our letter and the Charge here.

    We have now learned that when Ms. Cosgrove returned to work yesterday, on the exact day her maternity leave elapsed, she was informed that she no longer has a job.

    New Seabury Properties' action here is untenable and discriminatory. Ms. Cosgrove made it clear to New Seabury Properties on May 2, 2003 that she was accepting the position of Administrative Assistant, not because it was a position she wanted, but because New Seabury had eliminated her Sales Manager position and had given her no other option if she wanted to continue working. Ms. Cosgrove accepted this position in writing, by letter to you dated May 2, 2003. In that letter, she also informed you of her belief that New Seabury's elimination of her position after she gave notice of her pregnancy was discriminatory, and that barring New Seabury's reconsidering her demotion, she would be filing a discrimination claim.

**PYLE, ROME, LICHTEN & EHRENBERG, P.C.**

Mr. Stephen Brennan
October 8, 2003
Page 2 of 2

In light of the above, New Seabury Properties' action here is on its face unlawful retaliation and evidences a serious disregard for Massachusetts' anti-discrimination laws.  We plan to add New Seabury Properties' most recent act of discrimination to Ms. Cosgrove's Charge and file it immediately.

Please call me if you would like to discuss this matter.

Sincerely,

M. Amy Carlin

Enclosures
cc:    Shannon Liss-Riordan, Esq.
       Patricia Cosgrove

# Exhibit J



# PAYROLL CHANGE NOTICE

and

## NEW HIRE AUTHORIZATION



Today's Date: _3/5/03_

Dept. #: _520_     Dept. Name: _Golf maint._

Effective Date: _3/12/03_

Employee/New Hire Name: _Dan Stone_

Social Security Number: _011 - 70 - 6198_

Employee File Number: _604_

## Reason For Change(s):

| | | | |
|---|---|---|---|
| ☐ New Hire | | ☐ | Probationary Period Completed |
| ☐ Re-hire | | ☐ | Length of Service Increase |
| ☐ Promotion | | ☐ | Re-evaluation of Exisiting Position |
| ☐ Demotion | | ☐ | Resignation |
| ☐ Transfer | | ☐ | Termination (Reason, see other below) |
| ☐ Merit Increase | | ☐ | Layoff |
| | | ☐ | Eligible for Rehire (Y or N, see other below for explanation) |

☐ Leave of Absence     From: [          ]     To: [          ]

(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☐ Other (details)     _____

| | | FROM | TO |
|---|---|---|---|
| ☐ | Department | 520 | 520 |
| ☑ | Position | Golf Super. | Asst Super. |
| ☑ | Rate | $2230.77  58,000. | $1730.77 Biwk  45,000. |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:     Yes          No          Signed Policy Attached: _____

Change Authorized By: _____     Date: _____

Change Approved By: _(signature)_     Date: _3/5/03_

CONFIDENTIAL

C362

## CHANGE OF STATUS

Name: _Scott Nickerson_     Effective Date _1-27-03_     File No. _____

New Hire _____     Rehire _____     Transfer _____     Termination _____

Source: Advertisement ___ Employee Referral ___ Resume ___ Walk In ___
Employment Agency ___ Dept/Emp.& Training ___ Other ___

Merit Increase ___     Promotion ___     Other ✓
_CHANGE IN POSITION & RESPONSIBILITIES_

### New/Current Status:                              Change To:

Department Name _____          Department Name _____
Department Number _____          Department Number _____

Job Title _DIR. OF GOLF OP'S_          Job Title _GOLF COURSE SUPT._
Pay Grade _____          Pay Grade _____

Salary: $_____ Hour          Salary: $_____ Hour
$_____ BiWeekly          $_3,1539_ BiWeekly
$_90,000_ Annual          $_81,000_ Annual

Non-Exempt _____ Exempt ✓          Non-Exempt _____ Exempt ✓
Tip ___ Ind-Tip ___ Non-Tip ___          Tip ___ Ind-Tip ___ Non-Tip ___

Status Type:          Status Type:
Full Time ___ Part Time ___          Full Time ___ Part Time ___
Temporary ___ End Date ___          Temporary ___ End Date ___
Seasonal ___ End Date ___          Seasonal ___ End Date ___

Scheduled Hours per Week _____          Scheduled Hours per Week _____
Adj. Hours/Emp Convenience _____          Adj. Hours/Emp Convenience _____

Performance Review Date: _____          Performance Review Date: _____

Authorized Use of Company Vehicle          Authorized Use of Company Vehicle
Yes ✓ No ___          Yes ✓ No ___
(If yes attach signed Vehicle Policy)          (If yes attach signed Vehicle Policy)

CONFIDENTIAL

0363

 

## PAYROLL CHANGE NOTICE

and

## NEW HIRE AUTHORIZATION

Today's Date:  _1-15-03_

Dept. #:  _510_          Dept. Name:  _GOLF OPERATIONS_

Effective Date:  _1-20-03_ ✓

Employee/New Hire Name:  _Robert McGraw_

Social Security Number  ___-___-___

Employee File Number:  _____

**Reason For Change(s):**

| | | | |
|---|---|---|---|
| ☐ | New Hire | ☐ | Probationary Period Completed |
| ☐ | Re-hire | ☐ | Length of Service Increase |
| ☐ | Promotion | ☒ | Re-evaluation of Exisiting Position |
| ☐ | Demotion | ☐ | Resignation |
| ☐ | Transfer | ☐ | Termination (Reason, see other below) |
| ☐ | Merit Increase | ☐ | Layoff |
| | | ☐ | Eligible for Rehire (Y or N, see other below for explanation) |

☐ Leave of Absence     From: _____     To: _____

(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☒ Other (details)  _____

_____

_____

| | | | |
|---|---|---|---|
| ☐ | Department | | |
| ☒ | Position | _Head Golf Prof._ | _Dir. of Instruction_ |
| ☒ | Rate | _2230.77_ | _1346.15_ |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:     Yes ✓     No          Signed Policy Attached: _____

Change Authorized By: _____     Date: _____

Change Approved By: _~~signature~~_          Date: _1-15-03_

CONFIDENTIA

´36´

# Exhibit K



# New Seabury® Cape Cod



---

Date:   January 15, 2003

---

To:   Mark J. O'Neil, Sr.

From:  Rhonda H. Rodgers

CC:   Lee O'Shea, Personnel

Re:   Notification of Maternity Leave

---

This is to notify you of my request for a twelve-week maternity leave beginning on or about my due date of February 28, 2003. It is my understanding that I will be paid 60% of my weekly salary for the first eight weeks of my leave and will not be paid for the remaining 4-week period.

I intend on returning to my current position in a full time capacity at the end of my twelve-week leave. Please let me know if you require any additional information.

Thank you.

CONFIDENTIAL

0360

New Seabury Properties 98-1, LLC • New Seabury Properties 98-2, LLC • New Seabury Development, LLC
New Seabury Properties, LLC • New Seabury Resource Management, Inc. • Architectural Review Committee
Post Office Box 549, 155 Rock Landing Road, Mashpee, MA 02649-0549 • Phone: 508 477 9111 • Fax: 508 477 9790 • http://www.newseabury.com

# Exhibit L

# PAYROLL CHANGE NOTICE

and

# NEW HIRE AUTHORIZATION



day's Date: _5/12/03_

pt. #: _501_    Dept. Name: _Membership_

fective Date: _5/2/03_

mployee/New Hire Name: _Rhonda Rodgers_

cial Security Number: _381 - 90 - 1042_

mployee File Number: _8784_

**eason For Change(s):**

| | | | |
|---|---|---|---|
| ☐ | New Hire | ☐ | Probationary Period Completed |
| ☐ | Re-hire | ☐ | Length of Service Increase |
| ☐ | Promotion | ☐ | Re-evaluation of Exisiting Position |
| ☐ | Demotion | ☐ | Resignation |
| ☐ | Transfer | ☐ | Termination (Reason, see other below) |
| ☑ | Merit Increase | ☐ | Layoff |
| | | ☐ | Eligible for Rehire (Y or N, see other below for explanation) |

☐ Leave of Absence    From: [        ]    To: [        ]

(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☐ Other (details)

_Did not return from maternity leave_

| | | | |
|---|---|---|---|
| ☐ | Department | | |
| ☐ | Position | | |
| ☐ | Rate | | |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:    Yes    No    Signed Policy Attached: _____

Change Authorized By: _____    Date: _____

Change Approved By: _____    Date: _____

0357

CONFIDENTIAL

# Exhibit M



# New Seabury® Cape Cod



**To:** Stephen Brennan, General Manager

**From:** Michele M. O'Brien

**Date:** 2/14/03

**Re:** Maternity Leave

---

This letter is to serve as notice for my request for twelve-week maternity leave beginning on or about my due date of August 28, 2003. As stated in the New Seabury Resource Management, Inc Employee Handbook, I understand as a full-time employee I will receive 60% of my average weekly salary paid in accordance with Company payroll schedule for a period of eight weeks.

At the end of this twelve-week leave, it is my intention to resume my current position and schedule.


*Michele M. OBrien*                    02-14-08

Michele M. O'Brien                    Date


*[signature]*                         8/21/03

Stephen Brennan                       Date


*Steve--*
*Please sign and*
*forward to Lee*
*O'Shea for my*
*employee file.*
*Thank you - michele*

*Steve -*
*michele is*
*aware that it*
*is for only 8 wks*
*Lee*

CONFIDENTIAL    0356

New Seabury Properties 98-1, LLC • New Seabury Properties 98-2, LLC • New Seabury Development, LLC
New Seabury Properties, LLC • New Seabury Resource Management, Inc. • Architectural Review Committee
Post Office Box 549, 155 Rock Landing Road, Mashpee, MA 02649-0549 • Phone: 508 477 9111 • Fax: 508 477 9790 • http://www.newseabury.com

# Exhibit N



# PAYROLL CHANGE NOTICE

and

## NEW HIRE AUTHORIZATION

 

Today's Date: **3/10/03**

Dept. #: **330**    Dept. Name: _Condo R-E Sales_

Effective Date: **3/10/03**

Employee/New Hire Name: _Michele O'Brien_

Social Security Number: 033 - 64 - 4516

Employee File Number: 1172

**Reason For Change(s):**

| | |
|---|---|
| ☐ New Hire | ☐ Probationary Period Completed |
| ☐ Re-hire | ☐ Length of Service Increase |
| ☐ Promotion | ☐ Re-evaluation of Existing Position |
| ☐ Demotion | ☐ Resignation |
| ☐ Transfer | ☐ Termination (Reason, see other below) |
| ☐ Merit Increase | ☑ Layoff  _Department change_ |
| | ☐ Eligible for Rehire (Y or N, see other below for explanation) |

☐ Leave of Absence    From: ☐    To: ☐
(FMLA, WORKERS COMP., DISABILITY, PROVIDE DETAILS BELOW)

☐ Other (details)

| | | | |
|---|---|---|---|
| ☐ | Department | | |
| ☐ | Position | | |
| ☐ | Rate | | |
| ☐ | Exempt/Non | | |
| ☐ | FT/PT, Seasonal | | |

Use of Company Vehicle:    Yes    No    Signed Policy Attached:

Change Authorized By: _[signature]_    Date: 3/20/03

Change Approved By: _____    Date: _____

CONFIDENTIAL    0353

# Exhibit O

*Perry*

EXHIBIT NO. 1

D. RUMSON

POSITION TITLE:        Sales Manager

DEPARTMENT:          Conference Sales

REPORTS TO:           Director of Sales

EXEMPT:    x                          NON-EXEMPT: _____

POSITION:

    Responsible for soliciting and booking group business and ensuring Group booking goals are met.

RESPONSIBILITIES:

1. Solicit group business through telemarketing.

2. Solicit group business via personal calls to corporations and other Group markets in assigned territory.

3. Arrange and perform site inspections of the property to potential Clients.

4. Ensure timely and accurate communication in both client and hotel Operation team.

5. Develop and maintain accurate and workable trace files to ensure timely contact of existing accounts.

6. Monitor the status of all bookings to ensure contracts and deposits are received in a timely manner.

7. Provide Conference Services department with accurate details and all pertinent information when turning over files.

7. Maintain contact with client and conference service representative Assigned to group while their events are taking place.

9. Attend and staff Trade Shows.

10. Attend local and regional trade meetings, i.e.,H.S.M.A., Meeting Planners International, etc.

11. Submit weekly activities report to Director of Sales.

12. Perform special projects as assigned by Director of Sales.

QUALIFICATIONS:

    EDUCATION:  College degree preferred.
    EXPERIENCE: Hotel or Other sales experience required.
    OTHER:      Overnight Travel flexability required.

# Exhibit P

1               UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF MASS

3                  C.V. NO.: 05-10791-GAO

4

5      * * * * * * * * * * * * * * * * * * * * * * * *

6    PATRICIA COSGROVE,                              *

7                       Plaintiff,                   *

8                       vs.                          *

9    NEW SEABURY RESOURCES,                          *

10   MANAGEMENT, INC.,                               *

11                      Defendant.                   *

12     * * * * * * * * * * * * * * * * * * * * * * * *

13

14          DEPOSITION OF:  PATRICIA COSGROVE

15

16          LAW OFFICE OF HOWARD WILGOREN

17                 6 Beacon Street

18           Boston, Massachusetts 02110

19

20

21      January 16, 2006    10:00 a.m. - 4:53 p.m.

22

23                 KATHRYN K. GIANNO

24                  COURT REPORTER

```
1    APPEARANCES:

2    Representing the Plaintiff:

3         HILLARY SCHWAB, ESQ.

4         PYLE, ROME, LICHTEN, ETTRENBERG

5         18 Tremont Street, 15th Floor

6         Boston, MA 02108

7         Tel.: 617.367.7200

8

9    Representing the Defendant:

10        HOWARD WILGOEN, ESQ.

11        6 Beacon Street

12        Boston, MA 02110

13        Tel.: 617.523.5233

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                         I N D E X

 2    WITNESS:  PATRICIA COSGROVE

 3

 4                        EXAMINATION

 5    MR. WILGOREN              5

 6
```

```
 7    EXHIBITS
                                                    PAGE
 8    1    Resume for Patricia A. Cosgrove................   54

 9    2    Trial Employment Agreement Dated

10         November 17, 2003 to Patricia Cosgrove

11         from Mark Snider..............................   75

12    3    Stanmar Benefit Package 12-01-03..............   94

13    4    Enrollment Form for Insurance.................   97

14    5    Eligibility Form for Dental...................   98

15    6    Pay Stubs from Stanmar........................   98

16    7    New Seabury Employee Handbook.................  125

17    8    Memo Requesting Maternity Leave Dated

18         February 3, 2003.............................  139

19    9    E-mail to Steve Brennan Dated April 30, 2003.....  152

20    10   Letter to Steve Brennan from Patricia Cosgrove

21         Dated May 2, 2003............................  159

22    11   E-mail from Lee O'Shea to Patricia Cosgrove

23         Dated May 6, 2003............................  170

24    12   Medical Note from Jean Talbert, M.D., Dated
```

1       May 6, 2003...................................... 173

2    13  E-mail from Patricia Cosgrove to Stephen

3        Brennan Dated May 7, 2003....................... 181

4    14  Photographs of Warehouse Facility............... 200

5    15  Photographs of Warehouse Facility............... 200

6    16  Job Description Prepared by Patricia Cosgrove.... 208

7    17  E-mail from Patricia Cosgrove to Stephen

8        Brennan Dated October 30, 2003.................. 217

9    18  Complaint....................................... 223

10   19  Plaintiff's Answers to Defendant's First

11       Set of Interrogatories.......................... 228

12   20  Classified Ad from Newspaper.................... 264

13   21  Social Security Statement of Benefits........... 269

14   22  Individual Tax Return 2003...................... 271

15   23  Individual Tax Return 2004...................... 275

16

17

18

19

20

21

22

23

24

1       Q       I stand corrected.  I said it was a bad

2    choice of words.  And that was done -- you were on

3    the clock when you were doing that, you were being

4    paid for that time?

5       A       Yes.

6       Q       And you say it wasn't done with the

7    consent, but it was done with the full knowledge of

8    the management of New Seabury?

9       A       Correct.

10      Q       On how many occasions during the course of

11   a regular day would it be necessary for you to leave

12   your work site and go to Tanya Copestik's office in

13   the administration building to pump your breasts?

14      A       Once or twice a day.

15      Q       How long would that entire process take?

16      A       Generally, 15 to 20 minutes each time.

17      Q       That would include leaving your work site,

18   getting in your car, driving over there, doing what

19   was necessary to pump your breasts and driving back?

20      A       Yes.  I would say, approximately.

21      Q       Fifteen to 20 minutes?

22      A       Yes.

23      Q       Maybe a little more?

24      A       Maybe a little more, maybe a little less.

```
1        A    No.

2        Q    How did you assign the rooms?

3        A    I was working in a program in the computer

4    that allows me to block rooms for corporate groups

5    separate from social reservations.

6        Q    And then you said you got a promotion?

7        A    Yes.

8        Q    Do you remember when that was?

9        A    Maybe a couple months after I started.

10       Q    What did your job duties consist of at

11   that time?

12       A    Selling the actual rooms and function

13   space, meeting with clients, showing the property.

14       Q    How would you go about -- did you obtain

15   clients?

16       A    We were given lists for cold calling and I

17   would assume -- I assumed lists from other sales

18   staff.

19       Q    Were you proactive in any way in obtaining

20   customers or clients?

21            MS. SCHWAB:  Objection.

22            THE WITNESS:  Yes.

23   Q    (By Mr. Wilgoren:)  What would you do?

24       A    We would come up with creative ways to
```

1    draw in new clients, the sales team would.

2          Q      Did your job change at some point in time?

3          A      At some point in time from start to

4    finish?

5          Q      Yes.

6          A      Yes, it did.

7          Q      When was the next change in your job

8    responsibilities or title?

9          A      I would say probably the next significant

10   change was when the old clubhouse was torn down and

11   the new clubhouse was built.

12         Q      What happened to your job at that time?

13         A      They relocated me to the sales office in

14   the new country club.

15         Q      What was your job title at that point?

16         A      It was the same position.

17         Q      So your position stayed the same until it

18   was eliminated?

19         A      Yes.

20         Q      That was Sales Manager?

21         A      Sales Manager, correct.

22         Q      And is it fair to say that, particularly

23   when you were in the country club when you relocated

24   there, that the focus of your job was on the lodging

1    aspect of groups that would come to New Seabury?

2        A    That was probably 50 percent of the job

3    description.

4        Q    Well, without regard to the job

5    description, I'm asking you about what your actual

6    job duties were on a day-to-day basis.

7        A    Yes, that was primarily my responsibility.

8        Q    Tell me how you would go about handling

9    groups that came in, the lodging aspect of that.

10       A    I would assign them -- block them rooms,

11   with the initial contact from the client, I believe,

12   I blocked the rooms based on their needs for their

13   attendees.  I would also set up function space for

14   them and meeting rooms.

15       Q    You set up the function space?

16       A    Yes.

17       Q    How would you go about doing that?

18       A    I would secure and reserve function space

19   based on our availability.

20       Q    How would you do that?

21       A    They had a log, quite a large book in the

22   conference sales and catering sales department that

23   recorded all events going on on a day-to-day basis.

24       Q    What else did you do?

```
 1      A     Rooms, function space, meeting space.  I

 2  would secure the meeting space the same way.

 3      Q     In the logbook?

 4      A     By looking at the log, correct.

 5      Q     Where is this logbook located?

 6      A     In the sales office in the country club.

 7      Q     Then at some point would you transfer the

 8  group over to someone else in the sales department?

 9      A     The catering sales department would then

10  handle it for all food and beverage selections.

11      Q     Who would you hand the case off to?

12      A     Generally the manager of catering sales.

13      Q     Who was?

14      A     Jennifer Perry at the time.

15      Q     What percentage of your job

16  responsibilities for groups revolved around lodging?

17      A     100 percent.

18      Q     So the other functions were very little

19  part -- took up very little part of your time?

20      A     They were in conjunction with the rooms.

21            MR. WILGOREN:  Let's have this marked as

22      Exhibit 1.

23

24                        (Exhibit No. 1, Resume for
```

1    corporations or other group markets did you

2    undertake?

3        A    I'm not sure I follow the question.

4        Q    Well, you list your -- I take it under

5    "New Seabury Properties" in your resume, that you

6    engaged in "related marketing endeavors to

7    corporations and other group markets."  Do you see

8    that, the first line under "New Seabury"?

9        A    Oh, "telemarketing, mailings and related

10   marketing endeavors."

11       Q    Right.

12       A    Telemarketing would be cold calls;

13   mailings, we sent out specific promotions.

14   Especially when the new club opened, we introduced

15   the new club with new conference space, state of the

16   art function and meeting space.  Related marketing

17   endeavors would probably relate to any off-site

18   sales meetings, Chamber meetings, expos.

19       Q    You would attend all of those?

20       A    Yes.

21       Q    Now, what is "a range of performed site

22   inspections of the property to potential clients"

23   mean?

24       A    Clients would set up an appointment with

1    myself or other sales teams to view the property and

2    view the sleeping accommodations, the whole property

3    from function rooms, to meeting rooms, to

4    restaurant, to pool and tennis facilities and

5    lodging.

6        Q    That's something that you or other members

7    of the sales staff, catering sales staff would

8    perform?

9        A    Catering sales, no.

10       Q    Who do you mean by "sales staff"?

11       A    It would be directly in conference sales.

12   At one point it was Rhonda Rogers, Tanya Copestik

13   and myself.

14       Q    Who was it after your job was eliminated?

15       A    After my job was eliminated?

16       Q    Right.

17       A    I couldn't say.

18       Q    Or prior to your job being eliminated?

19       A    Just myself.

20       Q    Just yourself?  You were the only one that

21   showed potential clients the facility?

22       A    No.

23       Q    Who else would do that?

24       A    The catering sales probably showed

1      Q      Would the catering sales staff also book

2      meeting and function space?

3      A      Yes.

4      Q      And take reservations, revisions, deposits

5      and billings?

6      A      They would not take reservations, no.

7      Q      Well, lodging reservations?

8      A      No.

9      Q      You were the only one that did that until

10     your job was eliminated?

11     A      Yes.

12     Q      Would the catering sales staff also create

13     and maintain existing group accounts, contracts,

14     deposits, and invoices?

15     A      Yes.

16     Q      And assist clients with all on- and

17     off-property activity arrangements as needed?

18     A      Yes.

19     Q      And assist catering sales in function,

20     setup, and other departments as needed?

21     A      Yes.

22     Q      Attend weekly events, order food and

23     beverage meetings to address needs related to

24     upcoming group events?

```
 1      A    Yes.
 2      Q    Would the other folks in catering sales
 3 also attend local retail trade shows and meetings?
 4      A    Yes.
 5      Q    Including Cape Cod Chamber of Commerce
 6 meetings?
 7      A    On occasion, yes.
 8      Q    And the Cape Cod Hospitality Marketing
 9 Association meetings?
10      A    No.
11      Q    No?  You were the only one that went to
12 those meetings?
13      A    Yes.
14      Q    Where were those meetings held?
15      A    Different locations on the Cape, hotels or
16 restaurants.
17      Q    How many hours a week did you work?
18      A    Forty-plus.
19      Q    Forty-plus?  What does "40-plus" mean?
20      A    Forty on a regular basis, but more if they
21 needed me to.
22      Q    You didn't have a rule that you would work
23 no more than 40 hours?
24      A    No.
```

```
 1        A      When did I first become pregnant or when
 2   did I notify them?
 3        Q      When did you first become pregnant?
 4        A      November '02.
 5        Q      When did you first notify anyone at New
 6   Seabury that you were pregnant?
 7        A      February of '03.
 8
 9                          (Exhibit No. 8, Memo Requesting
10                          Maternity Leave Dated February
11                          3, 2003.)
12
13   Q      (By Mr. Wilgoren:) Ms. Cosgrove, I'll show you
14   what's been marked as Deposition Exhibit No. 8 and
15   ask if you can identify that document.
16        A      It's the memo requesting maternity leave
17   to the general manager.
18        Q      That's Steven Brennan?
19        A      Yes, with a copy to Mark O'Neil.
20        Q      When was Mr. Brennan engaged as the
21   general manager; do you know?
22        A      Maybe January of '03.
23        Q      Who was the general manager prior to that
24   time?
```

1      A      He acknowledged the fact that he had

2    received my request for a maternity leave, and

3    congratulated me. And I then informed him I had

4    planned on staying at New Seabury through my

5    maternity leave and -- up to my maternity leave if

6    my health permitted me to, and I intended on coming

7    back as a full-time employee after my maternity

8    leave.

9      Q      What, if anything, did Mr. Brennan

10   respond?

11     A      And then he was, like, "Well, unless

12   you're like my wife and you're on bed rest for a

13   while and don't ever go back to work." Something to

14   that extent.

15            And I said, "I totally am committed

16   to coming back to work after my maternity leave."

17     Q      All of which was what you said in the

18   memorandum?

19     A      Yes.

20     Q      Why did you feel the need to reiterate

21   that if it was in your memorandum?

22     A      Because I believe that personal contact is

23   a good way to handle things as well.

24     Q      Did he ever tell you you couldn't have

1       A       He mentioned that there would be a pay cut

2    from my hourly salary from, I think it was $17 to

3    $12 an hour.

4       Q       Was there any further discussion about the

5    job you were being offered?

6       A       That the hours -- I had asked if the hours

7    would change, if it was still Monday through Friday.

8    And he had informed me that he would like it to be

9    Tuesday through Saturday since Saturday is one of

10   the busiest days for the catering sales department,

11   and that's when they need the most help for sites.

12   And the other catering sale staff was usually very

13   busy with weddings and functions on that day, so

14   they would need someone in the office.

15      Q       So the office was another reason, the fact

16   that the administrative office was closed on Monday.

17   Was that communicated to you?

18              MS. SCHWAB:  Objection.

19              THE WITNESS:  No, it was never closed on

20       Monday.

21      Q       (By Mr. Wilgoren):  Did other members of

22   the catering department work Tuesday to Saturday as

23   well?

24              MS. SCHWAB:  Objection.

1    Q    They all felt it was just a bad business

2  decision or unfortunate?

3          MS. SCHWAB:  Objection.

4          THE WITNESS:  No, I don't believe they

5          commented either way.

6  Q    (By Mr. Wilgoren:) Is that the only people you

7  spoke to about the elimination of your job up to

8  May 5, 2003?

9    A    No, I believe I mentioned that, as well,

10  there was family and friends that I spoke to about

11  my elimination.

12

13                    (Exhibit No. 10, Letter to Steve

14                    Brennan from Patricia Cosgrove

15                    Dated May 2, 2003.)

16

17  Q    (By Mr. Wilgoren:) Ms. Cosgrove, I've put in

18  front of you what's been marked Deposition Exhibit

19  No. 10.  Can you identify this document?

20    A    Yes, it was the document that I sent to

21  Steve after he informed me of my position being

22  eliminated.

23    Q    Well, look at the date, it's May 2, 2003.

24  That would have been the Friday after the Monday.

1          THE WITNESS:  I believe it was part of the

2     reason.

3     Q    (By Mr. Wilgoren:)  But you were not denied

4     maternity leave, were you?

5     A    No, I was not.

6     Q    So you met with Steve Brennan on May 5,

7     2003?

8     A    Yes.

9     Q    Where did the meeting take place?

10    A    In Jen Perry's office.

11    Q    Who was present?

12    A    Jen Perry, Steve and myself.

13    Q    Tell me, to the best of your recollection,

14    exactly what each individual in the room said at

15    that meeting.

16    A    To the best of my recollection, Steve had

17    my letter in his hand and said, "I received your

18    letter and it is what it is.  Your position has been

19    eliminated as conference sales manager.  We've

20    offered you a position as administrative assistant

21    in the sales office, and that's the offer on the

22    table."

23    Q    Did anyone else say anything in response?

24    A    No, Jennifer was silent.

1    Q   Did you say anything?

2    A   I said, "Well, I really would like my old

3  job back." And I stated the reasons why, because I

4  felt I was needed by the sales office to perform my

5  job as I had always been, and it was my recollection

6  that, at a past meeting with Mark O'Neil, we were to

7  work as a team, and that the sales office would be

8  combining conference sales and the catering sales to

9  work together as one department. And I was misled,

10  and I feel that my position is still needed.

11           But if this is the only the position

12  that's available, I will accept the position,

13  because I can't afford to be without a job or

14  healthcare benefits. So I intend on accepting the

15  position and will return after maternity leave.

16    Q   So your intention was to stop working at

17  that point as of the meeting?

18    A   No, to accept the position and return to

19  it when I come back from maternity leave.

20    Q   Anything else? Is that the full

21  recollection of what everyone said at the meeting?

22    A   Yes, it was a very short meeting.

23    Q   What did you do after the meeting?

24    A   I went back to work.

1      A      I don't know exactly what she said, but it

2    was something to the effect that, "Do what you need

3    to do.  Take care of yourself; you're pregnant."

4      Q      Had you provided any medical

5    documentation, any notes from Dr. Talbert prior to

6    May 6, 2003 to support the varicosity issue?

7      A      No, I don't believe so.

8      Q      What limitations on your activities did

9    you place on yourself outside of work as a result of

10   the varicosity issue?

11     A      Outside of work?

12     Q      Yes.

13     A      Rest with my right leg elevated, three

14   times a day.

15     Q      What had happened as of -- strike that.

16            You told me a few moments ago, Ms.

17   Cosgrove, that prior to receiving Lee O'Shea's

18   e-mail, you hadn't considered getting a medical

19   note.  What prompted the change, the drastic change

20   that resulted in Dr. Talbert writing this letter

21   recommending that you stop work as of May 11, 2003?

22     A      Based on her examination in her office,

23   she felt it best that I remain off my feet.

24     Q      And did you remain off your feet for the

1    duration of your pregnancy?

2        A    No, I did not.

3        Q    So, you stopped working because you were

4    supposed to remain off your feet, but you're

5    testifying here now that you did not follow the

6    doctor's advice and remain off your feet?

7        A    I followed the doctor's advice with her

8    restrictions to remain off my feet.  That

9    constituted the three times a day resting with my

10   feet elevated.  I was not housebound or bedridden.

11       Q    So, you elevated your foot three times a

12   day.  How long did you elevate your foot three times

13   a day, for each time?

14       A    An hour.

15       Q    What times during the day or night?

16       A    Morning, noon, and night, approximately.

17       Q    And that was the reason why you had to

18   stop work as of May 11, 2003?

19       A    Yes.

20       Q    Could you have elevated your leg at work

21   one of the three times and done the other two hours

22   at home?

23            MS. SCHWAB:  Objection.

24            THE WITNESS:  I did elevate my leg at

1      work.

2    Q      (By Mr. Wilgoren:)  I mean, after May 11?

3      A      Could I have?

4    Q      Yes.

5      A      I suppose I could have if my condition

6   hadn't progressed the way it did.

7      Q      How did your condition progress the way it

8   did as of May 11, 2003?

9      A      Because I was on my feet quite a bit at

10   work, it was not good for me to be on my feet.  My

11   job entailed a lot of walking.

12    Q      Where did you have to walk to as part of

13   your job responsibilities?

14     A      Up and down the stairs, using the

15   elevator, or showing the property to potential

16   clients, walking the property.

17    Q      How many occasions between January 2003

18   and April 28, 2003 or May 6, 2003 did you walk the

19   property to show it to customers?

20     A      I would say a couple times a week.

21    Q      Do you remember the names of any

22   particular clients that you did that with?

23     A      No, I don't.

24    Q      So, other than the -- let me just

1    2003?

2        A    Yes, I had no restrictions for driving.

3        Q    So, you testified that you were going to

4    continue for two weeks after May 6th in your

5    position as sales, conference sales, correct?

6        A    Approximately, right.

7        Q    You're sure about that?

8        A    Yes, it was probably about a week to ten

9    days, somewhere in there.

10        Q    Not a few days?

11        A    Well, from the time I gave my notice until

12    the time my doctor wanted me to finish.  No, it

13    wasn't a couple weeks, it was a matter of days.  But

14    from the change in my position in April to the

15    middle of May, it was a couple weeks.

16        Q    I see.

17

18                        (Exhibit No. 13, E-mail from

19                        Patricia Cosgrove to Stephen

20                        Brennan Dated May 7, 2003.)

21

22    Q    (By Mr. Wilgoren:) Let me show you what's been

23    marked as Deposition Exhibit No. 13.  Can you

24    identify this document?

1    seat in the sales office.

2                      And then some short time after,

3    another employee asked me to report to Steve in

4    his office.

5         Q    Had you indicated to anyone at New Seabury

6    that you were intending to return to work on

7    October 7th?

8         A    Yes, I spoke with Lee O'Shea and I spoke

9    with the administrative assistant at the time for

10   Steve.

11        Q    When did you speak with Lee O'Shea?

12        A    Probably about a week or two prior to

13   that.

14        Q    Why did you call Lee O'Shea?

15        A    To find when the exact day was that my

16   maternity leave was ended, I guess.

17        Q    Why would you call Lee O'Shea regarding

18   that?

19        A    Because she had the attendance record and

20   my personnel file as to when I left.  And she knew

21   how much vacation time I used and personal time and

22   maternity leave time.

23        Q    Tell me, as best you can recollect, the

24   full extent of your conversation between you and Lee

1    O'Shea.

2        A    Just a brief conversation checking on the

3    exact day I was to return, and what maternity leave

4    time I had used and vacation time up until then, and

5    what I had remaining when I returned.

6        Q    What, if anything, did Lee O'Shea say to

7    you?

8        A    She stated to me what I had used for

9    maternity leave and vacation and personal time.

10       Q    Did she tell you when you should be

11   reporting back to work?

12       A    I believe she confirmed with me, when I

13   had given her the date, she said, "That should be

14   the day that you should be returning."

15       Q    That was October 7th?

16       A    I believe so, yes.

17       Q    Now, you spoke to, you said, Steve

18   Brennan's administrative assistant?

19       A    Yes.

20       Q    What was that person's name?

21       A    At the time it was Jean Civitolo.

22       Q    And you called Jean Civitolo on the phone?

23       A    I actually called Steve, but Jean picked

24   up the phone.

193

1     Q    Tell me, if you will, the full extent of

2   your conversation with Jean Civitolo on that day.

3     A    I asked if Steve was in and she said he

4   wasn't in.

5               She asked if there was a message, and

6   I said I just wanted to touch base with Steve and

7   let him know that I'm going to be returning from

8   maternity leave, and that I would return on

9   October 7th, and I just wanted him to confirm that

10  with me; to please call me back about returning.

11    Q    Why did you call Steve Brennan?

12    A    He's the general manager.  I assumed that

13  he would report it to my supervisor.

14    Q    Well, your supervisor -- you mean Jen

15  Perry?

16    A    Yes.

17    Q    She was your supervisor when you were

18  conference sales, correct?

19    A    Right.

20    Q    Did Mr. Brennan call you back?

21    A    No.

22    Q    So, I think, before we digress back, you

23  had been told that Steve Brennan wanted to see you?

24    A    Yes.

1        Q    You were at the country club?

2        A    Yes.

3        Q    You got in your car and drove to

4   Mr. Brennan's office?

5        A    Correct.

6        Q    You had a meeting with Mr. Brennan?

7        A    Yes.

8        Q    In his office?

9        A    No.

10       Q    Where was the meetings?

11       A    Lee O'Shea's office.

12       Q    Who was present?

13       A    Lee O'Shea, Steve and myself.

14       Q    And tell me everything everyone said at

15   that meeting.

16       A    I remember waiting for Steve in Lee's

17   office, and Steve had come in and I informed him I

18   was back to work today, and that Jennifer wasn't

19   aware I was coming back.

20            And he stated, "We have nothing for

21   you." And I said, "What do you mean, you have

22   nothing for me?  I'm returning from maternity leave;

23   you've got to have a job for me."

24            And he said, "You never accepted the

1    position as administrative assistant in the country

2    club." I said, "I didn't accept that position.

3    That position was offered to Michelle O'Brien. You

4    offered me the administrative assistant in the sales

5    office, which I accepted prior to my maternity

6    leave."

7              And he said, "Well, that position

8    isn't available anymore." And I said, "Well, I

9    understand that when I went out on maternity leave

10    someone was asked to fill in the position while I

11    was on maternity leave, because it was a busy time

12    of year. And she was contacted and did so.

13              And Laura Lee, who filled in, was

14    leaving in another two weeks after I returned to

15    work. And it seemed to me that at the time that I

16    returned that Laura Lee was in a perfect position to

17    train me when I returned."

18              And he said, "Well, that position is

19    not available anymore," again. And I said, "It's

20    got to be available. You offered me the job and I'm

21    coming back to work."

22              And he said, "I'm telling you we have

23    nothing for you." I said, "Well, you have to have

24    something for me." I said, "I accepted the

1    not you had complied with the New Seabury policy

2    about returning to work from pregnancy leave?

3        A   No.

4        Q   No discussion whatsoever?

5        A   No.

6        Q   So then, did you, in fact, return to work

7    the next day?

8        A   Yes, I did.

9        Q   What happened?

10       A   I returned to the country club, and Steve

11   had said I should wait for John Shea, who was in

12   communications, to give me a project to do.  And I

13   waited for an hour or two, whatever, and he showed

14   up and said to come down to the warehouse.

15              And Steve had mentioned there were

16   some old files that they were trying to get on disk

17   or something that needed to be scanned that had been

18   sitting there and nobody had a chance to do it.  And

19   the person who was doing it was no longer employed

20   there.

21       Q   Did they tell you who the person who had

22   previously done it was?

23       A   I think it was Robin.  She used to work at

24   the health club.  And when the health club was

1    closed, she did that in her spare time.

2        Q    What was Robin's position or job title, do

3    you know?

4        A    I really don't know.

5        Q    Would it surprise you to learn that she

6    was an administrative assistant?

7        A    As far as I know, she worked as the health

8    club -- not coordinator, but she worked at the desk

9    at the health club and she worked in reservations.

10       Q    Did she work at the beach club at some

11   point in time?

12       A    Oh, yes.  I think she did work at the

13   beach club at one point, yes.

14       Q    Were you aware that she was the

15   administrative assistant at the beach club?

16       A    Yes, and then, I believe, in off-season

17   when everything closed down, she did some busy work.

18       Q    And then got laid off?

19       A    I don't know if she got laid off.

20       Q    So, John Shea took you to the office area

21   in the warehouse?

22       A    He asked me to meet him at the warehouse.

23       Q    Now, when you say "the warehouse," where

24   particularly did you meet him?  Is there an office

1    in the warehouse?

2        A    There are partitioned offices in the

3    warehouse.

4        Q    So you weren't in the warehouse itself,

5    you were in one of these partitioned offices?

6        A    Right, which is inside the warehouse.

7        Q    All right.  And what happened when you got

8    there?

9        A    He basically showed me a box of files and

10    said that they needed to be scanned.  And he

11    instructed me on how to use the computer and

12    scanner, and said it was a very long and slow

13    process.

14        Q    Now, where was Mr. Shea's office; do you

15    know?

16        A    Directly behind the partitioned office

17    that was assigned to me.

18        Q    So, he was in the office next to your

19    office?

20        A    It wasn't so much an office, it was a

21    communications room with all kinds of --

22        Q    Did it have a desk in there?

23        A    It may have, I'm not sure.

24        Q    This office that you were assigned to work

```
 1  in, it had a desk?

 2       A    It had a desk, yes.

 3       Q    Okay.

 4

 5                         (Exhibit Nos. 14 and 15,

 6                         Photographs of Warehouse

 7                         Facility.)

 8

 9   Q    (By Mr. Wilgoren:) Ms. Cosgrove, let me show

10  you what's been marked as Deposition Exhibits No. 14

11  and 15 and ask if you can identify these documents.

12       A    They are pictures of the warehouse

13  facility.

14       Q    And show me where the picture is of your

15  office where you worked.

16       A    The top photo.

17       Q    On the top?

18       A    Yes, top photo here, just inside the door

19  there.

20       Q    Inside the door.  So we really don't see

21  your office except for peeking through the door?

22       A    Correct.

23       Q    You didn't work in this outside area at

24  all, did you?
```

```
 1      A    No.

 2      Q    In fact, you never set foot in that

 3  outside area, did you?

 4      A    Yes, I did.

 5      Q    What purpose did you have for going in

 6  that --

 7      A    That was the only way I could get to my

 8  office, was to walk through that area.

 9      Q    Oh, I see.  How about the bottom picture,

10  what is that?

11      A    That's the area that I walked through.

12      Q    Isn't it true that you were given a key to

13  a separate entrance directly to your office?

14      A    No.

15      Q    That's not true?

16      A    That is not true.

17      Q    Anyone who said that would be telling a

18  lie?

19      A    I was given a key, but not to the building

20  itself.

21      Q    Well, let me call your attention to

22  Deposition Exhibit No. 14, the picture of the

23  exterior of the warehouse, correct?

24      A    Yes.
```

1  Q You didn't park here, did you?

2  A Yes.

3  Q Isn't it true that you went around the

4 side of the building and parked directly by a door

5 that entered directly to your office?

6  A No, I never did that.

7  Q If anyone said that you did, they would be

8 lying?

9  A Yes.

10  Q Now, there's a picture of a toilet here.

11  A Yes.

12  Q What is this picture of?

13  A That's the rest room used for male

14 employees and myself.

15  Q In fact, you never used this rest room,

16 did you?

17  A I tried not to.

18  Q You never used this rest room, did you?

19  A Yes, I did.

20  Q You're sure of that?

21  A Yes.

22  Q In fact, you were allowed to go to the

23 administration office to use the rest room

24 facilities there, were you not?

1       A    Yes, I was.

2       Q    In fact, that's where you -- when you had

3    to use the rest room facilities, that's where you

4    went, you didn't go to this toilet?

5            MS. SCHWAB:  Objection.

6            She testified she did go to that toilet.

7            THE WITNESS:  No, I did use that rest room

8        in the warehouse.

9    Q    (By Mr. Wilgoren:) You could also go to the

10   country club and use the rest room facilities there?

11      A    Yes.

12      Q    No one objected to you getting in your car

13   and driving a quarter mile away to use those

14   facilities any time you want, did they?

15      A    No.

16      Q    Was Mr. Shea your supervisor in this

17   project when you were scanning the documents?

18      A    No, I would say he was not.

19      Q    Who was supervising your work?

20      A    No one that I can recall.

21      Q    So, Mr. Shea wouldn't review the progress

22   you made in terms of the amount of documents you

23   scanned?

24      A    No.

1    allowed to.

2        Q    Sometimes if you talked to Tanya maybe it

3    was a little longer?

4        A    Yes.

5        Q    Maybe as much as a half hour?

6        A    It could have been.

7        Q    Could have been a half hour, twice a day?

8        A    It could have been; it could have been

9    less.

10       Q    Also, there was also heat in that office,

11   is that correct?

12       A    There was heat, yes.

13       Q    And you also were provided with a space

14   heater in addition?

15       A    Yes, it was a supplement.

16       Q    And you also were provided with a

17   refrigerator, were you not, to store the breast

18   milk?

19       A    Yes, after some time I was, yes.

20       Q    After how much time?

21       A    Maybe a week or two.

22       Q    Who did you -- did you make a request for

23   a refrigerator?

24       A    I believe I requested a refrigerator, yes.

1    a box.

2        Q    Your job duties didn't require you to go

3    in the warehouse area of that building for any

4    reason, did they?

5        A    Other than to receive any deliveries and

6    walk to and from my office and use the rest room or

7    the copy machine, no.

8        Q    How many occasions did you receive

9    deliveries?

10       A    Maybe once a week or so.

11       Q    How many times did you use the copy

12   machine?

13       A    On occasion, maybe two or three times.

14       Q    So you -- let me -- just so I understand,

15   you were given a key, but you never knew what it was

16   for?

17       A    No, I was given a key and I knew what it

18   was for.

19       Q    What was it for?

20       A    It was to enter the warehouse itself.  The

21   main entrance of the warehouse.

22       Q    And that's the only way you ever entered

23   or left your office was walking through the

24   warehouse?

```
 1       A    Yes.

 2

 3                          (Exhibit No. 16, Job Description

 4                          Prepared by Patricia Cosgrove.)

 5

 6   Q    (By Mr. Wilgoren:) I just want to be sure I'm

 7   clear on this point.  Except for the couple of times

 8   when you got deliveries and the occasion or two when

 9   you went to the copier, all of the work you

10   performed scanning the documents was done in a

11   separate office partitioned off from the warehouse?

12       A    Yes, it was partitioned within the

13   warehouse.

14       Q    Let me show you Deposition Exhibit No. 16

15   and ask if you can identify this document.

16       A    That was the job description I was asked

17   to prepare for the job I was performing prior to my

18   maternity leave, so that it could be passed along to

19   the employee who was going to fill in for me while I

20   was out on maternity leave.

21       Q    You weren't performing the administrative

22   assistant job prior to your maternity leave, were

23   you?

24       A    No, not fully, no.
```

1    Jennifer Perry and the other sales staff as to what

2    they needed the administrative assistant to

3    undertake on a day-to-day basis.

4        Q    Who asked you to prepare this document?

5        A    Jennifer Perry.

6        Q    Who did you give it to?

7        A    I believe I gave it to Jennifer Perry, and

8    I posted one in the sales office.

9        Q    Do you have any experience in designing

10   job descriptions?

11       A    No.

12       Q    Have you ever seen job descriptions?

13       A    In the past, yes, from other employers.

14       Q    Typically, they have a statement:  All

15   other duties assigned by the supervisor.

16            MS. SCHWAB:  Objection.

17            THE WITNESS:  They may.  I'm not aware of

18       that.

19   Q    (By Mr. Wilgoren:) That was not anything that

20   was approved by New Seabury or -- this was something

21   you created?

22       A    Yes, at the request of my supervisor.

23       Q    So, your view that scanning documents is

24   not part of the administrative assistant's job is

```
 1    Q     (By Mr. Wilgoren:) What was objectionable to

 2    you, or what did you find that was illegal about

 3    working in solitude?

 4    A     I believe it wasn't a position that was at

 5    all similar to the position I left.

 6    Q     What do you base that on?

 7    A     The duties that I was performing.

 8    Q     The fact of the matter is, you weren't

 9    working in solitude, were you?

10    A     For most of the day I was, yes.

11    Q     There were two other employees that were

12    working in that office as well, were there not?

13    A     Not on a regular basis, no.

14    Q     What about John Shea, wasn't he working

15    there?

16    A     On occasion.

17    Q     How about Jeff Fuller, where was he?

18    A     On occasion he was in the building.

19    Q     Where were the files that you were

20    scanning, they were in this loft?

21    A     I think that's where they were.

22    Q     Do you know how many boxes of files?

23    A     I have no idea.

24    Q     Hundreds, maybe?
```

1    A    Yes, seasonal employees.

2    Q    And you were advised by Steve Brennan that

3    the job you accepted as administrative assistant was

4    a seasonal job?

5    A    I was advised?

6    Q    Yes.

7    A    No, I was not.

8    Q    Now, calling your attention to October 31,

9    2003, did you have a meeting with Mr. Brennan that

10   day?

11   A    Yes, I did.

12   Q    How did that come about?

13   A    He asked me to see him at the end of the

14   workday.  I reported to his office just before 5:00

15   and he informed me that the administrative position

16   that I had filled would be ending today.

17   Q    Did he tell you you'd been laid off?

18   A    No.

19   Q    Tell me, where did this meeting take

20   place?

21   A    In his office.

22   Q    Who was present?

23   A    Just Steve and myself.

24   Q    Tell me, as best you can recall, exactly

222

1    what Mr. Brennan said to you and what, if anything,

2    you said to him.

3        A    I believe I may have mentioned that the

4    position I accepted was full-time year-round.  And

5    he said that the position has ended today as

6    administrative assistant.  I would receive any due

7    vacation time and/or unemployment that I had earned,

8    and I was to see Lee O'Shea for the information on

9    that and COBRA, my health insurance, and that might

10   have been it.

11       Q    Did you say anything to Mr. Brennan?

12       A    No, actually, I commented that, you know,

13   that's fine.  As long as I can still get my benefits

14   that's owed to me and, you know, my vacation pay and

15   COBRA insurance.

16       Q    Are you aware of other employees who had

17   been laid off at about the same time?

18       A    No, not that I can recall.

19       Q    You testified before that Laura Lee has

20   been working as an administrative assistant.  Were

21   you aware that she was laid off on October 10th,

22   2003?

23       A    No, I was not aware that she was laid off.

24       Q    Do you know a woman by the name of Joan

1    was it, as you previously testified?

2        A    It was unheated at one point because the

3    heater was not working properly, and that's why they

4    supplied me, after I requested, the space heater.

5        Q    When was it unheated?

6        A    For the first week or so I was there.

7        Q    Who did you tell -- complain that the heat

8    was not working?

9        A    I may have mentioned it to John Shea.

10       Q    You may have mentioned it to John Shea?

11   Do you have any recollection --

12       A    He was the one that brought the space

13   heater in, so I would assume.

14       Q    Do you have any recollection, as you sit

15   here today, that you did or did not mention it, that

16   the heater wasn't working, to John Shea?

17       A    To the best of my recollection, I did

18   mention it to him at one point.

19       Q    The next paragraph, 18, is not quite

20   precise, is it?  You were given the job of

21   administrative assistant after you returned from

22   maternity leave, although not the one you wanted.

23   You were given an administrative assistant job?

24                MS. SCHWAB:  Objection to the term

1    upset and tried to comfort me.

2        Q    When was that?

3        A    Maybe a week or so after it happened.

4        Q    Where did that take place?

5        A    In the country club.

6        Q    Where in particular?

7        A    Near my office.

8        Q    Now, you say that Tanya Copestik has

9    information about derogatory comments made about

10   you.  What information did she have in that regard?

11       A    At one point when I was in the reservation

12   center, I guess, she passed Mr. Brennan in the hall

13   and Mr. Brennan said to her, "Patricia is not to be

14   hanging around down here."  And Tanya stated that,

15   "Patricia is not hanging around down here.   I

16   offered her my office to pump, so that she could

17   have some privacy."

18                    And he stated, "We're walking a fine

19   line here as a company, so watch what you say."

20       Q    You consider those derogatory comments?

21       A    Yes.

22       Q    Who is Allison Counsel?

23       A    She was an employee in the function setup

24   department.

# Exhibit Q

# O'BRIEN&LEVINE

Court Reporting Services



YOUR BOSTON CONNECTION...WORLDWIDE

# Patricia Cosgrove v. New Seabury Resources Management

Transcript of the Testimony of:

# Stephen Brennan

# January 18, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

## ORIGINAL

Jill K. Ruggieri   1-17609

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

31

```
 1    Q    Do you remember if you looked into whether
 2         your employer at the time had a leave policy
 3         for new fathers?
 4              MR. WILGOREN:  Objection.  Relevance.
 5    A    No.
 6    Q    No, you didn't look into it?
 7    A    No.
 8    Q    When your wife became pregnant with Madison,
 9         did she stop work at any time during the
10         pregnancy?
11              MR. WILGOREN:  Objection.
12    A    She wasn't working.  She wasn't working at
13         that time.
14    Q    So she went back to work after she had
15         Taylor, and then when did she stop working?
16              MR. WILGOREN:  Objection.
17    A    She went back to work.  After the first day,
18         she said she couldn't go back.  She didn't
19         want to.  She wanted to stay home.  She gave
20         her notice, and that was two weeks or a
21         month or whatever the notice was, she
22         stopped after that notice.
23    Q    And she didn't go back to work before she
24         became pregnant with Madison?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

44

| 1 | Q | And what about for seasonal, do you know |
| 2 | | what the definition is? |
| 3 | A | Temporary employment.  There's no |
| 4 | | definition. |
| 5 | Q | And does the notation in somebody's |
| 6 | | personnel file refer to the rule of thumb |
| 7 | | definitions that you've used or the handbook |
| 8 | | definitions? |
| 9 | A | It would be the rule of thumb.  It's |
| 10 | | different from the -- whether they're |
| 11 | | eligible for benefits or not. |
| 12 | Q | Can you give me a rough estimate of how many |
| 13 | | employees you have in the golf department? |
| 14 | | Can you tell me how many -- let's |
| 15 | | look -- let's take 2005. |
| 16 | A | Mm-hmm. |
| 17 | Q | How many seasonal employees you had and how |
| 18 | | many full-time employees you had in the golf |
| 19 | | department. |
| 20 | | MR. WILGOREN:  Objection. |
| 21 | | When in 2005? |
| 22 | Q | Well, during the whole year. |
| 23 | A | Full-time, there's three. |
| 24 | Q | How many seasonal? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

45

| 1  | A | Fifty. |
|----|---|--------|
| 2  | Q | Fifty? |
| 3  | A | Ballpark. |
| 4  | Q | How about golf maintenance? |
| 5  | A | Year round is ten, and there are roughly 50. |
| 6  | Q | Tennis? |
| 7  | A | No employees. |
| 8  | Q | So what goes on in the tennis department? |
| 9  | A | It's a contract.  It's contracted out. |
| 10 | Q | Do you know how many contracted employees |
| 11 |   | there are? |
| 12 | A | I pay one contract. |
| 13 | Q | Excuse me? |
| 14 | A | I pay one contract.  I don't know how many |
| 15 |   | they have. |
| 16 | Q | How about fitness? |
| 17 | A | It's contract. |
| 18 | Q | Catering? |
| 19 | A | Catering currently there's two full-time |
| 20 |   | people and total headcount probably -- |
| 21 |   | probably exceeds 100. |
| 22 | Q | And that's during the high season, during -- |
| 23 | A | Yes, they're all part-time type. |
| 24 | Q | How about food and beverage? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

46

```
 1    A    Food and beverage, full-time year-round is
 2         three, inclusive of the kitchen.
 3    Q    And seasonal?
 4    A    It's around the same, right around 100, give
 5         or take.
 6    Q    Lodging/housekeeping?
 7    A    Lodging full-time/housekeeping has either
 8         three or four currently, and they get up to
 9         nine or ten, including the housekeeping.
10    Q    How about administration?
11    A    Six -- seven full-time year-round, and then
12         there's one additional that's a seasonal.
13    Q    Okay.
14              How about when you started in 2003?
15         So in January 2003, how many full-time
16         employees were there in the golf department?
17    A    I don't remember at this point.
18    Q    Any rough estimate?
19    A    No.  I'd have to look back to see what it
20         was.
21    Q    Do you remember if it was more or less than
22         three full-time?
23    A    It was more.
24    Q    Do you remember if it was -- how many more,
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

47

```
 1         approximately?

 2    A    It was a few more.  I don't honestly

 3         remember.

 4    Q    Okay.

 5              Could it have been as many as ten

 6         more?

 7    A    I wouldn't think so, no.

 8    Q    Five more?

 9    A    Could be somewhere in that ballpark.

10    Q    And in the high season in 2003, do you

11         remember how many seasonal employees there

12         were in the golf department?

13    A    No, I couldn't tell you what the number is.

14    Q    Was it more than 50?

15    A    Yes.

16    Q    Was it ten more than 50?

17    A    I don't know.  I don't recollect.

18    Q    How about in golf maintenance, how many

19         full-time employees were there in

20         December 2003?

21    A    I believe there were almost 15 at that point

22         in that department.

23    Q    How about seasonal in the summer of 2003?

24    A    They were a little bit larger than they were
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

48

| | | |
|---|---|---|
| 1 | | in '04. |
| 2 | Q | How about tennis, was tennis contracted out |
| 3 | | in 2003? |
| 4 | A | No.  There was -- they were all just |
| 5 | | summertime help, maybe four or five people. |
| 6 | Q | How about fitness? |
| 7 | A | Two or three people, part-time. |
| 8 | Q | When -- when did you start contracting out |
| 9 | | tennis and fitness? |
| 10 | A | Fitness was in '03.  Tennis was for the '04 |
| 11 | | season. |
| 12 | Q | So fitness the summer of '03 was contracted? |
| 13 | A | Yes. |
| 14 | Q | How about catering, how many full-time |
| 15 | | people were there in January '03? |
| 16 | A | I -- I don't know exactly. |
| 17 | Q | More than two? |
| 18 | A | Yes. |
| 19 | Q | As many as ten? |
| 20 | A | I wouldn't think it would be that high, no. |
| 21 | Q | How about how many seasonal employees in |
| 22 | | mid-2003 in catering? |
| 23 | A | Over 100. |
| 24 | Q | Any significant difference from the over a |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

49

```
 1              hundred that are currently employed

 2              seasonally in catering?

 3     A        Amount of hours.

 4     Q        How about food and beverage, how many

 5              full-time in January '03?

 6     A        I want to say about six.

 7     Q        And how many seasonal?

 8     A        There were over a hundred at that point.

 9     Q        Lodging and housekeeping, full-time

10              employees in January '03?

11     A        There were -- lodging there were at least

12              three.  In housekeeping, there was at least

13              ten.

14     Q        Were they separate departments at the time?

15     A        They reported up through lodging, so I

16              wouldn't call them separate.

17     Q        How many seasonal employees in mid-2003 in

18              lodging and housekeeping?

19                   MR. WILGOREN:  Mid-2003?

20     Q        Mid-2003.

21     A        I believe we took lodging down to three or

22              four, and housekeeping ended up being maybe

23              12 that summer.

24     Q        How about admin full-time in January 2003?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

50

```
 1    A    I think there was about eight.

 2    Q    How about seasonal in mid-2003?

 3    A    Would have been just one.

 4    Q    How have the revenues at New Seabury changed

 5         from when you started to now?

 6    A    The lodging revenues have been reduced

 7         dramatically due to the fact that in '02

 8         there was 100-plus units that were in the

 9         rental pool.

10              Today we have -- on a given day we

11         might have 20 to rent.  In excess of a

12         million dollars came out of the lodging

13         revenues.

14    Q    And what was the reason for the reduction in

15         the number of units?

16    A    We were able to sell off the existing

17         Maushop units, M-A-U-S-H-O-P.

18    Q    Is that a region?

19    A    It's a section.

20    Q    Any other reason that there was such a

21         reduction in units?

22    A    Yes, it was not profitable.

23    Q    So how have profits changed, then, in the

24         lodging area?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

51

```
 1                  MR. WILGOREN:  Objection.  Assumes
 2            that there were profits at a certain point
 3            in time.
 4    A       The lodging by itself is nearly a breakeven
 5            operation now, comparative to losing
 6            hundreds of thousands of dollars.
 7    Q       What other changes have there been in the
 8            revenues since you started?
 9    A       The dues line has increased dramatically.
10            The initiation fees have increased
11            dramatically.  The food and beverage and
12            catering sales have stabilized with
13            reasonable growth.  And the bottom line has
14            increased from 800,000 to 2.7 million.
15    Q       What's the bottom line?
16    A       Bottom line's EBITDA.
17    Q       I was waiting for that term to come back
18            into play.
19                  What type of information do you -- in
20            2005, what type of information did you give
21            to New Seabury employees about financials,
22            revenues, bottom line?
23    A       2005, the employee training, they get a
24            broad-brush stroke this is how much people
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

61

```
 1    A    The Villa Rental Program was an opportunity

 2         for homeowners to be able to participate in

 3         our rental program.

 4              They would give us X number of weeks,

 5         designate the weeks.  In lieu of that, we

 6         would attempt to rent those out through our

 7         lodging program, and they would get a

 8         percentage of the income from it, and we'd

 9         get a percentage.

10    Q    What percent would New Seabury keep, if you

11         remember?

12    A    It's 50 percent.

13    Q    And was that program in effect when you

14         started at New Seabury?

15    A    Yes.

16    Q    Did it end at some point?

17    A    Yes.

18    Q    What -- at what period did it end?

19    A    Basically went away at the end of '03,

20         beginning of '04.

21    Q    So in '04, did you rent any units through

22         the Villa Program?

23    A    They would have been a couple of the

24         existing Secor [ph.] units.  Where our units
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

62

```
1              are, they're quarter shares, so they could
2              put their quarter shares in with our quarter
3              shares because we were already maintaining
4              it.
5    Q    Other than that, any other --
6    A    Not outside of that.
7    Q    Did you -- were you involved in the decision
8         to end the Villa Program?
9    A    Yes.
10   Q    And what were -- and who else was involved
11        in that decision?
12   A    Tanya Copestick had written the budget two
13        ways, with the Villa rental program and
14        without it, and it came out black and white.
15   Q    When did Tanya Copestick write the two
16        budgets?
17   A    Would have been in the fall of '03.
18   Q    So what was the specific reason, then, for
19        ending the program?
20   A    It was not profitable.
21             MS. SCHWAB:  Why don't we take about
22        a five-minute break, if that's all right.
23             MR. WILGOREN:  Sure.
24             (Recess.)
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

69

| | | |
|---|---|---|
| 1 | | golf -- director of golf was demoted and |
| 2 | | moved him into the superintendent position. |
| 3 | | The superintendent was demoted from |
| 4 | | superintendent to assistant superintendent. |
| 5 | | And the golf pro was demoted to the |
| 6 | | instructor of golf. |
| 7 | | At that point, I had to hire a head |
| 8 | | golf professional. |
| 9 | Q | And when was that? |
| 10 | A | That -- I think he came on board in May, |
| 11 | | roughly. |
| 12 | Q | Is that a seasonal position? |
| 13 | A | That is a year-round position. |
| 14 | Q | What was your involvement in hiring the head |
| 15 | | golf pro? |
| 16 | A | Advertising, interviewing, going through the |
| 17 | | whole process. |
| 18 | Q | Did you make the final selection? |
| 19 | A | Yes, I did. |
| 20 | Q | Who is the person that you hired? |
| 21 | A | Brendan Reilly. |
| 22 | Q | What other -- let's focus on permanent or |
| 23 | | full-time people. |
| 24 | | What other full-time nonseasonal |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

71

| | | |
|---|---|---|
| 1 | Q | What positions did you promote them to? |
| 2 | A | Controller and assistant controller. |
| 3 | Q | What's Phyllis's last name, I'm sorry? |
| 4 | A | D'Eramo |
| 5 | Q | D'Eramo. |
| 6 | | Any other people from outside hired |
| 7 | | in permanent positions in 2003? |
| 8 | A | That I did, no. |
| 9 | Q | That you were involved in in any way. |
| 10 | A | Correct. |
| 11 | Q | And as to the head golf pro, before you |
| 12 | | hired Brendan Reilly, did you make an effort |
| 13 | | to hire -- hire that position internally? |
| 14 | A | The conversation was had with Bob McGraw to |
| 15 | | explain what the role and the parameters, |
| 16 | | the expectation of the position was. He was |
| 17 | | not interested in that. So he was the only |
| 18 | | one that would have been remotely even |
| 19 | | closely qualified for it. |
| 20 | Q | Was he the one who was demoted from director |
| 21 | | of golf, I think you said -- |
| 22 | A | No, from head golf professional to director |
| 23 | | of instruction. |
| 24 | Q | And was he at the top of the golf -- |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

72

| | | |
|---|---|---|
| 1 | A | Director of golf is the top.  That position |
| 2 | | was not replaced. |
| 3 | Q | That person was demoted to what position? |
| 4 | A | Superintendent.  Golf course superintendent. |
| 5 | Q | So you talked to McGraw -- Mr. McGraw about |
| 6 | | being head golf pro, and he indicated he |
| 7 | | wasn't interested? |
| 8 | A | Correct. |
| 9 | Q | Why was it that you approached Mr. McGraw |
| 10 | | before looking outside for the position? |
| 11 | A | To find out if he was really qualified, to |
| 12 | | find out if he was interested.  Ultimately, |
| 13 | | he had had a heart attack very young and did |
| 14 | | not want to -- couldn't physically maintain |
| 15 | | what we were -- what we needed. |
| 16 | Q | Would you have liked to have hired from |
| 17 | | within, if possible? |
| 18 | A | If there's an opportunity. |
| 19 | Q | And what about membership director, did you |
| 20 | | make an effort to hire from that position |
| 21 | | from within? |
| 22 | A | No. |
| 23 | Q | Why did you not do that? |
| 24 | A | Because you need a sales professional to do |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

75

```
 1    Q    Can you turn to page 7 of the document?

 2              The last paragraph, the third

 3         sentence, it says an outside salesperson was

 4         hired?

 5    A    Correct.

 6    Q    Who was the outside salesperson?

 7    A    That was the business development person,

 8         Marian Lent.

 9    Q    What were her duties relating to sales?

10    A    She goes and develops business relationships

11         for large one-day events.

12    Q    How was it that you determined that there

13         wasn't anybody internal who would be able to

14         satisfy your needs for this position?

15              MR. WILGOREN:  Objection.  Relevancy.

16    A    In my assessment, we didn't have any

17         professional salespeople.

18    Q    What was your assessment based on?

19    A    The lack of sales or developing new

20         business.  It was wait for the phone to

21         ring.  And we get our business that way, and

22         we needed to grow the business.

23    Q    Did you have any discussions with any

24         employees to determine if they might be
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

76

| 1 | | qualified to perform the duties of business |
|---|---|---|
| 2 | | developer/development? |
| 3 | A | At that time, no. |
| 4 | Q | How about subsequent to that? |
| 5 | A | Haven't needed to. |
| 6 | Q | When you started at New Seabury, were you |
| 7 | | involved in direct supervision of any |
| 8 | | employees? |
| 9 | A | Department heads. |
| 10 | Q | How many department heads were there? |
| 11 | A | It was eight or nine, somewhere in that |
| 12 | | vicinity. |
| 13 | Q | Were you involved in direct supervision of |
| 14 | | any other employees? |
| 15 | A | Department heads had direct -- well, the |
| 16 | | accounting staff, the controller was |
| 17 | | obviously there, worked directly with the |
| 18 | | accounting staff. |
| 19 | | There were many renovations in the |
| 20 | | accounting process that had to happen, and |
| 21 | | then I had an administrative assistant that |
| 22 | | reported directly to me. |
| 23 | Q | When you came on in part to do this |
| 24 | | turnaround, who else was involved in the |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

77

```
1              turnaround?
2                     MR. WILGOREN:  At what point in time?
3      Q    When you started, who else was involved in
4           affecting the turnaround?
5      A    Well, initially Mark O'Neil was brought in
6           as a consultant and was retained for a
7           period of time, I don't know, I guess 9
8           months, 12 months, something like that.  He
9           was there as well.
10                    He wasn't there.  He was involved as
11          well.
12     Q    Can you explain your role as compared with
13          Mark O'Neil's role?
14     A    Mark was a consultant hired by American Real
15          Estate Partners to basically get a team in
16          place -- me -- to, in effect, get the
17          properties at a level of profitability and
18          have it amenitized to the point that it was
19          ready when we started building homes.
20     Q    What -- after getting you in place, what
21          other involvement did Mark O'Neil have?
22     A    Reviewed financials, periodic visits, have a
23          second set of eyes.
24     Q    Did you discuss decisions with him, things
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

78

| | | |
|---|---|---|
| 1 | | that you were thinking of doing? |
| 2 | A | Yes. |
| 3 | Q | Did you discuss employment-related decisions |
| 4 | | with him? |
| 5 | | MR. WILGOREN:   Objection.   Vague. |
| 6 | A | I would say yes, we discussed everything |
| 7 | | from the, you know, budgeted dollars to |
| 8 | | efficiencies of departments. |
| 9 | Q | You mentioned before that you talked with |
| 10 | | department heads about reducing headcount. |
| 11 | | Were you involved in all of the |
| 12 | | decisions relating to what specific |
| 13 | | employees to lay off or terminate? |
| 14 | | MR. WILGOREN:   Objection. |
| 15 | A | I would -- you can't say all. |
| 16 | Q | Were you involved at all in decisions as to |
| 17 | | individual employees? |
| 18 | A | Some. |
| 19 | Q | What employees would you be involved in the |
| 20 | | decisions? |
| 21 | A | It would be more of -- as an example, the |
| 22 | | chef tried to figure out how he could pare |
| 23 | | down for the off season and how to do it. |
| 24 | | Counseled him on that, ways to become more |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

79

| | | |
|---|---|---|
| 1 | | efficient, doing it without the bodies. |
| 2 | Q | And what things did you talk about with the |
| 3 | | chef relating to that? |
| 4 | A | Basically being able to finish your what we |
| 5 | | call winter work.  It's the deep clean in an |
| 6 | | efficient time and manner, not to cast it |
| 7 | | out over a period of the wintertime and |
| 8 | | months. |
| 9 | | We closed the restaurant completely |
| 10 | | for six weeks to enable that.  It would be |
| 11 | | to walk through and challenge every position |
| 12 | | as to why do you need him when we don't have |
| 13 | | any business going on. |
| 14 | Q | So would you go through each specific person |
| 15 | | and say what are they doing?  Why do you |
| 16 | | need them? |
| 17 | A | I wouldn't say each person.  They would come |
| 18 | | with a recommendation.  If it was what I |
| 19 | | would deem as a more relevant position, I |
| 20 | | would be more involved.  If it was a less |
| 21 | | relevant position, I would be less involved. |
| 22 | Q | Did each department head come to you with a |
| 23 | | recommendation in terms of staffing |
| 24 | | decisions during that time period? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

80

```
 1    A    There was a discussion with each department
 2         head.
 3    Q    And what would you talk about during the
 4         discussions?
 5    A    What they need to do to maintain, be
 6         prepared for the spring, and doing it as
 7         efficiently as possible with as much
 8         cross-over as possible.
 9    Q    And would you have to sign off on every
10         staffing decision that was made?
11    A    Ultimately, yes.
12    Q    Was there a deadline that you gave to each
13         department head to come to you with a
14         proposal relating to staffing?
15    A    No, because it was ongoing.  It goes on to
16         this day.
17    Q    So in 2003 -- when you started in 2003, what
18         was the first meeting that you had with the
19         department head relating to restructuring of
20         staffing?
21    A    There was a department head meeting with all
22         of them, and at that point, put the
23         challenge forth on -- through the budget
24         process, establishing what they needed.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

84

```
 1          through position changes, either demotions

 2          or transfers?

 3   A      The three I already mentioned.  There were

 4          at least five.

 5   Q      Okay.

 6   A      Six.  At least six.

 7   Q      All right.

 8                 So there was Scott Nickerson, you

 9          mentioned Mr. Robert McGraw, and who was the

10          other golf person that you mentioned?

11   A      Dan Stone.

12   Q      Dan Stone.

13                 And then you said there were two or

14          three others?

15   A      Wayne Kapral was terminated.

16   Q      Okay.

17                 I'm just talking about demotions or

18          transfers.

19   A      Initially he was demoted from GM just to

20          CFO.

21   Q      Okay.

22   A      Ultimately to be terminated, but at that

23          point he was demoted.

24   Q      Okay.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

85

```
 1                    And then who else?

 2      A    Rhonda had the option of being transferred,

 3           Rodgers.

 4      Q    Okay.

 5                    Anyone else?

 6      A    Ultimately Patricia's position was

 7           eliminated and had an option to transfer.

 8      Q    Anyone else?

 9      A    That's who comes to mind right now.

10      Q    Okay.

11                    So those six people were either

12           transferred or demoted --

13      A    Correct.

14      Q    -- during 2003?

15                    About how many people -- how many

16           full-time employees had their jobs

17           eliminated or terminated in 2003?

18      A    I don't know.  On a year-over-year basis, I

19           mean, we reduced by close to 100 bodies,

20           whether full-time or part-time.  I don't

21           remember.

22      Q    Okay.

23                    Other than you mentioned Wayne Kapral

24           was terminated, right?
```

88

```
 1              house in New Hampshire and sold his house.

 2                   MS. SCHWAB:  Can I mark this as

 3              Exhibit 2?

 4                   (Exhibit No. 2 marked for

 5              identification.)

 6    BY MS. SCHWAB:

 7    Q    This document you've handed you is a

 8         three-page document with three different

 9         payroll change forms.

10              Can you turn to the third page of the

11         document?

12    A    Yes.

13    Q    Do you recognize this document?

14    A    Yes.

15    Q    What is it?

16    A    It's a payroll notice form.

17    Q    Did you fill it out?

18    A    No, Mark O'Neil did this.

19    Q    And where it says change approved by, do you

20         recognize that as Mark O'Neil's signature?

21    A    Yes, it is.

22    Q    Okay.

23              In the reason for the change, it says

24         reevaluation of existing position?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | Do you know why that -- that was checked |
| 3 | | there? |
| 4 | A | Because the position was changing to be a |
| 5 | | larger position than what he had previously |
| 6 | | had, and he didn't have an interest in |
| 7 | | taking that position or maintaining in the |
| 8 | | position as it was going to be restructured |
| 9 | | to, as far as responsibilities. |
| 10 | Q | So you would check reevaluation of existing |
| 11 | | positions when an existing position changed |
| 12 | | and the person doesn't accept that position, |
| 13 | | then is offered a different position? |
| 14 | A | It could simply be the position changed. |
| 15 | Q | But in his situation, the position changed, |
| 16 | | and then he took a different position? |
| 17 | A | Correct. |
| 18 | Q | Okay. |
| 19 | | And Scott Nickerson you talked about |
| 20 | | before. When was his position changed? |
| 21 | A | Roughly the same time, right at the end of |
| 22 | | January. |
| 23 | Q | And what was his position changed -- from |
| 24 | | what to what? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

90

```
 1    A    Director of golf to golf course
 2         superintendent.
 3    Q    Going back for a minute, I'm sorry, to
 4         Mr. McGraw, were you involved in the
 5         conversation with Mr. McGraw about his
 6         demotion?
 7    A    I was involved with the -- yes, ultimately,
 8         yes, I was.
 9              I was initially involved in the
10         discussion of his interest in the new
11         position and what it would entail.
12    Q    And what did you discuss during that meeting
13         with him?
14    A    What I saw as the objectives for the
15         position and the responsibilities of the
16         position as head golf professional, as I
17         needed it.
18    Q    And did you have any other discussions with
19         Mr. McGraw about his position change, other
20         than that initial conversation?
21    A    I guess I need more detail on your question.
22    Q    You said you were involved in seeing if he
23         was interested in the new --
24    A    Correct.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

93

```
 1              time I said I wanted my job back ultimately

 2              when that change had to be made.  And it was

 3              certainly fair to do that, and he's done a

 4              great job for us since then.

 5      Q       Okay.

 6                      So going back to November '02, what

 7              did you say and what did he say during that

 8              conversation?

 9      A       I just said that.

10      Q       You said he was very understanding, but what

11              specifically did you say to him during that

12              conversation?

13      A       The initial conversation was me gaining

14              insight as to the property, how the golf and

15              golf course operations work.

16                      You know, we spent half a day

17              together doing that, and from there at the

18              end of the conversation he said, I hope you

19              come aboard, you know, we have issues, we're

20              a sinking ship; and, you know, ultimately,

21              you know, as I stated when I first took this

22              position, I just want my position back, I

23              understand when it's time to do that.

24      Q       And you said he said, you know, I hope you
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

94

```
 1              come aboard.  We're a sinking ship.

 2                    What had you said about your general

 3              role?

 4       A      Nothing.  I was coming to view it for

 5              O'Neil, for another set of eyes.

 6       Q      So how did he -- was it your impression that

 7              he thought you were coming to restructure

 8              the company and -- but make it more

 9              profitable?

10       A      Oh, there's no question he understood that.

11       Q      And how did he understand that?

12       A      He's intelligent.

13       Q      Did you say something to him about that?

14       A      Not in that visit.

15       Q      Previously had you?

16       A      That was the first time I had ever met him.

17       Q      When is the next time you met Mr. Nickerson?

18       A      When I started.

19       Q      And when was the next conversation that you

20              had had about his position and his change of

21              position?

22       A      Conversation was probably the third week of

23              January, before I got there.

24       Q      And what was the conversation?  What did you
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

95

```
 1              say during that conversation?

 2      A       That we're going to move you back to the

 3              superintendent position.  Dan at the same

 4              time will be moving back to the assistant

 5              superintendent position, and, you know,

 6              let's go forward, make it the best we can.

 7      Q       And what did he say in response?

 8      A       He goes, Hurry up and get here.

 9      Q       And how would you characterize the change in

10              position from director to superintendent?

11      A       It changes from overseeing the golf course

12              and all of golf to simply overseeing --

13              "simply" is a poor term, but to overseeing

14              the golf courses only.

15      Q       Would you characterize it as a demotion?

16      A       Absolutely.

17      Q       And you mentioned that he wanted to be

18              returned to the director of golf operations?

19      A       No.

20      Q       Oh, I thought you said -- I misunderstood.

21                      I thought you said the first

22              position -- the first discussion you said he

23              wanted to be returned to his position?

24      A       As golf course superintendent.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

96

| | | |
|---|---|---|
| 1 | Q | When was he golf course superintendent? |
| 2 | A | Prior to being promoted to director of golf |
| 3 | | operations. |
| 4 | Q | And he wanted to be returned back to his |
| 5 | | previous position? |
| 6 | A | That's correct. |
| 7 | Q | I understand. |
| 8 | | Is Mr. Nickerson still working at New |
| 9 | | Seabury? |
| 10 | A | Yes, he is. |
| 11 | Q | And what's his position? |
| 12 | A | Golf course superintendent. |
| 13 | Q | And on this change of status form, do you |
| 14 | | have that -- that should be this -- I |
| 15 | | believe the second page in the exhibit? |
| 16 | A | Yes. |
| 17 | Q | Did you fill this form out? |
| 18 | A | I did not. |
| 19 | Q | Have you seen it before? |
| 20 | A | Yes. |
| 21 | Q | Do you know who filled it out? |
| 22 | A | I believe Mark O'Neil did. |
| 23 | Q | Okay. |
| 24 | | And it says change in position and |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

97

| | | |
|---|---|---|
| 1 | | responsibilities? |
| 2 | A | That would be correct. |
| 3 | Q | And we talked already about how his position |
| 4 | | had changed. |
| 5 | | Okay.  How about Dan Stone, when is |
| 6 | | the first time that you talked to Dan Stone |
| 7 | | about a position change? |
| 8 | A | Probably not until end of February. |
| 9 | Q | And are you basing that on the fact that the |
| 10 | | document is dated March 5, '03? |
| 11 | A | No, it was just -- it was after the fact. |
| 12 | Q | After what fact? |
| 13 | A | After the fact of me getting there and |
| 14 | | getting my feet on the ground. |
| 15 | Q | And what was the conversation that you had |
| 16 | | with Mr. Stone, the first conversation? |
| 17 | A | Scott Nickerson had the initial conversation |
| 18 | | with him, and then I explained the salary |
| 19 | | change. |
| 20 | Q | What's your understanding of what |
| 21 | | Mr. Nickerson said to Dan Stone? |
| 22 | A | I don't know.  I wasn't there. |
| 23 | Q | And so did you come in on a meeting that |
| 24 | | Mr. Nickerson and Mr. Stone were having? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

98

```
 1     A     No.

 2     Q     You had a separate meeting --

 3     A     Yes.

 4     Q     -- with Mr. Stone?

 5             And what did you say in that meeting

 6           to him?

 7     A     I just wanted to explain the change in the

 8           salary, the timing of it.  Went through

 9           that, and that was the conversation.

10     Q     What was -- what was Mr. Stone's reaction?

11     A     Well, people aren't generally happy when

12           they take a $13,000 pay cut, but he

13           understood, and it obviously worked well

14           since he's still there doing a good job for

15           us.

16     Q     Is he still in the same position?

17     A     He is.

18     Q     Did you explain during the meeting that

19           there was a restructure generally of New

20           Seabury at the time?

21     A     No, we talked about the department.

22     Q     The golf department?

23     A     Golf course, golf department, yes.

24     Q     And this form, the first page of Exhibit 2,
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

104

| | | |
|---|---|---|
| 1 | A | No, there's not. |
| 2 | Q | Who performs the responsibilities that |
| 3 | | Mr. Kapral was to perform as CFO? |
| 4 | A | The controller. |
| 5 | Q | You mentioned before that Rhonda Rodgers was |
| 6 | | somebody who had an option of a transfer in |
| 7 | | 2003. |
| 8 | | Can you explain what that option was? |
| 9 | A | We offered her the option to take over the |
| 10 | | lodging component. |
| 11 | Q | And what had her previous position been? |
| 12 | A | Membership sales. |
| 13 | Q | Did you have a discussion with her giving |
| 14 | | her that option? |
| 15 | A | Yes. |
| 16 | Q | Was there anyone else present? |
| 17 | A | I don't recall. |
| 18 | Q | Do you remember -- did you say anything to |
| 19 | | Ms. Rodgers at that meeting about the reason |
| 20 | | for the transfer? |
| 21 | A | The new membership director was already in |
| 22 | | place, which she was aware of. She was a |
| 23 | | quality individual that we felt could help |
| 24 | | the team. |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

107

```
 1            you say to Ms. O'Brien?
 2      A     I just said that unfortunately with the
 3            changes that we've gone through, as you're
 4            aware, we have very little real estate
 5            sale -- to sell, excuse me; that the
 6            fixed-asset responsibilities that she had
 7            were going as they should have all along to
 8            the assistant controller, and we didn't have
 9            a need for that position any longer.
10      Q     And --
11      A     I'm sorry.
12      Q     Go ahead.
13      A     You know, since then, we've had the
14            opportunity to have her explore other
15            options with us, and it hasn't worked out.
16      Q     What do you mean by that?
17      A     There was a position open in real estate
18            when we went back into the real estate
19            aspect of life, and so she had the
20            opportunity to see if she was interested in
21            that.  She decided she wasn't.
22      Q     When was that?
23      A     Sometime in '04.
24      Q     And getting back to the original termination
```

```
1              that you know of?

2       A      Not that I'm aware of.

3                     MS. SCHWAB:  Can I mark this

4              Exhibit 3?

5                     (Exhibit No. 3 marked for

6              identification.)

7       BY MS. SCHWAB:

8       Q      Mr. Brennan, do you recognize the document

9              that's been marked as Exhibit 3?

10      A      Yes.

11      Q      And what is that document?

12      A      It's Michelle's notice of maternity leave.

13      Q      And there where it says Stephen Brennan and

14             there's a signature above that, is that your

15             signature?

16      A      Yes.

17      Q      Do you remember receiving this document?

18      A      I don't remember receiving it, but obviously

19             I did.

20      Q      And do you now -- looking at the document

21             now, do you remember if you received this

22             document before Ms. O'Brien was terminated?

23      A      Yes.

24      Q      Going back to your termination discussion
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

110

```
 1            with her, do you now remember whether

 2            anything related to her pregnancy or her

 3            request for leave came up during that

 4            termination meeting?

 5     A      No.

 6     Q      No, you don't remember?

 7     A      I don't believe anything did.

 8                  MS. SCHWAB:  I'd like to mark this as

 9            Exhibit 4.

10                  (Exhibit No. 4 marked for

11            identification.)

12     BY MS. SCHWAB:

13     Q      Mr. Brennan, do you recognize this document?

14     A      I recognize the form.

15     Q      Have you ever seen this document with this

16            data before?

17     A      I may have.  It doesn't ring a bell.

18     Q      What -- looking over this document, what

19            information does it appear to communicate --

20                  MR. WILGOREN:  Objection.  The

21            document speaks for itself.

22     Q      -- to you?

23     A      Basically looks like Wayne Kapral

24            transferred Michele out of the club
```

113

```
 1            means?

 2    A       Department change.  No longer existed.

 3    Q       And would that be department 330 that no

 4            longer existed?

 5    A       Correct.

 6    Q       And actually going back for a moment to

 7            Exhibit 4, at the bottom it says change

 8            approved by, and that looks like Wayne

 9            Kapral's signature?

10    A       That's correct.

11    Q       Do you recognize the signature under change

12            authorized by?

13    A       Yes, Wayne Spencer.

14    Q       Wayne Spencer?

15    A       Yes.

16    Q       And that was the controller, right?

17    A       At the time it was the assistant controller.

18            There was no controller.  He was the

19            assistant controller.  He was promoted to

20            controller.

21    Q       I understand.  Okay.

22                 Is there a difference in the

23            positions between controller and CFO?

24    A       CFO is more global, reporting upward.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

114

```
 1    Q    What do you mean reporting upward?

 2    A    Public company, so we have a CFO in

 3         Manhattan, so therefore you don't have to

 4         have a CFO locally.  It was a duplication of

 5         duties.

 6    Q    Did Wayne Spencer become the controller

 7         after Wayne Kapral was terminated from his

 8         position as CFO?

 9    A    That's correct, shortly thereafter.

10    Q    Like within a week or so?

11    A    A week, a month, somewhere in that vicinity.

12    Q    Earlier we talked about Rhonda Rodgers and

13         that she was offered another position but

14         didn't take the position?

15    A    Correct.

16    Q    Did you have any discussion with Ms. Rodgers

17         during your conversation about offering the

18         transfer about her pregnancy or about her

19         request for leave?

20    A    Conversation about it?  I don't believe so.

21         I mean, I knew she was pregnant, obviously.

22    Q    So did you mention it at all during this

23         meeting with her?

24    A    Not that I recall.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

117

| | | |
|---|---|---|
| 1 | | leave for a period of time? |
| 2 | A | No.  The position was being replaced with a |
| 3 | | different body on the membership sales side. |
| 4 | | That was a foregone conclusion. |
| 5 | Q | Her -- |
| 6 | A | The new -- |
| 7 | Q | Excuse me. |
| 8 | | Her original position was being |
| 9 | | replaced? |
| 10 | A | Yes. |
| 11 | Q | Okay.  Go ahead. |
| 12 | A | That was a foregone conclusion.  She helped |
| 13 | | train that position as far as getting that |
| 14 | | person knowledgeable with the property |
| 15 | | itself.  He took over that position. |
| 16 | | With that, we said there will be a |
| 17 | | position for you.  Don't know what it is |
| 18 | | yet, but there will be a position for you. |
| 19 | | When she came back or was about to |
| 20 | | come back from maternity leave I believe is |
| 21 | | the time we had the conversation of the |
| 22 | | position in lodging. |
| 23 | Q | Who was the person who took over her |
| 24 | | original position? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

118

```
1    A    Bob Higgins.

2    Q    And who is involved in the decision to have

3         him take over that position?

4    A    I was and Mark O'Neil was.

5    Q    What were the reasons for that decision?

6    A    Lack of membership sales.

7    Q    And did you initially have a discussion

8         with --

9              Before having a discussion about the

10        transfer, did you have a discussion with

11        Ms. Rodgers about somebody else taking over

12        her position?

13   A    Yes.

14   Q    What did you say about that?

15   A    That somebody else was taking over the

16        position.

17   Q    Did you give her reasons for that?

18   A    We needed to increase the membership sales.

19        We needed to have a full complement of

20        members, and as quickly as we could.

21   Q    And did you previous to that or at that

22        meeting talk with Ms. Rodgers about her

23        ability to meet your needs in that respect?

24   A    To meet the needs in what respect?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

123

```
 1              people who were terminated, you said you
 2              thought some of the kitchen staff were
 3              full-time --
 4      A       Correct.
 5      Q       -- employees.
 6                      How many full-time kitchen staff were
 7              terminated in 2003?
 8      A       There were -- first they were laid off, not
 9              terminated, at the beginning of 2003 for the
10              slow season, and it would have been two or
11              three, maybe four that went from being
12              full-time year-round to the chef being
13              full-time year-round.
14      Q       And were those people who were laid off at
15              the beginning of the slow season --
16                      Do you remember if they were hired
17              back as seasonal employees?
18      A       I don't know if all of them were, but the
19              majority were.
20      Q       So most of them were not exactly laid off
21              but reduced from full-time to seasonal?
22      A       They were laid off for a period of anywhere
23              from a month to three months.
24      Q       And you mentioned also that there were some
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

124

```
 1           captains who had full-time positions that

 2           were ended?

 3     A     I believe the captains were reduced from

 4           being deemed as full time to being less than

 5           full time.  They were -- basically became on

 6           call during the off season.

 7     Q     Any that just had their position eliminated

 8           entirely that you can remember?

 9     A     Not that I can think of.

10     Q     Other than those kitchen staff and captains,

11           Wayne Kapral, Michele O'Brien and the

12           plaintiff, are there any other full-time

13           employees whose positions were eliminated in

14           2003?

15     A     There could have been.  I believe there was

16           a bartender.  It was the bar manager.  His

17           position was eliminated.  Wasn't replaced.

18                 There may have been a year-round

19           assistant food and beverage director that

20           was not brought -- was made not year-round.

21           I believe there was someone on the outside

22           golf staff that was year-round that was

23           eliminated to not be a year-round position.

24     Q     Anything else?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

125

```
 1    A    That's what comes to mind right now.

 2    Q    What was the name of the bar manager?

 3    A    Tom -- Tommy Sullivan.

 4    Q    And was he hired into a seasonal position

 5         or --

 6    A    No, the position was eliminated.

 7    Q    And he stopped working at New Seabury?

 8    A    Yes.

 9    Q    And then the assistant food and beverage

10         person, do you remember that person's name?

11    A    I don't remember the name.

12    Q    But that person wasn't eliminated, just

13         moved down to seasonal?

14    A    Right.

15    Q    And the same with the outside golf person?

16    A    Yes.

17              (Exhibit No. 8 marked for

18         identification.)

19    BY MS. SCHWAB:

20    Q    Do you recognize the document marked as

21         Exhibit 8?

22    A    I do.

23    Q    What is it?

24    A    It's a termination report.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

128

```
 1              when we first got there, converted to

 2              part-time positions.

 3         Q    So if somebody was terminated in this fourth

 4              quarter of the year and they were

 5              necessarily seasonal employees --

 6         A    They were probably seasonal employees.

 7         Q    Because the termination of full-time

 8              employees happened when?

 9         A    Really the early part of 2003.

10         Q    And then also in early 2003 happened -- the

11              people whose positions were reclassified

12              from full-time to seasonal?

13         A    Generally happened at that point.

14         Q    So can you identify anybody on this list who

15              was terminated from a full-time position at

16              this time?

17                   (Witness read document.)

18         A    Mary Polino.

19                   (Witness read document.)

20         Q    Is that it?

21                   (Witness read document.)

22         A    I don't recognize anybody else as being

23              full-time from the list.

24         Q    Mary Polino is the person we had spoken of
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

138

```
 1              different people have gotten?

 2    A         I don't believe there would be anything

 3              different.  It would be whatever the policy

 4              states.

 5    Q         Does New Seabury set requirements for how

 6              frequently somebody has to check in during

 7              their leave?

 8    A         Not at all.

 9    Q         So is there any requirement to call a

10              certain number of times during the leave

11              or --

12    A         There is no.

13    Q         -- as the leave is coming to an end?

14    A         There is not.

15                   MR. WILGOREN:  You're talking about

16              in the case of pregnancy leave or --

17                   MS. SCHWAB:  Well, he's testified

18              that they're one and the same.  There's

19              been -- the only people who have asked for

20              leave have been pregnancy leave, so it

21              doesn't seem to require a differentiation.

22    A         There was -- and I don't know if this

23              pertains to one of the questions you asked.

24                   Jeff Fullerton was out for an
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

142

| | | |
|---|---|---|
| 1 | | as well outside that department but in the |
| 2 | | same location. |
| 3 | Q | And what about during his second leave? |
| 4 | A | Same. |
| 5 | Q | Is there a set procedure for reinstating an |
| 6 | | employee who comes back from a family leave |
| 7 | | or a disability leave? |
| 8 | A | No. |
| 9 | Q | Is there a process for being contacted |
| 10 | | beforehand? |
| 11 | A | No. |
| 12 | | Generally an employee would contact |
| 13 | | us because they're excited about coming |
| 14 | | back. |
| 15 | Q | And after an employee contacts you about |
| 16 | | coming back, what next step is taken? |
| 17 | A | Nothing.  They're reactivated in the system |
| 18 | | to whatever their status was. |
| 19 | Q | Who is responsible for recording the date of |
| 20 | | when somebody's supposed to come back from |
| 21 | | leave? |
| 22 | A | Today it would be the HR/payroll department. |
| 23 | Q | What about in 2003? |
| 24 | A | Would have been payroll and HR department. |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

143

```
1    Q    Lee O'Shea?

2    A    Mm-hmm.

3    Q    And would Ms. O'Shea inform you when

4         somebody was coming back from leave?

5    A    She should have.

6    Q    Like a little bit beforehand, telling you

7         somebody is about to come back from leave?

8    A    She should have.

9    Q    And did she do that in case of Jennifer

10        Perry?

11   A    No, Lee was already gone.  Jennifer Perry

12        was in contact.

13   Q    Did she do that with Jeff Fullerton?

14   A    No, Jeff was in contact with us directly.

15   Q    Excuse me?

16   A    Jeff was in contact with his supervisor

17        directly.

18   Q    Was he in contact with you at all about

19        returning from leave?

20   A    Just stopping in to say he was excited to

21        get back.

22   Q    Who was his supervisor?

23   A    Dave Hatfield.

24   Q    For full-time employees at New Seabury,
```

157

```
 1    Q    Do you remember when you first met Patricia
 2         Cosgrove?
 3    A    No.
 4    Q    Do you remember when you first heard of
 5         Patricia Cosgrove?
 6    A    No.
 7    Q    Well, what's your first recollection of
 8         either hearing of her or having some
 9         interaction with her?
10    A    Probably on the headcount list that we had
11         that I looked at in October or November,
12         prior to my starting, saw the name.
13    Q    And did you -- was it anything other than
14         just seeing a name on a list?
15    A    Name on a list with a department, number of
16         people in the department, made it a
17         question.
18    Q    Excuse me?
19    A    Made it a question for me.
20    Q    What was the question?
21    A    Why we have so many people in this role.
22    Q    And what role was that?
23    A    The cross-over between catering, catering
24         sales and lodging.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

158

```
 1    Q    What was the headcount list?  You said you
 2         saw her name on a headcount list before you
 3         came.
 4              What was that list?
 5    A    It was a headcount list.
 6    Q    And what information did it have on it?
 7    A    Position, name.  That's what I can say
 8         definitively was on it.
 9    Q    Do you know who generated the list?
10    A    I would -- no, not for a fact.  I assume it
11         came through accounting.
12    Q    Was it something that you requested?
13    A    It was something that was given to me.
14    Q    Who gave it to you?
15    A    It came from Mark O'Neil.
16    Q    Excuse me?
17    A    It came from Mark O'Neil.
18    Q    And when you saw the headcount list, had a
19         question, any discussions about Ms. Cosgrove
20         at that time?
21    A    Not as a -- just as a number within the
22         department.
23    Q    And what conversations did you have about
24         her as a number?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

163

```
 1    Q    Do you remember any substance of your
 2         conversation with Lee O'Shea?
 3    A    No.  Patricia's pregnant, can you file this.
 4    Q    Anybody else you might have talked about it
 5         with?
 6    A    I mean, nothing comes to my mind.
 7    Q    Do you remember if you talked to
 8         Ms. Cosgrove after receiving this document?
 9    A    I don't recollect a conversation.
10    Q    At the bottom of the document, her last
11         sentence says, "I am entitled to a 12-week
12         leave, which upon return I'm entitled to the
13         same position I left or a similar position
14         with the same level pay and length of
15         service."
16              Did you ever discuss that line from
17         the document with anybody?
18    A    No, it's basically what our policy says.
19    Q    And you signed the document.
20              Did you agree to her characterization
21         of the policy
22    A    Yes.  I look at it as more of whatever our
23         policy was is what we'd follow.  Because she
24         wrote the document didn't mean this was a
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

168

1           stated here.

2      Q    And any conversation about her going on

3           leave?

4      A    No.

5      Q    So what did you say to -- and when you

6           talked about --

7                 Before talking to Ms. Cosgrove, you

8           said you planned to eliminate her position.

9                 Did you come up with any substitute

10          position to put her in at that time?

11     A    At that time, it looked as if there would be

12          the opportunity for an administrative

13          position in catering sales.

14     Q    And can you explain what that position would

15          be?

16     A    It would be an administrative assistant with

17          catering sales.

18     Q    And at what time was that, that looked like

19          that would be available?

20     A    Spring.

21     Q    With whom -- before talking to Ms. Cosgrove,

22          with whom did you talk about the

23          administrative assistant position in

24          catering sales?

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

169

```
 1    A    Would have been the same people, Jennifer
 2         Perry, that's correct.
 3    Q    And did you talk to all of them about
 4         putting Ms. Cosgrove into this position?
 5    A    At a minimum, Jennifer and Mark.
 6    Q    And what did you say to Mark about that?
 7    A    There's another position, obviously will be
 8         a lower paying position, but there's a
 9         position right now that is available.
10    Q    And what did he say to you about that?
11    A    He said it works.
12    Q    And what about Ms. Perry, what did you say
13         to her about the administrative assistant
14         position?
15    A    Basically the same, seemed to make sense.
16    Q    And what did she say to you?
17    A    Seemed to make sense.
18    Q    And can you elaborate at all about the
19         responsibilities of the administrative
20         assistant in catering sales?
21    A    As with any administrative position, it's
22         basically answering the phone, filing, doing
23         anything that's deemed necessary for the
24         operation.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

172

```
 1              away, and we had a -- an admin position

 2              available if she chose to.

 3                   It would be a cut in pay, but if she

 4              chose to, she had the opportunity to take

 5              that.

 6        Q     Did you explain anything else about what the

 7              admin position would be?

 8        A     Nothing comes to mind.

 9        Q     So just there's an admin position in

10              catering sales?

11        A     She was already located there.  She

12              understood what the role was, I would

13              assume.

14        Q     And do you remember it -- what Ms. Cosgrove

15              said at the meeting?

16        A     No.

17                   She was disappointed.  I remember the

18              emotion, but I don't remember what she said.

19        Q     Do you remember if she accepted the admin

20              position at that point?

21        A     I think she asked if she could think about

22              it.

23        Q     Do you remember if she later accepted the

24              position?
```

```
 1    A    Obviously the letter -- there's another
 2         letter that says that she did.
 3    Q    At the time did you remember her accepting
 4         the position?
 5    A    No, not until the letter was brought to my
 6         attention after the fact when she returned
 7         to work.
 8    Q    Did you discuss with Ms. Cosgrove -- did it
 9         come up at the meeting that Ms. Cosgrove was
10         planning on going on maternity leave?
11    A    I already knew that.
12    Q    But did it come up at the meeting?
13    A    Oh, I have no idea.
14    Q    So you don't remember if there's any
15         discussion on how her leave would affect the
16         fact that she was given this new position?
17    A    No, not during that time, as I said.  I
18         mean, I did -- this is what I was doing all
19         the time.  It was another person.
20    Q    So you don't remember?
21    A    No.
22              MS. SCHWAB:  Exhibit 13.
23              (Exhibit No. 13 marked for
24         identification.)
```

```
 1              full-time, part-time or seasonal.

 2      Q       Right.

 3      A       You could be full-time; you could be

 4              full-time seasonal.

 5      Q       But wouldn't seasonal be circled if you were

 6              a full-time seasonal?

 7      A       It could be.  It could be any of the above,

 8              if you were seasonal or full-time seasonal

 9              or you could be part-time seasonal.

10      Q       My understanding --

11      A       When Jennifer finished this out -- filled

12              this out, she obviously circled full-time.

13      Q       And you signed it as --

14      A       Right.

15      Q       -- an approval of the change?

16      A       Right.

17      Q       And full-time on this form means full-time

18              year-round?

19      A       On this form, I would say it does.

20      Q       Do you remember in Ms. Cosgrove started

21              assuming the responsibilities of

22              administrative assistant - catering sales

23              after you offered the position to her?

24      A       I don't believe she ever did.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

176

1    Q    And what do you remember happening?

2    A    More of a recollection from Monday, goes

3         back to when -- after this discussion, she

4         and Jennifer discussed wrapping up a few

5         things over the next couple of weeks

6         following the conversation on the catering

7         sales side; and before this ever became in

8         effect, she went out on leave, before she

9         ever assumed the duties of it, I should say.

10   Q    And did you ever discuss -- I know, as we

11        talked about on Monday, she went out on

12        leave earlier than anticipated.

13              Did you ever discuss with her how her

14        going out on leave earlier would affect this

15        new position?

16   A    No, I don't believe so.

17   Q    Do you remember discussing that with

18        anybody?

19   A    No -- at the time that we were heading

20        into -- into season, that we had to have

21        somebody cover the position for the season.

22   Q    So while Ms. Cosgrove was on maternity

23        leave, did you hire a replacement for that

24        position?

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

177

```
 1    A    Yes.

 2    Q    Who is that?

 3    A    Lauralee Taddeo, I believe the last name is.

 4    Q    Do you know what Ms. Taddeo was told about

 5         the permanency of the position?

 6    A    No idea.  Jennifer would have been the one

 7         to hire her.  I'm sure -- I don't know.  I

 8         wasn't in the conversation.

 9    Q    So you don't know if she was told that she

10         was a replacement for somebody out on leave?

11    A    No.

12    Q    Did you discuss with Ms. Cosgrove at your

13         meeting with her whether the position would

14         be a permanent position, that administrative

15         assistant - catering sales?

16    A    I don't recall that.

17              I will say.  This:  From the

18         standpoint of the full-time positions that

19         we have -- and I think I stated it before --

20         we assess this every month, every year.

21              This year we had another body that

22         was laid off that was a full-time position

23         that it wasn't necessary to keep as

24         full-time even though it was previously.
```

| | | |
|---|---|---|
| 1 | | established procedure into place from the |
| 2 | | handbook? |
| 3 | | MR. WILGOREN:  Objection. |
| 4 | A | No, there wasn't a reason to. |
| 5 | Q | So that's a no? |
| 6 | A | No, there wasn't a reason to. |
| 7 | | MR. WILGOREN:  The answer speaks for |
| 8 | | itself. |
| 9 | Q | Are you aware of what position Ms. Cosgrove |
| 10 | | was in when she went out on her leave? |
| 11 | A | You'll have to clarify the question. |
| 12 | Q | What position did she hold when she went out |
| 13 | | on her leave? |
| 14 | A | I believe it was called conference sales or |
| 15 | | conference services or something along those |
| 16 | | lines. |
| 17 | Q | And what -- do you remember what pay rate |
| 18 | | she was at? |
| 19 | A | I -- |
| 20 | | MR. WILGOREN:  Are you talking about |
| 21 | | the last day she worked? |
| 22 | Q | When she went out on her leave. |
| 23 | A | When she went out on her leave.  Her |
| 24 | | previous rate was $17 an hour.  The new rate |

1          was going to be $12, I believe.

2     Q    And do you remember what rate was in effect

3          during her leave?

4     A    I don't know.

5               MR. WILGOREN:  Well, I'm going to

6          object and move to strike the question

7          because it assumes facts not in evidence.

8               She wasn't -- Ms. Cosgrove wasn't

9          working.  There was no rate in effect at the

10         time of her leave.

11              MS. SCHWAB:  There is a rate in

12         effect for her disability leave.  How does

13         that assume facts not in evidence?

14              MR. WILGOREN:  First of all, there's

15         no evidence about --

16              MS. SCHWAB:  Well, my question was

17         what was her rate when she went out on

18         leave.

19              MR. WILGOREN:  Well --

20              MS. SCHWAB:  You can --

21    BY MS. SCHWAB:

22    Q    What was her rate the last day before she

23         went out on her leave?

24              And, Mr. Brennan, is your answer that

| | | |
|---|---|---|
| 1 | A | I can't say how Lee did it. |
| 2 | Q | Did you review Lee's schedules of maternity |
| 3 | | leave? |
| 4 | A | I did not. |
| 5 | Q | So would this be a document that you had |
| 6 | | reviewed? |
| 7 | A | No. |
| 8 | Q | Up at the top of the document, it says |
| 9 | | Patricia Cosgrove, $17; is that correct? |
| 10 | A | That's what it says. |
| 11 | Q | And then it appears to be -- although you |
| 12 | | haven't seen it before, it appears to be a |
| 13 | | document calculating maternity leave? |
| 14 | A | That's what it looks like. |
| 15 | Q | Reviewing this document, would you conclude |
| 16 | | from this document that she was paid 60 |
| 17 | | percent of a $17 per hour salary on her |
| 18 | | maternity leave? |
| 19 | A | That would be the appearance. |
| 20 | Q | Would it surprise you that she would be paid |
| 21 | | at $17 an hour -- at a rate based on a $17 |
| 22 | | an hour salary for her maternity leave? |
| 23 | A | I guess versus being the $12 an hour? |
| 24 | Q | Yes. |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

192

```
 1    A    I would venture a guess.  It was probably

 2         asked which I wanted to do, and I said 17's

 3         fine.

 4    Q    Do you remember having that conversation?

 5    A    Not for a fact, no.

 6    Q    You think -- who would have asked you?

 7    A    Lee.

 8    Q    While Ms. Cosgrove was on maternity leave,

 9         did you have any discussions with anybody

10         about what position to return her to when

11         she came back?

12    A    No.

13              Frankly, at that point, I -- I was

14         lost in translation to the fact that she was

15         coming back.

16    Q    So at that point, you didn't expect her to

17         come back?

18    A    Correct.

19    Q    And did you have any discussions about her

20         with anybody during the time she was on

21         leave?

22    A    No.  I mean, my thought was that she was

23         gone.

24    Q    And what was the basis for your feeling that
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

193

| 1 | | she wasn't coming back? |
|---|---|---|
| 2 | A | I guess I had forgotten about the -- her |
| 3 | | couple of memos that she had sent; and then, |
| 4 | | as I said before, normally Lee O'Shea would |
| 5 | | do a -- you know, a notice, you know, back |
| 6 | | to me when somebody's maternity was coming |
| 7 | | up, and it didn't happen. |
| 8 | Q | During the time that Ms. Cosgrove was on |
| 9 | | leave, did you ever receive any messages |
| 10 | | from Ms. Cosgrove? |
| 11 | A | I believe so, yes. |
| 12 | Q | How many messages did you receive? |
| 13 | A | I have no idea. |
| 14 | Q | What do you remember about the messages you |
| 15 | | received from her? |
| 16 | A | That I was given a message that she had |
| 17 | | called. |
| 18 | Q | Do you remember the substance of the |
| 19 | | message? |
| 20 | A | No. |
| 21 | Q | Do you remember if you returned her call? |
| 22 | A | I don't believe I did. |
| 23 | Q | Do you remember thinking anything about why |
| 24 | | she might have been calling? |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

194

```
 1    A    Probably thought why is she calling.

 2    Q    And do you remember discussing with anybody

 3         that you had received a message from her?

 4    A    It was more coming from the secretary at the

 5         time telling me she had called.

 6    Q    And other than a message from Ms. Cosgrove,

 7         did you have any indication that she would

 8         be coming back from her leave before the day

 9         she came back?

10              MR. WILGOREN:  Object to the extent

11         it mischaracterizes -- assumes facts not in

12         evidence.

13    A    Can you repeat that?

14    Q    Other than the phone message from

15         Ms. Cosgrove, did you have any other

16         indication -- receive any other indication

17         that she was coming back from her leave?

18              MR. WILGOREN:  Objection to the

19         extent that the -- the conclusion is made

20         that the phone message supposes that

21         Ms. Cosgrove was coming back.

22    A    The -- obviously the other two documents

23         were there, although I had forgotten about

24         them.
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

195

1                    Other than that, I don't know if she

2          reached out or not.

3                    MS. SCHWAB:  Let me mark

4          Exhibit whatever.

5                    MR. WILGOREN:  17.

6                    (Exhibit No. 17 marked for

7          identification.)

8     BY MS. SCHWAB:

9     Q    Do you recognize the document marked as

10         Exhibit 17?

11                   (Witness read document.)

12    A    Yes.

13    Q    What is the document?

14    A    It's a letter from this law firm.

15    Q    And is there an attachment to the letter?

16    A    Yes.

17    Q    What's the attachment?

18    A    Attachment A.

19    Q    The page before Attachment A?

20    A    Okay.  Commission Against Discrimination.

21    Q    Do you remember receiving this letter?

22    A    I do.

23    Q    Do you remember if you received it before

24         Ms. Cosgrove returned to work?

| | | |
|---|---|---|
| 1 | A | I assume so.  I don't remember the timing of |
| 2 | | it. |
| 3 | Q | Did you contact an attorney after receiving |
| 4 | | this letter? |
| 5 | A | I'm sure I would have. |
| 6 | Q | Did you contact -- did you discuss the |
| 7 | | receipt of this letter with anybody else? |
| 8 | A | It would have been with our attorneys. |
| 9 | Q | Anybody other than the attorneys? |
| 10 | A | At that point, it -- Mark O'Neil probably. |
| 11 | Q | Do you remember what you said to Mark O'Neil |
| 12 | | about it? |
| 13 | A | No, just that Patricia had attorneys and |
| 14 | | wanted to take it to a discrimination court. |
| 15 | Q | Do you remember what Mr. O'Neil might have |
| 16 | | said about it? |
| 17 | A | No. |
| 18 | Q | Anybody else that you might have talked to |
| 19 | | about this? |
| 20 | A | Nobody comes to mind. |
| 21 | Q | This -- and did this letter notify you that |
| 22 | | Ms. Cosgrove was planning to return to work? |
| 23 | A | Yes, I believe it did. |
| 24 | Q | Okay. |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

197

```
 1                    And you testified before that because

 2          of a communication -- a miscommunication,

 3          you hadn't thought she was coming back.

 4                    What actions did you take after you

 5          received this letter and realized that she

 6          was planning to come back from maternity

 7          leave?

 8     A    I still wasn't aware she accepted, other

 9          than this saying she was coming back.

10                    In my mind, I didn't remember

11          anything of her accepting the other

12          position.

13     Q    So then what did you expect would happen

14          when she would return from leave?

15     A    I still wasn't expecting her to return from

16          leave.

17     Q    Even after receiving this letter?

18     A    Yes.

19     Q    And even though it says in paragraph 3,

20          "Ms. Cosgrove plans to return to work next

21          week to the administrative assistant's

22          position to which she was demoted" --

23     A    That point, I didn't believe she was coming

24          back.
```

1          that might need to be done.

2                I talked to John Shea, who is our IT

3          person, and he was able to set up a machine

4          and scanner to allow us to give her a

5          project to start on, that we needed to get

6          documents scanned in to eliminate paper.

7    Q    And what was the -- can you describe more

8          about what this position entailed?

9    A    It entailed scanning -- scanning documents,

10         financial documents and membership

11         documents, old existing documents that we

12         needed to maintain permanently, but they

13         were paper files so we were converting them

14         to electronic files.

15   Q    And where was the scanning to take place?

16   A    It was in the offices inside the warehouse

17         where the documents were all stored.

18   Q    How long did you anticipate this project

19         lasting?

20   A    The project is basically an ongoing project.

21         I envisioned -- I don't know, you know, not

22         a definitive period of time but until we

23         really slowed down and finished the layoffs.

24   Q    How would you compare this position to the

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

201

```
1              job of administrative assistant in the

2              catering sales department?

3        A     They're both clerical.

4        Q     Any other comparisons?

5        A     They're both basically clerical,

6              administrative positions.

7        Q     Are there differences between the two

8              positions?

9        A     At the point in time when she was working on

10             it, there wasn't a need for answering phones

11             and things of that nature.  That wasn't the

12             role or the project, where in catering sales

13             you would be answering phones.

14       Q     So they differed in that way.

15                   What about in the work environment,

16             was there a difference in the work

17             environment?

18       A     One's at the country club and one's in an

19             office in the warehouse.

20       Q     And what is the difference between those two

21             locations?

22       A     One's a warehouse and one's a country club.

23       Q     And so what's the warehouse like?

24       A     The warehouse has -- is a normal warehouse
```

| | | |
|---|---|---|
| 1 | | with three offices in it. |
| 2 | Q | And what's the country club like? |
| 3 | A | The country club is a normal country club |
| 4 | | with offices in it, meeting space in it and |
| 5 | | dining space in it, a golf shop in it, |
| 6 | | locker rooms. |
| 7 | Q | How many people work in the country club -- |
| 8 | | at that time how many people worked at the |
| 9 | | country club? |
| 10 | A | It depends on the day. |
| 11 | Q | What's the average? |
| 12 | A | It depends on the day. |
| 13 | | Are you talking about a Friday, a |
| 14 | | Saturday, a Tuesday, a Monday?  What day are |
| 15 | | you talking about? |
| 16 | Q | On a Tuesday. |
| 17 | A | On a Tuesday, you probably have -- if |
| 18 | | there's no events going on -- maybe 10 or |
| 19 | | 12. |
| 20 | Q | How about Friday when there are events going |
| 21 | | on? |
| 22 | A | Depending on the time of day, evening time, |
| 23 | | you could add another 10 to 15 service |
| 24 | | staff. |

205

1          something similar to what she accepted"?

2     A    I needed to have something administrative,

3          administrative type position.

4     Q    Is it your understanding anything that falls

5          under the administrative/clerical category

6          is similar to anything else that falls into

7          that category?

8               MR. WILGOREN:  Objection.  The

9          question's vague.  I don't understand.

10    A    I guess I need a little clarification on

11         what your question is.

12    Q    Did you understand that you could return

13         Ms. Cosgrove to any position that you would

14         categorize as administrative or clerical?

15    A    A like position with like pay.

16    Q    Anything that -- forget about the pay, but

17         anything that you would categorize as

18         administrative, did you think you could put

19         Ms. Cosgrove in that position?

20    A    A like administrative position.

21    Q    So --

22    A    Administrative duties include --

23    Q    Okay.

24               So any administrative position would

1           be like in your understanding?

2      A    Yes.

3      Q    And at some point, did you learn that

4           Ms. Cosgrove might have been dissatisfied

5           with her new position?

6      A    I think she sent an email or something to

7           the effect.

8      Q    And did you take any action in relation to

9           that?

10     A    No, that was the position we had.

11              I know it was an issue with heat or

12          something at one point.  The guys fixed heat

13          or added heat or something to it.  I know

14          she needed a refrigerator.  They brought a

15          refrigerator to her.

16              They try to meet what you need.

17              MS. SCHWAB:  Let me mark Exhibit 18.

18              (Exhibit No. 18 marked for

19          identification.)

20     BY MS. SCHWAB:

21     Q    Do you recognize this document?

22     A    Yes.

23     Q    Do you remember receiving it?

24     A    Vaguely.

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

207

```
 1    Q    And do you remember if you took any action
 2         after you received the document?
 3    A    I don't recall.
 4    Q    Do you recall calling an attorney after you
 5         received it?
 6    A    I would have forwarded it to my attorney.
 7    Q    Do you recall if you contacted Ms. Cosgrove
 8         after receiving the document?
 9    A    I don't recall.
10    Q    Were you aware of Ms. Cosgrove going to
11         Tanya Copestick's office to pump breast milk
12         during the time she was working in the
13         warehouse?
14    A    Yes.
15    Q    How did you become aware of that?
16    A    I don't know.  Someone told me.  I don't
17         know.
18    Q    Do you remember who might have told you?
19    A    No.
20    Q    Do you remember what your reaction was when
21         you learned?
22    A    I didn't see it as a big issue.
23    Q    Did you comment to Ms. Cosgrove about it?
24    A    I believe I did.
```

```
 1    Q    And what do you remember you said?

 2    A    Something to the effect of we're walking a

 3         fine line here.  Don't cross the line.

 4    Q    With Ms. Cosgrove, you said that?

 5    A    Yes -- to -- no, not Ms. Cosgrove,

 6         Copestick.  I'm sure.

 7    Q    Okay.

 8              And what did you mean when you said

 9         we're walking a fine --

10              So you said that --

11    A    To Tanya, I'm sorry.

12    Q    You said, We're walking a fine line right

13         now, and what else, I'm sorry?

14    A    Just watch what you say, or something to

15         that effect.

16    Q    And what did you mean by that?

17    A    Basically Patricia had already put us on

18         notice that she was looking to try to sue

19         us.

20    Q    So how were you walking a fine line?

21    A    We just had to make sure that our ducks were

22         in a row and that we were doing what we

23         could to accommodate her.

24    Q    Did you make any comment to anybody else
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

216

| | | |
|---|---|---|
| 1 | | warehouse? |
| 2 | A | No. |
| 3 | Q | Did you know she was unhappy -- |
| 4 | A | And I believe, by the way, there were at |
| 5 | | least two phones in the warehouse.  One of |
| 6 | | them might have been locked, but the other |
| 7 | | one was not. |
| 8 | Q | Do you remember if she was unhappy with the |
| 9 | | isolation in the warehouse? |
| 10 | A | I believe she felt that was an issue, even |
| 11 | | though there were two other people officed |
| 12 | | there. |
| 13 | Q | Do you remember seeing Ms. Cosgrove at the |
| 14 | | conference center at some point in October |
| 15 | | and instructing her that you wanted her back |
| 16 | | down at the warehouse? |
| 17 | A | She had an -- took an excessive amount of |
| 18 | | time away from the warehouse.  In other |
| 19 | | words, as John Shea said, she was never |
| 20 | | there. |
| 21 | Q | So you do remember saying that to her? |
| 22 | A | I remember saying that.  I remember that |
| 23 | | being the issue. |
| 24 | Q | And do you remember addressing that with |

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

219

```
1    A    No.

2    Q    Did you contact an attorney before

3         terminating Ms. Cosgrove's position?

4              MR. WILGOREN:   Objection.

5    A    I can't say definitively.

6    Q    Did you make the final decision to terminate

7         Ms. Cosgrove?

8    A    Yes.

9    Q    And --

10   A    To do the layoff, you mean?

11   Q    To terminate her employment.

12   A    To the layoff.

13   Q    You would characterize it as a layoff?

14   A    Yes.

15   Q    And did you discuss this decision with

16        Ms. Cosgrove?

17   A    I informed her.

18   Q    And what were the circumstances of that?

19   A    I believe it was myself and Jen Perry, I

20        believe.

21   Q    And did you meet in the warehouse?

22   A    I don't remember where it was.

23   Q    And what did you say to Ms. Cosgrove?

24   A    Basically that the position was ending for
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

```
 1              the season, you know, effective that day.

 2     Q        And what did Ms. Perry say?

 3     A        I don't think she said anything.

 4     Q        And how about Ms. Cosgrove?

 5     A        I don't remember what she said.

 6     Q        Did you -- before terminating -- before

 7              laying Ms. Cosgrove off, did you think about

 8              any other administrative position that you

 9              could put her into?

10     A        No, there were none.

11     Q        Did you think about it?

12     A        There weren't any to be thought of.  We had

13              eliminated -- continued to eliminate those

14              positions for the season.

15     Q        How many people were employed as

16              administrative assistants at New Seabury at,

17              say, November 2003?

18     A        I would say from the October-November range,

19              maybe five.

20     Q        And what about in December?

21     A        There would have been two.

22     Q        Two?

23     A        Mm-hmm.

24     Q        Who were the two in December?
```

Stephen Brennan 1-18-2006
Patricia Cosgrove v. New Seabury Resources Management

236

| | | |
|---|---|---|
| 1 | A | For a layoff or termination. |
| 2 | Q | I see. |
| 3 | | Was that happening with some |
| 4 | | frequency in the first part of 2003? |
| 5 | A | Yes. |
| 6 | Q | Now, you testified that you had discussions |
| 7 | | with Jen Perry and Roy Chase about |
| 8 | | Ms. Cosgrove's job duties prior to your |
| 9 | | making the decision to eliminate her |
| 10 | | position? |
| 11 | A | Correct. |
| 12 | Q | Okay. |
| 13 | | What did Jen Perry tell you about |
| 14 | | Ms. Cosgrove's job duties? |
| 15 | | MS. SCHWAB:  Objection.  Asked and |
| 16 | | answered. |
| 17 | A | The primary function revolved around booking |
| 18 | | the lodging units for groups of anything |
| 19 | | over ten rooms.  Rooms was the major scope |
| 20 | | of her work.  At that point, having a |
| 21 | | lodging department, I saw it as duplication. |
| 22 | Q | And did they say was -- was that the same |
| 23 | | report you received from Mr. Chase? |
| 24 | A | Yes.  The question to Roy, Will this effect |

# Exhibit R

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Patricia Cosgrove v. New Seabury Resources Management, Inc.

Transcript of the Testimony of:

# Jennifer L. Perry

# April 7, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

# ORIGINAL

Deborah G. Rumson  18770

6

| | | |
|---|---|---|
| 1 | | my current position since then. |
| 2 | Q. | That's the position you came in as? |
| 3 | A. | Right. |
| 4 | Q. | What were your responsibilities as catering |
| 5 | | sales manager? |
| 6 | A. | Selling weddings, social events, |
| 7 | | coordinating weddings and social events, |
| 8 | | staffing. |
| 9 | Q. | Did you have any supervisory |
| 10 | | responsibilities in that role? |
| 11 | A. | Yes, the wait staff. |
| 12 | Q. | What are your responsibilities as director |
| 13 | | of catering sales? |
| 14 | A. | Responsibilities of the catering sales |
| 15 | | manager, in addition to supervising the |
| 16 | | catering sales managers that I have on |
| 17 | | staff, the two. |
| 18 | Q. | How many people do you supervise currently? |
| 19 | A. | I have three, two managers, and the rest are |
| 20 | | all wait staff. |
| 21 | Q. | Any admin? |
| 22 | A. | And the admin person as well.  It is an |
| 23 | | assistant catering sales manager.  We no |
| 24 | | longer have the admin position. |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

7

1    Q.    Who are the two catering sales managers now?

2    A.    Aaron Brochu and Regina Aubuchon.

3    Q.    And who is the assistant catering sales

4          manager?

5    A.    Amber Gindememenico.

6    Q.    What are the responsibilities of the

7          assistant catering sales person?

8    A.    She does sites.  She does some

9          administration work.  She also oversees

10         events, meets with brides, helps plan and

11         execute weddings.

12   Q.    What do you mean by "does sites"?

13   A.    She meets with a client and shows them the

14         space.  A bride will come in and she is

15         looking to do a wedding, and she will show

16         her the space.

17   Q.    When you say she does some administrative

18         work, does she answer the phones?

19   A.    Yes.  One of Amber's responsibility is

20         answering the phone.

21               Can you ask the question again.

22   Q.    I think you answered it.

23               Does she send faxes that need to be

24         sent?

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

8

| | | |
|---|---|---|
| 1 | A. | Sometimes. |
| 2 | Q. | What about sending out correspondence? |
| 3 | A. | Yes. |
| 4 | Q. | Does she do any of the billing? |
| 5 | A. | Primarily we do most of the billing. |
| 6 | Q. | We being? |
| 7 | A. | The catering sales managers.  We are |
| 8 | | responsible for our events and our own |
| 9 | | billing. |
| 10 | Q. | Does she send out the wedding packages? |
| 11 | A. | Yes, she does. |
| 12 | Q. | Who generates the invoices? |
| 13 | A. | I generate my invoices for my events.  Aaron |
| 14 | | generates his, and Regina will generate |
| 15 | | hers. |
| 16 | Q. | Who follows up to make sure that everything |
| 17 | | has been paid? |
| 18 | A. | Typically the catering sales manager of the |
| 19 | | event.  We divide the events up amongst each |
| 20 | | other. |
| 21 | Q. | How long has Aaron Brochu been a catering |
| 22 | | sales manager? |
| 23 | A. | He started in 2001, five years in April. |
| 24 | Q. | What about Regina Aubuchon? |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

9

```
 1    A.    She started at the end of February, a couple

 2          of months.

 3    Q.    Before that was there someone else?

 4    A.    There was.

 5    Q.    Who was that?

 6    A.    Jane Henry.

 7    Q.    How long was Jane Henry a catering sales

 8          manager?

 9    A.    Jane was there for about four and a half

10          years.

11    Q.    What about Amber Gindememenico; how long has

12          she been there?

13    A.    She has been with the company, I don't know

14          exactly, between seven and nine years.  She

15          started when she was 16.  I think it is

16          about eight years.

17    Q.    How long has she been in the position of

18          assistant catering sales manager?

19    A.    She has been in that position since probably

20          September -- no.  January of 2005.

21    Q.    So for a little more than a year?

22    A.    Yes.

23    Q.    She had been full time?

24    A.    She was in the lodging department before
```

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

10

| | | |
|---|---|---|
| 1 | | that. |
| 2 | Q. | From January 2005 to the present has she |
| 3 | | been full time? |
| 4 | A. | Yes. |
| 5 | Q. | Before her who was in the position of |
| 6 | | assistant catering sales manager? |
| 7 | A. | Prior to that, there wasn't anybody in it |
| 8 | | right before she started.  It was a seasonal |
| 9 | | position.  We usually hired in May.  It |
| 10 | | would go until October.  Laura Lee Taddeo |
| 11 | | was in that position before.  But again it |
| 12 | | was a seasonal position. |
| 13 | Q. | Laura Lee Taddeo was in the position in 2004 |
| 14 | | from what month to what? |
| 15 | A. | From May to October.  But, again, the |
| 16 | | position has changed.  It is a different |
| 17 | | title and different responsibilities. |
| 18 | Q. | What was the title when Laura Lee Taddeo was |
| 19 | | in the position? |
| 20 | A. | Well, it is -- let me make it clear.  It is |
| 21 | | not the same position.  Laura Lee's position |
| 22 | | was an administrative assistant.  It was a |
| 23 | | position from May through October typically. |
| 24 | | That could have changed.  She may have |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

26

```
 1            would be supervising her?

 2    A.      I would assume so, yes.

 3    Q.      Do you remember doing that?

 4    A.      No.

 5    Q.      Do you remember reviewing her

 6            responsibilities at any point when she came

 7            into your department?

 8    A.      She had her responsibilities initially.

 9            She, basically, was -- I was just the one

10            she was reporting to and who she would go to

11            if she needed time off or scheduling.

12            That's, basically, my extent of managing

13            her.  She pretty much managed herself.

14    Q.      She would just ask you about

15            personnel-related things?

16    A.      For the most part, yes.

17    Q.      Did your supervision of Ms. Cosgrove ever

18            become more in depth than that, than just

19            asking for time off, things like that?

20    A.      Not really.

21    Q.      At any point did you have conversations with

22            either the general manager or anyone else at

23            New Seabury about Patricia's

24            responsibilities and what she was doing?
```

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

28

| | | |
|---|---|---|
| 1 | | sales staff. |
| 2 | Q. | What specifically did you talk about?  Did |
| 3 | | he ask if you could absorb those |
| 4 | | responsibilities? |
| 5 | A. | Yes. |
| 6 | Q. | What did you say? |
| 7 | A. | That we could. |
| 8 | Q. | Did you talk to the catering sales managers |
| 9 | | about that? |
| 10 | A. | I don't think so. |
| 11 | Q. | At the time did you and he talk about |
| 12 | | specific responsibilities that Ms. Cosgrove |
| 13 | | had and who would take over those |
| 14 | | responsibilities? |
| 15 | A. | We just talked about if we would be able to |
| 16 | | take on those responsibilities.  We knew |
| 17 | | what they were.  I knew what they were.  And |
| 18 | | because there wasn't that much to sell, I |
| 19 | | thought we could, and we did. |
| 20 | | MS. SCHWAB:  I am going to mark |
| 21 | | this as Exhibit 1. |
| 22 | | (Document marked as Exhibit 1 for |
| 23 | | identification). |
| 24 | Q. | I am handing you Exhibit 1.  Do you |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

31

| | | |
|---|---|---|
| 1 | Q. | "No. 2.  Solicit group business via personal |
| 2 | | calls to corporations and other group |
| 3 | | markets in assigned territory," do you know |
| 4 | | if that's something that Ms. Cosgrove did? |
| 5 | A. | Not while she worked in the country club |
| 6 | | area, that I am aware of.  I didn't see a |
| 7 | | call list.  She may have done it, but I |
| 8 | | didn't actually know that she was doing it. |
| 9 | Q. | Were either responsibilities, 1 or 2, things |
| 10 | | that were absorbed into the catering sales |
| 11 | | department? |
| 12 | A. | At this time, no, we are not -- I am |
| 13 | | personally not soliciting business from |
| 14 | | corporate clients because there is not -- we |
| 15 | | don't have a lot of guest rooms or meeting |
| 16 | | room space to solicit that business for.  We |
| 17 | | do have some repeat clients that come back, |
| 18 | | people that call in, smaller groups, but we |
| 19 | | end up turning away a lot of business |
| 20 | | because we do not have the meeting room |
| 21 | | space or the overnight accommodations. |
| 22 | Q. | As to Responsibility No. 3, "Arrange and |
| 23 | | perform site inspections of the property to |
| 24 | | potential clients," do you know if this is |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

32

| | | |
|---|---|---|
| 1 | | something Ms. Cosgrove did as conference |
| 2 | | sales manager? |
| 3 | A. | Yes. |
| 4 | Q. | Who took over Ms. Cosgrove's |
| 5 | | responsibilities doing that? |
| 6 | | MR. WILGOREN:  Objection. |
| 7 | A. | We do that. |
| 8 | Q. | We? |
| 9 | A. | Myself, my two catering sales managers. |
| 10 | Q. | When did you and the two catering sales |
| 11 | | managers start taking over that |
| 12 | | responsibility? |
| 13 | A. | I would say when Patricia left in May, |
| 14 | | whenever she had left, whatever year that |
| 15 | | was. |
| 16 | Q. | 2003? |
| 17 | A. | 2003. |
| 18 | Q. | "No. 4.  Ensure timely and accurate |
| 19 | | communication in both client and hotel |
| 20 | | operation team," is this something that Ms. |
| 21 | | Cosgrove did? |
| 22 | A. | Yes. |
| 23 | Q. | Did someone take over those |
| 24 | | responsibilities? |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

33

1    A.    Yes.

2    Q.    Who was that?

3    A.    Myself and the catering sales managers.

4    Q.    How about No. 5; "Develop and maintain

5          accurate and workable trace files to ensure

6          timely contact of the existing accounts," is

7          that something Ms. Cosgrove did?

8    A.    Yes.

9    Q.    Is that something that the catering sales

10         department has taken over?

11   A.    Yes.

12   Q.    "Monitor the status of all bookings to

13         ensure contracts and deposits are received

14         in a timely manner," is that something Ms.

15         Cosgrove did?

16   A.    Yes.

17   Q.    Something that's been taken over in catering

18         sales?

19   A.    Yes.

20   Q.    How about No. 7; "Provide conference

21         services department with accurate details

22         and all pertinent information when turning

23         over files," is that something Ms. Cosgrove

24         did?

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

34

```
 1    A.    Prior to joining the catering sales office,
 2          yes.
 3    Q.    Is that something that has been taken over
 4          in the catering sales department?
 5    A.    We are, in essence, the conference sales
 6          representative.  We book it and coordinate
 7          it.
 8    Q.    So there is no conference services
 9          department anymore; is that right?
10    A.    I have absorbed that responsibility in my
11          department as well.
12    Q.    So you have the details and pertinent
13          information?
14    A.    Yes.
15    Q.    The second No. 7, which is actually No. 8,
16          "Maintain contact with client and conference
17          service representative assigned to the group
18          while their events are taking place," is
19          that something that Ms. Cosgrove did?
20    A.    Yes.
21    Q.    What has happened to that responsibility?
22    A.    Again, the conference sales position is a
23          representative.  That's my position.  So I
24          am that person.
```

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

35

```
 1    Q.   How about 9; "Attend and staff trade shows,"
 2         do you know if that's something that Ms.
 3         Cosgrove did?
 4    A.   Yes.
 5    Q.   Is that something that's been taken over?
 6    A.   We don't do that anymore.
 7    Q.   "No. 10.  Attend local and regional trade
 8         meetings, for example, HSMA, Meeting
 9         Planners International, et cetera," is that
10         something that Ms. Cosgrove did?
11    A.   Yes.
12    Q.   Is that something that has been taken over
13         by the catering sales department?
14    A.   We no longer do that.
15    Q.   "No. 11.  Submit weekly activities report to
16         director of sales."  Is that something that
17         Ms. Cosgrove did?
18    A.   Not when she was reporting to me.
19    Q.   She didn't submit a weekly activities report
20         to you?
21    A.   No, she didn't.
22    Q.   Did you ask her for that?
23    A.   No, I didn't.
24    Q.   And did you assign her any special projects
```

36

```
 1           when she was reporting to you?

 2    A.     Occasionally, yes.

 3    Q.     What types of special projects?

 4    A.     I don't remember.

 5    Q.     Can you give me an example of, would it have

 6           been something administrative?

 7    A.     Possibly.  It was a long time ago.

 8    Q.     You said that as to Nos. 9 and 10,

 9           "Attending trade shows and regional trade

10           meetings," that's not something that's done

11           anymore.  Was there an explicit decision not

12           to attend trade shows and regional trade

13           meetings?

14    A.     The trade shows that Patricia was attending

15           were in relation to meetings, groups coming

16           in doing their meetings and lodging, which,

17           again, there wasn't a lot of space for them

18           to stay or meet in.

19                  We did do wedding trade shows, but

20           stopped that because we were not booking

21           weddings from those trade shows.  She did

22           not attend -- just the trade shows for the

23           meetings.  It was not necessary.  It didn't

24           bring in anymore business, so there was no
```

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

49

| | | |
|---|---|---|
| 1 | Q. | Who was that? |
| 2 | A. | I believe it was Laura Lee Taddeo. |
| 3 | Q. | Do you remember how that happened? |
| 4 | A. | No. |
| 5 | Q. | Do you know, were you involved in contacting |
| 6 | | Laura Lee Taddeo? |
| 7 | A. | I don't remember. |
| 8 | | MS. SCHWAB:  I am going to mark |
| 9 | | Exhibit 3. |
| 10 | | (Document marked as Exhibit 3 for |
| 11 | | identification) |
| 12 | Q. | Ms. Perry, do you recognize this document? |
| 13 | A. | Are you asking if I have seen it before? |
| 14 | Q. | Yes. |
| 15 | A. | I don't remember seeing it, but everything |
| 16 | | on here is familiar. |
| 17 | Q. | The descriptions are familiar? |
| 18 | A. | Right. |
| 19 | Q. | What's familiar about them? |
| 20 | A. | It says "administrative assistant" at the |
| 21 | | top, and then it has responsibilities |
| 22 | | underneath it, which looks to be what that |
| 23 | | position would do. |
| 24 | Q. | The position that Ms. Cosgrove was offered? |

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

50

```
 1    A.    Right.

 2    Q.    Can you go through and just read through to

 3          yourself and let me know if there is

 4          anything in this list that isn't within the

 5          administrative assistant position that Ms.

 6          Cosgrove was offered.

 7    A.    Can you repeat that question.

 8    Q.    Just go through and read to yourself and see

 9          if anything in here is something that

10          wouldn't be done by the administrative

11          assistant position.

12    A.    Everything would be done by the

13          administrative assistant.

14    Q.    Does it leave anything out?

15    A.    There is always room in a position for other

16          areas that you might do, but just depends

17          upon what it is.

18    Q.    Anything specific jump to mind that's not in

19          this description?

20    A.    There's nothing about meeting with clients

21          or doing site visits, things like that.

22          That was something that sometimes they would

23          do.

24    Q.    Anything else?
```

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

69

```
 1    A.   She did not.

 2    Q.   New Seabury's policy provides for disability

 3         pay for pregnancy leave?

 4    A.   Am I aware of it?

 5    Q.   Yes.

 6    A.   I am aware there is disability leave.  I

 7         don't know all of the details.

 8    Q.   And you get paid a certain percentage of

 9         your income?

10    A.   Yes.

11    Q.   Do you know what that percentage of your

12         income is based upon?

13    A.   To be honest, I don't know.

14    Q.   Well, would it be what you're earning prior

15         to going out on a leave of absence?

16    A.   Right.

17    Q.   Do you know what Ms. Cosgrove received for

18         her disability pay?

19              MS. SCHWAB:  Objection.

20    A.   Yes.

21    Q.   Tell us what she received.

22    A.   It was the disability percentage on her

23         original salary of $17 per hour.

24    Q.   Does that lead you to conclude that at the
```

Jennifer L. Perry 4-7-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.

70

| | | |
|---|---|---|
| 1 | | time she commenced her leave of absence she |
| 2 | | was still in the position of the manager? |
| 3 | A. | Yes. |
| 4 | | MS. SCHWAB:  Objection. |
| 5 | Q. | And do you know how that came about, that |
| 6 | | Ms. Cosgrove obtained disability pay based |
| 7 | | on her compensation as catering sales |
| 8 | | manager or conference sales manager? |
| 9 | A. | What I remember, she was finishing out that |
| 10 | | week in her one position, her initial |
| 11 | | position as sales manager and was going to |
| 12 | | start the next week as administrative |
| 13 | | assistant, but then went out on disability |
| 14 | | at the end of that week. |
| 15 | Q. | Do you have any sense as to why she did it |
| 16 | | that way? |
| 17 | | MS. SCHWAB:  Objection. |
| 18 | A. | She was getting paid more money to go out on |
| 19 | | the higher salary. |
| 20 | | MS. SCHWAB:  Objection.  How could |
| 21 | | she have a sense of why Ms. Cosgrove went |
| 22 | | out on leave. |
| 23 | Q. | Now, do you know the reason -- did Ms. |
| 24 | | Cosgrove go out on the maternity leave of |

# Exhibit S

# O'BRIEN&LEVINE

Court Reporting Services

CONFIDENTIAL

CONFIDENTIAL



YOUR BOSTON CONNECTION...WORLDWIDE

# Patricia Cosgrove v. New Seabury Resources Management, Inc.

Transcript of the Testimony of:

# Mark O'Neil

# February 14, 2006

www.court-reporting.com
mail@court-reporting.com

195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)

# ORIGINAL

CONFIDENTIAL

CONFIDENTIAL

Linda L. Guglielmo  1-17996

14

```
 1          and New Seabury.

 2     Q.   What happened next?

 3          A.    I met with -- several phone conversations

 4          with Wayne, first of all, and then I visited the

 5          site to meet with him personally at New Seabury.

 6     Q.   When did that take place?

 7          A.    Summer of 2002, I believe late summer.

 8     Q.   And what happened at that meeting?

 9          A.    Obviously, I was questioning Wayne as to what

10          he was looking for and what type of consultation

11          agreement he was looking for, and he conveyed to

12          me that New Seabury was owned by American Real

13          Estate Partners out of New York and that Wayne's

14          primary background and experience was not in

15          facility or operational manager at the resort

16          level and that his primary background, if I'm

17          correct, was in finance or financial matters.  And

18          they were looking for someone to come in and

19          support their efforts at improving the operational

20          profitability of New Seabury.

21     Q.   At that meeting did you and Mr. Kapral talk at all

22          about staffing?

23                          THE WITNESS:  At that specific

24          meeting?
```

CONFIDENTIAL Mark O'Neil 2-14-2006 CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

15

```
 1                    MS. SCHWAB: Yes.

 2         A.    I'm sure there was a cursory discussion about

 3         it.  I do not remember specific individuals,

 4         positions or anything of that nature.

 5    Q.   Was there anyone else at the meeting?

 6         A.    I don't believe so.

 7    Q.   Did you meet other people when you were at the

 8         facility at that first meeting?

 9         A.    Yes, did.  I'm sure I was introduced to

10         numerous people.  I can't specifically remember

11         who I met, other than I did meet, I believe Scott

12         Nickerson who was the golf course

13         superintendent -- I'm sorry, at that time was

14         director of golf.  I'm sure I met other

15         individuals in the organization.  I specifically

16         can't remember who they might be.

17    Q.   After that first meeting with Mr. Kapral, what

18         happened next?

19         A.    To the best of my recollection, I believe I

20         was asked to provide some form of management

21         proposal, which I'm sure I created a management

22         proposal with a fee structure typical to any

23         management consulting agreement, and I furnished

24         that to Wayne Kapral.
```

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

18

```
 1          proposal, what happened next?

 2          A.   I believe I was then contacted by the

 3          president of a American Real Estate Holdings in

 4          New York to discuss the agreement -- I'm sorry, to

 5          discuss the proposal.

 6    Q.    About when would that have been?

 7          A.   To the best of my recollection, August 2002.

 8    Q.    And the president, is that Albo Antenucci?

 9          A.   Albo Antenucci.

10    Q.    What happened during that conversation?

11          A.   I can't recall the specifics of the

12          conversation, but I remember in general Albo asked

13          me to expand on the types of things I would cover

14          in a proposal, and at that time that was I believe

15          our first discussion about the possibility of

16          performing a more detailed operational audit is

17          what it's called in the industry.

18    Q.    What's a detailed operational audit?

19          A.   Basically it's when you retain a firm like an

20          Essex Golf or someone in that capacity to review

21          the operation from top to bottom or in fairly

22          strong detail, department by department and

23          essentially to gather information, review the

24          details and the data and then make a
```

19

```
 1          recommendation to whoever retained you to perform

 2          the operation on audit.

 3     Q.   Had you conducted operation audits on other

 4          facilities previous to this?

 5     A.   In one form or another, yes.

 6     Q.   Can you give me examples of facilities for which

 7          you've consulted operational audits?

 8     A.   Yes.  Tournament Players Club, River

 9          Highlands in Cromwell, Connecticut, Tournament

10          Players Club at Avenel in Washington, D.C. or

11          Potomac, Maryland.  Tournament Players Club at

12          Scottsdale, in Scottsdale, Arizona.  And then

13          anywhere from 10 to 20 additional clubs over the

14          period of 1990 to 2000.

15     Q.   Tournament Players Club, did you conduct

16          operational audits for those facilities through

17          Essex Golf Club?

18     A.   No.  I was acting in the role as an employee

19          of the PGA Tour.

20     Q.   With Essex Golf Club previous to New Seabury had

21          you conducted operational audits?

22     A.   I don't recollect any specific operational

23          audits.  No.

24     Q.   During this conversation you had with Mr.
```

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

27

```
 1          obviously, while reviewing departmental structures

 2          and operational efficiencies, I was also at the

 3          same time reviewing his abilities and knowledge of

 4          those positions.

 5    Q.    And what were your conclusions during that period?

 6                    THE WITNESS:  With regards to

 7          Mr. Kapral or specific departments?

 8                    MS. SCHWAB: With regards to

 9          Mr. Kapral.

10    A.    Mr. Kapral if my mind or in my professional

11          opinion was knowledgeable in the areas of

12          financial management and accounting; however, his

13          experience and knowledge of daily operations and

14          resort and/or golf club management was lacking.

15    Q.    What about Mr. Nickerson?

16    A.    Scott was, previously to my arrival or

17          involvement with New Seabury, was functioning in

18          the role of golf course superintendent.  I thought

19          in that role or his knowledge which would be

20          commensurate with that role was fine, excellent.

21          However, Scott, prior to my involvement, and I'm

22          not sure of the exact date was promoted into the

23          position called director of golf which was then

24          responsible for not only the golf course
```

28

```
 1        maintenance and management of the turf conditions

 2        and the playing -- the golf course, also became

 3        responsible for the oversight of the golf

 4        operation which included the retail store, golf

 5        professional staff, and things that are normally

 6        under the jurisdiction of either a golf

 7        professional trained PGA professional or general

 8        manager.

 9             I felt that Scott's experience was excellent

10        with golf course maintenance but was lacking in

11        the area of golf operations in general,

12        explicitly, the retail components and the

13        operational side of the business.

14   Q.   Were there any other specific positions other than

15        those two that you identified as in need of

16        restructuring or some sort of reorganization,

17        during that period?

18                       MR. WILGOREN: Objection.  Which

19        period?

20                       MS. SCHWAB: During the period of

21        approximately August to December 2002.

22   A.       During that time frame when I was reviewing

23        all departments, in addition to those two specific

24        positions.  I felt there was numerous areas of
```

CONFIDENTIAL    Mark O'Neil 2-14-2006    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

29

1           restructuring required and reorganization required

2           within most of the other departments.

3    Q.    And any specific positions?

4           A.    Numerous.  Which department would you want to

5           start with?

6                       MS. SCHWAB: Let's start with golf

7           maintenance.

8           A.    With golf maintenance, I felt that the

9           appropriate staffing levels would have been to

10          have more of what would be considered typical

11          structure which would be a golf course

12          superintendent overseeing the operations of the

13          department, potentially one or two assistant

14          superintendents with specific duties and

15          responsibilities for various portions of the golf

16          course maintenance budget.  And a golf course

17          mechanic, and then the staffing or what we

18          normally call the operators or front line staffing

19          below that.  At the time of reviewing that

20          department, it appeared to me in my review that

21          there were some gross inefficiencies taking place

22          within golf course maintenance which led to higher

23          than normal labor costs.

24   Q.    And what about golf operations?

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

30

1        A.    Golf operations, which is normally considered

2        in the industry the inside part of the business, I

3        felt that there was a gentleman named Bob McGraw

4        who had been promoted to the head golf

5        professional position and was really functioning

6        in a different role completely.  He was really

7        functioning in the role of director of instruction

8        because I believe if I'm correct, 75 percent or

9        more of his time was spent providing instruction

10       lessons to members and non-members.  He really did

11       not have the oversight and daily responsibility

12       for the retail operation and some of the other

13       specific duties, cart maintenance, outside

14       operations where people pull up and, you know, you

15       take the bag and direct them.

16            I felt that there were other people within

17       that department that did not have clearly defined

18       duties and responsibilities and seemed like there

19       was numerous redundancies in what certain people

20       were doing, and I felt there, once again, that the

21       labor costs relative to the amount of

22       responsibilities and duties that were undertaken

23       by the department as well as the revenue that was

24       generated in an area such as retail golf shop.  I

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

31

1        felt the labor was excessive for the product that

2        was being delivered.

3    Q.    What about in general and administrative?

4        A.    Under the G & A department, it was clear that

5        they were overstaffed in many areas, there was

6        many inefficiencies taking place within that

7        department.  There was numerous people performing

8        to me what seemed to be like tasks and in

9        comparison to other clubs of a similar size,

10       nature, revenue, magnitude, that they were

11       overstaffed in numerous areas.

12   Q.    And food and beverage?

13       A.    Food and beverage was an extremely difficult

14       department to evaluate only because there are

15       several outlets that fall under the food and

16       beverage heading.  There is the main clubhouse,

17       there is the Popponesett Inn, snack bar, beverage

18       cart.  So, in that department also there appeared

19       to me to be a lack of direction and lack of

20       defined duties and responsibilities.

21   Q.    And membership?

22       A.    Membership at a club like New Seabury which

23       was in a membership sales mode, as are most clubs

24       at the time, I originally reviewed the department,

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

```
 1          I also felt that although the membership

 2          department had a couple of competent individuals,

 3          that their skills were probably not commensurate

 4          with what their tasks and duties were.  So I felt

 5          there was opportunities there to make changes,

 6          too.

 7    Q.    And facilities management?

 8    A.    Facilities management was unique in that for

 9          many years prior to my arrival, they were

10          responsible for a much larger area and number of

11          facilities and that had been reduced over the

12          years, and it was my observation that the staffing

13          levels and duties and responsibilities had not

14          been proportionally reduced as the number of

15          facilities they managed had been reduced.  So I

16          felt there was some inefficiencies there also.

17    Q.    Did you put your conclusions that we've just

18          discussed, into your operational audit?

19    A.    I believe so in summary form.

20    Q.    In producing the operational audit was your goal

21          to give full assessment of all the changes you

22          anticipated should be made at New Seabury?

23    A.    I was really charged with the task of

24          reviewing the daily operation of the resort and
```

CONFIDENTIAL                     Mark O'Neil 2-14-2006                     CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

33

```
 1        making limited recommendations as to things I

 2        thought would be wise to improve.

 3   Q.   But was your plan to give a complete assessment at

 4        that time?

 5   A.   A complete assessment in detail would have

 6        required -- a resort of that level, much more time

 7        than I was given.

 8   Q.   So, with respect to the staffing restructuring

 9        that we discussed before happened, would you say

10        that you had a fairly complete understanding of

11        what needed to be done to restructure in those

12        departments?

13   A.   I made an assessment based on my visits and

14        review of the club of what I thought were

15        appropriate adjustments that should be made.

16                  MS. SCHWAB: I want to get to the

17        operational audit in a minute, but first I want to

18        mark another Exhibit 3.

19                  (PLAINTIFF'S EXHIBIT 3

20                  MARKED FOR IDENTIFICATION)

21   Q.   Do you recognize Exhibit 3?

22   A.   Yes.

23   Q.   This document is not signed, but does this look

24        like the letter that you would have sent to
```

CONFIDENTIAL                Mark O'Neil 2-14-2006                CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

38

```
 1          A.    It appears to, without going through it in

 2          detail, it appears to be.

 3     Q.   And this is a document that you personally

 4          prepared?

 5          A.    Yes.

 6     Q.   Did you have any help preparing it?

 7          A.    I may have had help doing the word

 8          processing, things like that, administrative

 9          support.

10     Q.   But substantively?

11          A.    No.   Substantively, this was my review and my

12          work.

13     Q.   Unfortunately, the pages are not numbered, so

14          you're going to have to bear with me as I ask

15          questions.   I have numbered my pages and what I

16          have with operational audit results being Page 1,

17          Page 5 after that.   If that's one what would be

18          Page 5 starting with Professionals.   You list,

19          "The following minimum staff changes."   What do

20          you mean by staff changes there?

21          A.    I believe I was referring to that these

22          positions would require some form of change,

23          alteration, restructuring, something along --

24          something that would be considered a change in
```

CONFIDENTIAL                          Mark O'Neil 2-14-2006                          CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

39

```
 1        their duties and responsibilities, the position in

 2        general or further review.

 3   Q.   So, it could mean adding or eliminating?

 4        A.   Um-hum.

 5                  MR. WILGOREN: You need to say yes.

 6        A.   Yes.

 7   Q.   At the time who was the general manager, COO?

 8        A.   At this time that would have been Wayne

 9        Kapral.

10   Q.   And director of golf?

11        A.   That would have been Scott Nickerson.

12   Q.   Who was director of membership sales at the time?

13        A.   At that time would have been Rhonda Rodgers.

14   Q.   Corporate sales manager?

15        A.   I can't recall if there was one.

16   Q.   Banquet manager?

17        A.   I believe that would have been Jennifer,

18        Jennifer Perry.

19   Q.   And possible food and beverage director, that

20        sounds like a position that was to be added

21        potentially?

22        A.   I can't recall if there was an individual in

23        that position at that time, or it was the

24        possibility of either adding someone.
```

CONFIDENTIAL                 Mark O'Neil 2-14-2006                 CONFIDENTIAL
             Patricia Cosgrove v. New Seabury Resources Management, Inc.

40

```
 1   Q.   Okay.  We've spoken about Mr. Kapral and
 2        Mr. Nickerson.  What changes did you contemplate
 3        with respect to Rhonda Rodgers' position?
 4        A.   Rhonda was very capable and competent at,
 5        what I would call management relations, but the
 6        duty of this position was primarily to retain new
 7        members or to obtain new members, and I felt that
 8        Rhonda did not have the, necessarily, the
 9        prospecting and sales execution skills necessary
10        to increase the number of members.
11   Q.   And corporate sales manager, do you remember what
12        changes were made with respect to that position?
13        A.   I believe, to the best of my knowledge, we
14        recruited someone for this position.  So I don't
15        think at this time there was someone performing
16        that function.
17   Q.   How did you go about recruiting someone for that
18        position?
19        A.   I don't remember the specifics, but usually
20        it is through some form of targeted employment ad
21        in either an industry specific periodical, could
22        have been something as general as an ad in the
23        Boston Globe.  I don't remember specifically how
24        we tried to attract a person for that.
```

CONFIDENTIAL
Mark O'Neil 2-14-2006
Patricia Cosgrove v. New Seabury Resources Management, Inc.
CONFIDENTIAL

41

1   Q.   Was there any thought about hiring internally for

2         the corporate sales manager?

3   A.   I don't remember specifically to this

4         position, no.

5   Q.   Generally, when new positions came up, were there

6         efforts to hire internally?

7   A.   In general, our company's philosophy to first

8         look internally to see if there is an available

9         candidate prior to going outside the company, yes.

10   Q.   With respect to Jennifer Perry's position, what

11         changes did you think needed to be made?

12               THE WITNESS:  With respect to her

13         specific position?

14               MS. SCHWAB: Yes.  She's listed under

15         one of the minimum staff changes.

16   A.   I can't remember anything specific to her.

17         It would be conjecture for me to try to think of

18         specific things to her.

19   Q.   Do you know why her position would have been

20         listed as one of the minimum staff changes?

21   A.   I believe that that was a position that we

22         were considering altering the compensation

23         structure to be more incentive-based versus

24         salary-based, I believe.

42

```
 1    Q.   And what about possible food and beverage
 2         director, what changes did you think needed to be
 3         made?
 4         A.   I'm drawing a blank as to whether the food
 5         and beverage director was employed at that time or
 6         not; his name was Roy Chase.  I just can't
 7         remember.  I'm drawing a blank when Roy came
 8         onboard.
 9    Q.   So he was employed after this period, though, at
10         some point?
11         A.   He was employed at some point after this
12         period.  I just don't remember his official start
13         date and what his position was.
14    Q.   Prior to developing this operational audit, did
15         you have any specific -- did you have any
16         discussions with either Mr. Kapral, Mr. Nickerson,
17         Ms. Rodgers or Ms. Perry about possible changes to
18         their position?
19                   THE WITNESS:  To their specific
20         positions?
21                   MS. SCHWAB: Yes.
22         A.   I don't believe so.
23    Q.   Turning to four pages later beginning the
24         departmental reviews, under general and
```

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

44

1    Q.    Moving to the department's summary for food and

2          beverage a la carte under operational and

3          accounting, the page following the heading for

4          operational and accounting, the first bullet point

5          says, "Labor management controls needs to be

6          implemented in all areas of the department ASAP."

7          Can you explain what you mean by labor management

8          controls there?

9    A.    Specifically, cost controls, because as you

10         see in the next line, the labor percentage as a

11         percentage of sales is 54 percent, which is

12         extremely high as an industry standard, and what

13         I'm referring to is management controls, meaning,

14         management of labor costs.

15   Q.    Moving on to the following page, department, food

16         and beverage banquet catering.  You say, "A

17         restructuring of the sales and banquet team is

18         recommended."  Can you explain what you

19         contemplated with the restructuring of that team?

20   A.    To the best of my knowledge, I thought that

21         for the operational way it was performing, it

22         appeared to me to have too much expense at the

23         management level, and I felt duties and

24         responsibilities were not clearly defined and that

CONFIDENTIAL                        Mark O'Neil 2-14-2006                        CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

45

```
 1              there was operational efficiencies that could be

 2              gained by restructuring the management of that

 3              department.

 4       Q.     Do you remember what specific employees were --

 5              you mentioned the banquet sales manager and the

 6              banquet managers; do you remember who those

 7              employees were at the time?

 8       A.     Yes.  I believe they were Aaron, Jane and

 9              Patricia.

10       Q.     And then the second bullet point you recommended

11              "Dedicated catering sales manager to be utilized."

12              Did you contemplate that somebody already in the

13              department would take that position or that it

14              would be a new position?

15       A.     I do not recall.

16       Q.     And do you remember if there was -- a dedicated

17              catering sales manager was utilized at some point

18              in the department?

19       A.     I believe the person that was functioning in

20              that role was Jennifer Perry.

21       Q.     Before the creation of the operational audit, had

22              you met Patricia Cosgrove, that you can remember?

23                          THE WITNESS:  Prior to the creation

24              of this?
```

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

79

```
 1          created out of my office that discussed the F & B

 2          reorganization at New Seabury.

 3     Q.   Do you know when this document would have been

 4          produced?

 5     A.   Specifically, no.  In general, in conjunction

 6          with the 2003 budget preparation.

 7     Q.   When was the 2003 budget prepared?

 8     A.   Some time in the time frame of beginning

 9          December and going into January and maybe into

10          February 2003.

11     Q.   What does this document show?

12     A.   Page 1 appears to be a current versus

13          proposed incentive structure for the food and

14          beverage department.  Page 2 appears to be a

15          quarterly breakdown of incentive for the food and

16          beverage banquet sales department.  Page 3 appears

17          to be similar to Page 1 with minor changes.

18     Q.   Do you know why there would be two different F & B

19          departmental reorganizations with slightly

20          different numbers?

21     A.   Let's take a look.  Looks to me there were

22          some minor modifications made on base salary and

23          that's really the only difference, that I can see.

24     Q.   What do you remember about the discussions or
```

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

80

```
 1        plans that went into producing this
 2        reorganization?
 3        A.    I remember early on in the operational audit,
 4        I felt that the food and beverage sales department
 5        needed some reorganization.  I immediately
 6        questioned in reviewing the department the
 7        redundancy in positions for some of the slots so
 8        I'm sure that's what precipitated this.
 9    Q.  Do you remember having any discussions about
10        specific positions to be eliminated or
11        restructured?
12        A.    I remember specifically asking why do we have
13        three sales managers in addition to the
14        departmental sales manager, yes.
15    Q.  And it appears from this chart that the pay
16        structure as to Roy, Jennifer and Aaron is changed
17        from the current to proposed, Page 1?
18        A.    It appears that through my experience, this
19        would suggest that their base salary was being
20        lowered and their incentive was being altered.
21        So, as I maybe stated earlier, we were trying to
22        get to more of an incentive-based program as
23        opposed to a heavily-weighted based salary
24        program.
```

81

```
 1    Q.   Do you know if you had any discussions with either

 2         Roy, Jennifer or Aaron prior to producing this

 3         document?

 4         A.   No, I don't believe so.

 5    Q.   Earlier I think you said Aaron, Jane and Patricia

 6         were all sales or catering managers, is that the

 7         position that you had, earlier you had said there

 8         were three people doing --

 9         A.   Earlier, as in just a minute or so ago, yes.

10    Q.   And what was the position, I'm sorry?

11         A.   I believe they were either food and beverage

12         sales managers or catering and food and beverage

13         are somewhat interchangeable.

14    Q.   In this proposed structure, Jane has a base

15         salary, it says the same, with no incentives but

16         Aaron's pay structure is changed.  Do you remember

17         why the difference between the those two

18         positions?

19         A.   To the best of my recollection, we were

20         transitioning Jane into a non-sales position but

21         more of an executive management position which is

22         not an incentive-based one.

23    Q.   And then as to Patricia, you have no proposed

24         salary as to her, do you remember why that is?
```

CONFIDENTIAL                              Mark O'Neil 2-14-2006                              CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

82

```
 1        A.    I believe that was one of the positions that

 2              we had targeted during the budget process at

 3              elimination because of the redundancy of the sales

 4              team.

 5    Q.    And is this a position that you would have

 6              mentioned in any of the documents that we

 7              discussed before, the operational audit or the

 8              memos to Mr. Antenucci?

 9                      MR. WILGOREN: Objection.  I think he

10              did in fact testify as to this position.

11                      MS. SCHWAB: You can answer.

12                      MR. WILGOREN: As part of the

13              operational audit and maybe some other documents.

14                      THE WITNESS:  I'm sorry, can you ask

15              it again?

16                      (QUESTION READ)

17        A.    I would assume that this -- the restructuring

18              of the food and beverage sales department as one

19              of the items that were brought up in the

20              operational audit.  I believe I questioned the

21              redundancy early on.

22    Q.    Do you know if the operational audit would have

23              contemplated the elimination of one of the

24              positions?
```

CONFIDENTIAL                       CONFIDENTIAL

129

```
 1    Q.    Flip two pages further on, there appears to be a

 2          notation in the column at the far right, zero.

 3          Can you explain that, that's next to the position

 4          held by Ms. Cosgrove?

 5                     MS. SCHWAB: Objection.  He hasn't

 6          testified whether he recognizes the handwriting.

 7    Q.    Do you recognize the handwriting?

 8    A.    It appears to be mine.

 9    Q.    Can you explain the significance of why you would

10          have written this a zero next to that?

11    A.    Similar to other positions, it looked like

12          one that I had targeted for being unnecessary.

13    Q.    Okay.  And that was part -- that was done as part

14          of the budgeting process in December 2002?

15                     MS. SCHWAB: Objection.  Again, he

16          testified he doesn't know when this document is

17          from.

18    A.    Normally that would be part of the budget

19          projection is to look at past wage levels and

20          scales, and I can assume that's what was going on

21          here.

22    Q.    When did you engage in the budgeting process for

23          New Seabury for 2003?

24                     MS. SCHWAB: Objection.  Asked and
```

CONFIDENTIAL                    Mark O'Neil 2-14-2006                    CONFIDENTIAL
Patricia Cosgrove v. New Seabury Resources Management, Inc.

130

```
 1          answered.

 2          A.   We began in December of 2002 and continued

 3          through January 2003.

 4     Q.   At that time did you have any knowledge as to

 5          whether Ms. Cosgrove was pregnant?

 6                    MS. SCHWAB: Objection.

 7          A.   No, I didn't.

 8     Q.   There is a question mark, do you recognize who

 9          wrote that?

10          A.   I would assume that would be me.

11     Q.   That's next to the sous-chef.  Do you have an

12          explanation why you would put a question mark next

13          to the sous-chef?

14                    MS. SCHWAB: Objection.  Foundation.

15          A.   I can assume it meant, if you look at this,

16          it was a higher paid position than the chef.

17          Typically a sous-chef is similar to an assistant.

18          So, my guess is, logical question as to what's

19          the -- what's going on with the sous-chef being

20          the highest paid person.

21     Q.   As part of the budgeting process did you create

22          certain models of staffing levels?

23          A.   Typically when you budget, you determine what

24          staffing levels are going to be, if that's what
```